# BEFORE THE BOARD OF SCHOOL TRUSTEES OF
# CARMEL CLAY SCHOOLS

IN THE MATTER OF THE CANCELLATION OF THE CONTRACT OF DIANNA STRINGHAM:

### Procedural Background

Mrs. Diana Stringham is employed as a Counselor for Carmel Clay Schools (CCS) under a Regular Teacher Contract. (Board Exh. 1). Principal, Dr. Tom Harmas, issued his Preliminary Recommendation for Cancellation on February 4, 2022. (Admin Exh 27). Dr. Harmas issued this recommendation before going on a medical leave that prevented his attendance at the Board conference. Superintendent Dr. Michael Beresford confirmed the authenticity of Dr. Harmas' signature on the Principal Cancellation letter and neither party raised any concern during the subsequent Superintendent Meeting, Pre-Meeting Telephone Conference or initial Meeting discussions with Counsel for the Board regarding the validity of the recommendation as coming from Dr. Harmas.

On February 8, 2022, pursuant to statute, Mrs. Stringham requested a meeting with Superintendent Dr. Beresford. (Admin Exh 28). That Superintendent Meeting then took place on February 24, 2022. On February 28, 2022, Mrs. Stringham requested a meeting with the Carmel Clay School Board of Trustees ("Board"). (Admin Exh 29). Dr. Beresford issued his support of the Principal Recommendation on March 1, 2022. (Admin Exh 30). The parties agreed to set the meeting date with the Carmel Clay Board of School Trustees for March 15, 2022.

1

**EXHIBIT 1**

This matter is before the Board based on the recommendation of the School Corporation's administration ("Administration") to cancel the regular teacher's contract of Dianna Stringham. The Administration identified four statutory grounds to cancel Mrs. Stringham's contracts:

(1) incompetence,

(2) neglect of duty,

(3) insubordination, and

(4) other good or just cause.

A meeting was held in this matter in the Board Meeting Room in the Educational Services Center located at 5201 E. Main Street Carmel, Indiana, on March 15, 2022. Five members of the Board—President Katie Browning, Vice President Louise Jackson, Secretary Jennifer Nelson-Williams, Member Layla Spanenberg and Member Michael Kerschner—participated in the meeting and consideration of this matter. The meeting lasted approximately four hours from 5:30 pm to 9:40 pm.

The Administration was represented by Jonathan Mayes of Bose McKinney & Evans LLP. Mrs. Stringham was represented by Jamie Maddox and Chad H. Holler of Betz + Blevins. Andrew Manna of Church Church Hittle + Antrim served as Board Counsel and was not a decision-maker in this matter.

The parties stipulated to exhibits and all were admitted into the record without objection. Specifically, Administration Exhibits 1-30 and Teacher Exhibits 1-46 are considered part of the record along with Board Exhibit 1, which was also admitted without objection.

The Board Members confirmed their ability to meet and listen to information presented regarding the recommendation for cancellation. The Board has the authority and jurisdiction to resolve the issue of whether Mrs. Stringham's regular teacher's contract should be cancelled. All

teacher cancellation procedures required by Indiana law, up to and including the Board consideration of the cancellation of Mrs. Stringham's regular teacher contract under Indiana Code § 20-28-7.5-1, *et seq.* have been followed..

The Parties agreed that the standard for the Board to support the cancellation is a preponderance of the evidence. Any finding of fact which states a conclusion of law is hereby adopted as a conclusion of law. To the extent any of the foregoing conclusions of law are more accurately stated as findings of fact, they are hereby incorporated into the above findings of fact.

### Findings of Fact

1. Mrs. Stringham has been employed with CCS since 2015 as a counselor at Carmel High School (CHS).

2. As a counselor, Mrs. Stringham's responsibilities include advising students on graduation requirements; assisting students with questions regarding class schedules; guiding students towards graduation and career pathways; communicating with families of students on schedules, graduation and career pathway requirements; and collaborating with her fellow counselors.

3. Beginning with the 2016-2017 school year, Mrs. Rachel Cole served as Mrs. Stringham's direct supervisor and primary evaluator in Mrs. Cole's role as Director of Counseling. (Admin. Ex. 1 p. 1).

4. For the 2016-2017 school year, Mrs. Cole gave Mrs. Stringham the evaluation rating of Highly Effective. (Admin. Ex. 1 p. 1).

5. Highly Effective is the highest rating a counselor could achieve. (Admin. Ex. 1 p. 1).

6. Likewise, for the 2017-2018 school year, Mrs. Cole gave Mrs. Stringham the evaluation rating of Highly Effective. (Admin. Ex. 1 p. 3).

7. Mrs. Cole also gave Mrs. Stringham the evaluation rating of Highly Effective for the 2018-2019 school year. (Admin. Ex. 1 p. 5).

8. For the fourth consecutive year, Mrs. Stringham received a Highly Effective evaluation rating for the 2019-2020 school year. (Admin. Ex. 1 p. 7).

9. However, Mrs. Stringham's performance was not flawless over the course of 2016-2020. Since becoming Director of Counseling, Mrs. Cole recorded concerns each year from 2017 until 2022 regarding Ms. Cole. (Admin. Ex. 2 pp.1-10).

10. These document a list of concerns-growing in severity and frequency- regarding Mrs. Stringham's performance that accelerated and escalated during the spring semester of the 2019-2020 school year. (Admin. Ex. 2 pp.1-10) (Transcript p. 51-52).

11. During this time, the COVID-19 pandemic forced remote learning, and many students were struggling.

12. Mrs. Maureen Borto, Assistant Principal, testified that the counseling department held weekly meetings during which counselors would present lists of students to discuss. (Transcript p. 20).

13. Counselors brought the names of several students for discussion, but Mrs. Stringham usually had none. (Transcript p. 20).

14. Mrs. Stringham was not connecting with students, reaching out to families, or reaching out to homes to get more information. Mrs. Stringham was also late to several virtual meetings with students and families where plans were being made to comply with CCS's obligations under federal law, specifically Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (as amended). (Transcript p. 20).

4

15. For the 2019-2020 evaluation, Mrs. Cole identified significant concerns in written comments that were included in the evaluation (Admin. Ex. 1 pp. 8).

16. Mrs. Stringham understood the comment in her 2019-2020 evaluation, and in particular where Mrs. Cole wrote "I want you to know I am concerned about your performance as a counselor", to convey significant performance concerns.

17. Mrs. Stringham received a copy of this evaluation and the written comments on June 24, 2020. (Admin. Ex. 1 pp. 7).

18. Over the 2020 summer, June or July more precisely, Ms. Borto and Ms. Cole, with assistance from Dr. Thomas Harmas, CHS Principal, and Dr. Thomas Oestreich, Assistant Superintendent, began preparing a detailed improvement plan for Mrs. Stringham.

19. As the 2020-2021 school year began, Mrs. Cole identified for Mrs. Stringham more performance issues, like placing students in the wrong cohort groups. (Teacher Ex. 3 pp. 4-5).

20. At this time and as Ms. Borto and Ms. Cole were finalizing the improvement plan for her, Mrs. Stringham, unbeknownst to Mrs. Cole or Mrs. Borto, filed an internal complaint with CCS's Human Resources Department on September 1, 2020. (Teacher Ex. 1).

21. Mrs. Stringham alleged that Mrs. Cole's continued citation of performance issues constituted harassment and discrimination on the basis of her ethnicity or race (Hispanic) and her sexual orientation (homosexual). (Teacher Ex. 1).

22. Mrs. Stringham alleged that the discrimination and harassment began in March 2020, but she did not complain until September 1, 2020. (Teacher Ex. 1).

23. Mrs. Stringham submitted a detailed account of events with her complaint. (Teacher Ex. 3).

24. Mrs. Stringham's complaint submission, she acknowledged that she believed in March or April, 2019 that Mrs. Cole was not discriminating against her because of her sexual orientation. (Teacher Ex. 3 p. 2).

25. Mrs. Stringham's complaint submission presents no evidence of whether anyone knew of her ethnicity. (Teacher Ex. 3 p. 2).

26. Mrs. Stringham's complaint was filed after she was informed by Mrs. Cole on June 24, 2020, "I want you to know that I am concerned about your performance as a counselor." (*Compare* Admin. Ex. 1 p. 7 *with* Teacher Ex. 1).

27. The 2020 Improvement Plan outlined three primary areas of concern: (1) "Communication (written and verbal)," (2) "Following procedures, policies and dates," and (3) "Professionalism." (Admin Ex. 3).

28. Each section of the 2020 Improvement Plan contained three parts as well: (1) "Facts" (intended to relay examples of the performance issues), (2) "Rules/Expectations" (the standard applied to the examples) and (3) Impact (how the failure to follow rules or expectations impacts the job performance). (Admin Ex. 3).

29. The 2020 Improvement Plan concludes with "Actions Necessary for Improvement," which further states with specificity the areas of improvement needed by Mrs. Stringham. (Admin Ex. 3).

30. Mrs. Cole and Ms. Borto met with Mrs. Stringham regarding the September 10, 2020 Improvement Plan. Mrs. Stringham had union representation during that meeting that took place on September 10, 2020. (Transcript p. 22).

31. After that meeting, Dr. Oestreich informed them on or around September 15, 2020, of the complaint and his intent to interview them.

32. Over several weeks, Dr. Oestreich interviewed all witnesses listed by Mrs. Stringham and others—10 witnesses in all.

33. Dr. Oestreich also wrote a detailed, five-page report provided to Mrs. Stringham.

34. Based on his investigation, Dr. Oestreich concluded that there was no evidence of discrimination.

35. Meanwhile, Mrs. Stringham continued her work, but the errors during the 2020-2021 school year accumulated. (Admin. Ex. 2 pp. 4-6).

36. In the spring semester of 2021, Ms. Borto had a heightened focus on graduation.

37. Historically, the focus at CHS is on graduation and getting those who are at-risk of not graduating to meet graduation requirements.

38. In the spring of 2021, the hybrid teaching and learning environment elevated the risk of more students falling short.

39. To combat the heightened risk of students falling short of graduation requirements, Ms. Borto began one-on-one meetings with counselors at the end of March 2021, to talk through each counselor's list of potential seniors who would not graduate.

40. Ms. Borto met with Mrs. Stringham at the end of March 2021 to go over at-risk student status.

41. At the March 2021 meeting between Ms. Borto and Mrs. Stringham identified four of her assigned students as at-risk seniors.

42. When the end of the semester came, which is when counselors notify the CHS administration of who did not graduate, Mrs. Stringham alerted Mrs. Cole and Ms. Borto of five students who failed to graduate.

43. At most, counselors usually have no more than one (1) student, but usually there are none.

44. Upon further investigation of these five students, Ms. Borto discovered that Mrs. Stringham did not identify any of the five names when she and Mrs. Stringham met in March 2021.

45. Of the five students who did not graduate, three could have graduated through intervention or changes in graduation pathways or classes.

46. Two of the three students who could have graduated through intervention or changes in graduation pathways or classes never graduated from CHS.

47. Mrs. Stringham did not dispute Ms. Borto's recollection of events but described her efforts made to engage the students.

48. Mrs. Stringham discussed these students with Mrs. Cole *after* they had failed to graduate.

49. Ms. Borto reviewed her notes from Student Support Team ("SST") meetings and found insufficient mention of these students by Mrs. Stringham.

50. The SSTs are collaborative venues where counselors bring the names of students that are struggling and need help so the counseling team can brainstorm on ideas to engage and support the students.

51. One of Mrs. Stringham's three students who failed to graduate, but could have, was never mentioned in SST meetings.

52. Another of Mrs. Stringham's three students who failed to graduate was mentioned once in SST meetings. (Admin. Ex. 8).

53. For the 2020-21 school year, Ms. Borto and Mrs. Cole wanted to give Mrs. Stringham a Needs Improvement evaluation rating, which is lower than Highly Effective and Effective but above Ineffective. Mrs. Stringham on multiple occasions provided incorrect information to students and their families; and Mrs. Stringham failed to identify the three at-risk students in the spring semester of the 2020-2021 school year. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31).

54. Dr. Oestreich disagreed with Ms. Borto and Mrs Cole on Mrs. Stringham's 2020-21 evaluation rating.

55. Dr. Oestreich believed that while there was sufficient verbal communication to Mrs. Stringham of her performance concerns, he wanted more written artifacts to relay in writing the concerns within the evaluation system, Standards for Success.

56. Artifacts are used and/or considered as part of a teacher's evaluation process. (Transcript p. 47).

57. The artifacts are also used for performance purposes. (Transcript p. 47).

58. Dr. Oestreich, however, supported the institution of a more stringent improvement plan.

59. Based on the continued performance concerns, Mrs. Stringham began the 2021-2022 under a performance improvement plan ("2021 Improvement Plan"). (Admin. Ex. 4).

60. The 2021-22 Improvement Plan set clear goals, instituted regular meetings with Mrs. Cole and Ms. Borto, and also required that Mrs. Cole (and later added Ms. Borto) be copied on all emails. (Admin. Ex. 4).

61. Mrs. Stringham was again represented by union representation regarding the 2021 Improvement Plan, as she had been during the fall semester meetings. (Admin. Exs. 18, 21, 22 & 24).

9

62. Ms. Cole was asked, and the parties agreed as part of the Improvement Plan, that she would be copied on emails. (Transcript p. 134).

63. The emails led to more recognition regarding performance concerns by Mrs. Stringham and more artifacts being uploads. (Transcript p. 136-137).

64. On September 5, 2021, Mrs. Stringham received twenty-four (24) artifacts. (Teacher's Ex. 15; Teacher's Ex. 16 at 1-10).

65. On September 22, 2021, Mrs. Stringham received two (2) artifacts. (Teacher's Ex. 16 at 11-12).

66. On September 29, 2021, Mrs. Stringham received three (3) artifacts. (Teacher's Ex. 16 at 13-15).

67. On October 10, 2021, Mrs. Stringham received two (2) artifacts. (Teacher's Ex. 16 at 16-17).

68. Thus, in four (4) days, Mrs. Stringham received thirty-one (31) artifacts. (Teacher's Exs. 15-16).

69. After receiving these thirty-one (31) artifacts, Mrs. Stringham went on medical leave on October 11, 2021. (Transcript p. 70).

70. Ms. Cole gave feedback of concerns to other counselors on their annual evaluations. (Transcript p. 135-136).

71. Mrs. Stringham continued making serious errors such as supplying wrong information to students and did not proactively pursue students' needs. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31).

72. During the fourth meeting on October 11, 2021, Mrs. Stringham was informed that Mrs. Cole and Ms. Borto would be extending the 2021 Improvement Plan because they did not see sufficient improvement. (Admin. Ex. 24).

73. Mrs. Stringham filed notice of medical leave with Dr. Oestreich's office after the October 11, 2021 meeting (Teacher Exs. 22-24).

74. Mrs. Cole and Ms. Borto were unaware that Mrs. Stringham had requested medical leave until the leave was approved.

75. While Mrs. Stringham was on leave, Ms. Borto observed Mrs. Stringham on CHS video surveillance footage visiting the counseling department offices and cutting her own name out of the plastic inserts on the internal CHS signage.

76. No other CHS employee on leave had before cut their name out of CHS signs.

77. Mrs. Stringham also emptied her office during a weekend within her leave period.

78. Mrs. Stringham went to social media to voice her concerns.

79. Mrs. Stringham complained about CHS in her social media posts, stating that she was being targeted in similar fashion to a social worker who was "not gay" but "pushed out" by Mrs. Cole. (Admin. Ex. 24 p. 2).

80. Explaining this, Mrs. Stringham agreed that she believed Mrs. Cole was mean to everyone—gay and "not gay". (Admin. Ex. 24 p. 2).

81. When she returned from leave in mid-January, 2022, Mrs. Stringham continued on the 2021 Improvement Plan.

82. Mrs. Stringham also sought to have Mrs. Cole and others sign paperwork necessary for her to obtain a mental health counselor license from the State of Indiana.

83. Originally, she supplied the form to Mrs. Cole, but Mrs. Cole was reluctant to sign the certification because she could not certify that Mrs. Stringham performed the tasks mentioned in the form.

84. Mrs. Cole raised concerns with Dr. Oestreich about the mental health counselor license form.

85. Mrs. Stringham did not meet certain requirements reflected in the form, including failure to complete an internship with CCS, never receiving individual supervision, and never receiving group supervision. (Stringham Testimony, Admin. Ex. 26(A) pgs. 10-11).

86. Dr. Oestreich independently reviewed the mental health form.

87. In a January 26, 2022, email to Mrs. Stringham, Dr. Oestreich identified concerns regarding the form and gave her a directive to contact him with any follow-up.

88. Instead of contacting Dr. Oestreich for further discussion as directed, Mrs. Stringham confronted Mrs. Cole on January 28, 2022. (Transcript p. 120).

89. This was not the first time Mrs. Stringham had been angry and slammed Mrs. Cole's door. It also happened in February 2019. (Transcript p. 101, 102).

90. On January 28, 2022, Mrs. Stringham was visibly angry when she arrived, began yelling and berating Mrs. Cole ("you're being ridiculous" and "you're ridiculous"), and leaning over her desk, waiting arms.

91. Mrs. Stringham did not follow Dr. Oestreich's directive on January 28 when she went to Rachel Cole to discuss this matter.

92. Ms. Borto has never witnessed anyone yelling at their supervisor at CHS.

93. Mrs. Stringham also admitted to yelling.

94. Mrs. Stringham thinks it was acceptable at Carmel High School for a counselor to yell at their supervisor and say you're being ridiculous in these circumstances.

## Conclusions of Law

1. Incompetence under Indiana Code § 20-28-7.5-1 (e) (3) specifies "incompetence" as a basis for cancelling a regular teacher contract. Incompetence has been defined by *Harrison-Washington Community School Corp. v. Bales,* 450 N.E.2d 559, 564 (Ind. Ct. App. 1983) as "wanting in practical efficiency and discipline."

2. Indiana Code § 20-28-7.5-1(e)(5) specifies "neglect of duty" as a basis for cancelling a regular teacher contract. Neglect of duty has been broadly defined under Indiana case law, including, but not limited to, in *Harrison-Washington Community School Corp. v. Bales,* 450 N.E.2d 559, 564 (Ind. Ct. App. 1983) and *State ex rel. Newton v. Board of School Trustees*, 404 N.E. 2d 47 (Ind. Ct. App. 1980) as:

    a. Sleeping during classroom period
    b. Failure to follow administrative direction in teaching/grading and failure to improve teaching methods after administrative conferences
    c. Failure to make proper classroom preparation
    d. Failure to keep and have control of classroom, maintain proper discipline
    e. Repeatedly reporting late to school
    f. Failing to comply with corporal punishment policy
    g. Failure to issue interim progress reports to students
    h. Failing to make reasonable efforts to implement the principal's improvement plan for bettering relationships with parents and students.

3. Indiana Code § 20-28-7.5-1(e)(2) specifies "[i]nsubordination" as "a willful refusal to obey the state school laws or reasonable rules adopted for the governance of the school building or the school corporation."

4. Indiana Code § 20-28-7.5-1(e)(7) specifies "other good or just cause" as a basis for cancelling a regular teacher contract. The Indiana Supreme Court has stated that good or just cause is any reason which is put forward in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the Board's task of building up and maintaining an efficient school system. *Board of School Trustees of the City of Peru v. Moore*, 218 Ind. 386, 393 (1941).

5. Based on the foregoing findings of fact, the Board determines that the preponderance of the evidence shows that Mrs. Stringham neglected her duties as a counselor.

6. The most significant findings supporting the conclusion that Mrs. Stringham was incompetent include that Mrs. Stringham was warned in her 2019-2020 evaluation (no later than June 24, 2020), in the 2020 Improvement Plan (in September 2020), in her 2021 Improvement Plan (in July 2021), in the four (4) meetings with Mrs. Cole and Ms. Borto (September to October, 2021), and in the extension of her 2021 Improvement Plan (January 2021) that her continued performance issues were a concern. Her overall evaluation rating also dropped. And in the end, her continued shortcomings were not meeting expectations as a counselor at CHS. This also falls into neglect of duty and other good or just cause.

7. Similarly, several findings support the conclusion that Mrs. Stringham has neglected her duties as a counselor, including that three students did not graduate due to her oversight; Mrs. Stringham also on multiple occasions provided incorrect information to students and their families; and Mrs. Stringham failed to identify the three at-risk students in the spring semester of the 2020-2021 school year. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31.) In addition to neglect, this is also incompetence.

8. The foregoing findings of fact independently show, by a preponderance of the evidence, that other good or just cause exists to cancel Mrs. Stringham's contract.

9. Several findings support the conclusion that other good or just cause exists to cancel Mrs. Stringham's contract: in addition to the artifact uploads and other testimonial evidence of Mrs. Stringham's performance issues, it is undisputed that three students did not graduate because of Mrs. Stringham's failure in her job duties. Mrs. Stringham attempts to blame the students, but Mrs. Stringham does not dispute the testimony by Ms. Borto that she failed to sufficiently raise these students in SST meetings or with Ms. Borto in the March 2021 one-one-one meeting. These shortcomings, together with the artifacts demonstrating continued performance issues, establish good cause exists to end Mrs. Stringham's employment.

10. The foregoing findings of fact independently show by a preponderance of the evidence that Mrs. Stringham's actions constituted insubordination.

11. Several findings support the conclusion that other good or just cause exists to cancel Mrs. Stringham's contract, especially Mrs. Stringham's yelling at Mrs. Cole on January 28, 2021, a highly inappropriate response, even though Mrs. Cole—her supervisor—asked her to leave and Dr. Oestreich two days earlier instructed her to contact him with any follow up questions; and explicitly disregarding a directive by her Assistant Superintendent.

12. Mrs. Stringham's argument that Mrs. Cole and CCS were discriminating against her because of her race/ethnicity (Hispanic) and her sexual orientation are unfounded.

13. The Administration bears the burden of proof, by a preponderance of evidence, and the burden of persuasion that Mrs. Stringham's conduct constitutes incompetence, neglect of

duty, insubordination, and/or other good or just cause under Indiana law, all of which are non-discriminatory bases for employment action.

14. While Mrs. Stringham is assumed to be a member of a protected class (Hispanic and homosexual), and she suffered an adverse employment action, she has not satisfied the second element required to prove unlawful discrimination. Mrs. Stringham cannot show she was meeting legitimate work performance expectations any time after the fall semester 2019, as her performance failures persisted after that time. Mrs. Stringham acknowledged the mistakes, but simply argued that other counselors made similar mistakes.

15. Mrs. Stringham also has not satisfied another element required to prove unlawful discrimination, as Mrs. Stringham testified that no other counselor had allowed three students to fall through the cracks in the spring semester 2021. Nor had any other counselor been placed under two improvement plans. And Mrs. Stringham did not point to any other employee or counselor at CHS who yelled at a supervisor, called their supervisor ridiculous, and kept their job.

16. Mrs. Stringham did not show that the proffered reasons for cancellation—her performance issues and the January 28 yelling incident—were phony (*i.e.*, pretextual) and that the real reason was her Hispanic heritage or sexual orientation. Indeed, Mrs. Stringham offers this as a pure guess. Mrs. Stringham argued that she, as the only Hispanic and homosexual counselor, is the only counselor receiving more than 60 artifact uploads and two improvement plans. But, then again, Mrs. Stringham has been in the office since 2015, and under Mrs. Cole's supervision since January 2017, and her first improvement plan came in September 2020. The performance concerns surfaced in June

2020 and were the subject of the creation of the 2020 Improvement Plan in June and July, 2020, before Mrs. Cole and Ms. Borto were informed of Mrs. Stringham's race in mid-September 2020.

17. Mrs. Stringham also argued that disciplinary action was retaliation for her filing complaints of discrimination. However, the facts do not support her claim.

18. Mrs. Stringham argues that the 2020 Improvement Plan, the 2021 Improvement Plan and now her contract cancellation are retaliation for her filing her September 2020 and January 2022 complaints of discrimination and harassment.

19. In regards to the 2020 Improvement Plan, Mrs. Stringham cannot show that the adverse action—the improvement plan—came after the protected activity—the complaint. The undisputed evidence is that the CHS administration team began preparing the 2020 Improvement Plan before Mrs. Stringham filed her complaint. And Mrs. Stringham was put on notice no later than June 24, 2020, when Mrs. Cole wrote, in the written comments accompanying Mrs. Stringham's 2019-2020 evaluation, "I want you to know that I am concerned about your performance as a counselor." *Compare* Admin. Ex. 1 p. 7 *with* Teacher Ex. 1. Most importantly, Mrs. Cole and Ms. Borto testified that Mrs. Stringham's complaint played no role in the creation of the 2020 Improvement Plan as both Mrs. Cole and Ms. Borto were unaware that Mrs. Stringham had filed a complaint with Dr. Oestreich's office when they issued the 2020 Improvement Plan.

20. As for the 2021 Improvement Plan constituting retaliation, that allegation cannot meet the third element—the causal connection between the adverse action and the protected activity. The 2021 Improvement Plan was installed July 2021—at least 10 months after Mrs. Stringham's September 1, 2020, complaint. This 10-month gap is insufficient as

courts have held that a two-month span was not a strong enough link. *Igasaki*, 988 F.3d at 959 ("Therefore, the two-month gap between Igasaki's protected activities and his termination cannot show retaliation on its own.").

21. Mrs. Stringham's claim that her contract cancellation is caused by her January 2022, complaint is unsupported by the evidence. Dr. Oestreich testified that the January 2022, complaint lodged the same allegations as the September 1, 2020, complaint without new evidence. And so, the January 2022, complaint—a restatement of the September 1, 2020, complaint—is also too attenuated to create a causal connection.

22. The facts demonstrate continued performance concerns constituting legitimate, nondiscriminatory reasons for CCS's decision to cancel Mrs. Stringham's contract.

23. The evidence does *not* support a conclusion that any retaliatory motive caused the contract cancellation or discipline as Mrs. Stringham's sole argument is the timing of events.

24. In the context of Mrs. Stringham's discrimination claims, particularly on sexual orientation claims Mrs. Cole is the primary actor. It is uncontested that Mrs. Cole knew of Mrs. Stringham's sexual orientation since Mrs. Stringham's hiring in 2015, and, knowing this, gave Mrs. Stringham four consecutive years of the highest performance rating. While Mrs. Stringham argued that Mrs. Cole made a derogatory statement approximately six years ago when Mrs. Stringham married her wife—a statement that Mrs. Cole categorically denied—the consistent evidence is that Mrs. Cole gave Mrs. Stringham good evaluations even after that disputed comment. Thus, the Board infers that since Mrs. Cole consistently gave Mrs. Stringham high marks over a long period of time

while knowing Mrs. Stringham's sexual orientation, Mrs. Cole, and by extension, CCS, does not harbor animus based on Mrs. Stringham's sexual orientation.

25. Dr. Oestreich's involvement is an important consideration under the same-actor inference as it is applied to Mrs. Stringham's retaliation claim. In the fall semester of the 2020-2021 school year, Dr. Oestreich received and thoroughly investigated Mrs. Stringham's complaint, concluding (as we do here) that there is insufficient evidence of race or sexual orientation discrimination or harassment. Later that year, Dr. Oestreich reversed CHS's recommendation that Mrs. Stringham be rated Needs Improvement as he believed that while there was sufficient verbal warning, he desired more written documentation of performance issues in the form of artifacts uploaded in the SFS system. Later in January 2022, Dr. Oestreich independently reviewed and supported the recommendation for contract cancellation. This is important to consider when evaluating motive. If CCS sought to retaliate against Mrs. Stringham, then it had its chance with the 2020-2021 evaluation. Alas, it did not. Indeed, CCS (again) gave Mrs. Stringham the benefit of the doubt and a higher performance rating than she deserved for the 2020-2021 school year.

26. Board Policy 9600 states that "[d]isruptive or uncivil behavior includes, but is not limited to: . . . c. Raising one's voice above an appropriate level." (Admin. Ex. 26(B).

27. Mrs. Stringham argued that the Policy 9600 language preferring a progressive discipline approach was not followed, but that paragraph applies to non-employees as it mentions issuance of a no-trespass order. The paragraph explicitly applicable to employees states, "For CCS employees and students who behave in an uncivil or disruptive manner, appropriate disciplinary action will be taken in accord with negotiated agreements, employee handbooks, and the Student Code of Conduct." Nothing in the negotiated

agreements handbooks or code of conduct mandate progressive discipline in this instance, and if it did, Ms. Borto and Mrs. Cole testified that Mrs. Stringham was well on her way down a progressive discipline path with the multiple improvement plans.

28. The Administration has demonstrated by a preponderance of the evidence the existence of appropriate statutory grounds to cancel Mrs. Stringham's regular teacher's contracts with CCS, and Mrs. Stringham has not established that this recommendation is caused by unlawful discrimination or retaliation or is in any way impermissible.

## Decision

Based on the preceding findings of fact and conclusions of law, the Board by the vote of __5__ of the five (5) members taking part in the consideration of this matter resolve that Dianna Stringham's regular teaching contract with Carmel Clay Schools should be and hereby is cancelled as of the date of this decision, which is March 28, 2022.

**ENTERED OF RECORD IN THE MINUTES OF THE BOARD OF SCHOOL TRUSTEES OF CARMEL CLAY SCHOOLS THIS TWENTY-EIGHTY DAY OF MARCH, 2022.**

_____
Katie Browning, President

_____
Louise Jackson, Vice-President

_____
Jennifer Nelson-Williams, Secretary

_____
Layla Spanenberg, Member

_____
Mike Kerschner, Member