# Carmel High School Faculty Handbook



## 2021-2022

This handbook is designed for staff to easily access information related to all things 'CHS'. It provides links to information and resources and is organized by similar topics to streamline focus on teaching, learning, and supporting our students.

CCS 00420

CCS  00421

# Table of Contents

## CHS Guiding Principles

- ❖ Mission, Vision, and Beliefs
- ❖ Diversity Statement
- ❖ School Improvement Plan

## PLC Team Resources

## Teaching & Learning

- ❖ Systems of Support

## Operations

## Student Services and Activities

## 2021-2022 COVID Response Guide

CCS 00422

CCS 00423

# CHS Guiding Principles

## Statement of Mission, Vision, and Beliefs

The **Mission** of Carmel High School is central to everything we do. The staff of CHS has promoted a process of continuous school improvement for a number of years. This climate of continuous improvement has made validating our Mission Statement a function of what we do **every day in every classroom with every student.** We truly strive to create a positive environment in which all are challenged and inspired to achieve their potentials. Underlying our mission are five **belief statements** that were written and adopted by all the major stakeholders in the education of our students.

- Students are at the core of every decision.
- A safe, non-threatening learning environment is essential.
- Students' academic, social, emotional and physical needs must be addressed.
- Effective teaching and learning requires continuous improvement.
- Diverse opportunities benefit all students.

Carmel High School's **Vision** is to:

- Provide opportunities for all students to realize their potential in an ever-changing world.

At CHS, student learning is our "bottom line." Our efforts are focused directly on student performance. The energies of all staff and administrators are directed primarily toward what is happening in the classroom, and we measure learning in terms of what students can demonstrate. We are able to show in concrete ways that students are graduating equipped to be productive citizens. The following indicators reflect our philosophy for realizing our vision and fulfilling our mission:

- Congruence between what we say and what we do is apparent to all those affected by our services. Our actions reflect our philosophy.
- Stakeholders involved in educating our youth have a sense of ownership in the values and principles that undergird our programs and policies. There is a widely-shared sense that "we are all in this together."
- Our focus is on students-as-learners, rather than on teachers-as-deliverers-of-services.
- Before graduating, students must exhibit what we expect them to know and do. These exhibitions embody the qualities, skills, and knowledge they will need to be productive citizens.
- We enjoy an educational environment in which all staff members feel free to take risks for the good of students. Experimentation with new programs and strategies is commonplace.
- Each staff member and administrator is actively engaged in a continuous process of personal and professional growth.

CCS  00424

CCS 00425

As a reinforcement of our mission and belief statements, our statement of CHS Student Expectations declares that **Carmel High School graduates are**:

- Effective communicators who exhibit a broad base of skills, including listening, reading, speaking, and writing; make appropriate use of contemporary technology in processing information; and demonstrate the ability to interact with various groups.
- Critical thinkers who visualize, think creatively, and generate new ideas; make wise value judgments and prudent decisions; and apply knowledge and solve problems.
- Responsible citizens who know how social, political, and environmental systems work and interact; recognize the contributions of diverse cultures; are able to identify, organize, and utilize human and material resources; and promote values, practices, and policies that improve the quality of life.
- Confident individuals who understand and use their unique abilities to be lifelong contributors to their world; are willing to take risks for their personal growth; exhibit self-discipline; and can recognize and appreciate their successes.
- Caring persons who demonstrate concern for others; respect a variety of viewpoints; and build healthy personal relationships.
- Cooperative team members who act in a responsible, tolerant, and appropriate manner; willingly seek and give help and support; and accept personal responsibility.
- Self-directed learners who recognize the necessity for and enjoy the challenge of acquiring new knowledge and skills; use effective learning techniques; and set goals, monitor and evaluate progress, and complete tasks.

# Diversity Statement

We value the diversity of culture, identity, perspective, and expression in our school community; therefore, regardless of race, gender, religion, nationality, sexual identity, ability, or socioeconomic status, we are committed to ensuring a safe, supportive, and inclusive learning environment for all members of the Carmel High School community.

Back to Top

CCS 00426

CCS  00427

# CHS School Improvement Plan



2019-2022 School Improvement Plan
CARMEL HIGH SCHOOL

CCS  00428

Teacher Exhibit 34 - p. 010

CCS  00429

**Topic: Equity & Inclusion**

Objective: Carmel High School will be an equitable learning environment where students of all backgrounds have the same opportunities to learn and develop their knowledge.

Critical Initiative 1: We will create an Equity & Inclusion Alliance that will lead the efforts of professional development around implicit bias and culturally responsive teaching for staff.

| Activity | Context (faculty share, late start, team meeting, etc) | Person(s) Responsible for Implementation | Timeframe (Launch Date and Target Date) | Required Resources | Key Measures | Benchmarks |
|---|---|---|---|---|---|---|
| Professional Development | Ongoing – Departments, PLC teams, Instructional Coaches | Assistant Principal, Associate Principal, Principal | September 2020 -Spring 2023 | Teaching Tolerance, Edutopia, IUPUI Equity Institute, CCS resources | Teacher feedback at the end of the year | Implicit Bias and culturally responsive teaching training for all staff |
| Form Focus Groups to work on specific areas. Include students, parents, and community members in these groups. | Meetings before and after school, SSRT | Assistant Principals, Equity & Inclusion Alliance | Begin by October 2020 with meetings throughout the year | Teaching Tolerance, Edutopia, IUPUI Equity Institute, CCS resources | Completion of focus group goals, such as visual representation in the school, celebrations of diversity; development of anti-racism policies | Groups meeting consistently; work on focus group items moving forward to administration |
| Create a CHS Equity Mission Statement | Equity & Inclusion Alliance Meetings | Assistant Principal, Equity & Inclusion Alliance | Begin October 2020 with completion by spring 2021 | Teaching Tolerance, Edutopia, IUPUI Equity Institute, CCS resources | CHS Equity Mission Statement adopted and published by the end of the year | Development of CHS Equity Mission Statement |

Critical Initiative 2: As each department goes through the curriculum writing process, we will include a comprehensive review of all materials and texts through an equity and inclusion lens.

| Activity | Context (faculty share, late start, team meeting, etc) | Person(s) Responsible for Implementation | Timeframe (Launch Date and Target Date) | Required Resources | Key Measures | Benchmarks |
|---|---|---|---|---|---|---|
| English Department will fully implement new curriculum with intentional representation on diversity and inclusion. | PLC team meetings, English department work | CCS Director of Curriculum, Assistant Principal, English Department Chair, English Teachers | Launch in fall 2020 (process began in 2019-20); completion spring 2021 | Books and articles on best practice instruction; Texts, Media Center Specialist; Teaching Tolerance | Diverse text and materials selection. Feedback from stakeholders, including students and parents, on text and materials selections. | Text selection completed and sent to School Board by April 2021; Curriculum maps and assessments completed by summer 2021. |
| Social Studies Department will implement new curriculum with intentional representation on diversity and inclusion. | PLC team meetings, English department work | CCS Director of Curriculum, Assistant Principal, Social Studies Department Chair, Social Studies Teachers | December 2020 – begin program evaluation April 2021 – completion of program evaluation Curriculum writing and materials adoption – 2021-2022 | Books and articles on best practice instruction; Texts, Media Center Specialist; Teaching Tolerance | Diverse text and materials selection. Feedback from stakeholders, including students and parents, on text and materials selections. | Program evaluation completed by April 2021; Curriculum maps and assessments completed by summer 2022 |

Critical Initiative 3: We will gather, share, and analyze data related to equity and inclusion with the entire staff.

| Activity | Context (faculty share, late start, team meeting, etc) | Person(s) Responsible for Implementation | Timeframe (Launch Date and Target Date) | Required Resources | Key Measures | Benchmarks |
|---|---|---|---|---|---|---|
| Review of equity data | Department chair | Principal, Associate | Begin October | Pinnacle, Power School | Representation Data, Grade Data, | |

CCS  00430

CCS 00431

| | meetings, admin team meetings, PLC meetings, Equity & Inclusion Alliance meetings | Principal, Assistant Principals, Department Chairs, Equity & Inclusion Alliance | 2020 and continue throughout the 2020-2021 school year | | Attendance Data, Discipline Data | S1 grades, attendance, and discipline data; schedule requests for 2021-2022 |
| Data from students regarding their experiences with equity & inclusion at CHS. | SSRT | Equity & Inclusion Alliance | Spring 2021 | Panorama, Senior Survey | Survey data | Feedback from student groups throughout the year. |

**Topic: Social Emotional Learning**

**Objective: Students and staff will develop social-emotional skills to recognize and proactively address challenges within personal and academic pursuits.**

Critical Initiative 1: *As a school, we will intentionally teach the IDOE SEL Competencies with particular emphasis on regulation, collaboration, critical thinking, and mindset.*

| Activity | Context (faculty share, late start, team meeting, etc) | Person(s) Responsible for Implementation | Timeframe (Launch Date and Target Date) | Required Resources | Key Measures | Benchmarks |
|---|---|---|---|---|---|---|
| GKOM Curriculum Integration | In freshman SSRT classes | GKOM Council and GKOM Sponsors | Continuous throughout the school year beginning in September | IDOE SEL Competencies Framework | Student Survey at the end of each semester | We will look for student growth in SEL skills throughout the school year. |
| Teacher Professional Development- Create a common vocabulary for Social Emotional Learning and then work with teachers to help them identify ways to organically build on the instruction they are already doing in their classes. | During teacher Prep periods | SEL Taskforce | Begin by October 2020 and continue with one PD session each month throughout the school year | Panorama Education Playbook for SEL; IDOE Science of Happiness course; CASEL SEL School Implementation Framework | Teacher feedback at the end of each semester. | We will look for teachers to feel more comfortable and competent in delivering SEL instruction in their classes. |

Critical Initiative 2: *As each department goes through the curriculum writing process, they will include the IDOE SEL Competencies in their Curriculum Maps.*

| Activity | Context (faculty share, late start, team meeting, etc) | Person(s) Responsible for Implementation | Timeframe (Launch Date and Target Date) | Required Resources | Key Measures | Benchmarks |
|---|---|---|---|---|---|---|

CCS  00432

CCS  00433

| English Department will integrate the SEL Competencies into the curriculum map for each course. | English Department Curriculum writing meetings | SEL Taskforce members, English Department Chair, and English Teachers writing new curriculum maps | Launch in fall 2020 with completion by spring of 2021 | IDOE SEL framework; CASEL SEL School Implementation Framework | Completed curriculum maps | Each course will specifically identify the units where they will intentional teach each SEL skill. |
| The Social Studies Department will integrate the SEL Competencies into the curriculum map for each course. | Social Studies Department Curriculum writing meetings | SEL Taskforce members, Social Studies Department Chair, and Social Studies Teachers writing new curriculum maps | Launch when curriculum evaluation begins in 2020-2021 school year. Completion by the end of 2021-2022 school year. | IDOE SEL framework | Completed curriculum maps | Each course will specifically identify the units where they will intentional teach each SEL skill. |

Critical Initiative 3: *We will create an SEL Taskforce that will combine the efforts of the School Improvement Committee with the efforts of the Culture of Care Committee to specifically address the IDOE SEL Competencies among students and staff.*

| Activity | Context (faculty share, late start, team meeting, etc) | Person(s) Responsible for Implementation | Timeframe (Launch Date and Target Date) | Required Resources | Key Measures | Benchmarks |
|---|---|---|---|---|---|---|
| We will create an SEL Taskforce designed to identify ways to introduce intentional SEL instruction into all classrooms in the building. | SEL Taskforce meetings | School Improvement Co-Chair and SEL Taskforce | Launch in September 2020 with ongoing work throughout the school year. | Panorama Education Playbook for SEL. The Taskforce will investigate additional resources to assist with intentional instruction. | Bi-annual SEL survey for all students through Panorama Education. | Introduction to SEL skills for freshmen by the end of year one. Introduction to SEL skills to all students by the end of year three. |
| We will develop lines of communications between leaders of the SEL Taskforce and the Culture of Care Committee | Meetings between leaders of the SEL Taskforce and Culture of Care Committee | School Improvement Co-Chair, SEL Taskforce, and Culture of Care representatives | Launch in September 2020 with ongoing communication throughout the school year | None | Monthly check-ins between SEL Taskforce leaders and representatives of the Culture of Care | Co-planned events and PD throughout the year |

**Back to Top**

CCS  00434

CCS  OO435

# PLC Team Resources

PLC Team Resources are accessible here as well as through the CCS Staff Portal.

# Teaching & Learning

## Academic Dishonesty

Cheating and plagiarism compromise the integrity and character of students and do not align with the mission and philosophy of CHS. Academic dishonesty occurs when a student engages in any behavior or uses any unauthorized device (including but not limited to cell phones, calculators, and other electronic devices) which gives the student an unfair advantage or represents another person's work as his/her own. Examples of these behaviors include, but are not limited to plagiarism, talking during assessments, using cheat sheets (paper or electronic), looking at or copying another student's work, and/or relaying information to students in other classes about specific information covered in that class. Should an incident of cheating occur, teachers should:

- Conference with the student
- Contact parent(s)
- Complete an office referral indicating academic dishonesty occurred (in the "other" section) and describe the incident
- Provide an alternative assignment

Student consequence for a first offense of academic dishonesty may result in an out of school suspension. A second offense may lead to a withdrawal (W), if currently passing, or withdrawal while failing (WF) of the course.

## Accommodations

At the beginning of each semester, teachers will receive student IEPs/504s/ILPs. Teachers are required to read through these documents to better understand the student's needs and accommodations. Teachers are required by law to provide any and all accommodations within these documents. If a teacher has a question about a student's plan, teachers can reach out to the student's teacher of record (IEP and ILP) or counselor (504), who sent the plans.

### Conferences

A general education teacher is required to attend all IEP and 504 conferences. Unless the teacher will not be in the building, a teacher is required to attend any conference to which they are invited. If the conference is scheduled during a teacher's class time, a sub will be provided to cover the class. Efforts are made to minimize the number of conferences a teacher is asked to attend and ample time is provided for teachers to plan accordingly. Efforts are also made to minimize the time required at the conference.

Teacher Exhibit 34 - p. 017

CCS 00436

CCS 00437

# Auditing or Retaking Classes

Students who wish to retake a course in order to improve the grade may do so in consultation with their counselor and may be referred for an evaluation by our academic departments and approval of the principal. Students wishing to improve a single semester grade for a yearlong course will be allowed to retake the entire year if they choose to do so.   When retaking a course, the highest academic grade earned will appear on the transcript  and an "R" for retake will replace the lower academic grade that was repeated,  The higher grade will be associated with the credit and factored into the student's GPA. The "R" will remain on the transcript with a notation that the course was retaken, but will not be included in the calculation of the student's GPA. In order to be placed into a higher-level course than what was recommended by the Carmel Clay School System, a student may request to sit for a placement exam prior to starting the next sequence course to determine placement. Incoming ninth graders with high school credit earned in middle school may retake those courses at Carmel High School after consultation with their high school counselor and may be referred for an evaluation by our academic departments and approval of the principal. When retaking a course previously taken in middle school, the course, credit and grade earned in middle school will not be a part of the Carmel High School transcript. In some cases, students transferring to Carmel High School may audit a class if the audit is recommended after appropriate evaluation by an academic department and is approved by the principal. During the regular school year, an audit or retake may be denied if placing a student in a particular class for this purpose causes the class size to be excessive. Again, the principal will make the decision in such cases. Before enrolling in non-CHS courses, the student must have permission from their CHS counselor to enroll and to apply the specific course toward CHS diploma requirements. A maximum of eight credits earned from other approved accredited programs will be accepted.

# Class Lists, Powerteacher and Grade Reporting

Class lists are available in Powerteacher. Grades will be reported via the computer using Powerteacher. Teachers are expected to update their grades through Powerteacher on a weekly basis.  Powerteacher serves as the electronic grade record for reporting academic progress. Joe Schaller can assist CHS staff with grade reporting procedures.

# Conducting Research

Certain course experiences and curriculum standards may require students to conduct research and collect data from a variety of sources, including human subjects. When it is necessary to involve human subjects in a research project, proposals and procedures must be reviewed and approved by the teacher of that course. Data collection may include, but is not limited to questionnaires, observations, or interviews. Teachers should work with the Assistant Principal for Curriculum prior to any student beginning research involving human subjects, and teachers and students are responsible for adhering to the guidelines detailed agreed upon in that process when such research is necessary.

**Back to Top**

CCS  00438

Teacher Exhibit 34 - p. 020

CCS  00439

# Field Trips

We have a school policy of conservative encouragement in regard to field trips. Much educational benefit can be derived from well-planned trips that utilize the community, county, and state as a resource. We encourage the use of our community and its resources. Some trips, however, provide very limited experiences and are discouraged.

1. The activity must be consistent with and promote the educational philosophy and objectives of the school corporation and the State Board of Education.
2. The activity must facilitate the attainment of specific educational objectives of the class and represent an integral component of the curriculum.
3. The activity CANNOT occur without interrupting the instructional day and presents a **unique** opportunity the students would not normally experience.
4. Trips, which facilitate learning for a specific class, are scheduled on the day that class meets and are scheduled between 9:30 a.m. and 2:00 p.m.
5. The field trip is not scheduled for the **last week** of a grading period or the last **three weeks** of the semester.
6. Students will be instructed to return to their regularly scheduled class immediately upon return from the field trip and are responsible for any work missed.
7. Copies of student field trip permission slips including emergency contact information must accompany staff during the field trip.
8. A Breathalyzer must be taken on every field trip leaving the CHS campus. Directions for administering the Breathalyzer are on the Field Trip Request form (on the Shared P: drive in the Field trips folder). Breathalyzers are available in the Main Office.

## Steps for Requesting a Field Trip

1. The teacher fills out the Field Trip Request form and gives it to the department chair for approval.
2. Teachers must complete a supervision plan for any travel that will extend outside the counties contiguous to Marion County. The plan must include specific details for the supervision of students. It may be possible to submit one form that will apply to multiple field trips. The plan must be submitted to the appropriate administrator prior to the date of the field trip.
3. Absence from the building must be reported in AESOP and a Request for Leave form for the teacher must be turned in with the Field Trip Request form.
4. The department chair determines if the field trip meets the guidelines and signs the form.
5. The teacher or department chair gives the form to Valerie Piehl **at least three weeks** before the trip for approval. If approved, she will give a signed copy back to the teacher. All field trips, including those that are in-house or don't require a bus must be scheduled through Valerie Piehl.
6. The class list for the field trip, in alphabetical order by last name, must be sent to Brittany Wiseman in the student services office and distributed to the staff via email one week prior to the trip.
7. All out-of-state or overnight field trips must be approved by David Woodward with prior approval through the Principal.
8. A field trip permission form must be signed by parents before a student is allowed to take the field trip.

CCS  00440

CCS  00441

9. Bus transportation must be scheduled by the teacher through BusHive at least three weeks prior to the trip.

10. Activity buses should be scheduled through Tricia McGuire in the main office.

# Grading

CHS strives to create a learning environment that is meaningful for all students. Grading and assessment practices play a significant role in creating that environment. In order for grades to be effective, they must be accurate, meaningful, consistent, and support learning (O'Conner, p. 3). The following framework provides a structure for creating a system where these occur.

**Grades will reflect academic achievement and what the students know.** *Reductions for late work should be minimal, if at all. Reductions should not be significant enough that it provides a misrepresentation of what the student knows.*

**A significant part of the students' grade should be based on summative assessments rather than formative assessments and daily practice.**

**Class work must be relevant, meaningful and tie directly to academic standards.**

**Zeroes should be used to indicate a student knew nothing rather than did nothing.** *NHI should be used to indicate "not handed in" and INC should be used to indicate work that is "incomplete". Other PowerSchool codes such as missing, late, and collected should be used to communicate to students and parents and to track trends/progress.*

**Grading policies and practices should reflect the philosophy that new evidence of learning will replace old evidence of learning.**

Our grading philosophy is rooted in the belief that learning is a continual process emphasizing growth over time. As a result, courses should be designed allowing students the opportunity to demonstrate understanding of important concepts throughout the entire semester. Based on this philosophy, grades at the midpoint of each semester are a snapshot in time of the student's progress in the class.

While report cards are not issued at the midpoint of each semester, it is essential teachers update PowerSchool grades to the greatest extent possible for all students by the date grades are due for the entire district. CHS parents and students will receive a school messenger encouraging them to log in to PowerSchool to check progress in all their courses. The Athletics Office also captures grades submitted at this time to determine eligibility for participation in sports.

Grade reports will be available to students and families electronically approximately one week following the end of each semester.

The teacher's grade book is a valuable documentation of student work. Grades and progress should be reported in a timely manner and updated in PowerSchool as to provide feedback for students and parents. Grades are a reflection of academic progress in class. All teachers should follow Carmel High School's Guiding Practices concerning grading.

CCS  00442

CCS  00443

Carmel High School's grading scale is as follows:

| | |
|---|---|
| 100-93 A | 76-73 C |
| 92-90 A- | 72-70 C- |
| 89-87 B+ | 69-67 D+ |
| 86-83 B | 66-63 D |
| 82-80 B- | 62-60 D- |
| 79-77 C+ | 59-Below F |

When calculating a student's grade at the end of a marking period (quarters and semester), percentages ending with 0.5 or higher are to be rounded to the next higher percent. For example, 87.5% should be rounded to 88%.

## Grade Changes

It is sometimes necessary for a teacher to change a grade reported through Powerteacher. A Grade Change Form should be completed and submitted to the registrar. Teachers cannot change a grade by email or phone call. Anytime a grade is changed parents or guardians should be notified by the teacher with a phone call home.

## Homework and Make-up Work

Carmel Clay Schools believes strongly that successfully completing homework and class work are important components to achieving academic success. CHS students are expected to complete and turn in class work and to make up missed work; therefore, homework assignments should be clear in expectations, meaningful, and relevant to the curriculum. Since our grading policies and practices reflect the philosophy that new evidence of learning will replace old evidence of learning, an emphasis on opportunities for redos/retakes must be taken into account.

## Zeroes and Missing Work

Since grades reflect academic achievement rather than behavior, and work is to be relevant, meaningful and tied to academic standards; each teacher should have a plan to address zeroes and missing work. This plan should be approved by the department chair and communicated to students and parents in course policies and procedures. The following is a sample of what a plan might entail when a student chooses not to complete work:

1. Teacher conference with the student (parent contact if needed)
2. Teacher conference with the student and parent
3. Teacher conference with the student, parent and requires the student to attend an SRT help session for additional assistance

After teachers have made various attempts to work with the student in correcting the behaviors, an office referral may be written for noncompliance and/or defiance. The Assistant Principal will work with the student, parent, teacher and counselor to determine a plan of action. An academic contract and/or other interventions will be initiated on a case-by-case basis.

CCS  00444

CCS  00445

### Incompletes

A student will be given an "I" for incomplete if extended illness or some other reason beyond the student's control prevents him/her from completing work on time. An "I" counts as a failure in computing academic athletic eligibility and in computing a Grade Point Average. Students should not be given an "F" instead of an "I", if the student will be allowed to make up work. A student will be given one day for each day of absence to make up work. Teachers must clear any situation that warrants an incomplete with his/her department chair if a student will have an "I" at the end of a grade period. The maximum limit will be two weeks after the grade period ends. Once the two-week window concludes, teachers are to complete a grade change form. Any extension of this time limit must be approved by Joe Schaller or his designee.

Every teacher who gives an "I" has the responsibility to:

- Communicate with the student and parent **before** the end of the grading period to inform him/her of:
    - What is expected of him/her in order to meet the grading requirements
    - The date the "I" is to be completed.
- Report the grade promptly to the registrar for processing.

### Communication to Parents/Guardians

Communication to parents/guardians should be proactive, timely and continual.  When a student is performing below expectations, or anytime a student is at risk of failing a course, it is an expectation that teachers will be in communication with the student's parents or guardians to keep them informed of the student's progress and to help develop a plan to move the student toward success.

# Guest Speakers

Teachers who use guest speakers must always have the permission of the department chair. If the department chair is reluctant to approve a proposed guest speaker, the department chair should seek the counsel of the assigned assistant principal who would approve or deny the request.

# Homebound Instruction

Students with identified disabilities receiving special education and/or related services who are temporarily disabled as a result of special health problems, temporary illness, injuries, or physical limitations and students who are not eligible for special education but are temporarily disabled due to special health problems, temporary illness, injuries, or physical limitations that preclude their attendance at school for a minimum of twenty (20) instructional days shall be provided with instruction in the home, in the hospital, or at another site at the election of the school corporation.  Once a student has been authorized to receive homebound instruction, the student's counselor will make arrangements for assigning the necessary homebound programming.

CCS  00446

CCS  00447

# Lesson Plans

Lesson plans should always be prepared in advance of the lesson being taught. Evidence of a well-written plan should be obvious to anyone observing any teacher's class. Each course should have a written course of studies, which serves as the overall plan. The lesson plans should have a consistent format and one that shows continuity. The degree of planning, obvious in the presentation of a lesson, will be part of the teachers' evaluations.

## Substitute Lesson Plans

When a teacher needs to be out of the classroom, they are expected to have updated, easily identifiable, lesson plans. The teacher should accompany his/her plans with:

- A seating chart for each class
- A complete schedule of classes, including lunchtime, prep, etc.
- Information on how attendance is taken.

# Student Schedule Changes

Carmel High School students are encouraged to invest quality time in planning their schedules for the coming school year and the administration and counseling staff allow ample time for a student and parents to make a firm decision regarding the student's program plan for each school year. Each student is given the time from the initial scheduling meeting until May 1 to make revisions to the schedule.

After May 1, changes in a student's schedule will be made for either semester for the following reasons only:

- Errors made by the school in developing the schedule.
- The school's need to balance class sizes.
- Medical reasons with documentation.
- Change in program placement for students with learning problems, such as adjustments in or assignments to special services or resource classes.
- Request to take courses to qualify for the Academic Honors Diploma or Core 40.
- Failure of a course required for graduation.
- Failure of a prerequisite; i.e., anything that would prevent a student from going on to a requisite course as published in the Program of Studies.
- Failure of a course required for entrance into post-secondary education.
- Request to add a course required for college (with documentation from the college).
- Adding a seventh course to replace a study hall.
- A student has failed with a teacher previously in a course, and he/she gets the same teacher for exactly the same course.
- A student requests to attend the full year rather than be a mid-year graduate.
- Move-in students who may need a second or third study hall because we are unable to match courses. (This applies only after the tenth day of each semester.)
- Adding a class to continue the sequence of a year-long course.
- Adding a required course in lieu of an elective class.

CCS  00448

CCS  00449

If a student requests to drop or add a class from a teacher, the student will stay in class and the teacher should encourage the student to schedule a time to meet with their counselor using the link on the Counseling Canvas page.  The counselor will meet with the student to discuss the request in accordance with the guidance above.  Occasionally, there will be individual situations arise that will be reviewed by school personnel to determine whether or not a schedule change is needed or can be granted. These situations will be considered with feedback from the student, teacher, parents, counselor, etc. The respective department chair will base the decision whether to allow a change or withdrawal based on this information. Any appeal is made to an assistant principal.

## Course Withdrawals

A withdrawal after 15 school days in a semester course follows the procedure listed above and must be approved by the respective department chair. An approved withdrawal:

- Becomes a "W" if a student is passing the course at the time of withdrawal which will not be factored into the student's cumulative GPA.
- Becomes a "WF" if a student is failing the course at the time of withdrawal. A "WF" counts the same as a "F" when computing the grade point average.

# Student Teachers

Mentoring student teachers is an important part of being in the field of education. We have developed a positive reputation among colleges and universities and we look forward to continuing to help in growing future educators.  A teacher may accept any appropriately prepared person as long as such acceptance is beneficial to the student teacher, our students and our staff member. A staff member may not have more than one student teacher per year. Teachers in their first two years in our school may not accept student teachers. Assistant principal Joe Schaller will work with the designated department chairs and will give final approval for all student teacher assignments.  With the implementation of the Carmel RISE evaluation system, it is important to understand that cooperating teachers will still be held accountable to the Teacher Effectiveness Rubric when they have a student teacher. Therefore, the following procedures and expectations will take place:

1. A team teaching format is essential.  Cooperating teachers should not leave the classroom for extended periods of time throughout the student teacher's experience as the cooperating teachers will be held accountable for the student learning that takes place.
2. It is critical that the cooperating CCS teacher understands the impact their student teacher is having on student learning, and thus, the potential impact on the teacher's evaluation.
3. An orientation, including specific expectations of CCS and CHS, will be provided to student teachers by Joe Schaller, Department Chair, and/or the cooperating teacher.

Back to Top

CCS  00450

CCS  00451

# Supported Student Resource Time (SSRT)

SSRT occurs every other day during the G2 period and is an important part of the students' schedule. The following procedures are in place to allow students to maximize their time and opportunities during this block period.

Announcements via television and/or PA will occur the first ten minutes of SSRT. Teachers and students' undivided attention is expected during this time.

Creating Connections is the 20 minute time period after announcements and before SSRT resource time. This time is devoted to school initiatives. An example would be scheduling, Culture of Caring, or graduation information. Teachers are provided a Canvas Course titled SSRT to reference for ALL materials and information included in the Creating Connections time frame. The course calendar will also provide ALL information related to SSRT for teacher reference.

- Each SSRT homeroom teacher keeps a log of all students who present passes to leave the homeroom. No student is to leave homeroom without showing a pass that has been obtained from the teacher/monitor of his/her intended destination prior to arriving. (Exception: a counselor or an administrator may send a pass to the SSRT room to have a student sent to his/her office).
- SSRT homeroom teachers are not to give any student a pass to leave homeroom except in the event of extreme emergency. Restroom passes are to be given very sparingly, and only one student should be excused to use the restroom at a particular time. Each pass should be written and signed individually by the teacher. Bricks, paddles, etc. are not to be used.
- Teachers/monitors at resource destinations must check passes of arriving students and have them sign a log sheet he/she will have prepared as a result of giving passes the previous day. Names of students who do not report to a particular destination should be reported to the Student Services office.
- A student may stay in one location for more than one session as long as the pass is signed accordingly.
- Students may not leave early from a particular destination. Teachers are asked not to dismiss students from a session prior to the end of it.
- Classroom teachers are asked to encourage students who need help to see them during SSRT period.
- For future reference, passes and logs should be stored by SSRT homeroom teachers and the teacher/monitors of resource rooms until the end of the semester.
- Counselors and administrators will send students back to SSRT homeroom following appointments. Such may occur prior to or following the SSRT session break times.
- A teacher must sign each pass with his/her last name written legibly and in full (no initials or abbreviations) and indicate the appropriate time.

<u>Back to Top</u>

CCS 00452

CCS  00453

# Systems of Support

The CHS Systems of Support is designed to provide resources for helping all of our students. As teachers work with students and recognize lagging skills, they can use this pyramid as a place to find resources.

- The Tier 1 resources are for all students who may need support with instruction, executive functioning, social/emotional learning, etc. Each area in Tier 1 is hyperlinked to a google folder with staff-created resources for teachers to use with their students.
- The Tier 2 resources are for more at-risk students who need support beyond the classroom. Tier 2 resources are determined through a student services' support team (social workers, counselors, administrators).
- The Tier 3 resources are for our individual students in most need of intensive support provided through a 504, IEP, alternative programming, school-based therapy, or Carmel Youth Assistance. Students who receive these supports have typically exhausted Tier 1 and 2. Tier 3 resources are determined through a multi-disciplinary team (counselor, school psychologists, social worker, administrators).

Our students have a team of support (teachers, counselor, social worker, and parents) to help implement interventions. Whenever possible, please include all team members on student intervention communication.

# Operations

## Administrative Responsibilities

Specific information regarding areas of oversight by the CHS administrative team can be found here. Your department chairperson can provide valuable assistance with many questions pertaining to these areas. If appropriate, utilize their knowledge before reaching out to the assigned assistant principal.

## Announcements

Announcements will be made at the beginning of period 2 on Blue Day, periods 4, and at the end of the school day if any changes/cancellations occur. Video announcements are televised at the beginning of SSRT. Sponsors are to notify the main office administrative assistant prior to 9:30 am for morning announcements.

**Back to Top**

CCS  00454

CCS  00455

# Community Recognizing Educators' Worth (C.R.E.W)

The CREW account at Carmel High School allows us to recognize and acknowledge significant moments in the lives of the Carmel High School family. Staff members are strongly encouraged to make a $20.00 donation at the beginning of each school year.

# Criminal History Background Check

Any person who may be the sole supervisor of students affiliated with any Carmel High School event or activity, on or off school grounds must get a Criminal History Background Check. It is the person responsible for the activity to confirm the Background Check with the Principal's administrative assistant before participation.

# Dress/Attire

Clothing worn by teachers affects the work, attitude, and discipline of students. We dress for four main effects: respect, credibility, acceptance, and authority. Staff members are asked to dress in a manner that reflects these professional goals. Staff dress should be "business casual"; No jeans, No T-shirts, No shorts.

Teachers need to seek approval from their department chair should a planned activity necessitate a teacher to "dress down".

On "Spirit Fridays" staff may wear jeans and other attire that promotes school spirit.

# Email Etiquette

When communicating with families, it is important to remember that email is tone deaf and intent can easily be misconstrued. Trust your gut when communicating information to parents/guardians. A phone call can help express sentiments that might be misinterpreted in writing. CCS email accounts are intended for professional use. Please do not send all-staff emails for personal reasons and don't post personal items for sale. Remember every email is subject to a records request so approach your use with no expectation of privacy.

# Emergency Contact Information

Staff should provide/update emergency contact information such as alternative phone numbers and email addresses for notification in emergency situations.

**Back to Top**

CCS 00456

CCS 00457

# Evaluations

Staff members will be observed and evaluated using the Carmel RISE Rubric and based on the contractual language established between the CTA and CCS. A pilot group of teachers will be utilizing the Teacher Talent Development System (TTDS) for their evaluation process this year. Carmel Clay Schools is exploring expanding this program in the coming years.

# Faculty, Department, and PLC Team Meetings

Faculty meetings and department meetings provide an important avenue for professional development at Carmel High School. Faculty meetings with the whole staff will be held as needed during the school year. Department meetings may also be scheduled as necessary. If no whole group meeting is needed, that time will be given to teachers to meet in their PLC teams. PLC teams will be expected to meet weekly. PLC teams will work with department chairs to determine the times they will meet each week. This common collaboration time provides teachers an opportunity to explore best practices and their impact on learning.

# Mailboxes

All teachers should check their mailboxes upon arriving at school each morning and before leaving at night.

USPS picks up outgoing mail every day in the mailroom. Letters may be left there for pick up. Please do not put letters in the "Outgoing U.S. Mail" basket without stamps. Letters to be metered (stamped) are to be brought to the mailroom, labeled by the group responsible for the mailing and put in the basket labeled 'Letters to be Metered'.

The mailroom may contain personal and confidential information. Unsupervised students are not allowed in the mailroom.

# Maintenance/Technology Support

School Dude is Carmel Clay Schools Maintenance Request system. It is an internet based service to submit work requests for Maintenance.

Kayako should be used to submit technology requests. This service helps us to promptly attend to your issues and concerns.

Kayako Knowledgebase is a centralized location for technology tips, tutorials and updates.

Each of these resources can be found within the CCS Staff Portal.

**Back to Top**

CCS 00458

CCS  00459

# Master Activities Calendar

A master calendar of our activities will be kept in the Activities office under the supervision of Toby Steele, assistant principal. Do not schedule any school activities without first clearing the date, time and place with Karen Hayes in the Activities Office.  This office is to be notified of any major changes in the calendar.

# Network & Internet Acceptable User Guidelines

Carmel Clay Schools provide network and Internet {hereafter referred to as Network} access to

- support the achievement of Indiana academic standards
- enhance the development of 21st Century skills
- provide access to information
- encourage innovation and creativity

Network access is a privilege, not a right, and as such, users take seriously the responsibilities associated with signing this user agreement.

Users should NOT use the Network to

- access, create, send or receive, store, or display obscene materials
- create or send threatening or libelous communications or communications which include vulgar, abusive, or otherwise inappropriate language
- access or use other individuals' accounts, information, or files without permission
- access websites, files, or other information or resources using passwords not specifically assigned to themselves
- pursue commercial or for-profit endeavors
- wantonly waste district resources
- damage, disable, or otherwise disrupt the operation of the Network
- violate any local, state, or federal statutes, including but not limited to copyright law

Users who find themselves inadvertently accessing inappropriate materials or resources are directed to immediately and discretely terminate that access and report the incident to your department chair.

Users are directed to exercise caution while online regarding the disclosure of personal information such as name, age, gender, home address, telephone number, and are encouraged not to respond to unsolicited online contacts and to report any online contacts which are frightening, threatening, or otherwise inappropriate to the department chair,

It is the joint responsibility of students, parents, and employees of the school district to assure the appropriate and effective use of technology to both enhance the quality of student learning and the efficiency of district operations.  The smooth and reliable operation of the Network is dependent upon the proper conduct of the end users who must adhere to stated guidelines.

Back to Top

CCS  00460

CCS  00461

# Parking

All staff members are to park in the designated areas around the building and should display their CHS staff parking tag on the rearview mirror of their car. Parking tags can be attained in the Activities Office.

# School Closing/Weather

When school is delayed or canceled, Carmel Clay School officials will use a multi-faceted system to notify staff. It is important for staff to have their correct primary phone number on file with the district.

School Messenger, a system which allows information to be shared in a variety of ways, will serve as the primary notification method. Once the Superintendent has made the decision to delay or cancel school, all staff in the district will be notified.

# School Day

The building will be open to admit students at 8:15 a.m. each day. Busses will unload for school as they arrive and students are allowed in the building. Classes begin at 9:05am and will conclude at 4:05pm with all busses scheduled to leave campus around 4:17pm.

# Security and Keys

All staff members must recognize the need to maintain building and facilities security. During the school day teachers' classrooms should always be locked for safety purposes. Doors may be open or closed during instructional time and closed and secure when the room is vacant.

Each afternoon before leaving the building, ensure windows are latched and classroom doors are locked.

Building entrances are locked at 4:30 p.m. If entering the building after that time, please ensure the door locks upon entering and exiting.

All teachers are issued keys/fobs for accessing the building and his/her classroom. Keys/Fobs are issued for teacher use only and should not be given to a student or unauthorized person. No keys may be duplicated for any reason. In the event keys are lost or stolen, please inform your department chair/supervisor by the end of the school day.

Back to Top

CCS 00462

CCS 00463

# Smoke and Tobacco Free

In support of the provisions of the Indiana Clean Indoor Air Law effective September 1987, the school is committed to reduce involuntary exposure to tobacco smoke among students and staff. The use of tobacco products in a school building denies students, staff and visitors access to clean air, introduces a substantial health hazard to those persons, and interferes with learning and teaching. The use of all tobacco products by staff in school buildings, on school property and in school owned vehicles is prohibited. Use of tobacco shall mean all uses of tobacco/nicotine, including a cigar, cigarette, pipe, snuff, or any other matter or substance that contains tobacco, as well as electronic, "vapor," or other substitute forms of cigarettes.

# Staff Identification

All staff will be issued a photo ID that should be worn during the school day. Following school safety protocols, staff members may be asked to present his/her ID for verification purposes.

# Staff Training

All staff members participate in educational or safety training throughout the year.  In an effort to maximize training opportunities, CCS utilizes web-based and in-person instruction.

# Supervision

Hallway supervision is essential to creating a safe and caring environment for our students. Before school, during passing periods and after school, teachers are expected to be outside of their classrooms greeting students as they enter and exit.  During the passing period teachers are on prep, they are encouraged to walk the hallways and walk through the bathroom of their gender.  Department chairs will be walking the hallways of their respective departments. Administrators will be stationed throughout the building at high-traffic areas for our students.  If a staff member sees something of concern, they are encouraged to address the student and seek an administrator for support if needed.

# Supply Requisition

All department chairpersons and some staff have had training using the supply requisition software. CHS personnel desiring to make supply requests should first seek approval from his/her respective department chairperson.  The department chairperson can then enter the request electronically. All supply requests are forwarded to Toby Steele for approval. A purchase order form is generated and assigned for the supplies requested. Upon receiving supplies, please email Karen Hayes in the Activities Office verifying the order has been received and is in good condition.  The custodians will distribute packages delivered to the loading dock.

**Back to Top**

CCS  00464

CCS  00465

# Teacher Absence

Anytime a staff member is absent from school for illness or personal reasons, they should access Absence Management in the Staff Portal to report the absence, whether a substitute is needed or not. An absence form should be turned in as soon as possible before or after returning to school.

Teachers requesting a professional day should follow the procedures outlined below.

1. Teacher goes to Department Chair with PD leave request. Request must include date(s), event, location of event, and whether the sub is reimbursed.

2. If DC approves of the leave day request, DC will complete the Google form. Only the DC should complete the form.

3. Valerie Piehl will receive the form request and will check the date(s) on the district calendar. If the date is available and the leave is approved, Valerie will notify the DC.

4. DC will then let the teacher know to enter the absence into Aesop. Teachers should not enter any professional leave day absences into Aesop until they receive confirmation from the DC. Plans, including but not limited to registration fees and travel accommodations, should not be made until a request has been approved.

5. If DC does not immediately approve or has additional questions on the leave request, DC will contact Valerie Piehl.

6. Teachers do not need to print or provide any additional documentation of the absence in Aesop once it is recorded.

# Textbooks

All textbooks are available to students on a rental basis. Teachers will distribute textbooks to students. Textbook Rental fees will be issued on October 1 and are due by November 1.

Students who drop a class or withdraw from CHS must return textbooks to the bookstore.

Whether textbooks are added through adoption or replacement, effort should be made to keep them in the best possible condition. Please advise students that if their textbooks are lost or damaged, they will be required to pay for replacement of the text or a fine for damages. If a book needs repairing the student may take them to the bookstore. Check textbooks at midterm and end of the semester for any exterior damages or obvious highlighting, ink, pencil, obscene language/picture, or water damage. Anytime damage is noticed, please send the student to the bookstore for fine assessment. Send a pass with the student so that you may verify that he/she did report to the bookstore. Any student who withdraws from school has a responsibility to return any rental textbooks and/or pay any outstanding fees.

**Back to Top**

CCS 00466

CCS  00467

# Tutoring

No teacher may tutor a student on a private-fee basis if the student regularly attends as a member of his/her class. The exception is that a teacher may tutor a student of his/her class providing the student is officially approved for home instruction services. Tutoring shall not be conducted for any student during normal school hours unless such tutoring has been specifically recommended by the building principal and approved by the Superintendent. Private tutoring shall not be conducted on school property. All private tutoring arrangements shall be the responsibility of the parents and the tutor.

# Voice Mail

Each teacher has a voice mail account for receiving telephone messages. Directions for setting up an account are located in the Staff Portal/Kayako Knowledgebase.

# Visitors

In an effort to provide a safe and secure learning environment, CHS limits visitors during the school day. Parent/Guardian conferences with staff members should be made by appointment. Visits by former students should be discouraged as persons other than parents or guardians will not be allowed. All Carmel Clay Schools utilize SchoolGate Guardian to provide the best possible security for our students and staff. All visitors are required to scan their driver's license or state identification card to enter the school. This increased level of security will allow the school to better track visitors and help increase the safety and security of our students and staff. As visitors enter the school, they will be required to scan their identification card and be issued a badge to wear. When they leave the school, they will scan and return that badge.

# Student Services and Activities

# Aggressive Student

If a staff member is involved in an incident involving an aggressive student, the staff member is required to complete an Aggressive Student Report Form.

**Back to Top**

CCS 00468

CCS  00469

# Athletic Eligibility and Alternative Credits

## CLC Policy for IHSAA or CHS eligibility

Students who attend the Carmel Learning Center (CLC) will not be eligible for IHSAA or other Carmel High School extra-curricular activities. This will be clearly explained and in print on the CLC application. In the event of a circumstance existing that a compelling argument is made for a CLC student to participate in an IHSAA or CHS activity, it will ultimately be the Principal's decision to grant eligibility with the understanding that minimum credit requirements are met.

## Credit Recovery (day and after school)

In the event that an athlete would need to utilize a credit recovery option to maintain eligibility the following guidelines will be in effect:

- Only one course per class period will be counted.
- Students must be passing and have supplemental materials completed at a satisfactory level.

# Cell Phones

Students may use cell phones before/after school, during passing periods and at lunch. Cell phone use during instructional time is to be determined by the teacher.

# Child Abuse/Neglect

If a staff member has reason to believe that a student is the victim of child abuse or neglect, that staff member shall immediately make an oral report to local law enforcement or Department of Child Services (DCS) at 1-800-800-5556. After the report is made, the staff member shall immediately notify the building administrator if the building administrator was not with the staff member when the report to law enforcement/DCS was made. If appropriate, the building administrator may also immediately make an oral report to the Superintendent and/or designee.

An employee who fails to or restricts a report of suspected abuse or neglect as stated in this policy may be subject to disciplinary action up to and including termination. In addition, failure to report may subject the employee to criminal prosecution.

The Carmel Clay School Corporation Child Abuse/Neglect policy can be found here.

# Corporal Punishment

Corporal punishment is not to be used by any staff member.

**Back to Top**

CCS 00470

CCS  00471

# Discipline

The first line of responsibility for the discipline in the school rests with the classroom teacher who is expected to motivate the student and plan classes so as to minimize behavior problems. Many issues with behavior can be resolved with a phone call home. A tiered list of interventions for teachers to use can be found in the CHS Systems of Support pyramid located in the CHS Teacher Portal.

The teacher has a right to student compliance and may take any of several corrective measures (including contacting a parent, imposing detention, revoking privileges, and referring/sending students to administrators or school counselors). If a student is referred or sent from the classroom, the teacher should contact a parent. A teacher may send a student to the office for the remainder of the class period, although the decision to suspend a student from a class must be made by an administrator. A phone call home becomes necessary whenever you send a student to the (referral or not).The teacher has a right to be consulted in any referral case and to receive a report of any action taken.

# Fundraising

## Process:

1. Complete the Fundraiser Request Form two weeks before the start of the activity. Request forms are also located on the shared drive (P:) under Forms, titled Carmel High School Fundraising.
2. Fundraiser requests will be sent to Brittany Wiseman, Student Services 10-12 office, for approval.
3. Sponsors and Treasurer will receive the approved copy. If it requires a facility, sponsors are responsible for providing a copy to Karen Hayes, Activities Office, when reserving space.

## Remember:

- All fundraisers must be officially approved before any activities may take place.
- If your group is not a recognized club or activity, you may not hold a fundraiser.
- Fundraising activities shall not be conducted for the purpose of solely benefiting an individual.
- Most fundraising activities are limited to: students selling a product (e.g., candy), their own effort (e.g., walk-a-thon) and service (e.g., car wash), or monetary contributions(e.g., donations).
- Gambling activities (e.g., raffle) will not be approved.
- Organized selling of food during the school day (This means 8:25am -4:05pm) must meet *IC 20-26-9-19* status as a "better choice" food. (See back of fundraising application)
- Fundraising should not take place during class or SRT.
- An advisor must be present at all after school hours (after 4:00 PM during weekdays and all day on weekends) for club approved functions.
- All funds that are brought in must be deposited into your activity account at school or given directly to the charitable organization. You can never directly spend cash that you

CCS 00472

CCS  00473

<u>make on purchases or donations.</u>  The Treasurer cannot accept the money with an approved form on file.

- **REIMBURSEMENTS**: Once the fundraiser funds have been deposited, complete a "Claim for Payment" form with all receipts, bills, or Purchase Orders attached. The Treasurer's Office will then process your request for payment.
- Don't carry around cash from your fundraiser. The money should be deposited as soon as possible (preferably immediately after an event).

# Lunch Procedures

Adherence to the schedule must be maintained for the sake of order and the smooth operation of the cafeteria. Since approximately three-fourths of Period 3 classes are in session during each lunch period, students should go to and from the cafeteria quickly and quietly. Students at lunch are to remain in the cafeteria/commons. Students may go to the media center provided they have a pass. Students may go to their locker only at the beginning of their lunch period or after the bell tone sounds signaling the end of the period.

# Passes and Tardy Procedure

During the school day, you may choose to send or allow a student to leave class. If a student leaves your class, they need to have a hall pass that is dated, timed, and signed by you. Each teacher will be provided with a supply of hall passes. Students should not be admitted to your class during the class period without a signed, dated, timed pass. Students late/tardy to class need to pick up a pass for admittance to class from the Attendance Office. Teachers should not keep students after class without giving them a pass or prior approval from the receiving teacher.

# Student Attendance

It is important that each classroom teacher record attendance and submit using Powerteacher at the beginning of each period. If a discrepancy occurs, the teacher's hardcopy will be the official record. When students enter class tardy or with an authorized pass the teacher needs to update the attendance record. Student expectations can be found in Pathways. If a class meets in an alternate location from the classroom, a note is required to be placed on the door of the classroom.

# Student Anti-Hazing *I.C. 35-42-2-2*

The School Board believes that hazing activities of any type are inconsistent with the educational process and prohibits all such activities at any time in school facilities, on school property, and at any Corporation-sponsored event.

Hazing shall be defined for purposes of this policy as performing any act or coercing another, including the victim, to perform any act of initiation into any class, group, or organization that

CCS 00474

CCS  00475

causes or creates a risk of causing mental, emotional, or physical harm. Permission, consent, or assumption of risk by an individual subjected to hazing shall not lessen the prohibitions contained in this policy.

## The Role of School Personnel in Hazing Awareness and Prevention

- **Your attitude** and willingness to address hazing will be a major factor in its prevention on your team or club.
- **Understand the reasons** why hazing happens to ensure it doesn't develop.
- Know the differences between **what hazing really does versus what your students believe it does.**
- Send an appropriate **anti-hazing** message that spells out the **consequences for non-compliance.**
- Be sure that everything you do contributes to an environment of **civility, respect and dignity** for everyone.

## What Should School Personnel be Responsible for?

- Take **an emphatic position about treating everyone with total respect** at all times from the moment they set foot on your campus, even during recruiting. This message needs to be heard by all group members, frequently.
- Conduct open discussions to help you understand your group's views and activities. This would include ongoing discussions with senior members of the group.
- Avoid addressing new members using power terms such as "rookie." This says to the new player, "You're not the same as everyone else!" Avoid any other words or actions that create division between your veterans and new students.
- **Address the issue of hazing annually and consistently,** and put your group/team rules in writing. It is a "must" conversation for you and your group/team, regardless of how uncomfortable it may be. Spell out the consequences for non-compliance and what your expectations are for your group/team members toward each other on and off the field of play.
- Involve your group or team in discussions about this issue and dispel the myths they believe about hazing. Students believe that there is a clear and distinctive difference between someone being **"forced or seriously pressured"** to participate, versus someone who volunteers. They believe if there is no force, it is not hazing. They need to know that **passive participation** can make one a contributor. And that **"consent" does not rule out hazing.**
- Explain that *hazing* occurs when there is an expectation, whether implicit or explicit, that to be accepted or part of the group, students must participate in the activity. An expectation can subtly coerce athletes to do things they would not normally do.
- **Reinforce the message that what counts most is your students' work and dedication.** The desire to be on your group/team renders the new student powerless when confronted by an older classmate. New students will take the **path of least resistance**. They need to hear you talk about demonstrating a **positive attitude**, having the **initiative** to do what is needed, and displaying a **strong work ethic**. The teacher/coach is the determining factor on who makes the group/team and their role.

Teacher Exhibit 34 - p. 057

CCS 00476

CCS  00477

**They need to be told to walk away from any hazing and know that you will support their actions.**

- Help your group/team develop **positive traditions** that are **significant** and **meaningful** and that contribute to their bonding and coming together as a group. This important strategy will help reduce the temptation to use hazing as a means of group/team bonding.

- Support **leadership training** for your captains or leaders and define your expectations for their role within the group. Be sure that you have the right person to step up to that responsibility, even if it means you make the captain an appointed position. Other than yourself, the student leadership will be the most significant person in the prevention of hazing within your group.

- Accept this responsibility as part of your job. **Hazing** incidents that end in tragedy or a lawsuit can ruin the careers of students and school personnel.

# Student Dress

Our school philosophy emphasizes that education is to help the individual develop their potential in an atmosphere of self-disciplined behavior. The basic dress code is intended to encourage students to "dress for success" and to come to school properly prepared to participate in the educational process. We will not interfere with the right of students and their parents to make decisions regarding their appearance, except when their choices:

- Present a hazard to the health or safety of the student or to others in the school;
- Interfere with school work, create disorder or disrupt the educational program;
- Cause excessive wear or damage to school property;
- Prevent the student from achieving his/her own educational objectives because of blocked vision or restricted movement.

Details of the student dress code can be found in the student handbook. If a teacher feels a student is in violation of adhering the dress code and uncomfortable discreetly working with the student to resolve the violation, email Rita Winters or Gina Blanchford (10-12th grade students) or Robyn Schroeder (9th grade students) including the name of the student and the violation. A pass will be sent directing the student to either 10-12 Student Services or the Freshman Center Office.

# Suspected Influence of Alcohol or Drugs

If a teacher or other staff member observes a student who appears to be under the influence of alcohol or drugs and/or is not functioning properly, the teacher should:

- Immediately contact the Student Services Office by phone or in person (face to face or voice to voice). Student Services will initiate contact with the Health Center.
- Stay with the student until an administrator and school nurse arrives.
- Write up an incident report outlining what was said and observed.

**Back to Top**

CCS  00478

Teacher Exhibit 34 - p. 060

CCS  00479

# Suspected Student Self-Harm/Suicide

If a staff member has reason to believe that a student is engaging in or may engage in self-harm, that staff member shall immediately make a voice to voice or face to face report to administration:

- During the school day, call 10-12 Student Services (ext. 7511 or 7423), 10-12 Counseling (ext. 7530 or 7430), 9th Grade Main Office (ext. 7625 or 7309), or 9th Grade Counseling (ext. 7657).
- After school hours, please call Mo Borto (317-442-8896), Amy Skeens-Benton (317-919-9241), or Karen McDaniel (317-473-1473).

# Texting and Use of Social Media with Students

Staff members shall only engage in electronic communication with students via email, texting, social media and/or online networking media when such communication is directly related to curricular matters or co-curricular/extracurricular events or activities. Staff members are prohibited from electronically transmitting any personally identifiable image of a student(s) or themselves, including video, photographs, streaming video, etc. via email, text message, or through the use of social media and/or online networking media, unless such transmission has been made as part of a curricular matter or co-curricular/extracurricular event or activity such as a school-sponsored publication or production. (School Board Policy 0213)

# Transporting Students in Personal Vehicles

Staff members shall not transport students in a private vehicle without the approval of the Superintendent. *(School Board Policy 0213)*

**Back to Top**

CCS 00480

CCS 00481

# Carmel High School

## 2021-2022



# PLC Handbook

CCS 00482

# Table of Contents

Introduction to the Professional Learning Community
What Are Professional Learning Communities? ..................... 3
3 Big Ideas of a PLC ..................... 3
4 Critical Questions ..................... 4
6 Essential Characteristics of a Highly Effective PLC ..................... 4
What Does This Mean for CHS? ..................... 5
Our Plan: Mission, Vision, Values ..................... 6
Tight v. Loose ..................... 7

Individual Vs. Team: Developing the Collaborative Culture
The Difference Between Team and Group ..................... 8
Setting the Foundation for Effective Teamwork ..................... 8
Creating Team Norms/Collective Commitments ..................... 8
The Role of Conflict ..................... 8
Establishing Team Goals ..................... 9

Teach Vs. Learn: Doing The Right Work
4 Critical Questions ..................... 9
Determining the Most Essential Learning Objectives ..................... 10
Team-Developed Common Formative Assessments ..................... 10
Formative vs. Summative Assessment ..................... 10
How Will We Respond When They Don't Learn? ..................... 10
Responsive Interventions/Existing Resources ..................... 11
Rewarding/Celebrating Student Success ..................... 11

Activity Vs. Results
Focus on Results, Not Activities ..................... 12
A Note About Sharing Data ..................... 12
Analyzing Data ..................... 12
Sustaining Success ..................... 13

References ..................... 14

Appendix: Resources, Reproducibles, Templates, and Examples ..................... 16

CCS 00483

# Introduction to the Professional Learning Community

## What Are Professional Learning Communities?

According to Richard DuFour, Rebecca DuFour, Robert Eaker, Thomas W. Many, and Mike Mattos (2016), a Professional Learning Community is "an ongoing process in which educators work collaboratively in recurring cycles of collective inquiry and action research to achieve better results for the students they serve" (p. 10). On a basic level, a Professional Learning Community works together to collect and analyze evidence to ensure that ALL students are achieving their potential and beyond. Engaging in a true Professional Learning Community requires that we act together, that we are interdependent and proactive in order to prevent students from falling through the cracks. The foundation of any successful PLC is composed of collaborative teams.

## 3 Big Ideas of a PLC



(DuFour et al., 2016)

CCS 00484

3

## The 4 Critical Questions

| |
|---|
| 1. What do we want our students to know and be able to do? (outcome) |
| 2. How will we know if each student has learned it? (assessment & data) |
| 3. How will we respond when some students do not learn it? (interventions) |
| 4. How will we extend the learning for students who have demonstrated proficiency? (extensions) |

(Adapted from *Learning by Doing*, by DuFour et al., 2016, p. 59. Copyright 2016 by Solution Tree Press)

## 6 Essential Characteristics of a Highly Effective PLC

1. **Shared mission, vision, values, and goals:** Educators in a Professional Learning Community (PLC) benefit from clarity regarding the work they are doing.

2. **Collaborative teams focused on learning:** In a PLC, according to DuFour et al. (2016), "collaboration is a systematic process in which we work together, interdependently, to analyze and impact professional practice in order to improve our individual and collective results" (p. 10). Teachers and students learn in a PLC.

3. **Collective inquiry:** In a PLC, teams question and reflect on current practices and seek out new methods of teaching and learning. They work together to build a shared knowledge of the current reality as well as best practices, and this guides the decision-making process.

4. **Action orientation and experimentation:** Members of a PLC constantly turn their learning and insights into action. They learn by doing.

5. **Commitment to continuous improvement:** Team members constantly seek better ways to achieve mutual goals and accomplish the fundamental purpose of learning.

6. **Results orientation:** Educators in a PLC assess their efforts on the basis of tangible results. They use results (evidence) to inform and improve their practice.

(Adapted from *Learning by Doing*, by DuFour et al., 2016. Copyright 2016 by Solution Tree Press)

CCS  00485

## What Does This Mean for CHS?

# PLC is PD. This means that our professional development will be driven by our

professional learning community. We will improve our current practices by working together, interdependently. As you can see in the visual, the PLC is at the center of all of the work we are doing.



## The Big Picture

| PHASE 1 | PHASE 2 | PHASE 3 | PHASE 4 |
|---------|---------|---------|---------|
| **Individual vs. Team** | **Teach vs. Learn** | **Activity vs. Results** | **Full PLC Immersion** |
| The Culture Shift | The Conversation Shift | The Improvement Shift | |

CCS 00486

5



## Our Mission, Vision, and Values

We strive to create a positive environment in which all are challenged and inspired to achieve their potentials.

### What does this Mission mean for Carmel High School?

Every Student, Every Day, Every Class

### Carmel High School's <u>Vision</u>

- Provide opportunities for all students to realize their potential in an ever-changing world.

### Carmel High School's <u>Values</u>

We collectively commit* to:
- Ensure all students learn at high levels.
- Utilize results to inform decisions.
- Work as teams because we are better together.
  (*Determined by Carmel High School's PLC Guiding Coalition 2019)

### Carmel High School's <u>Guiding Practices for Grading</u>

CCS 00487

6

## Tight vs. Loose

As a Professional Learning Community, we must establish clear parameters and priorities that enable individuals to work within established boundaries in a creative and autonomous way. A PLC is characterized by the "freedom to act and lead within clearly articulated boundaries" (Marzano & Waters, 2009). This means we must define what aspects of the Professional Learning Community we will be strict (tight) and relaxed (loose) about.

### What is TIGHT?

- Team participation and collaboration, including weekly meetings
- Team goal(s)
- Ongoing formative assessment and interventions
- Team-based grading practices anchored in the following tenets:
    - Practice and feedback are valued over the number of gradebook entries.
    - Grades represent academic performance on *essential* learning objectives.
    - Semester grades reflect student growth and new learning.

### What is LOOSE?

- Team meeting location/day on non-late start weeks
- Team professional learning plan/product design
- Assessment design
- Instructional design
- How data is compiled and analyzed
- How teams respond to student data in order to achieve student growth

(Adapted from *Learning by Doing*, by DuFour et al., 2016. Copyright 2016 by Solution Tree Press)

**Back to Top**

CCS 00488

7

# Individual Vs. Team: Developing the Collaborative Culture

## The Difference Between Team and Group

The main difference between a team and a group is that a team works interdependently, while a group coordinates. Group members are civil and respectful of each other, but do not need anyone else to do their job. Team members, though, need each other, as the work they do is not possible without their team members.

## Setting the Foundation for Effective Teamwork

Every team in our PLC should be focused on the right work. Right work means that team meetings and conversations center around learning (students and teachers). Team-generated learning plans are to be worked out with department chairs.

## Creating Collective Commitments/Norms

Team norms are the expected behaviors that team members create together and work to uphold in order to ensure the collective success of our students. Creating these is only the first step. After establishing norms, teams should develop protocols for revisiting and reflecting on the team's norms.  Referring back to norms can help "the members of a (team) to 're-member,' to once again take out membership in what the (team) values and stands for; to 'remember,' to bring the (team) back to a cooperating whole" (Kegan & Lahey, 2001, p. 194).  Ultimately, you have to find out what works for your team.

## The Role of Conflict

High-functioning collaborative teams drive the work of a Professional Learning Community. These teams maintain an equal balance of both respect and affability. These teams understand that their success is measured by their impact on student learning, not on how happy they are as individuals or when working together. As a result, high-functioning collaborative teams understand that disagreement and conflict are a necessary part of the process. High-functioning collaborative teams engage in "lively, sometimes heated debate without eroding trust or compromising their ability to get their work done. Why?...True collaborative teams embrace student learning as their primary purpose, and sometimes teams must go through difficult conversations in order to make this a reality" (Bayewitz, 2015).

## Establishing a Team Goal

Goals are inextricably connected to the concept of *team*.  Absent a goal, the collaborative team becomes a group of teachers. Teams should work with their department chair to develop meaningful and measurable goals. An option for teams are SMART goals.  SMART goals are specific in that they clarify precisely what students should learn, the level of the learning (proficiency level), the assessments that will be used to make the proficiency determination, and a time frame. The amount of team goals within a given year depends on the scope of the goal(s) and readiness of the team.

**Back to Top**

CCS  00489

# Teach Vs. Learn: Doing the Right Work



## Determining the <u>Essential Learning Objectives</u>

You might ask, why would we determine essential outcomes? Doesn't the state already do that for us? Actually, no. Standards are not essential outcomes. Standards can be ambiguous, too complex, or irrelevant. Additionally, there are way too many standards to attempt to learn in a given year. As Marzano (2003) puts it, "To cover all this content, you would have to change schooling from K-12 to K-22." The *achieved* curriculum is the ultimate goal.

While curriculum is looked at through program evaluation, the essential outcomes should be part of team discussion each year, each unit, as these are the things **you are guaranteeing all students will know and be able to do at the end of your course; these are the** <u>non-negotiables</u>.

CCS 00490

9

## Team-Developed <u>Common Formative Assessment</u>

Why? Team-developed common formative assessments generate evidence of student learning that diagnostically indicates the essential outcomes achieved, and those not achieved, for each student. This information enables teams **to definitively know if and what each student has learned**, and provide the necessary interventions or extensions. These assessment results also enable teams to depersonalize data, analyze instructional strategies, and learn from one another to strengthen professional practice.

## Formative v. Summative Assessment

A <u>formative assessment</u> is any assessment that informs students and teachers about learning and instructional effectiveness. The type, length, place within a unit, or grade weight does not determine if something is formative or summative. If the results are used to benchmark and improve upon the learning process, then the assessment is formative. Additionally, formative assessment should be viewed as practice and does NOT have to be entered in the gradebook. Ultimately, grades should reflect summative learning - not the process of learning.

## How Will We Respond When They Don't Learn?

Tier 1 interventions are critical to helping each student achieve in the classroom. Our CHS Systems of Support pyramid provides access to a variety of resources to support students. Through the lens of responsive interventions, teams consistently ask themselves--

- Where do our students struggle the most?
- What are some of our effective instructional strategies?
- What resources are available for intervening?
- What needs to be done by each of us to implement the strategy?
- What classroom checks will we use and when?
- Are students assured extra time and support for learning?

(Adapted from *Learning by Doing*, by DuFour et al., 2016, Copyright 2016 by Solution Tree Press)

One thing teachers can do to provide better interventions is to improve the quality of the feedback they provide to their students. As Dr. John Hattie's (2009) research found, "the most powerful single innovation that enhances achievement is feedback." Feedback should provide concrete steps for students to improve. According to Hattie (2018), "the key question [for every teacher and team] is, does feedback help someone understand what they don't know, what they do know, and where they go?" (as cited in Sparks, 2018)

CCS 00491

10

## Existing Resources

We are fortunate to have many existing resources in place to help us offer students the necessary interventions and extensions. First, you have your teammates. Collectively, working to identify ways to extend and remediate learning and to provide intervention as a team allows you to develop these activities in more depth and in a more timely fashion. Your team can access our CHS Systems of Support for a comprehensive pyramid of resources and intervention ideas. Second, you have the instructional coaches. Consider using the instructional coaches as resources for your entire team to help all students, rather than just using the coach to help students in your room. As a team, you can then work with the instructional coach to acquire new tools and develop skills to strengthen instructional practice. Third, you have the various committees, cadres, and guiding coalition. If you or your team are unsure of which resource to consult, reach out to your department chair.

## Rewarding/Celebrating Student Success

Our students want to do well; however, some of them, especially those who struggle the most to master a skill or those who struggle with perfectionism, wonder if it is even possible or good enough. We must make sure that students know how much we believe in them and how capable we think they are because, according to Hattie (2009), "teachers would have more success if they addressed students' low self-efficacy before trying to raise their achievement." Additionally, when our students do experience growth or master a skill, we must celebrate and/or reward that progress. This also helps to improve their self-efficacy, as it offers evidence that they can in fact accomplish their goals and be proud of their work.

**Back to Top**

CCS 00492

# Activity Vs. Results

## Focus on Results, Not Activities

Rather than focusing on what we, as teachers, will do, we should focus on what students will learn. By focusing on the goal or results, we can prove "how we know if our strategies are resulting in gains in student learning" (Dufour et al., p. 93). When teams understand and commit to the results rather than implementing a set of activities, they can make significant changes in student learning.

## A Note About Sharing Data

Because we are focused on the results (data), not on the activities, it requires that we are willing to be vulnerable with our teammates. We each have classes composed of a series of unique individuals with different needs and skills. This means that what our students know and can do varies, classroom by classroom and year by year. Data are not indications of who is an effective teacher and who is not. Sharing your results with your team allows you to reach more students, including the ones not sitting in your classroom and to improve student learning collectively, which is our goal.

## Analyzing Data

Student learning data is the focus of highly functioning teams as part of an ongoing assessment cycle. Learning results enable teachers to understand student learning and respond accordingly. Additionally, data enables teachers to learn instructional skills and tools from one another. This entire process relies upon a manageable way to collect, display, and analyze data. According to Sarah Schuhl (2016), teams can be more effective and efficient when analyzing and responding to data when they do the following:

1. **Start with a common assessment**: Collaboratively plan the common assessment. Organize the assessment by essential learning standards, determine the rigor, agree on how to score it, and then define proficiency for these essential learning standards.
2. **Look at the data from a big picture perspective.** Determine the percentage of students who demonstrate proficiency by putting all of the student data on one document. Then discuss—what is expected? What is unexpected? Any anomalies?
3. **Identify students by standard proficiency.** Determine which students demonstrated proficiency in one area and then highlight them in a specific color. Determine which students did not demonstrate proficiency in one area and then highlight them in another color. Determine which students went beyond proficiency in this one area and then highlight them in a third color.
4. **Look for trends and patterns in student work from highest to lowest.** What caused students to be proficient? What did they do differently? What about the ones close to proficient? What about the lowest? Is there something to target to get students to proficiency? How can student learning be improved?
5. **Develop intervention/extension plans.** Work together to determine how to best improve student learning.

CCS 00493

(Adapted from "Doing it or Doing It Well: Using Data for Learning", by Schuhl, 2016. Copyright 2019 by Solution Tree Press)

## Sustaining Success

As DuFour et al. (2016) says, "we cannot settle for giving students the chance to learn; we must ensure high levels of learning for each student" (p. 257). To do this, we must engage in a recursive process. We learn by doing. We must continue to engage in the PLC process by revisiting the 4 Critical Questions consistently. We must focus on how to improve student learning, grow professionally, and engage in an ongoing process to achieve better results for the students we serve at CHS.



**Back to Top**

CCS 00494

# References

Ainsworth, L., & Viegut, D. (2006). *Common formative assessments: How to connect to standards-based instruction and assessment.* Thousands Oaks, CA: Corwin Press.

Bayewitz, M. (2015). Dealing with conflict on collaborative teams. *Solution Tree.* Retrieved from http://www.allthingsplc.info/blog/view/315/dealing-with-conflict-On-collaborative-teams.

Conzemius, A., & O'Neill, J. (2013). *Handbooks for SMART school teams: Revitalizing best practices for collaboration.* Bloomington, IN: Solution Tree Press.

DuFour, R., DuFour, R., Eaker, R., Many, T., Mattos, M. (2016). *Learning by doing: A handbook for professional learning communities at work.* Bloomington, IN: Solution Tree Press.

Hattie, J. (2009). *Visible learning for teachers: Maximizing impact on learning.* New York: Routledge.

Lezotte, L.W. (1991). *Correlates of effective schools: The first and second generation.* Okemos, MI: Effective Schools Products. Accessed at www.effectiveschools.com/correlates.pdf on May 18, 2019.

Marzano, R.J. (2003). *What works in schools: Translating research into action.* Alexandria, VA: Association for Supervision and Curriculum Development.

Marzano, R.J., & Waters, T. (2009). *District leadership that works: Striking the right balance.* Bloomington, IN: Solution Tree Press.

Muhammad, A. (2019). Building and sustaining PLCs: Creating healthy learning environments for all students [PPT]. Retrieved from http://newfrontier21.com/wp-content/uploads/One_day_PLC1.pdf.

Reeves, D.B. (2002). *The leader's guide to standards: A blueprint for educational equity and excellence.* San Francisco: Jossey-Bass.

CCS  00495

Saphier, J. (2005). *John Adam's promise: How to have good schools for all of our children, not just for some*. Acton, MA: Research for Better Teaching.

Schuhl, S. (2016). Doing it or doing it well? Using data for learning. *Solution Tree*. Retrieved from http://allthingsassessment.info/2016/05/04/doing-it-or-doing-it-well-using-data-for-learning/

Sparks, S. (2018). Getting feedback right: A Q & A with John Hattie. Retrieved from https://www.edweek.org/ew/articles/2018/06/20/getting-feedback-right-a-qa-with-jo Hn.html

Stiggins, R. (2002). Assessment, student confidence, and school success. *Phi Delta Kappan*, *81*(1), 22-27.

CCS 00496

15

Appendix: Resources, Reproducibles, Templates, and Examples

# Carmel High School

## 2021-2022



# PLC Handbook
# Resources/Examples

Appendix A
CHS Mission, Vision, and Values



# What does this <u>Mission</u> mean for Carmel High School?

"Every Student, Every Day, Every Class"

## Carmel High School's <u>Vision</u>

- Provide **real world** and **hands-on** learning to help students see the **connection** between their high school experiences, college, career, and life.
- Enhance and foster **culturally responsive** structures to meet the academic and **socio-emotional** needs of **ALL** learners.

## Carmel High School's <u>Values</u>

We believe...

- all students can learn at high levels.
- results should inform decisions.
- we are better together.

(Formed by Carmel High School's PLC Guiding Coalition 2019)

<u>Back to Top</u>

# Appendix B
## Sample Quarterly Meeting Calendar

| Team: US History | Team Leader: Teacher 1 | Quarter: 1 |
|---|---|---|

Team Members: Teacher 1, Teacher 2, Teacher 3, Teacher 4, Teacher 5

| 2021 Calendar | Meeting | Location/Time | Deliverable Product |
|---|---|---|---|
| August 12 – 16 | 1 | August 12 First Day Meeting | Team-developed meeting calendar |
| August 19 – 23 | 2 | August 20 during B Lunch in E212 | N/A |
| August 26 – 30 | 3 | August 24 during Late Start with department | Team Norms |
| September 2 – 6 | 4 | September 4 during Late Start with department | Team SMART Goal and Action Plan |
| September 9 – 13 | 5 | September 12 at 7:15am in E212 | N/A |
| September 16 – 20 | 6 | September 18 during Late Start with department | Essential Outcomes for the unit you are about to teach |
| September 23 – 27 | 7 | September 24 at 3:15pm in E212 | Team-developed Common Formative Assessment |
| September 30 – October 4 | 8 | October 3 during B lunch in E212 | N/A |
| October 7 – 11 | 9 | October 9 during Late Start with department | Analysis of student achievement, insight into what worked and what didn't, and team strategies for improving your effectiveness in teaching the essential outcomes |

**Back to Top**

# Appendix C
## 2021-2022 Blue/Gold Calendar

### 2021-2022 School Calendar



| | School Closed/Holidays |
| --- | --- |
| | Teacher Work Day (no students)  8/9/21 - 8/11/21, 1/3/22, 5/26/22 |
| | Homecoming  8/24/21 |
| | Final Exams  12/14/21 -12/17/21 & 5/20/22 - 5/25/22 |
| | PSAT Testing 10/26/21 |
| | SAT Testing 3/2/22 |
| | Late Start |
| | Midterms  10/13/21 & 3/11/22 |
| | End of Semester  12/17/21 & 5/22/22 |

**Back to Top**

CCS  00500

## Appendix D
### Quarterly Meeting Calendar Template

- Meeting weekly (late starts included)
- Total of 15 times first semester and 18 times second semester (see your department chair with any adjustments)
- Meeting times should be approximately 30 minutes

| Team: | Team Leader: | Quarter: |
|---|---|---|

| Team Members: | | | |
|---|---|---|---|
| Date | Meeting | Location/Time | Deliverable Product |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Back to Top**

Appendix E

Team Norms/Collective Commitments: Alternate Template

**Tools For Schools**

# Developing norms

| WHEN ESTABLISHING NORMS, CONSIDER: | PROPOSED NORM |
|---|---|
| **TIME**<br>• When do we meet?<br>• Will we set a beginning and ending time?<br>• Will we start and end on time? | |
| **LISTENING**<br>• How will we encourage listening?<br>• How will we discourage interrupting? | |
| **CONFIDENTIALITY**<br>• Will the meetings be open?<br>• Will what we say in the meeting be held in confidence?<br>• What can be said after the meeting? | |
| **DECISION MAKING**<br>• How will we make decisions?<br>• Are we an advisory or a decision-making body?<br>• Will we reach decisions by consensus?<br>• How will we deal with conflicts? | |
| **PARTICIPATION**<br>• How will we encourage everyone's participation?<br>• Will we have an attendance policy? | |
| **EXPECTATIONS**<br>• What do we expect from members?<br>• Are there requirements for participation? | |

**August/September 1999**

Source: Keys to successful meetings by Stephanie Hirsh, Ann Delehant, and Sherry Sparks. Oxford, Ohio: National Staff Development Council, 1994.

**Back to Top**

CCS 00502

# Appendix F
## Team Norms/Collective Commitments

| Team: | Team Leader: | Year: |
|-------|--------------|-------|
| Team Members: | | |

In 2012, Google set out to find out what makes the perfect team. Researchers discovered two norms that almost all effective teams shared. First, members spoke in roughly the same proportion. Second, the best teams were skilled at intuiting how others felt based on their tone, expressions, and other nonverbal cues (Duhigg, 2016). Ultimately, norms are unique to your team. Find out what works based on the people and dynamic of your team.

### We expect each team member to...

**Examples**
- show up to team meetings on time and prepared.
- add value to the team's conversations.
- make concerns or questions known to the team.
- uphold consensus-reached decisions.

**Your Team**
- 
- 
- 
- 
- 
- 

**Back to Top**

CCS 00503

## When a norm is violated we will...

**Examples**

- review the commitments we made to each other.
- make it a point to hear from each team member.
- make a plan for how to resolve the issue rather than let it fester.

**Your team**

- 
- 
- 
- 
- 
- 
- 

## We will remind ourselves of these commitments by...

**Examples**

- having them posted at the start of each meeting.
- reflecting on them as a team at the end of each meeting.
- 'grading' ourselves quarterly.

**Your team**

- 
- 
- 
- 
- 
- 
- 

**Reminders:**

- These examples are simply that—examples; they might not work for your team.
- You **don't** want to create a "sergeant-at-arms"; you want to create a team working together to achieve a common goal.
- Norms may change and develop overtime.

**Back to Top**

CCS  00504

# Appendix G

## Sample Team Roles: Example 1

### Establishing PLC Team Roles

All team members are responsible for the success of the PLC team. Team members must work collaboratively to achieve their goals, but each individual's official role describes ways in which he/she will contribute and relate to the the overall team. Roles may be assigned and rotated to allow for fair and equitable responsibility. As a team, determine who will be assigned each of the roles listed below.

| Team Role | Responsibilities | Person Assigned | Length of Service |
|---|---|---|---|
| Facilitator | • Develop the agenda and distribute it to all team members<br>• Facilitate the meeting<br>• Keep team focused on the SMART goal<br>• Make sure all voices are heard | | ☐ Month<br>☐ Quarter<br>☐ Other: |
| Recorder | • Record minutes<br>• Post minutes in PLC Shared Folder (i.e. One Drive)<br>• Maintain PLC team Shared Data folder that contains team information and resources | | ☐ Month<br>☐ Quarter<br>☐ Other: |
| Timekeeper | • Monitor agenda times and topics<br>• Keep the group focused and moving<br>• Monitor start and end times<br>• Call for tabling the subject or making a decision | | ☐ Month<br>☐ Quarter<br>☐ Other: |
| Reporter | • Review norms at the start of the meeting<br>• Assess the team's use of norms at the end of the meeting<br>• Review minutes from previous meeting<br>• Act as a liaison to school personnel outside of the team | | ☐ Month<br>☐ Quarter<br>☐ Other: |

**Back to Top**

CCS  00505

Appendix H

## Sample Team Roles: Example 2

# Team Roles & Job Descriptions

*PLC teams develop and designate the roles of their choosing as would be appropriate to the number of people on the team, their grade level and/or subject area. Following are a few suggestions for possibilities:*

## Facilitator

- Polls members for agenda items via email
- Types up agenda and makes copies for meeting
- Gets the agenda to the Resource person so they can prepare materials for the meeting if necessary.
- Makes sure that everyone's ideas are heard and respected.

## Recorder

- Keeps accurate notes of what everyone in the group says and agrees to.
- Maintains copies in Team Binder

## Resources

- Ensures that the group has the resources it needs to complete the agenda.
- Determines what resources the group needs to complete long term projects.

## Follow-up

- Makes contact with outside persons involved in a topic.
- Makes parent phone calls if appropriate.
- Asks questions of outside persons to get information for the team.

## Communications

- Helps develop outside communications such as newsletters, postcards home, flyers, etc.

## Time Keeper

- Break down the group's agenda and determine how much time is needed for each part.
- Keeps track of the time and moves things along if necessary.
- Reminds team members when time is running out.

**Back to Top**

CCS  00506

Appendix I
Team Reflection

# Critical Issues for Team Consideration

Team Name:

Team Members:

Use the following rating scale to indicate the extent to which each statement is true of your team.

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|
| Not True of Our Team | | | | Our Team Is Addressing This | | | | True of Our Team | |

1. _____ We have identified team norms and protocols to guide us in working together.

2. _____ We have analyzed student achievement data and established SMART goals to improve on this level of achievement we are working interdependently to attain (SMART goals are specific and strategic, measurable, attainable, results oriented, and time bound. SMART goals are discussed at length on page 89).

3. _____ Each team member is clear on the knowledge, skills, and dispositions (that is, the essential learning) that students will acquire as a result of our course or grade level and each unit within the course or grade level.

4. _____ We have aligned the essential learning with state and district standards and the high-stakes assessments required of our students.

5. _____ We have identified course content and topics we can eliminate to devote more time to the essential curriculum.

6. _____ We have agreed on how to best sequence the content of the course and have established pacing guides to help students achieve the intended essential learning.

7. _____ We have identified the prerequisite knowledge and skills students need in order to master the essential learning of each unit of instruction.

8. _____ We have identified strategies and created instruments to assess whether students have the prerequisite knowledge and skills.

9. _____ We have developed strategies and systems to assist students in acquiring prerequisite knowledge and skills when they are lacking in those areas.

10. _____ We have developed frequent common formative assessments that help us determine each student's mastery of essential learning.

CCS  00507

REPRODUCIBLE

11. _____ We have established the proficiency standard we want each student to achieve on each skill and concept examined with our common assessments.

12. _____ We use the results of our common assessments to assist each other in building on strengths and addressing weaknesses as part of an ongoing process of continuous improvement designed to help students achieve at higher levels.

13. _____ We use the results of our common assessments to identify students who need additional time and support to master essential learning, and we work within the systems and processes of the school to ensure they receive that support.

14. _____ We have agreed on the criteria we will use in judging the quality of student work related to the essential learning of our course, and we continually practice applying those criteria to ensure we are consistent.

15. _____ We have taught students the criteria we will use in judging the quality of their work and provided them with examples.

16. _____ We have developed or utilized common summative assessments that help us assess the strengths and weaknesses of our program.

17. _____ We have established the proficiency standard we want each student to achieve on each skill and concept examined with our summative assessments.

18. _____ We formally evaluate our adherence to team norms and the effectiveness of our team at least twice each year.

**Back to Top**

CCS  00508

# Appendix J
## PLC Team Evaluation/Collaboration Check

For each group of statements, please circle the number that corresponds to the description that is most often true for your team.

1.
   A.   There is a culture of mutual respect and purpose.
   B.   There is a culture of mutual respect but disagreement on the purpose.
   C.   There is a lack of respect for each other and/or the purpose.

2.
   A.   We have a collaborative process (that we agreed on together) for monitoring student progress.
   B.   We have a set of individual processes for monitoring student progress.
   C.   We don't have a set of processes for monitoring student progress.

3.
   A.   We use consensus-building processes to identify solutions and resolve conflicts together.
   B.   We identify solutions and resolve conflicts on our own but discuss our individual processes.
   C.   We like to talk more about problems (as they pertain to our coworkers, students, etc.) than work to solve problems.

4.
   A.   Conversations during team meetings are centered on student learning.
   B.   Some conversations during team meetings are centered on student learning.
   C.   Conversations during team meetings are rarely centered on student learning.

5.
   A.   We are interdependent, meaning we couldn't imagine doing this without each other.
   B.   We are coordinators, meaning we are a group of individuals who are organized and on the same page.
   C.   We are independent, meaning we are individuals who just happen to teach the same course(s).

6.
   A.   Gains in student achievement and team accomplishments are celebrated.
   B.   Gains in student achievement and individual accomplishments are celebrated individually and/or shared.
   C.   Nothing is celebrated.

7.
   A.   We collect data on student learning and regularly analyze that data (results from common assessments, student products, etc.) using an agreed upon protocol together.
   B.   We collect data on student learning as determined by our own individual needs or based on agreed upon check-ins and then discuss our analysis of this data at one of our meetings.
   C.   Data may/may not be collected, but no discussions of data occurs during meetings.

CCS  00509

28

8.

A.   Consistent scoring/analysis of student work takes place with the use of scoring guides, rubrics, etc. that are developed and/or agreed upon by the team; a student submission would be scored on the same criteria and the same way regardless of the teacher.

B.   Common rubrics or scoring guidelines are in place for summative assignments; these rubrics or scoring guidelines were created by select members (or an outside agency—think AP/IB rubrics) and then presented to the members for review. A student submission would be scored on the same criteria but the score may vary between teachers.

C.   Scoring of student work is determined by individual teachers; there is no consistency across classrooms in terms of scoring.

9.

A.   We hold each other accountable, meaning we are not afraid to acknowledge when we or someone else in our group has failed to live up to one of our agreed upon guidelines. (Ex. If one of us is late, someone will remind that person of the start time.)

B.   We coordinate guidelines and expectations for our meetings, but struggle to actually enforce those rules or hold each other accountable. (Ex. If one of us is late, we notice but do not say anything.)

C.   We are individuals; there is no protocol in place to hold ourselves or each other accountable. (Ex. If one of us is late, it doesn't matter.)

10.

A.   Working as a team, we can come up with many more options for supporting students within our school and ensuring that they all move forward than we would have on our own.

B.   Working together, we compile our individual ideas or practices for supporting students within our school and ensuring they are moving forward.

C.   Instead of compiling our individual ideas or practices for supporting students, our conversations may focus on problems with the school, our classroom, or lives. The majority of our time is spent detailing problems or complaining.

11.

A.   A typical question that might be asked during one of our meetings is: How can we help students improve their problem-solving skills?

B.   A typical question that might be asked during one of our meetings is: Anyone have any suggestions that have worked for you on how to help students work on problem-solving skills?

C.   A typical question that might be asked during one of our meetings is: Anyone else notice how much lower this year's students are in comparison to last year's students? Who would have recommended them for this course?

12.

A.   A student who signs up to take this course will have a very similar, positive experience that provides the student with opportunities to succeed with the course regardless of which teacher he/she has.

B.   A student who signs up to take this course will complete the same major assessments or learn the same information but the quality of the teaching and learning will vary in the course because of which teacher a student has.

CCS  00510

C.   A student who signs up to take this course will complete an essentially different course because of which teacher a student has.

Total # of A's: _____

Total # of B's: _____

Total # of C's: _____

C                    B                    A

CCS  00511

30

| PLC Team Members | 1 | 5 | 10 |
|---|---|---|---|
| Interdependency | Members want all students to be successful and each member will work his/her hardest in being the best teacher he/she can be independent of others. | Members share PLC managerial duties and exchange instructional ideas freely but find it awkward to hold each other accountable for full participation on the team and/or team exams. Team is more than colleagues, they are friends. Each teacher only takes responsibility for students listed under his/her name. | All PLC members deeply share collective responsibility for the mastery of promise standards for all students found in each of the PLC member's classes. Members can't imagine doing their job without their team. Members profoundly believe that what they can achieve together is greater than what they can achieve alone. Each member comes to meetings prepared and understands he/she are accountable to each other and collectively to the students assigned to their team. |
| Team Goals | Each PLC member has independent goals. There are no working goals or collective commitments that document the progress of the PLC. | PLC collectively writes goals for student learning, but goals are not time bound and it is difficult to measure the success of each goal. | PLC writes SMART goals with each unit to identify success for student learning and monitors each goal as they work to make changes in instruction to improve instruction. Team has established collective commitments for their PLC. |
| Promise Standards | PLC has not identified promise standards and learning targets for students to master in the given school year. | PLC has identified promise standards in their content but have a hard time ensuring all students master each. Promise standards are too broad. Learning targets exist but also are broad and vague. | PLC has identified narrow promise standards and aligned learning targets in their content. PLC monitors and assures every student's mastery of promise standards in the given school year. |
| CFA's | PLC has had conversations regarding CFAs but uses them sporadically and with limited success. | PLC has created, implemented, and had conversation regarding CFA's for some of the most important standards but do not use data for reteaching or professional growth. | PLC has identified what below, proficient and exemplary are for each standard; have ongoing conversations around CFA's and have written CFA's that are easily analyzed for regrouping of students. PLC consistently compares data, teacher by teacher, to learn from one another. |
| Sharing Instructional Strategies | PLCs plan and implement all units in the content. Each member plans for instruction independently without interaction or conversation with others. Student success varies between classrooms. Some students are viewed as lucky to have certain teachers. | PLCs plan and implement all units in the content. When a team member is excited about student learning or a new strategy, they share it with their team. Some PLC members, but not all, consistently collaborate around identifying and implementing effective instructional strategies. | After analysis of CFA data, all PLC members engage in conversation about effective instructional strategies that have created the most student learning. All teachers share practices, model for one another, and regroup students to ensure all students are learning. |
| Interventions | PLC members provide interventions for students found in his/her classroom only. | PLC members work together to provide interventions when students don't learn but systematic tracking of each student, by standard, is missing. | PLC members work together to provide interventions when students don't learn. The PLC systematically charts the progress of each student and responds accordingly when students haven't learned a promise standard or have already mastered a standard with appropriate interventions. |

*Adopted for Mike Mattos Are We a Group or a Team?

**Back to Top**

# Appendix K
## Managing Conflict

*from* "Managing Conflict in School Leadership Teams"
By Elena Aguilar in Edutopia on March 22, 2016

### Name the Conflict

Because many of us are afraid of conflict, we can hide in denial of its existence. The first step is to acknowledge that there's conflict in a team you lead, and to name it. It helps if you name the conflict as a communication dynamic rather than blame conflict on individuals. There's a difference between thinking, *James is so resistant to new ideas*, and *James makes declarative statements that put an end to discussions*. Identify the behaviors that generate unhealthy conflict and separate them from people as human beings.

Once you've identified the conflict in the team, then you'll need to name it with the group. Sometimes you may need to name it for them, and sometimes you'll see more investment from your team if you facilitate a discussion in which they identify the conflict. A team may experience conflict because the personalities of individuals are very different from each other or because they disagree on goals or action steps. Identifying the sources of conflict can help to depersonalize it. Sources can also include a shortage of resources or time, organizational politics, and organizational dysfunction.

### Consider Addressing the Conflict Now or Later

When you notice unhealthy conflict in your team, you'll need to make an assessment about whether it needs to be addressed in the moment, with the team, or whether it's a conflict between two team members that needs to be addressed later. Most likely, you'll know if the situation is the latter; you'll have seen these team members engage in unhealthy conflict with each other before, or you'll be able to see the clearly interpersonal conflict between two people. There's a whole set of tools you'll need in order to address the interpersonal conflict later (that's the content for a future blog post).

### Anchor Team Members in Their Norms

Hopefully, your team has some norms or community agreements for how members will behave with each other. Ideally, these help to prevent unhealthy conflict. When a norm is broken, you can remind the team of their norms and share the impact on the team when a norm isn't adhered to. You might say something like, "I want to remind everyone that one of our

CCS 00513

agreements is to assume positive intent," and that might be enough to subtly shift how a group is behaving.

Sometimes it's useful to name how the unproductive behavior is affecting the group by saying, for example, "When we interrupt, we don't get to hear someone's full idea. We need everyone to contribute and share their thoughts so that we can be sure we're making the best decision. If we don't make good decisions, we're less likely to get full commitment from each other. Let's be mindful of giving everyone the full time they need to express their thoughts."

If unhealthy conflict continuously surfaces, then you may need to go back to norms, and team members will need to recommit to how they want to work together.

### Conflict Can Be Healthy

There's healthy and unhealthy conflict. Most of us are familiar with the unhealthy kind, but what does healthy conflict look and sound like? One leadership team I worked with identified the following as indicators that their team was engaging in healthy conflict:

- We wrestle with ideas.

- We ask questions to probe for deeper understanding.

- We change our minds.

- We demonstrate curiosity.

- We hold student needs at the center of our work.

This kind of conflict can lead to deep discussions that positively impact students. Having a discussion with a team about the role that healthy conflict can play, and what healthy conflict looks and sounds like, can help mediate unhealthy conflict and set the team on a powerful path.

As team leaders, rather than just stopping certain behaviors, our role is to shift unhealthy team dynamics into becoming healthy ones. Such an intention has transformational potential

**Back to Top**

CCS 00514

33

# Appendix L
## Team Meeting Agenda: Sample 1

| Date: | Location: | Meeting #: |
|---|---|---|
| Team: | Team Leader: | Year or Unit: |
| Team Members: | | |

### Our team's current SMART goal.

### Review action steps from the last meeting.

### Celebration item(s) to share that have happened since our last meeting.

**The following analysis is based on our team's [common] assessment of the following essential learnings: (*What do we want all students to learn?*)**

**1. What is the metric we are using to determine if a student is below proficiency, proficient, or highly proficient?** (*How will we know when each student has learned it?*)

**2. Which of our students need additional time and support to achieve at or above proficiency in essential learning?** (*How will we respond when a student experiences difficulty?*)

a. How will we provide that time and support? [This may include re-teaching, supplemental groups, etc.]

3. What is our plan to enrich and extend the learning for students who are highly proficient? (How will we respond when a student has already demonstrated understanding?)

4. What is an area where my students struggled?

    a.  What strategies were used by my teammates whose students performed well?

5. What is an area where our team's students struggled? Based on what results?

    a.  What do we believe is the cause?

    b. What interventions might work? How will we know these interventions worked?

6. What else do we need to talk about?

Recap action steps for next meeting.

CCS 00516

35

**Group Norms:**

1.

2.

3.

4.

5.

# Appendix M
## Team Meeting Agenda: Sample 2

| Date: | Location: | Meeting #: |
|-------|-----------|------------|
| Team: | Team Leader: | Year or Unit: |
| Team Members: | | |

### Our team's current SMART goal.

| | |
|---|---|

| Topic for Discussion | Minutes |
|----------------------|---------|
| Review norms and agenda items, recap last meeting actions (3 minutes) | |
| Outcomes for Today's Meeting (2 minutes) | |
| Celebrations (3 minutes) | |
| Action Item 1 (Should include a review of current, relevant data; 10 – 15 minutes. Repeat for each action item.) | |
| Recap and Next Steps (5 minutes) 1. What did we learn from our meeting today? 2. What action do we need to take? Who/what/when/how? 3. When are we meeting next? What additional topics need to be on our next agenda? | |
| Meeting Process Reflection. (5 minutes) 1. How did our collaborative data team meeting go? 2. What do I need to do differently to have a more efficient and effective team? | |

Back to Top

CCS 00518

## Appendix N
### Shifting the Team Focus During Collaborative Meetings

| If your team is doing this... | Consider doing this instead... |
|---|---|
| **Grading papers during team time.** | • Bringing sample papers to collectively score to calibrate your scoring as a team.<br>• Bringing sample papers to collectively score to determine what proficiency looks like for a specified standard or skill.<br>• Bringing sample papers to identify what the common strengths and weaknesses of students are for a specified standard or skill. |
| **Talking about a test students took.** | • Review the results to determine what the common strengths and weaknesses of students are for the assessed standards/skills.<br>• Create activities for remediation and enrichment for identified students.<br>• Discuss instructional strategies used by each teacher on the team to determine what may have worked or is in need of improvement when it comes to teaching students to learn this standard/skill. |
|  |  |
|  |  |
|  |  |

**Back to Top**

CCS 00519

# Appendix O
## SMART Goal Planning Form: Example 1

A SMART goal clarifies exactly what students should learn, the standard of expected learning, and the measures used to determine if students have achieved that standard.

## SMART Goal Examples

1. 90% of AP Seminar students will score a medium or higher in the understanding and analysis argument row of the End of Course Exam: Part A rubric as measured by the common Part A assessment given in October of 2019.
2. Our goal is that 80% of our Spanish 4/4+ students will earn an 8/10 or better on the National Spanish Exam Listening Comprehension Exam Level 4.

## NOT an example of a SMART Goal

1. My students will do better on their math tests.
2. My biology students will complete 80% of their homework.

## Drafting a SMART Goal

| Specific - WHO? |
| --- |
|  |

| Achieve - WHAT? |
| --- |
|  |

| Assessment - HOW? |
| --- |
|  |

| (By) Time of Year - WHEN? |
| --- |
|  |

**Back to Top**

## Appendix P
### SMART Goal Planning Form: Example 2

**S-SPECIFIC:** says exactly what the learner (student) will be able to do.

**M-MEASURABLE:** can be observed (tangible product)

**A-ATTAINABLE:** for learners within the scheduled time and conditions

**R-RESULTS BASED & RELEVANT:** learners can demonstrate their learning and what is being asked is relevant to the needs of the learners within the specific course(s)

**T-TIME-BASED:** achievable by the end of an identified time frame set by the team

| SMART Goal Fill in the blank |
|---|
| By _____ (date), _____ (who [include % if appropriate]) will be able to _____ _____ (specific/ measurable action) with _____ _____ (attainable results/accuracy). |

**Back to Top**

## Appendix Q
### Team SMART Goal(s) and Action Plan(s)

| Team: | Team Leader: | Year or Unit |
|---|---|---|

**Team Members:**

| Examples of year-long SMART goals: | Examples of short-term SMART goals: |
|---|---|
| • Last year, 75% of students scored a 3 or higher on the AP US History exam. This year, 80% of our students will score a 3 or higher on that exam.<br>• By the end of this school year, 85% of students will earn 5/5 marks on our rubric for the criterion of establishing a central claim. | • Last year, when we gave this unit assessment, 78% of our students met the proficient standard. This year, 83% of our students will demonstrate proficiency.<br>• Last year, only 60% of students demonstrated an ability to analyze 'author's purpose' on this unit's document analysis rubric. This year, 75% of students will demonstrate that skill on this end-of-unit assessment. |

| Team SMART Goal | Strategies and Action Steps<br><br>What will you do as a team to achieve the desired outcome? | Responsibility<br><br>Who is involved in achieving this desired outcome? What will be done collectively and individually? | Timeline<br><br>Given the goal, how frequently will you check to see what progress has been made? | Evidence of Effectiveness<br><br>What evidence will you collect and track throughout the process to monitor your progress toward the desired outcome? |
|---|---|---|---|---|
|  |  |  |  |  |

CCS 00522

**Back to Top**

## Appendix R
### 4 Critical Questions of Learning



**Short-Term Cycle**

**Plan**
- Identify power standards.
- Unwrap the standards.
- Design unit assessment.
- Set short-term SMART goal for unit.
- Write the assessments.

**Act**
- Provide additional time and support or enrichment to students who need it.
- Monitor the results with additional formative assessment.

**Do**
- Preassess the students.
- Determine and use instructional strategies from best practice.
- Administer common formative assessments.

**Study**
- Examine the results of each assessment—collaboratively.
- Look for strengths and weaknesses in the instructional strategies used.
- Plan for how to respond to students who learned or needed enrichment.

**Back to Top**

## Appendix S
### Essential Learning Outcomes

| Team: | Team Leader: | Unit: |
|---|---|---|
| Team Members: | | |

## What is it we expect students to learn?

**Consider:**

- **Does it have endurance?** Do we really expect our students to retain it over time, as opposed to merely learning it for a test?
- **Does it have leverage?** Will proficiency help the student in other areas of the curriculum and other academic disciplines?
- **Does it develop student readiness for the next level of learning?** Is it essential for success in the next unit, course, or grade level? (Reeves, 2002)
- What content do we currently teach that we can eliminate from the curriculum because, although it may be nice to know, it is not essential?

| Descriptions | Prerequisite Skills | Common Formative Assessment |
|---|---|---|
| What are the essential learning objectives? | What prior knowledge, skills, and/or vocabulary is/are needed for a student to master the objective? | What common formative assessment will be used to measure student mastery? |
| | | |
| | | |
| | | |

Teacher Exhibit 35 - p. 043

CCS 00524

43

**Back to Top**

# Appendix T
## Essential Standard Analysis Template

| Proposed Standard: |
|---|

| Readiness |
|---|
| If students meet this standard, will they be prepared for the next class, course, or grade level? |
| What classes or courses might expect students to have the knowledge acquired by meeting this standard? |

| Endurance |
|---|
| If students meet this standard, will they have knowledge and skills that will serve them beyond a single test or one unit of study? |
| What knowledge or skills would students acquire by meeting this standard? |

| Assessed |
|---|
| Would students benefit from having met this standard when they take an upcoming state exam, national exam, or a college-readiness exam? |

| | | |
|---|---|---|
| Upcoming state exams? | Yes | No |
| Upcoming national exams (AP, IB, etc.) | Yes | No |
| College-readiness exam (PSAT, SAT, ACT)? | Yes | No |

| Leverage |
|---|
| By meeting this standard, will students have knowledge and skills that they can use and would need in multiple disciplines? |
| What knowledge and skills would students acquire by meeting this standard? |

CCS  00525

Back to Top

# Appendix U
## Essential Standards Unit Plan Template

| Essential Standard | | | ☐ Knowledge |
|---|---|---|---|
| | | | ☐ Reasoning |
| | | | ☐ Performance Skills |
| | | | ☐ Product |
| **End-of-unit assessment** | | | **When taught** |
| | | | **Instructional days needed** |

| Knowledge Targets | Reasoning Targets | Performance Skills Targets | Product Targets |
|---|---|---|---|
| | | | |

**Student-friendly Learning Targets ("I Can..." statements)**

| Assessment | Connection to Standard | Student Involvement | Timeline |
|---|---|---|---|
| Which target(s) are being assessed? How will the assessment be used? Is it a common or individual assessment? | How will this assessment set up students for successful mastery of the standard? | How will students engage in the assessment process? | |
| 1 | | | |
| 2 | | | |
| 3. | | | |

Back to Top

CCS 00526

## Appendix V
### Essential Standards Unit Plan Example

| Essential Standard | |
|---|---|
| Students will represent multiplication to two-digit by three-digit numbers and describe how that representation connects to the related number sentence. | ☐ Knowledge |
| | ☑ Reasoning |
| | ☐ Performance Skills |
| | ☐ Product |

| End-of-unit assessment | |
|---|---|
| Twenty-five-item test: five items with one digit X two or three digits, five items with two digits X two digits, five items with two digits X three digits, and ten points for problem solution with description. | **When taught** March |
| | **Instructional days needed** 16 |

| Knowledge Targets | Reasoning Targets | Performance Skills Targets | Product Targets |
|---|---|---|---|
| • Know basic facts 0-10<br>• Know and use several models to represent number sentences | • Explain how the representation matches the number sentence<br>• Identify and explain strategies used to solve problems<br>• Compute multiple-digit problems accurately | | |

**Student-friendly Learning Targets ("I Can..." statements)**
- I can recall basic facts, 0-10, quickly and accurately.
- I can set up multiplication problems.
- I can use two ways to solve multiplication problems.
- I can use effective strategies to solve problems and find a workable solution.
- I can explain my thinking and strategies

| Assessment | Connection to Standard | Student Involvement | Timeline |
|---|---|---|---|
| Which target(s) are being assessed? How will the assessment be used? Is it a common or individual assessment? | How will this assessment set up students for successful mastery of the standard? | How will students engage in the assessment process? | |
| 1. Ongoing daily quizzes of basic multiplication facts 0-10; one formative quiz - that the student chooses - per week (individual) | Students develop accurate and fluent recall of multiplication facts to successfully compute multiple-digit problems. | Students track daily progress and determine when they are ready for a formative quiz each week. | Ongoing, daily |

CCS  00527

| | | | |
|---|---|---|---|
| 2. Single-digit X two to three digits using two different models and with explanation of models (formative and summative, common formative) | Students develop fluency with multiple algorithms and mathematical language to explain their thinking. | Students self-assess and peer-assess the pretest and make corrections | Day 3: Pretest (formative) |
| 3. Two digits X two digits using different models and with explanation of models (formative and individual) | Students develop fluency with multiple algorithms and mathematical language to explain their thinking with problems that have two-digit multipliers. | Students self-assess, the pretest, make corrections, and set goals for the end of the unit test. | Day 9: Formative

Day 12: Formative |
| 4. Two-digits X three-digit numbers (mysterious multiplication) (formative, common) | Students use multiplication understanding to solve problems and identify workable solutions. | Students self-assess, select appropriate practice activities, and set goals for end of unit assessment. | Day 14: Formative

Day 16: End of unit |

**Back to Top**

# Appendix W

## Common Formative Assessment Item Quality Checklist

Consider the following general; multiple-choice; true or false, matching, and completion or fill-in; and constructed-response guidelines when crafting assessments. Additionally, consider the formatting, writing, and producing guidelines for assessments.

## Following General Guidelines for All Formats

1. Unwrap and unpack standards into learning targets and write questions around the most important targets.
2. Create an assessment planning chart to ensure adequate cognitive demand and number of questions asked per target.
3. Remember the goal is to know whether students know the material, not whether they can use good test-taking strategies to guess the right answer.
4. Provide a sufficient number of items to know whether a student learned, but not so many that the assessment takes too long.

## Following Multiple-Choice Guidelines

1. Make sure that each item assesses only one target.
2. State the whole question in the item stem.
3. Put the answer choices in an order that makes sense, such as largest to smallest or alphabetical.
4. Be sure there is only one correct or best answer unless directions say otherwise.
5. Keep response options brief and parallel in:
    a. Length
    b. Grammatical construction
2. Limit use of *all or none of the above.*
3. Use *always* and *never* with caution.
4. Vary the number of responses; don't add answers just to make them even.

## Following True or False, Matching, and Completion or Fill-In Guidelines

1. True or false items:
    a. Make them entirely true or entirely false as stated.
    b. Avoid negatives, which make questions ambiguous.
    c. Make sure there is only one target per question.
2. Matching items:
   Provide clear directions for the match to be made. Indicate if a response can be used more than once or if an item has more than one match.
    a. Include no more than ten items.
    b. Put the responses on the left and the trigger items on the right.
    c. Include only homogeneous items. Do not mix dates, events, and names in a single exercise.
    d. Provide more responses than trigger items.
3. Completion or fill-in items:
    a. Ask a question.
    b. Provide one blank per item.
    c. Do not make length a clue.

CCS 00529

d. Put a blank toward the end.

## Following Constructed-Response Guidelines

1. Creating questions:
    a. Make the context and the expectations clear to the student.
    b. Don't provide options that allow students to choose areas in which they feel most competent. (You want to know what they really know!)
1. Scoring:
    a. Establish scoring criteria in advance.
    b. Set a policy about non achievement factors, such as writing skills.
    c. Score collaboratively, if possible.
    d. Score all responses to one exercise at a time. (It's faster!)

## Formatting Assessment Items

1. Be Consistent in the presentation of an item type.
2. List the learning target being assessed.
3. Avoid crowding too many questions onto one page.

## Writing Directions

1. Write clear, explicit directions for each item type.
2. Indicate how the answer should be expressed. (For example, should *true* or *false* be written, or *T* or *F*? Should numbers be rounded to the nearest tenth? Should students include units such as months, meters, or grams in the answer?)

(From Global PD Facilitators Guide Common Formative Assessment)

**Back to Top**

# Appendix X
## Common Formative Assessment Planning Template

| Team: | Team Leader: | Unit: |
|---|---|---|

| Team Members: |
|---|

| **How will we know if each student has learned it?** | |
|---|---|
| **Common Formative Assessment**<br>Provide the Common Formative Assessment | |
| **Proficiency**<br>What does proficient student work look like?<br>Provide an example and/or description. | |
| **Timeline for Assessment**<br>By when will all team members have given the common formative assessment? | |
| **Data**<br>How will we collect/compile the student learning results? | |
| **Follow-Up Data Meeting**<br>What meeting will we plan to conduct the learning analysis? | |

**Back to Top**

CCS 00531

# Appendix Y
## Data Analysis Activity

1. Look at one of your common assessments. What is proficiency on the common assessment?

2. How can you organize the results/data from the common assessment?

3. How will you analyze the results/data? (*Which questions do you want to ask? Which protocol do you want to use?*)

4. Which students will be identified in the report? (*Proficient? Close to proficient? Far from proficient?*)

5. Which instructional practices will be identified in the report or discussed?

6. Are you making progress toward the SMART goal?

**Back to Top**

# Appendix Z
## Student Learning Analysis

| Team Name: | Team Leader: | Unit: |
|---|---|---|
| Team Members: | | |

**Common Formative Assessment Description:**

| Essential Learning Outcomes: | Type of Assessment | Proficiency Expectation: |
|---|---|---|
| | | |

**Student Learning Results:**

| | Number of Students Below Proficiency | Number of Students at Proficiency | Number of Students Above Proficiency |
|---|---|---|---|
| Teacher 1 | | | |
| Teacher 2 | | | |
| Teacher 3 | | | |
| Teacher 4 | | | |
| Teacher 5 | | | |

CCS  00533

## What will we do if the students do not learn it?

- What skill/content did students do well on?
- Where did students struggle?
- What worked and what didn't?
- How will we modify current practices to increase the achievement of our current students?
- What strategies and/or interventions can we use?
- How are we differentiating our instruction?
- How could an instructional coach help?
- Where can we look for additional ideas?
- What are other teams doing?
- What structures could we change to give students what they need?
- How could we observe one another teach to learn?
- How can we be creative with scheduling and time?
- What help and/or training might we need?

## What will we do if they already know it?

- What skill/content did students do well on?
- Where did students struggle?
- What worked and what didn't?
- How will we modify current practices to increase the achievement of our current students?
- What strategies and/or interventions can we use?
- How are we differentiating our instruction?
- How could an instructional coach help?
- Where can we look for additional ideas?
- What are other teams doing?
- What structures could we change to give students what they need?
- How could we observe one another teach to learn?
- How can we be creative with scheduling and time?
- What help and/or training might we need?

### Our Team To-Do List

| Task | Person(s) Responsible | Completion Date |
|------|----------------------|-----------------|
|      |                      |                 |
|      |                      |                 |
|      |                      |                 |
|      |                      |                 |

**Back to Top**

CCS 00535

# Appendix AA
## Proficiency Status Check Protocol

Course:_____          Date:_____

Where are we now?

Suppose you will give a summative assessment tomorrow in your course. Which students in your classes would earn scores of level 4 (exceeds proficiency), level 3 (meets proficiency), level 2 (nearly meets proficiency), and level 1 (does not meet proficiency) based on your common formative assessment data?

|  | LEVEL 4 (Exceeds) | LEVEL 3 (Meets) | LEVEL 2 (Nearly Meets) | LEVEL 1 (Does Not Meet) |
|---|---|---|---|---|
| Teacher: |  |  |  |  |
| Teacher: |  |  |  |  |
| Teacher: |  |  |  |  |
| Teacher: |  |  |  |  |
| Total Number: |  |  |  |  |

What is your specific plan to have students increase in proficiency before _____ (date)? Check on our goal often to see if students would move based on your common formative assessment data.

**Team Plan**

| Up From Level 3 | Up From Level 2 | Up From Level 1 |
|---|---|---|
|  |  |  |
| **Goal:** This plan will help move _____ students by _____ (date). | **Goal:** This plan will help move _____ students by _____ (date). | **Goal:** This plan will help move _____ students by _____ (date). |

**Back to Top**

CCS  00536

55

Appendix AB
Data Discussion Template

# What Did Students Learn? What's Next?
### (Adapted from National School Reform Faculty)

Determine a member of the group to facilitate the discussion. For each of the three steps, spend time individually documenting your thoughts. Then discuss the responses as a team. Be sure each member has an opportunity to share and enter the conversation at each step.

### 1. Predictions
Before looking at the data, make predictions about what you will observe. Think about what you assume, predict, wonder, or believe you will learn from the data.

### 2. Observations
Look at the data presented and document your observations. Remember to only record facts. Explanations, conclusions, and hypotheses will be discussed in the third step. Think about what you observe, what patterns you notice, and what you may be surprised to see.

### 3. Inferences
Make inferences regarding the data observed in Step 2. The inferences may include:
- Explanations
- Identification of additional data to confirm or refute explanations
- Possible solutions or responses to the data
- Identification of data needed to determine if possible solutions or responses are working

**Back to Top**

CCS 00537

56

## Dianna Stringham

From:           Taryn Wanninger
Sent:           Monday, August 2, 2021 11:56 AM
To:             Dianna Stringham
Cc:             Rachel Cole
Subject:        RE: Mary Foster

Hi Dianna,
If you could schedule a meeting for the parent and child to either come in to school or via zoom and you and I will both be present as well. We will complete a gender support plan during this time.
Thank you!

*Taryn Wanninger, LCSW, LSSW*
10-12 Social Worker
Carmel High School
520 E. Main Street
Carmel, IN. 46032
Ph: 317-571-5922 x 8 -7106
twanning@ccs.k12.in.us
CCS Virtual Mindfulness Room for the High School Community



From: Dianna Stringham
Sent: Thursday, July 29, 2021 10:28 AM
To: Taryn Wanninger <twanning@ccs.k12.in.us>
Cc: Rachel Cole <RCole@ccs.k12.in.us>
Subject: Mary Foster

**Redacted: Attorney-Client Privilege**

Taryn,
Hi! I had a parent come in and request a name change and pronoun change. The student's birth name is Mary, but preferred name is Florian. Rachel would like us to set up a meeting with the parent, you, me and Florian.
Please let me know how and when you would like to do this.
Thanks,
Dianna

**Dianna Stringham**
**10-12 Counselor**
**Carmel High School**
**520 E Main St**
**Carmel, IN 46032**
dstringh@ccs.k12.in.us
**317-571-5922 X7505**

*'Be the reason someone feels welcomed, seen, heard, valued, loved and supported.'  (unknown author)*

CCS 00538

**Dianna Stringham**

*Written-up for My response*

| | |
|---|---|
| **From:** | Dianna Stringham |
| **Sent:** | Wednesday, July 28, 2021 6:42 PM |
| **To:** | [student name] via Canvas Notifications; Rachel Cole |
| **Subject:** | Re: [student name] (CHS Counseling) just sent you a message in Canvas. |

[student name]

Good evening! I hope you are getting excited about the start of the school year! I know I'm excited to start the year.

I wish I could help accommodate your request, but I cannot. It is school policy not to change schedules because of teachers. I'm sorry. I know you will do well.

Please let me know if I can help you with anything else.

Thanks,

Mrs. Stringham

---

**From:** [student name] <notifications@instructure.com>
**Sent:** Wednesday, July 28, 2021 12:23 PM
**To:** Dianna Stringham <dstringh@ccs.k12.in.us>
**Subject:** [student name] (CHS Counseling) just sent you a message in Canvas.

**WARNING..External Sender.**

### Pre-calculus teacher

Hi! When we met at the end of last year to change my schedule you told me to email you close to the start of school and remind you to give me a good teacher for my math course. I would really appreciate having a good math teacher this year considering my struggle with algebra 2 last year. Thanks so much!

 [student name]

You can reply to this message in Canvas by replying directly to this email. If you need to include an attachment, please log in to Canvas and reply through the Inbox.



View this message in Conversations  |  Update your notification settings

CCS 00539

## Dianna Stringham

| | |
|---|---|
| **From:** | Rachel Cole |
| **Sent:** | Monday, August 30, 2021 7:05 PM |
| **To:** | Dianna Stringham |
| **Subject:** | RE: student  (CHS Counseling) just sent you a message in Canvas. |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Dianna,
You need to explore why she wants to switch and provide some guidance. She is reaching out for help and just approaching it with an inappropriate solution. You can probably provide some guidance on how to help her if you knew why she was wanting a new teacher. It would be best to call her down and see what is going on or ask her to stop by before school starts one morning.

Rachel Cole
Director of Counseling
Carmel High School
520 East Main Street
Carmel IN, 46032

**From:** Dianna Stringham
**Sent:** Monday, August 30, 2021 10:31 AM
**To:** student  via Canvas Notifications <reply+aae0af84ebb50e74-3402~100885765-1630333654@notifications.canvaslms.com>
**Cc:** Rachel Cole <RCole@ccs.k12.in.us>
**Subject:** RE: student name  (CHS Counseling) just sent you a message in Canvas.

student

Hi! How are you? I'm hoping you are having a great start to the school year. It is CHS policy that we do not switch classes based on teachers. I'm sorry, but I cannot do this for you. Please let me know if there is anything else I can help you with.
Thanks,
Mrs. Stringham

**From:** student name  <notifications@instructure.com>
**Sent:** Monday, August 30, 2021 10:28 AM
**To:** Dianna Stringham <dstringh@ccs.k12.in.us>
**Subject:** student  (CHS Counseling) just sent you a message in Canvas.

**WARNING..External Sender.**

CCS 00540

## Class Change

There's no way I can switch to a different Spanish III class?



You can reply to this message in Canvas by replying directly to this email. If you need to include an attachment, please log in to Canvas and reply through the Inbox.



View this message in Conversations | Update your notification settings

CCS 00541

APC Waitlist (Fall)

David Schleper <dschlepe@ccs.k12.in.us>
Tue 8/4/2020 8:23 AM

To: David Mikesell <dmikesel@ccs.k12.in.us>; Bettina Cool <bcool@ccs.k12.in.us>; Dianna Stringham
<dstringh@ccs.k12.in.us>; Kelly Wernke <KWernke@ccs.k12.in.us>; Kevin McDonough <KMcDonou@ccs.k12.in.us>;
Alyson Harbor <aharbor@ccs.k12.in.us>; Stephanie Payne <spayne@ccs.k12.in.us>; Becky Stuelpe
<rstuelpe@ccs.k12.in.us>; Emily Clark <EClark@ccs.k12.in.us>; Kris Hartman <KHartman@ccs.k12.in.us>; Casey
Danubio <cdanubio@ccs.k12.in.us>; Leslie Brown <lbrown1@ccs.k12.in.us>; Cary Schwartz
<cschwar1@ccs.k12.in.us>; Katherine Barsten <kbarsten@ccs.k12.in.us>

Hi everyone.

I royally screwed up and forgot to add a kid to the APC waitlist back on March 9th...I know there's a
super long waitlist and it's overbooked anyway, but would anyone mind if I moved my kid to the
top? The request came on March 9th, and I totally spaced it and the parents are pretty upset with
me, deservedly so... Let me know if this is a problem.


Dave Schleper
Freshman Center Counselor
317-571-4621 ext. 7665


*Counselor not written up*

CCS 00542

ATTORNEYS

Kevin W. Betz
_Lead Founding Counsel_

Sandra L. Blevins
_Managing Partner_

Jamie A. Maddox
_Partner_

Courtney E. Endwright
_Senior Associate_

Chad H. Holler
_Associate_

PARALEGALS

Abigail L. DeCoursey
_Director of Administration_

Allyson J. Utley
_Director of Accounts_

PRACTICE AREAS

Severance and
Employment Agreements

Professional Licensing

Wrongful Discharge

Family and Medical
Leave Act

Employee Benefits

Federal and State Court
Litigation

Covenants Not to
Compete

Professor/Teacher
Tenure and Discipline

Physician Rights
and Nurses Rights

Discrimination and
Retaliation

CONTACT

One Indiana Square
211 N. Pennsylvania St.
Suite 1660
Indianapolis, IN 46204

Phone 317.687.2222

Follow us on Twitter:
@BetzBlevins

BetzAdvocates.com



# BETZ+ BLEVINS
LITIGATION AND EMPLOYMENT LAW

December 3, 2021

**VIA ELECTRONIC MAIL**
Dr. Michael Beresford, Superintendent
CARMEL CLAY SCHOOLS
5201 E. Main Street
Carmel, IN 46033
mberesfo@ccs.k12.in.us

Re:   *Ms. Dianna Stringham v. Carmel Clay Schools*

Dear Dr. Beresford:

We represent Dianna Stringham ("Ms. Stringham") in connection with her employment at Carmel Clay Schools, specifically Carmel High School ("Carmel High"). Ms. Stringham has retained our law firm to represent her in matters relating to Carmel's discrimination against her. Please direct all future correspondence and inquiries concerning this matter and related matters to our firm.

The purpose of this letter is to address the issues involved with Ms. Stringham's employment and to explore how we might reach an amicable and professional resolution of the issues.

If you have legal counsel in this matter, please let us know immediately so that we can communicate with your attorney directly.

## I.   FACTUAL BACKGROUND

As you know, Ms. Stringham was hired by Carmel High as a Counselor on July 28, 2014. Ms. Stringham has performed her job duties exceptionally in her role as Counselor as she has received performance evaluation grades of "Effective" and "Highly Effective" on her previous evaluations since her employment began with Carmel High.

Ms. Stringham's current supervisors are Mrs. Rachel Cole, the Counselor Director, and Dr. Thomas Harmas, the Carmel High Principal. Ms. Stringham and Mrs. Cole originally worked in similar roles prior to Mrs. Cole's promotion to Counseling Director. Since working together, Ms.

**ADVOCATES FOR INDIVIDUALS**

Dr. Michael Beresford, Superintendent
CARMEL CLAY SCHOOLS
December 3, 2021
Page 2 of 3

Stringham has had numerous negative interactions with Mrs. Cole without explanation. Mrs. Cole constantly micromanages Ms. Stringham, questions her decision making and overall makes snide and curt comments to Ms. Stringham in the workplace as well as in work emails.

During one workday at Carmel High, Ms. Stringham was having a conversation with another counselor, Abby Cartwright, who was dating someone of the same sex. Ms. Cartwright informed Ms. Stringham that she believed Mrs. Cole was targeting her as well for dating someone of the same sex. As you may know, Ms. Stringham is married to a woman. Ms. Stringham's co-worker informed Ms. Stringham that Mrs. Cole told her that dating another individual of the same sex was not a great idea. Mrs. Cole also said to this individual, "Can you believe Stringham is married to a woman? That is weird."

Following this and the continued negative treatment from Mrs. Cole, Ms. Stringham filed a Report of Discrimination and/or Harassment with Carmel Clay Schools in October of 2020. In this Report, Ms. Stringham reported that she believed she was discriminated against based on her sexual orientation, homosexual, and her race and/or national origin, Hispanic. After Ms. Stringham filed this Report, she was placed on a Performance Improvement Plan ("PIP") by Mrs. Cole. As part of the PIP, Ms. Stringham was required to copy Mrs. Cole on all emails, log all emails, write down all phone contacts, make two-week lesson plans, summarize all reprimands she has ever had, observe two (2) other counselors in SST and do a write up summary of her observations, and create a list of at-risk students every day by 4:15 p.m. every Friday. Ms. Stringham was also written up for "not being culturally aware." She was the only non-Caucasian to be written up for this PIP. Lastly, since the beginning of the 2021-2022 academic year, Ms. Stringham has been written up thirty-two (32) times in a sixty (60) day period. Ms. Stringham is not aware of any other counselor who is on a PIP and/or has been written up thirty-two (32) times in a sixty (60) day period. Ms. Stringham is now currently on FMLA leave because of the emotional stress and anxiety the discrimination, harassment, and retaliation has caused.

## II.   ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **race**,…**sex, or national origin**…" 42 U.S.C. § 2000e-2(a)(1)(emphasis added). "Discrimination on the basis of sexual orientation is a form of sex discrimination." *Hively v. Ivy Tech Cmty. College of Ind.*, 853 F.3d 339, 341 (7th Cir. 2017). Thus, a claim of discrimination on the basis of sexual orientation is considered pursuant to Title VII of the Civil Rights Act of 1967. *Hively*, 853 F.3d at 351-352. Mrs. Cole is Caucasian and identifies as heterosexual, and Ms. Stringham is Hispanic and identifies as homosexual. Ms. Stringham is the only non-Caucasian in her department, and she is the only one in her

Dr. Michael Beresford, Superintendent
CARMEL CLAY SCHOOLS
December 3, 2021
Page 3 of 3

department that identifies as homosexual. While Mrs. Cole was Ms. Stringham's supervisor, she was constantly harassed about her work even though she was substantially meeting her work expectations. Her marriage to another woman was also criticized. The most recent PIP and subsequent 32 write ups are an attempt to paper Ms. Stringham's file and impose discipline as a potential set up for her termination; in other words, it is pretext for race, sexual orientation, and national origin discrimination. It is also retaliation for Ms. Stringham's report of discrimination in October of 2020. *See* 42 U.S.C. § 2000e-3(a) (providing in part that it is illegal to discriminate against any individual who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing….").

Ms. Stringham was also subjected to a hostile work environment by Carmel High, a further Title VII violation. To state a claim for hostile work environment, it must be demonstrated that "1) [s]he was subject to unwelcome harassment; 2) the harassment was based on [her race, sexual orientation, and national origin]; 3) the harassment was so severe [or] pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is basis for employment liability." *Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). The negative comments and actions towards Ms. Stringham from Mrs. Cole that continued until Ms. Stringham took her FMLA leave subjected Ms. Stringham to a work environment that is hostile. Ms. Stringham reported this unlawful, hostile environment. Nothing changed.

### III.   CONCLUSION

Based on the above, we believe that Ms. Stringham's treatment at Carmel High is discriminatory and retaliatory in violation of Title VII and has resulted in a hostile work environment. Unless these issues are resolved amicably and professionally, Ms. Stringham will be compelled to pursue all legal relief against Carmel Clay Schools.

If you would like to discuss resolution of this matter amicably and professionally, please contact me by **December 10, 2021**.

Respectfully,

*Jamie A. Maddox*

Jamie A. Maddox

EEOC Form 5 (11/09)

## AMENDED CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | 470-2022-01401 |
| ☒ EEOC | |

### Indiana Civil Rights Commission
and EEOC
*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mrs. Dianna Stringham | (317)514-1004 | 06/25/1967 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 4151 Limbaugh Way | Westfield, IN 46062 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Carmel Clay Schools | 201-500 | (317)844-9961 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 5201 E. Main Street | Carmel, IN 46033 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☒ OTHER (Specify)  **Hostile Work Environment**

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 4/23/2020     Latest: Present

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Please see the attached.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 2/25/2022        *[signature]* Dianna Stringham | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date        Charging Party Signature | |

CCS 00546

## AMENDED CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act
Statement and other information before completing this form

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | 470-2022-01401 |
| ☒ EEOC | |

### Indiana Civil Rights Commission

*State or local Agency, if any* and EEOC

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by Carmel Clay Schools, specifically Carmel High School ("Carmel High") as a Counselor on July 28, 2014. I have performed my job duties exceptionally in my role as Counsel and have received performance evaluation grades of "Effective" and "Highly Effective" on my previous evaluations since my employment began with Carmel High. My current supervisors are Ms. Rachel Cole, the Counseling Director, and Dr. Thomas Harmas, the Carmel High Principal. Ms. Cole and I originally worked in similar roles prior to her promotion to Counseling Director. Since she became my supervisor, Ms. Cole has had numerous negative interactions with me without explanation. She constantly micromanages me, questions my decision making and overall makes snide and curt comments in the workplace and in work emails.

During one workday at Carmel High, I was having a conversation with another counselor, Abby Cartwright, who was dating someone of the same sex. Ms. Cartwright told me that she believed Ms. Cole was targeting her as well for dating someone of the same sex. I am also married to a woman. My co-worker also told me that Ms. Cole told her that dating another individual of the same sex was not a great idea. Ms. Cole also said to Ms. Cartwright, "Can you believe Stringham is married to a woman? That is weird."

After I received this information and the continued negative treatment from Ms. Cole, I filed a Report of Discrimination and/or Harassment with Carmel Clay Schools in October of 2020. In this Report, I reported that I believed I was discriminated against based on my sexual orientation, homosexual, and my race and/or national origin, Hispanic. After I filed this Report, I was placed on a Performance Improvement Plan ("PIP") by Ms. Cole. As part of the PIP, I was required to copy Ms. Cole on all emails, log all emails, write down all phone contacts, make two-week lesson plans, summarize all reprimands I have ever had, observe two (2) other counselors in SST and do a write up summary of my observations, and create a list of at-risk students every day by 4:15 p.m. every Friday. I was also written up for "not being culturally aware." I am the only non-Caucasian to be written up for this. Since the beginning of the 2021-2022 academic year, I have been written up thirty-two (32) times in a sixty (60) day period. I am not aware of any other counselor who is on a PIP and/or has been written up thirty-two (32) times in a sixty (60) day period. I was on FMLA leave because of the emotional stress and anxiety the discrimination, harassment and retaliation has caused me, but I returned to work at Carmel High on January 11, 2022. Since this time, I have been written up an additional 30 times by Ms. Cole. Ms. Cole has also refused to sign paperwork validating my years and work as a Licensed Professional School counselor. I am working on more professional development and adding to my license, Mental Health counselor. I just need validation to the state that I have been active in this role. I also was refused by Dr. Tom Oestreich, assistant superintendent for the same matter. Thereafter, on January 31, 2022, I was placed on paid administrative leave. I was placed on leave after I made additional complaints of discrimination based on my sexual orientation, race and national origin Most recently, on February 4, 2022, I received a Notice of Principal's Preliminary Decision & Statement of Your Conference and Conference/Hearing Rights, cancelling my teaching contract with Carmel High.

I believe that I have been harassed and discriminated against by Carmel Clay Schools because of my sexual orientation, homosexual, and my race and/or national origin, Hispanic, in violation of Title VII. I further believe that I have been retaliated against for complaining about discrimination, in violation of Title VII, and been subject to a hostile work environment, a further Title VII violation.



### CARMEL CLAY SCHOOLS

5201 East Main Street, Carmel, Indiana 46033 • Telephone: 317.844.9961 • Fax: 317.844.9965 • www.ccs.k12.in.us

January 31, 2022

Mrs. Dianna Stringham
4151 Limbaugh Way
Westfield, IN 46062

Dear Mrs. Stringham:

This letter notifies you that the school district has placed you on paid administrative leave effective immediately, January 31, 2022 pending review. Your leave will continue until the school district notifies you otherwise.

You are not to report to work or otherwise be on the premises at Carmel High School or any school district property until further notice. If you feel there is a legitimate reason for you to be on school or district property, you may make that request to me in writing and I will review.

You will receive further documentation in the near future outlining next steps.

Please free to contact me at any time if you have any other questions.

Sincerely,

Dr. Thomas A. Oestreich
Assistant Superintendent, Staff and Student Services
Carmel Clay Schools

*Experience excellence...Explore opportunities...Realize potential*

CCS 00548



## CARMEL CLAY SCHOOLS

5201 East Main Street, Carmel, Indiana 46033 • Telephone: 317.844.9961 • Fax: 317.844.9965 • www.ccs.k12.in.us

February 4, 2022

### SENT VIA **CERTIFIED MAIL** AND **EMAILED**

Dianna Stringham
4151 Limbaugh Way
Westfield, IN 46062

## Notice of Principal's Preliminary Decision &
## Statement of Your Conference and Conference/Hearing Rights

Dear Mrs. Stringham:

I have made the preliminary decision to cancel your teaching contract. I am making this recommendation for the following reasons:

- Your unprofessional behavior directed towards your supervisor on January 28, 2022 where you were yelling loudly at her about a form you demanded she sign, when the assistant superintendent already communicated with you that any questions should be directed to him about the topic.

- You continued job performance that falls below what we expect out of our counselors at Carmel High School. You continue to make errors in your role as a counselor that impacts other staff and students.

These reasons constitute, insubordination, incompetence, neglect of duty and other good and just cause within the meaning of Indiana Code section 20-28-7.5-1(b)(6).

You have a right to a private conference with the Superintendent to discuss my preliminary decision. In order to have this right to the Superintendent's Conference you must request it in writing within five (5) days of your receipt of this preliminary decision letter. If you request such a conference, it will be conducted with the Superintendent at our Education Service Center (ESC) located at 5201 East Main Street Carmel, IN 46033. At the conference with the Superintendent you may be accompanied by a representative. If you do not request a conference with the Superintendent, my preliminary decision becomes final.

*Experience excellence...Explore opportunities...Realize potential*

CCS 00549



### CARMEL CLAY SCHOOLS

5201 East Main Street, Carmel, Indiana 46033 • Telephone: 317.844.9961 • Fax: 317.844.9965 • www.ccs.k12.in.us

If you request and have a conference with the Superintendent and are not satisfied with his recommendation, you may request a conference with the Board of Education in Executive Session. To have a private conference/hearing with the Board, you must submit a written request for a private conference with the Board to the Superintendent not later than five (5) days after your conference with the Superintendent. If requested timely, that private conference will be scheduled. You may be accompanied by a representative at this conference as well.

The Board may vote to cancel your teaching contract by a majority vote of the full Board in a public meeting evidenced by a signed statement in the minutes of the Board. The Board's decision will be in writing and is final.

If the Board votes to cancel your teaching contract, your teacher contract will terminate at the end of the day of when the board publicly votes. If the Board does not terminate your contract on that day, you will be scheduled to meet with me in my office on the next day to reassume your duties consistent with the Board's decision.

Enclosed with this preliminary decision is a copy of Indiana Code chapter 20-28-7.5, which provides further detail on the process and your statutory rights.

2/4/2022
DATE

Dr. Thomas Harmas
Principal, Carmel High School

Enclosure

*Experience excellence...Explore opportunities...Realize potential*

Teacher Exhibit 44 - p. 001

ATTORNEYS

Kevin W. Betz
President/General Counsel

Sandra L. Blevins
Managing Partner

Jamie A. Maddox
Partner

Courtney E. Endwright
Senior Associate

Chad H. Holler
Associate

PARALEGALS

Abigail L. DeCoursey
Director of Administration

PRACTICE AREAS

Severance and
Employment Agreements

Professional Licensing

Wrongful Discharge

Family and Medical
Leave Act

Employee Benefits

Federal and State Court
Litigation

Covenants Not to
Compete

Professor/Teacher
Tenure and Discipline

Physician Rights
and Nurses Rights

Discrimination and
Retaliation

CONTACT

One Indiana Square
211 N. Pennsylvania St.
Suite 1660
Indianapolis, IN 46204

Phone 317.687.2222

Follow us on Twitter:
@BetzBlevins

BetzAdvocates.com

# BETZ+
# BLEVINS
### LITIGATION AND EMPLOYMENT LAW

February 8, 2022

**VIA ELECTRONIC MAIL**
Dr. Michael Beresford, Superintendent
CARMEL CLAY SCHOOLS
5201 E. Main Street
Carmel, IN 46033
mberesfo@ccs.k12.in.us

Re:   *Ms. Dianna Stringham v. Carmel Clay Schools*

Dear Dr. Beresford:

As you know, we represent Ms. Dianna Stringham relating to the proposed cancellation of her teaching contract. We are in receipt of the letter dated February 4, 2022 from Dr. Thomas Harmas to Ms. Stringham notifying Ms. Stringham that a preliminary decision has been made to cancel Ms. Stringham's teaching contract.

This is Ms. Stringham's timely formal written request for a conference with you pursuant to Ind. Code § 20-28-7.5-2. Please contact me with proposed dates and times for this conference.

Please let me know if you have any questions.

Respectfully,

*Jamie A. Maddox*

Jamie A. Maddox

pc:   Brent Borg, Esquire (via email)

**ADVOCATES FOR INDIVIDUALS**

CCS 00551



**CARMEL CLAY SCHOOLS**
TOGETHER WE ACHIEVE

5201 East Main Street
Carmel, IN 46033

317.844.9961

www.ccs.k12.in.us

March 1, 2022

Ms. Katie Browning, Board President
Board of School Trustees
Carmel Clay Schools                      **VIA HAND DELIVERY & EMAIL**
5201 East Main Street
Carmel, IN 46033

RE:   <u>Superintendent's Recommendation</u>

Dear President Browning:

On February 24, 2022, I conducted the Superintendent's conference with Dianna
Stringham, a counselor at Carmel High School, pursuant to Mrs. Stringham's request and Indiana
Code § 20-28-7.5-2. Mrs. Stringham and I visited for approximately one hour as she thoroughly
explained her reasons for why I should not following the preliminary recommendation by her
principal, Dr. Harmas, to cancel her regular teacher's contract.

Dr. Harmas presented two reasons for cancellation. First, Mrs. Stringham on January 28,
2022, was witnessed by several individuals to be yelling and generally behaving unprofessionally
towards her supervisor, Rachel Cole, Director of Counseling. Second, Mrs. Stringham's continued
performance issues were not rectified by plans of assistance. Thus, Dr. Harmas found Mrs.
Stringham's conduct to constitute insubordination, incompetence, neglect of duty, and other good
and just cause as those terms are defined under Indiana law.

In regards to the January incident, Mrs. Stringham acknowledged that she was upset when
she confronted Ms. Cole about signing some paper forms, but that she never yelled. However,
multiple witnesses, including some who physically were located some distance away, recall the
volume at which Mrs. Stringham relayed her frustrations. And this confrontation with Ms. Cole
over the forms came after Dr. Thomas Oestreich, Assistant Superintendent for Staff and Student
Services, had asked that Ms. Stringham follow up with him should there be any questions regarding
the forms.

Furthermore, in relation to her job performance, Mrs. Stringham acknowledged that she
had been under a plan of assistance following several years of Highly Effective or Effective
evaluations given by Ms. Cole. A plan of assistance was in place during 2020-2021, and a new
one installed for the 2021-2022 school year. The 2021-2022 plan of assistance was further
extended as well. Nevertheless, performance issues related to communications with families and
fulfillment of job duties persisted.

CCS  00552

Ultimately Mrs. Stringham believes that the reason for the contract cancellation recommendation from Dr. Harmas was due to animus possessed by Ms. Cole because of her sexual orientation and ethnicity. But at the Superintendent's conference Mrs. Stringham did not offer evidence that animus was a motivating factor. Indeed, this reason was offered as speculation because Mrs. Stringham did not conclude the other reasons were true.

Thus, based on my review and Mrs. Stringham's presentation at the Superintendent's conference, it is the Superintendent's recommendation to the Board of School Trustees that the Board should cancel Mrs. Stringham's regular teacher's contract.

Sincerely,

Dr. Michael Beresford
Superintendent

4323882_1

cc:     Mrs. Dianna Stringham (via email)
        Mr. Jonathan L. Mayes (via email)

CCS 00553

Teacher Exhibit 46 - p. 001

ATTORNEYS

Kevin W. Betz
Senior Founding Counsel

Sandra L. Blevins
Managing Partner

Jamie A. Maddox
Partner

Courtney E. Endwright
Senior Associate

Chad H. Holler
Associate

PARALEGALS

Abigail L. DeCoursey
Director of Administration

PRACTICE AREAS

Severance and
Employment Agreements

Professional Licensing

Wrongful Discharge

Family and Medical
Leave Act

Employee Benefits

Federal and State Court
Litigation

Covenants Not to
Compete

Professor/Teacher
Tenure and Discipline

Physician Rights
and Nurses Rights

Discrimination and
Retaliation

CONTACT

One Indiana Square
211 N. Pennsylvania St.
Suite 1660
Indianapolis, IN 46204

Phone 317.687.2222

# BETZ+ BLEVINS

LITIGATION AND EMPLOYMENT LAW

February 28, 2022

**VIA ELECTRONIC MAIL**
Carmel Clay School Board
c/o Andrew A. Manna, Esquire
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
andrew@cchalaw.com

Re:   *Mrs. Dianna Stringham v. Carmel Clay Schools*

Dear Andrew:

As you know, we represent Mrs. Dianna Stringham relating to the proposed cancellation of her teaching contract. A private conference was held on February 24, 2022 between Mrs. Stringham and her counsel and Superintendent Michael Beresford and his counsel.

Although Mrs. Stringham has not yet received Dr. Beresford's recommendation, pursuant to Ind. Code § 20-28-7.5-2, this is Mrs. Stringham's timely formal written request for a conference with the Carmel Clay School Board in the event Dr. Beresford concurs with the Principal's preliminary decision to cancel Mrs. Stringham's contract.

Please contact me with proposed dates and times for this conference. Please let me know if you have any questions.

Respectfully,

*Jamie A. Maddox*

Jamie A. Maddox

pc:   Jonathan L. Mayes, Esquire (via email)

Follow us on Twitter:
@BetzBlevins

BetzAdvocates.com

**ADVOCATES FOR INDIVIDUALS**

CCS  00554

11675

**REGULAR TEACHER CONTRACT**

*Prescribed pursuant to Ind. Code 20-28-6-3 as the regular and uniform contract*
*for the employment of teachers pursuant to Ind. Code 20-28-6-4(b)*

This regular teacher contract ("Contract") is by and between the governing body of the **Carmel Clay Schools** ("Corporation") and **Dianna Stringham** ("Teacher"). **Dianna Stringham**  is a teacher as defined in Ind. Code 20-18-2-22.

In exchange for the Teacher's services described below, the Corporation and the Teacher agree that:

1. The Teacher shall teach in the schools of the Corporation for the school term, beginning **08/09/2021**, and ending on **06/30/2022**. Ind. Code 20-28-6-2(a)(3)(A)

2. The school term described in paragraph 1 immediately above for services under this Contract consists of **195** days. Ind. Code 20-28-6-2(a)(3)(B)

3. The number of hours per day the Teacher is expected to work under this Contract is **7.5**. Ind. Code 20-28-6-2(a)(3)(E)

4. The Corporation shall pay the Teacher for services under this Contract the total salary of **$71,367.00** during the school year. Ind. Code 20-28-6-2(a)(3)(C)

5. The Corporation shall pay this amount in **26** installments. Ind. Code 20-28-6-2(a)(3)(D) Ind. Code 20-28-6-5(1)

6. This Contract may be cancelled during its term for any of the grounds set forth in Ind. Code 20-28-7.5-1(b) pursuant to the procedures set forth in Ind. Code 20-28-7.5-2 and Ind. Code 20-28-7.5-3.

7. This contract is public record pursuant to Ind. Code 20-28-6-2(d) and Ind. Code 5-14-3.

Agreed this 9th day of August, 2021.

Teacher:

School Corporation by:

President

Attested:

Superintendent

Secretary

CCS  00555

**BEFORE THE BOARD**
**OF SCHOOL TRUSTEES OF CARMEL CLAY SCHOOLS**

| | |
|---|---|
| IN RE: THE BOARD OF SCHOOL TRUSTEES | ) |
| CONSIDERATION OF THE CANCELLATION | ) |
| OF DIANNA STRINGHAM'S TEACHING CONTRACT | ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW**
**AND DECISION OF DIANNA STRINGHAM**

Dianna Stringham ("Mrs. Stringham"), by counsel, respectfully submits the following proposed findings of fact and conclusions of law. At the private conference with the Board held on March 15, 2022, Mrs. Stringham was represented by Jamie A. Maddox and Chad H. Holler of Betz + Blevins. Carmel Clay Schools ("CCS") was represented by Jonathan L. Mayes of Bose McKinney and Evans.

## I. **FINDINGS OF FACT**

1. Mrs. Stringham loyally served as a counselor for almost eight (8) years at CCS from 2014 to the present, 2022. (Tr. 50:18-21).[1]

2. From 2014 to 2021, Ms. Stringham was always rated as Highly Effective or Effective on her evaluations. (Teacher's Exs. 6-12).

3. Mrs. Stringham is Hispanic. (Tr. 58:18-22).

4. She is the only non-Caucasian in the counseling department. (Tr. 59:13-17; 135:7-21).

5. Mrs. Stringham is homosexual. (Tr. 58:23-59:4).

---

[1] Citations to "Tr." are citations to the draft transcript provided to counsel for the parties on March 16, 2022.

6.     On or about September 1, 2020, Mrs. Stringham filed a Report of Discrimination and/or Harassment against Rachel Cole, the Director of Counseling for Carmel High School. (Teacher's Exs. 1-3).

7.     Mrs. Stringham felt like Mrs. Cole was targeting her because she was homosexual and because she was Hispanic. (Tr. 76:15-24).

8.     Mrs. Cole told Abby Cartwright, a former Carmel High School Social Worker, that she didn't think Ms. Cartwright dating women "was a great idea." (Teacher's Ex. 3 at 2).

9.     Ms. Cartwright told Mrs. Stringham that "things changed after [Ms. Cartwright] started dating women." (Teacher's Exhibit 3 at 2).

10.    She also told Mrs. Stringham that she felt like Mrs. Cole was targeting Ms. Cartwright because she was gay. (Teacher's Ex. 40 at 2; Teacher's Ex. 41 at 2).

11.    Mrs. Cole also stated to Ms. Cartwright: "Can you believe Stringham is married to a woman? That is weird." (Teacher's Ex. 40 at 2; Teacher's Ex. 41 at 2).

12.    When Ms. Cartwright spoke to Mrs. Stringham about Mrs. Cole and her concerns, she was terrified, and she did not want Mrs. Cole to know she was in the office talking to Mrs. Stringham. (Teacher's Ex. 3 at 2; Tr. 78:25-79:5).

13.    On September 10, 2020, Mrs. Stringham was placed on her first improvement plan. (Teacher's Ex. 4).

14.    This was the first improvement plan Mrs. Stringham had ever been placed on. (Tr. 62:14-24).

15.    Mrs. Stringham did not believe she should be placed on an improvement plan. (Teacher's Ex. 5).

16. Mrs. Stringham did not agree with it because she had been highly effective every year. (Tr. 81:12-19).

17. For Mrs. Stringham's 2020-2021 evaluation, Mrs. Cole initially gave Mrs. Stringham a "Needs Improvement." (Tr. 81:20-25).

18. This was nonsensical as Mrs. Stringham had received "Highly Effective" in ten (10) of the evaluation categories, and "Effective" in four (4) of the evaluation categories. (Teacher's Ex. 12).

19. Mrs. Stringham received no "Improvement Necessary" or "Ineffective" on her 2020-2021 evaluation (Teacher's Ex. 12).

20. Dr. Thomas Oestreich, the Assistant Superintendent of CCS, directed Mrs. Cole to change it from "Needs Improvement" to "Effective" as there was no evidence to support a "Needs Improvement." (Tr. 141:12-142:6).

21. Mrs. Stringham was placed on a second improvement plan in July of 2021. (Teacher's Ex. 17).

22. On September 5, 2021, Mrs. Stringham received twenty-four (24) artifacts. (Teacher's Ex. 15; Teacher's Ex. 16 at 1-10).

23. On September 22, 2021, Mrs. Stringham received two (2) artifacts. (Teacher's Ex. 16 at 11-12).

24. On September 29, 2021, Mrs. Stringham received three (3) artifacts. (Teacher's Ex. 16 at 13-15).

25. On October 10, 2021, Mrs. Stringham received two (2) artifacts. (Teacher's Ex. 16 at 16-17).

26. Thus, in four (4) days, Mrs. Stringham received thirty-one (31) artifacts. (Teacher's Exs. 15-16).

27. Artifacts are used and/or considered with a teacher's evaluation. (Tr. 47:13-15).

28. The artifacts are also used for performance purposes. (Tr. 47:16-18).

29. Prior to Mrs. Stringham receiving artifacts/write-ups in 2021 and 2022, she had never received any artifacts and/or write-ups. (Tr. 46:19-47:2).

30. After receiving these thirty-one (31) artifacts, Mrs. Stringham went on medical leave on October 11, 2021. (Tr. 70:15-16).

31. Mrs. Stringham went on medical leave because she was suicidal, stressed, anxious, and depressed because of Mrs. Cole's treatment of her. (Tr. 83:17-84:1).

32. Mrs. Stringham filed a second Report of Discrimination and/or Harassment against Mrs. Cole on January 3, 2022. (Teacher's Ex. 26).

33. Mrs. Stringham never received a decision relating to her second complaint of discrimination. (Tr. 84:23-25; 145:6-9).

34. Mrs. Stringham returned to work after her medical leave on January 11, 2022. (Tr. 84:2-3).

35. When Mrs. Stringham returned to school, she was placed on another improvement plan. (Teacher's Ex. 27).

36. Again, Mrs. Stringham did not believe that she should be placed on a third improvement plan. (Tr. 84:4-9).

37. No other counselors at Carmel High School had ever been placed on an improvement plan. (Tr. 127:13-15).

CCS  00559

38.     On January 23, 2022, Mrs. Stringham received twenty-nine (29) artifacts. (Teacher's Exs. 29-31).

39.     Thus, in a total of five (5) days, Ms. Stringham received sixty (60) total artifacts. (Teacher's Exs. 15-16, 29-31).

40.     The most artifacts any other counselor ever had was two (2) or three (3) artifacts. (Tr. 127:4-10).

41.     No counselor had ever received sixty (60) or more artifacts. (Tr. 127:11-12).

42.     Indeed, Dr. Oestreich testified that no employee at Carmel had ever received sixty (60) or more artifacts in a matter of thirty-five (35) days. (Tr. 145:22-25).

43.     Although other counselors had made errors, Mrs. Cole did not submit artifacts for these counselors when an error was made. (Tr. 127:16-21).

44.     Other counselors had also had issues with their audits, but these counselors were not placed on an improvement plan. (Tr. 128:23-129:3).

45.     Mrs. Stringham is the only counselor to whom Mrs. Cole has provided negative feedback. (Tr. 136:3-7; 137:6-138:2).

46.     As part of Mrs. Stringham's licensing to become a Mental Health Counselor, she needed Mrs. Cole to sign a form or provide verification of Mrs. Stringham's employment as a counselor on CCS letterhead. (Tr. 71:7-9; 85:15-86:5).

47.     Mrs. Cole refused to sign it. (Tr. 86:15-16).

48.     After Mrs. Cole initially refused to sign the forms, Mrs. Stringham went to Mrs. Cole's office to explain what needed to be done for the forms. (Tr.86:21-90:10).

49.     Mrs. Stringham explained that the State of Indiana merely needed verification that Mrs. Stringham had been a professional school counselor for the past 7 ½ years at Carmel High School. (Tr. 87:8-12).

50.     Mrs. Cole still refused to sign the form. (Tr. 87:13-14).

51.     Mrs. Stringham asked her to call the State so that they could explain to Mrs. Cole what was needed. (Tr. 87:19-21).

52.     Again, Mrs. Cole refused. (Tr. 87:20-21).

53.     Mrs. Stringham asked her to put the needed information on CCS letterhead, but Mrs. Cole refused. (Tr. 88:1-3; 97:19-24).

54.     Mrs. Stringham stated that Mrs. Cole's tone was aggressive. (Tr. 88:9-10).

55.     Mrs. Stringham never leaned over the desk as Mrs. Cole claimed. (Tr. 88:11-18).

56.     Mrs. Stringham believes that others heard the conversation because the walls are thin. (Tr. 89:19-90:7).

57.     Mrs. Stringham stated that the walls were so thin, others could hear people sneeze while they were in different offices. (Tr. 90:8-10).

58.     Indeed, the walls in the Carmel High School Counseling Department are so thin that each counselor was issued a white noise machine to drown out any noise. (Tr. 48:7-11; 107:6-17).

59.     On January 31, 2022, Mrs. Stringham was placed on paid administrative leave. (Teacher's Ex. 42).

60.     No reasons for this paid administrative leave were given in writing. (Teacher's Ex. 42).

61.     On February 4, 2022, Mrs. Stringham received a *Notice of Preliminary Decision & Statement of Your Conference and Conference/Hearing Rights*. (Teacher's Ex. 43).

62.     The *Notice* listed only two (2) reasons for the proposed cancellation of Mrs. Stringham's teaching contract:

- Your unprofessional behavior directed towards your supervisor on January 28, 2022 where you were yelling loudly at her about a form you demanded she sign, when the assistant superintendent already communicated with you that any questions should be directed to him about the topic.
- You [sic] continued job performance that falls below what we expect out of our counselors at Carmel High School. You continue to make errors in your role as a counselor that impacts other staff and students.

(Teacher's Ex. 43 at 1).[2]

63.     Although the letter was purportedly signed by Dr. Thomas Harmas, the Carmel High School Principal, Dr. Thomas was not present to confirm that he signed and issued the *Notice*. (Tr. 151:18-20; 153:2-12).

64.     For the alleged incident on January 28, 2022, CCS never reminded Mrs. Stringham to "remain civil and be respectful and courteous to others" contrary to CCS's own *Civility and Decorum* policy. (Administration Ex. 26B; Tr. 91:4-12).

65.     CCS also never attempted to progressively discipline Mrs. Stringham for the alleged incident on January 28, 2022. (Administration Ex. 26B; Tr. 91:13-24).

66.     Again, this was contrary to CCS's own *Civility and Decorum* policy. (Administration Ex. 26B).

---

[2] The CCS Board asked a question of Dr. Oestreich about the CCS social media policy. Because CCS failed to provide notice of any allegations relating to any social media policies to Mrs. Stringham as required by due process, counsel for Mrs. Stringham objected to any discussion of any alleged violations of a social media policy. (Tr. 146:4-149:8).

67.     On February 8, 2022, Mrs. Stringham timely requested a conference with the Superintendent. (Teacher's Exhibit 44).

68.     On February 24, 2022, a private conference between Mrs. Stringham and Dr. Beresford was held. (Teacher's Exhibit 45).

69.     On February 28, 2022, Mrs. Stringham timely requested a private conference with the Board. (Teacher's Exhibit 46).[3]

70.     On March 1, 2022, Dr. Beresford affirmed the *Notice of Preliminary Decision & Statement of Your Conference and Conference/Hearing Rights*. (Teacher's Exhibit 45).

71.     On March 15, 2022, a private conference was held with the Board.

## II.     <u>CONCLUSIONS OF LAW</u>

1.     Pursuant to Ind. Code § 20-28-7.5-3, the governing body of the school corporation must have a majority vote to cancel the permanent contract of a teacher.

2.     The issues for determination by the CCS School Board are whether Mrs. Stringham committed "insubordination," "incompetence," "neglect of duty" and "other good and just cause" with her alleged unprofessional behavior directed towards her supervisor on January 28, 2022 and/or with her job performance that allegedly fell below what was expected of Carmel High School counselors.

---

[3] Counsel for the Administration seemed to insinuate that Mrs. Stringham somehow knew what Dr. Beresford's recommendation would be and/or did not care what Dr. Beresford's recommendation would be because she requested a board conference prior to receiving Dr. Beresford's recommendation. (Tr. 73:19-75:23). As counsel for the Administration is aware, Indiana Code § 20-28-7.5-2(f) provides that a request for a conference with the Board must be made "not later than five (5) days after the initial private conference with the superintendent." Had Mrs. Stringham not requested a board conference within the five (5) day timeframe, she would have lost all rights to a board conference. Moreover, Mrs. Stringham specifically stated in her request for a board conference that she was requesting a conference "in the event Dr. Beresford concurs with the Principal's preliminary decision to cancel Mrs. Stringham's contract." (Teacher's Ex. 46).

CCS  00563

3. CCS must prove by a preponderance of the evidence that Mrs. Stringham committed "insubordination," "incompetence," "neglect of duty" and "other good and just cause."

4. CCS must prove by a preponderance of the evidence that Mrs. Stringham engaged in unprofessional behavior directed towards her supervisor on January 28, 2022 and/or that her job performance fell below what was expected of Carmel High School counselors.

5. CCS has failed to meet its burden of proof regarding its claim of "insubordination" pursuant to Ind. Code § 20-28-7.5-1(e)(2) by failing to present evidence that Mrs. Stringham willfully refused to obey state school laws or reasonable rules adopted by the CCS. The evidence presented does not meet the legal standard required under Ind. Code § 20-28-7.5-1-(e)(2) because Mrs. Stringham did not "willfully" violate such a law, rule or policy.

6. Indeed, CCS failed to provide any evidence whatsoever that Mrs. Stringham willfully refused to obey state school laws or reasonable rules adopted by the CCS. No state school law or reasonable rule were presented to the CCS School Board.

7. CCS has failed to meet its burden of proof regarding its claim of "incompetence" pursuant to Ind. Code § 20-28-7.5-1(e)(3) by failing to present evidence that Mrs. Stringham "receiv[ed] an ineffective designation on two (2) consecutive performance evaluations or an ineffective designation or improvement necessary rating under IC 20-28-11.5 for three (3) years of any five (5) year period."

8. Indeed, Mrs. Stringham never received **any** ineffective and/or improvement necessary designations during her entire tenure at Carmel High School. In Mrs. Stringham's entire tenure at Carmel High School, she only received "Highly Effective" or "Effective" designations:

- 2014-2015: Effective (Teacher's Ex. 6 at 23);

- 2015-2016: Highly Effective (Teacher's Ex. 7 at 24);

- 2016-2017: Highly Effective (Teacher's Ex. 8 at 20);

- 2017-2018: Highly Effective (Teacher's Ex. 9 at 22);

- 2018-2019: Highly Effective (Teacher's Ex. 10 at 13);

- 2019-2020: Highly Effective (Teacher's Ex. 11 at 11);

- 2020-2021: Effective (Teacher's Ex. 12 at 16);

9.      CCS has failed to meet its burden of proof regarding its claim of "neglect of duty" pursuant to Ind. Code § 20-28-7.5-1(e)(5) by failing to present evidence that Mrs. Stringham engaged in unprofessional behavior directed towards her supervisor on January 28, 2022 and/or that her job performance fell below what was expected of Carmel High School counselors. The evidence presented does not meet the legal standard required under Ind. Code § 20-28-7.5-1(e)(5) because Mrs. Stringham did not engage in unprofessional behavior nor did her job performance fall below what was expected of Carmel High School counselors.

10.      Indeed, Mrs. Stringham always received Highly Effective or Effective evaluations. Mrs. Cole only placed Mrs. Stringham on multiple improvement plans in retaliation for Mrs. Stringham filing two (2) complaints against Mrs. Cole alleging discrimination on the basis of sexual orientation and race and/or national origin. These multiple improvement plans and sixty (60) artifacts only came **after** Mrs. Stringham filed her complaints of discrimination and retaliation.

11.      The administration has failed to meet its burden of proof regarding its claim of "other good and just cause" pursuant to Ind. Code § 20-28-7.5-1(e)(7) by failing to present evidence that Mrs. Stringham engaged in unprofessional behavior directed towards her supervisor

on January 28, 2022 and/or that her job performance fell below what was expected of Carmel High School counselors. The evidence presented does not meet the legal standard required under Ind. Code § 20-28-7.5-1(e)(7) because Mrs. Stringham did not engage in unprofessional behavior nor did her job performance fall below what was expected of Carmel High School counselors.

12.     Indeed, Mrs. Stringham always received Highly Effective or Effective evaluations. Mrs. Cole only placed Mrs. Stringham on multiple improvement plans in retaliation for Mrs. Stringham filing two (2) complaints against Mrs. Cole alleging discrimination on the basis of sexual orientation and race and/or national origin. These multiple improvement plans and sixty (60) artifacts only came **after** Mrs. Stringham filed her complaints of discrimination and retaliation.

13.     CCS failed to present evidence that Mrs. Stringham's alleged conduct constituted "insubordination," "incompetence," "neglect of duty" and/or "other good and just cause" amounting to a terminable offense.

14.     Mrs. Stringham always received Highly Effective or Effective evaluations. Mrs. Cole only placed Mrs. Stringham on multiple improvement plans in retaliation for Mrs. Stringham filing two (2) complaints against Mrs. Cole alleging discrimination on the basis of sexual orientation and race and/or national origin. These multiple improvement plans and sixty (60) artifacts only came **after** Mrs. Stringham filed her complaints of discrimination and retaliation.

15.     By violating federal law – namely by CCS and Mrs. Cole discriminating against and retaliating against Mrs. Stringham in violation of Title VII of the Civil Rights Act of 1964 – Mrs. Stringham's contract cannot be terminated.

16.     Based on this lack of evidence, the recommendation made by Mr. Harmas and Dr. Beresford for termination of Mrs. Stringham's contract is hereby denied.

### III.   DECISION OF THE BOARD OF SCHOOL TRUSTEES

Based on the preceding findings of fact and conclusions of law, the Board of School Trustees of Carmel Clay Schools by the vote of _____ of the five (5) members resolves and decides that Mrs. Stringham's teaching contract and employment as a counselor for Carmel Clay Schools should not be cancelled upon approval of these findings of fact and conclusions of law.

APPROVED AS TO FORM AND LEGALITY.


_____
Andrew Manna, Board Counsel


ALL OF WHICH IS ENTERED INTO THE RECORD OF THE MINUTES OF THE BOARD OF SCHOOL TRUSTEES THIS 28TH DAY OF MARCH, 2022.

_____                    _____
Katie Browning, President                                        Louise Jackson, Vice-President

_____                    _____
Jennifer Nelson-Williams, Secretary                      Layla Spanenberg, Member

_____
Mike Kerschner, Member

CCS  00567

**BEFORE THE**
**BOARD OF SCHOOL TRUSTEES**
**CARMEL CLAY SCHOOLS**

| | |
|---|---|
| **IN THE MATTER OF THE BOARD OF** | ) |
| **SCHOOL TRUSTEES CONSIDERATION** | ) |
| **OF THE CANCELLATION OF THE** | ) |
| **TEACHING CONTRACT OF DIANNA** | ) |
| **STRINGHAM AS A COUNSELOR** | ) |

**SUBMISSION OF SCHOOL ADMINISTRATION'S PROPOSED**
**FINDINGS OF FACT, CONCLUSIONS OF LAW,**
**AND DECISION**

The Carmel Clay Schools, by and through its Superintendent Dr. Michael Beresford and

through its counsel, Jonathan L. Mayes, submits its "Proposed Findings of Fact, Conclusions of

Law, and Decision" in the above captioned matter.

Respectfully submitted,

_____
Jonathan L. Mayes
BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN  46204
(317) 684-5000; (317) 223-0245 (Fax)
jmayes@boselaw.com

*Attorney for Carmel Clay Schools and*
*Superintendent Dr. Michael Beresford*

CCS  00568

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing "Proposed Findings of Fact, Conclusions of

Law, and Decision" have been served upon the following before 12:00 P.M. Eastern Daylight

Time this 23rd day of March, 2022:

Ms. Jamie Maddox, *Esq.*  
Betz + Blevins  
Via e-mail at jmaddox@betzadvocates.com

*Counsel for Dianna Stringham*

Mr. Andrew Manna, *Esq.*  
Church Church Hittle + Antrim  
Via email at Andrew@cchalaw.com

*Counsel for the Board of School Trustees for Carmel Clay Schools*


_____

Jonathan L. Mayes


CCS  00569

**BEFORE THE**
**BOARD OF SCHOOL TRUSTEES**
**CARMEL CLAY SCHOOLS**

IN THE MATTER OF THE BOARD OF )
SCHOOL TRUSTEES CONSIDERATION )
OF THE CANCELLATION OF THE )
TEACHING CONTRACT OF DIANNA )
STRINGHAM AS A COUNSELOR )

<u>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION**</u>

This matter is before the Board of School Trustees ("Board") of Carmel Clay Schools ("CCS") based on the recommendation of the School Corporation's administration ("Administration") to cancel the regular teacher's contract of Dianna Stringham. The Administration identified four statutory grounds to cancel Ms. Stringham's contracts: (1) incompetence, (2) neglect of duty, (3) insubordination, and (4) other good or just cause.

An in-person hearing was held in this matter in the Board Meeting Room in the Educational Services Center located at 5201 E. Main Street Carmel, Indiana, on March 15, 2022. Five members of the Board—President Katie Browning, Vice President Louise Jackson, Secretary Jennifer Nelson-Williams, Member Layla Spanenberg and Member Michael Kerschner—participated in the hearing and consideration of this matter.

The Administration was represented by Jonathan Mayes of Bose McKinney & Evans LLP. Ms. Stringham was represented by Jamie Maddox and Chad H. Holler of Betz + Blevins. Andrew Manna of Church Church Hittle + Antrim was the Board's counsel and, without objection, presided as the hearing officer. Mr. Manna advised the Board as a private attorney and was not a decision-maker in this matter.

The parties stipulated to exhibits and all were admitted into the record without objection. Specifically, Administration Exhibits 1-30 and Teacher Exhibits 1-46 are considered part of the

record along with Board Exhibit 1, which was also admitted without objection.

Based on the evidence presented to the Board, the Board's evaluation of the demeanor and credibility of the witnesses, the proposed findings of fact and conclusions of law submitted by the parties, and the arguments of counsel, the Board now makes the following findings of fact and conclusions of law.

### Findings of Fact

1.      Mrs. Stringham is employed as a counselor at Carmel High School ("CHS") with CCS pursuant to a regular teacher's contract in accordance with Indiana Code § 20-28-6-4. (Board Ex. 1.) Mrs. Stringham was present throughout the hearing and she testified as a witness at the hearing.

2.      Rachel Cole has been Director of Counseling at CHS since December 2017 and previously served as a freshman counselor at CHS. Mrs. Cole testified as a witness at the hearing.

3.      Maureen Borto has been Assistant Principal at CHS with oversight of counselors since the start of the 2020-2021 school year. Ms. Borto previously served as a teacher and Chair of CHS's english department for eighteen years. Ms. Borto testified as a witness at the hearing.

4.      Dr. Thomas Oestreich has been Assistant Superintendent of Staff and Student Services since January, 2020, and previously was Assistant Superintendent with the Metropolitan School District of Washington Township. Dr. Oestreich testified as a witness at the hearing.

5.      Dr. Michael Beresford has been Superintendent of CCS since July, 2018, and previously was Assistant Superintendent of Hamilton Southeastern Schools. Dr. Beresford testified as a witness at the hearing.

CCS  00571

6.     A transcript of the entire hearing was recorded by a court reporter.  The transcript and documents admitted into evidence by the Board constitute the record of the proceedings.

7.     Mrs. Stringham has been employed with CCS since 2015 as a counselor at CHS.

8.     As a counselor, Ms. Stringham's responsibilities including advising students on graduation requirements; assisting students with questions regarding class schedules; guiding students towards graduation and career pathways; communicating with families of students on schedules, graduation and career pathway requirements; and collaborating with her fellow counselors.

9.     In December 2017, a fellow counselor at CHS, Rachel Cole, was promoted to Director of Counseling.

10.     Beginning with the 2016-2017 school year, Mrs. Cole served as Mrs. Stringham's direct supervisor and primary evaluator. (Admin. Ex. 1 p. 1.)

11.     For the 2016-2017 school year, Mrs. Cole gave Mrs. Stringham the evaluation rating of Highly Effective. (Admin. Ex. 1 p. 1.)

12.     Highly Effective is the highest rating a counselor could achieve. (Admin. Ex. 1 p. 1.)

13.     Likewise, for the 2017-2018 school year, Mrs. Cole gave Mrs. Stringham the evaluation rating of Highly Effective. (Admin. Ex. 1 p. 3.)

14.     Mrs. Cole also gave Mrs. Stringham the evaluation rating of Highly Effective for the 2018-2019 school year. (Admin. Ex. 1 p. 5.)

15.     For the fourth consecutive year, Mrs. Stringham received a Highly Effective evaluation rating for the 2019-2020 school year. (Admin. Ex. 1 p. 7.)

CCS  00572

16.     However, concerns began to surface regarding her performance and escalated during the spring semester of the 2019-2020 school year. During this time, the COVID-19 pandemic forced remote learning, and many students were struggling. Ms. Borto testified that the counseling department held weekly meetings during which counselors would present lists of students to discuss. Counselors brought the names of several students for discussion, but Mrs. Stringham usually had none. It was evident, according to Ms. Borto, that Mrs. Stringham was not connecting with students, reaching out to families, or reaching out to homes to get more information. Mrs. Stringham was also late to several virtual meetings with students and families where plans were being made to comply with CCS's obligations under federal law, specifically Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (as amended).

17.     With each evaluation, Mrs. Cole provided written comments. (Admin. Ex. 1 pp. 2, 6, 8 & 10.)

18.     For the 2019-2020 evaluation, Mrs. Cole identified significant concerns in written comments that were included in the evaluation (Admin. Ex. 1 pp. 8.):

**Final Evaluator Comments:**
Dianna your overall observations when observing working with a student are highly effective. You do a nice job when sitting with student's one to one listening and taking time to try to support them. You do need to be careful that we stay within our school policies even if you think you want to make something happen for a student. I think your heart and intention are to support them, but there are also boundaries and professionally that is an expectation you need to follow even if your opinion differs from our school policy or guidelines. (Plato World History, Study hall and aide in schedules doubled, Senior Transition). I think you have given time and done and given great guidance to help students dig themselves out of some holes and/or walked them through how they might make a tough decision on a college or course choice. You have a lot of patience and it is evident they feel comfortable coming to talk to you. I do want to express that I do have some concerns. I feel that information at SST isn't always fully done to the extent it needs to be done and there needs to be continued improvement in that area, I also know that administration has asked you to do something like set a 504 up or contact them back and it simply wasn't done I think because you didn't understand why? I need you to recognize that and follow through with what was requested or communicate back to them any questions or concerns. This year we have some information not communicated correctly as well. Email communication was a concern in some areas and the response back to parents for some needs to improve. When I had you do the ASVAB scoresheets you gave the counselors some misinformation and we went over it together, when you sent out the email a few weeks ago you shared that information about fifth year seniors and it simply wasn't true... These are things that I need my counselors to do correctly and that I am fearful I won't be able to catch and correct if I don't know about it. I want you to know I am concerned about your performance as a counselor. The Rise framework does show Highly Effective but moving forward I do want to work on improvement in your role as a counselor overall. I am glad to hear you followed through with reaching out to the employee assistance folks and am very supportive of them and what they do for our district.

CCS  00573

19.     Mrs. Stringham testified that she understood the comment in her 2019-2020 evaluation, and in particular where Mrs. Cole wrote "I want you to know I am concerned about your performance as a counselor", to convey significant performance concerns.

20.     Mrs. Stringham received a copy of this evaluation and the written comments on June 24, 2020. (Admin. Ex. 1 pp. 7.)

21.     Over the 2020 summer, June or July more precisely, Ms. Borto and Ms. Cole, with assistance from Dr. Thomas Harmas, CHS Principal, and Dr. Oestreich, began preparing a detailed improvement plan for Mrs. Stringham.

22.     And as the 2020-2021 school year began, Mrs. Cole identified for Mrs. Stringham more performance issues. (Teacher Ex. 3 pp. 4-5.)   In fact, since becoming Director of Counseling, Mrs. Cole recorded concerns each year from 2017 until 2022. These document the growing list of concerns—growing in severity and frequency—that accelerated beginning in 2020. (Admin. Ex. 2 pp. 1-10.)

23.     Unbeknownst to Mrs. Cole or Ms. Borto, Mrs. Stringham filed an internal complaint with CCS's Human Resources Department on September 1, 2020. (Teacher Ex. 1.)

24.     Mrs. Stringham alleged that Mrs. Cole's continued citation of performance issues constituted harassment and discrimination on the basis of her ethnicity or race (Hispanic) and her sexual orientation (homosexual). (Teacher Ex. 1.)

25.     Mrs. Stringham alleged that the discrimination and harassment began in March, 2020, but she did not complain until September 1, 2020. (Teacher Ex. 1.)

26.     Mrs. Stringham submitted a detailed account of events with her complaint. (Teacher Ex. 3.) Ironically, in that submission, she acknowledged that she believed in March or April, 2019 that Mrs. Cole was not discriminating against her because of her sexual orientation.

CCS  00574

(Teacher Ex. 3 p. 2.) And her submission presents no evidence of whether anyone knew of her ethnicity.

27.     Mrs. Stringham's complaint was filed after she was informed by Mrs. Cole on June 24, 2020, "I want you to know that I am concerned about your performance as a counselor." (*Compare* Admin. Ex. 1 p. 7 *with* Teacher Ex. 1.)

28.     Without knowledge of her complaint, Mrs. Cole and Mrs. Borto set a meeting with Mrs. Stringham and her union representation.

29.     The 2020 Improvement Plan outlined three primary areas of concern: (1) "Communication (written and verbal)," (2) "Following procedures, policies and dates," and (3) "Professionalism." (Admin. Ex. 3.) Each section contained three parts as well: (1) "Facts" (intended to relay examples of the performance issues), (2) "Rules/Expectations" (the standard applied to the examples) and (3) Impact (how the failure to follow rules or expectations impacts the job performance). Finally, the 2020 Improvement Plan concludes with "Actions Necessary for Improvement," which further states with specificity the areas of improvement needed by Mrs. Stringham.

30.     After Mrs. Cole and Ms. Borto met with Mrs. Stringham regarding the 2020 Improvement Plan, Dr. Oestreich informed them on or around September 15, 2020, of the complaint and his intent to interview them.

31.     Over several weeks, Dr. Oestreich interviewed all witnesses listed by Mrs. Stringham and others—10 witnesses in all. He also wrote a detailed, five-page report provided to Mrs. Stringham.

32.     Based on his investigation, Dr. Oestreich concluded that there was no evidence of discrimination.

CCS  00575

33.     First, as to race (or national origin) discrimination, the evidence showed that everyone interviewed (except for Mrs. Stringham) was unaware that Mrs. Stringham was Hispanic, and there was no other evidence of discrimination on the basis of her Hispanic ethnicity.

34.     Second, as to sexual orientation discrimination, evidence identified a comment made six years prior by Mrs. Cole, which Mrs. Cole categorically denied. The interviewees also recounted no evidence of discriminatory conduct. Rather, the interviewees supported Mrs. Cole concerns regarding performance with many of the interviewees recounting their own observations of Mrs. Stringham's poor work performance.

35.      Meanwhile, Mrs. Stringham continued her work, but the errors during the 2020-2021 school year accumulated. (Admin. Ex. 2 pp. 4-6.)

36.     In the spring semester of 2021, Ms. Borto had a heightened focus on graduation. Historically, the focus at CHS is on graduation and getting those who are at-risk of not graduating to meet graduation requirements. But in the spring of 2021, the hybrid teaching and learning environment elevated the risk of more students falling short. To combat this, Ms. Borto began one-on-one meetings with counselors at the end of March, 2021, to talk through each counselor's list of potential seniors who would not graduate.

37.     Ms. Borto met with Mrs. Stringham at the end of March, 2021, and Mrs. Stringham had four students on her list of at-risk seniors.

38.     But when the end of the semester came, which is when counselors notify the CHS administration of who did not graduate, Mrs. Stringham alerted Mrs. Cole and Ms. Borto of five students who failed to graduate.

CCS  00576

39.     At most, counselors usually have no more than one (1) student, but usually there are none.

40.     Upon further investigation of these five students, Ms. Borto discovered that none of the five names were identified when she met with Mrs. Stringham in March, 2021. And of the five students, three could have, through intervention or changes in graduation pathways or classes, graduated. Two of the three students never graduated from CHS.

41.     Mrs. Stringham did not dispute Ms. Borto's recollection of events but described her efforts made to engage the students. Mrs. Stringham also suggested that she had alerted Mrs. Cole to these students, but Mrs. Cole testified that Mrs. Stringham discussed these students with Mrs. Cole *after* they had failed to graduate, which Mrs. Stringham never contested in her testimony or evidence.

42.     Additionally, Ms. Borto reviewed her notes from Student Support Team ("SST") meetings and found insufficient mention of these students by Mrs. Stringham. The SSTs are collaborative venues where counselors bring the names of students that are struggling and need help so the counseling team can brainstorm on ideas to engage and support the students. One of Mrs. Stringham's three students that failed to graduate, but could have, was never mentioned in SST meetings. Another was mentioned once. (Admin. Ex. 8.)

43.     Ms. Borto and Mrs. Cole wanted to give Mrs. Stringham a Needs Improvement rating, which is lower than Highly Effective and Effective but above Ineffective. However, Dr. Oestreich disagreed. He believed that while there was sufficient verbal communication of Mrs. Stringham's performance concerns, he wanted more written artifacts to relay in writing the concerns within the evaluation system, Standards for Success. Dr. Oestreich, however, supported the institution of a more stringent improvement plan.

CCS  00577

44.     Based on the continued performance concerns, Mrs. Stringham began the 2021-2022 under a performance improvement plan ("2021 Improvement Plan"). (Admin. 4.) This set clear goals, instituted regular meetings with Mrs. Cole and Ms. Borto, and also required that Mrs. Cole (and later added Ms. Borto) be copied on all emails.

45.     Mrs. Stringham was again represented by union representation regarding the 2021 Improvement Plan. And union representation was present at the meetings during the fall semester. (Admin. Exs. 18, 21, 22 & 24.)

46.     Mrs. Stringham did not respond well.  She continued making serious errors such as supplying wrong information to students and did not proactively pursue students' needs. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31.)

47.     During the fourth meeting on October 11, 2021, Mrs. Stringham was informed that Mrs. Cole and Ms. Borto would be extending the 2021 Improvement Plan because they did not see sufficient improvement. (Admin. Ex. 24.)

48.     Mrs. Stringham then filed notice of medical leave with Dr. Oestreich's office (Teacher Exs. 22-24), but Mrs. Cole and Ms. Borto were unaware until the leave was approved.

49.     While on leave, Ms. Borto observed Mrs. Stringham on CHS video surveillance footage visiting the counseling department offices and cutting her own name out of the plastic inserts on the internal CHS signage. Mrs. Stringham testified that she cut out her name from the sign because she did not want a substitute confused with her while she was on leave. Testimony by witnesses at the Board conference also confirmed that no other CHS employee on leave had before cut their name out of CHS signs.

CCS  00578

50.     Mrs. Stringham also emptied her office during a weekend within her leave period. She removed her lamp, speakers, paintings and other décor and personal effects. She testified that she did this to keep people from taking these items.

51.     Furthermore, Mrs. Stringham went to social media to voice her concerns. She complained about CHS and stated that she was being targeted in similar fashion to a social worker who was "not gay" but "pushed out" by Mrs. Cole. (Admin. Ex. 24 p. 2.) Explaining this, Mrs. Stringham agreed that she believed Mrs. Cole was mean to everyone—gay and "not gay".

52.     When she returned from leave in mid-January, 2022, Mrs. Stringham continued on the 2021 Improvement Plan.

53.     Mrs. Stringham also sought to have Mrs. Cole and others sign paperwork necessary for her to obtain a mental health counselor license from the State of Indiana. Originally, she supplied the form to Mrs. Cole, but Mrs. Cole was reluctant to sign the certification because she could not certify that Mrs. Stringham performed the tasks mentioned in the form. Mrs. Cole raised concerns with Dr. Oestreich.

54.     In her testimony before the Board, Mrs. Stringham acknowledge not meeting certain requirements reflected in the form. She never completed an internship with CCS, never received individual supervision, and never received group supervision. (Admin. Ex. 26(A) pgs. 10-11.)

55.     Dr. Oestreich independently reviewed the form. In a January 26, 2022, email to Mrs. Stringham, Dr. Oestreich identified the concerns:

CCS  00579

I am in receipt of your request that CCS fill out a form representing that you have completed certain requirements for licensure as a mental health counselor or mental health counselor associate. It does not appear that CCS can validly attest to the information that has been requested. Among other requirements, the form requires a person filling it out to represent that you have completed an internship, received academic credit, and performed supervised clinical experience. As far as your employment with CCS is concerned, none of these is true.

If you think I have misinterpreted this form or what you are requesting, then I recommend that you contact me directly for further discussion.

Thank you,
Dr. Oestreich

56.    Mrs. Stringham responded later that day seeking to clarify, but Dr. Oestreich never relayed a change of mind.

57.    Instead of contacting Dr. Oestreich for further discussion, Mrs. Stringham confronted Mrs. Cole. Mrs. Cole recounted how Mrs. Stringham was visibly angry when she arrived, began yelling and berating Mrs. Cole ("you're being ridiculous" and "you're ridiculous"), and leaning over her desk, waiting arms. Seeking to deescalate the situation, Mrs. Cole asked Mrs. Stringham to leave, but she did not. Ultimately, staff located Ms. Borto and requested her assistance. When Ms. Borto arrived, she could hear Mrs. Stringham's yelling from several offices over. Ms. Borto proceeded to extract Mrs. Cole from the situation and ordered Mrs. Stringham to leave.

58.    At the Board conference, Mrs. Stringham was asked, "And then did you follow [Dr. Oestreich's] directive on January 28 when you went to Rachel Cole to discuss this matter?" She responded, "No."

59.    Ms. Borto testified that she has never witnessed anyone yelling at their supervisor at CHS.

60.    Mrs. Stringham also admitted to yelling.

13

CCS  00580

61.     When asked by the Administration's counsel at the Board conference whether she "think[s] its acceptable at Carmel High School for a counselor to yell at their supervisor and say you're being ridiculous," Mrs. Stringham responded under oath, "In the circumstances, yes."

62.     Board Policy 9600 states that "[d]isruptive or uncivil behavior includes, but is not limited to: . . . c. Raising one's voice above an appropriate level." (Admin. Ex. 26(B). Mrs. Stringham argued that the Policy 9600 language preferring a progressive discipline approach was not followed, but that paragraph applies to non-employees as it mentions issuance of a no-trespass order. The paragraph explicitly applicable to employees states, "For CCS employees and students who behave in an uncivil or disruptive manner, appropriate disciplinary action will be taken in accord with negotiated agreements, employee handbooks, and the Student Code of Conduct." Nothing in the negotiated agreements handbooks or code of conduct mandate progressive discipline in this instance, and if it did, Ms. Borto and Mrs. Cole testified that Mrs. Stringham was well on her way down a progressive discipline path with the multiple improvement plans.

63.     Following this event, CHS administration recommended contract cancellation. Dr. Oestreich independently reviewed the information and agreed with the conclusions.

64.     Dr. Harmas, before going on a medical leave that prevented his attendance at the Board conference, issued his principal's preliminary decision (Admin. Ex. 27):

CCS 00581

I have made the preliminary decision to cancel your teaching contract. I am making this recommendation for the following reasons:

- Your unprofessional behavior directed towards your supervisor on January 28, 2022 where you were yelling loudly at her about a form you demanded she sign, when the assistant superintendent already communicated with you that any questions should be directed to him about the topic.

- You continued job performance that falls below what we expect out of our counselors at Carmel High School.  You continue to make errors in your role as a counselor that impacts other staff and students.

These reasons constitute, insubordination, incompetence, neglect of duty and other good and just cause within the meaning of Indiana Code section 20-28-7.5-1(b)(6).

65.     Mrs. Stringham exercised her statutory right to a conference with Superintendent Dr. Beresford. (Teacher Ex. 44.) Mrs. Stringham testified at the Board conference that she was afforded the opportunity to say everything she wanted to say at the February 24, 2022, superintendent's conference, which lasted approximately one hour.

66.     Following the superintendent's conference, Mrs. Stringham requested a conference with the Board on February 28, 2022, four days after her conference with Dr. Beresford. (Teacher Ex. 46.)

67.     On March 1, 2022, Dr. Beresford issued his recommendation to the Board following his conference with Mrs. Stringham. (Teacher Ex. 45.) Dr. Beresford recorded how Mrs. Stringham acknowledged being upset on January 28, but she stated that she did not yell even though other key witnesses heard her yelling. He did not find her statement sufficient to outweigh the statements by other witnesses. Dr. Beresford was also troubled by the fact that this confrontation by Mrs. Stringham on January 28 came days after Dr. Oestreich had instructed her to contact him should there be further discussion. As for her job performance, Mrs. Stringham did little to assuage concerns and argued that discrimination motivated the corrective action. But

CCS  00582

Mrs. Stringham offered no evidence but merely as speculation because she did not believe she was falling short of legitimate expectations.

68.   Throughout the Board conference, Mrs. Stringham's credibility was seriously weakened by her evasive and inconsistent answers, testimony that was not believable, and testimony that is inconsistent with the documentary evidence as indicated by the following:

a.  During her testimony, Mrs. Stringham testified that she was confused as to why Mrs. Cole would not sign the form. But the email from Dr. Oestreich articulates CCS's concerns. (Teacher Ex. 32 p. 2.) And Mrs. Stringham's own testimony was that she did not meet the requirements because she never went through an internship with CCS, never received individual supervision, and never received supervision, each of which she was wanting Mrs. Cole to certify. (Admin. Ex. 26(A) pgs. 10 & 11.)

b.  At the Superintendent's conference on February 24, 2020, Mrs. Stringham denied yelling. (Teacher Ex. 45 p. 1.) But when asked at the Board conference under oath if she yelled during her January 28, 2022, confrontation of Mrs. Cole, Mrs. Stringham said, "Yes. I mean no and yes." Then at the Board conference, Mrs. Stringham admitted to raising her voice. But while she admitted to yelling and raising her voice, Mrs. Stringham's demonstration of the volume used was not credible and in conflict with her own admissions that she was yelling and had raised her voice. Her inconsistent and evasive testimony on important facts related to this crucial incident weakened her credibility and enhanced the credibility of Mrs. Cole and Ms. Borto.

c.  Mrs. Stringham, relying solely on hearsay evidence, stated that no other counselor received any write-ups or artifacts uploaded. Mrs. Cole, however, disputed that firmly from her own personal knowledge.

16

CCS  00583

d.  Mrs. Stringham alleged sexual orientation discrimination by Mrs. Cole, but Mrs. Stringham also acknowledged that Mrs. Cole—*knowing Mrs. Stringham's sexual orientation*—gave Mrs. Stringham four consecutive years of the highest performance rating, Highly Effective. And Mrs. Stringham's own complaint alleging discrimination in September 2020 recorded that she believed in 2019 that Mrs. Cole was not targeting her because of her sexual orientation. In closing arguments, Mrs. Stringham's counsel argued that Mrs. Cole's views may have changed, and yet Mrs. Stringham and her counsel offered only conjecture and speculation—no evidence—in support of this theory.

e.  Mrs. Stringham also alleged that CCS did nothing in response to her second complaint of discrimination and harassment filed in January 2022, but on cross-examination she admitted that she was interviewed. Dr. Oestreich testified that the allegations filed in January 2022 were the same as stated in September 2020 with no new evidence. Mrs. Stringham did not dispute this testimony.

69.  In the main, Mrs. Stringham did not dispute much of the evidence presented at the Board conference.

70.  Mrs. Stringham, for example, did not offer testimony disputing that the 62 artifact uploads were incorrect, that she did not commit the acts recorded in the artifacts, or that she failed to identify the students at risk of not graduating in the Spring of 2021. Nor does Mrs. Stringham contest testimony from Mrs. Cole and Ms. Borto that she did not handle well the meetings in the fall semester of 2021. Rather, Mrs. Stringham argued that all of this was motived by discrimination or retaliation.

CCS  00584

71.     In stark contrast to Mrs. Stringham's credibility, or lack thereof, the Board finds the testimony of Mrs. Cole, Ms. Borto, Dr. Oestreich and Dr. Beresford to be credible as the events leading up to the contract cancellation. Indeed, Mrs. Stringham herself did not contest the vast majority of their testimony of events. And where there was dispute, such as the volume Mrs. Stringham used when she yelled at Mrs. Cole on January 28, Mrs. Stringham's account was less credible.

## Conclusions of Law

1.     The Board has the authority and jurisdiction to resolve the issue of whether Mrs. Stringham's regular teacher's contract should be cancelled.

2.     The procedure provided in Indiana law for the Board to consider the cancellation of Mrs. Stringham's regular teacher contract under Indiana Code § 20-28-7.5-1, *et seq.* has been followed and any statutory requirements for the cancellation of Mrs. Stringham's teacher's contract has been met.

3.     Indiana Code § 20-28-7.5-1(e)(5) specifies "neglect of duty" as a basis for cancelling a regular teacher contract.

4.     Indiana Code § 20-28-7.5-1(e)(7) specifies "other good or just cause" as a basis for cancelling a regular teacher contract.  The Indiana Supreme Court has stated that good and just cause is any reason which is put forward in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the Board's task of building up and maintaining an efficient school system.  *Board of School Trustees of the City of Peru v. Moore*, 218 Ind. 386, 393 (1941).

5.     Indiana Code § 20-28-7.5-1(e)(2) specifies "[i]nsubordination" as "a willful refusal to obey the state school laws or reasonable rules adopted for the governance of the school building or the school corporation."

CCS  00585

6.      Based on the foregoing findings of fact, the Board determines that the preponderance of the evidence shows that Mrs. Stringham neglected her duties as a counselor.

7.      Mrs. Stringham was warned in her 2019-2020 evaluation (no later than June 24, 2020), in the 2020 Improvement Plan (in September 2020), in her 2021 Improvement Plan (in July 2021), in the four (4) meetings with Mrs. Cole and Ms. Borto (September to October, 2021), and in the extension of her 2021 Improvement Plan (January 2021) that her continued performance issues were a concern. Her overall evaluation rating also dropped. And in the end, her continued shortcomings were not meeting expectations as a counselor at CHS.

8.      Similarly, the evidence independently demonstrates by a preponderance that Mrs. Stringham has been incompetent in her job as a counselor. Three students did not graduate due to her oversight. Additionally, Mrs. Stringham also on multiple occasions provided incorrect information to students and their families. Mrs. Stringham, in fact, does not dispute that she provided incorrect information to students in the fall of 2021 or failed to identify the three students in the spring semester of the 2020-2021 school year. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31.)

9.      The Board also finds that the foregoing findings of fact independently show, by a preponderance of the evidence, that other good or just cause exists to cancel Mrs. Stringham's contract.

10.     In addition to the artifact uploads and other testimonial evidence of Mrs. Stringham's performance issues, it is undisputed that three students did not graduate because of Mrs. Stringham's failure in her job duties. Mrs. Stringham attempts to blame the students, but Mrs. Stringham does not dispute the testimony by Ms. Borto that she failed to sufficiently raise these students in SST meetings or with Ms. Borto in the March, 2021, one-one-one meeting.

CCS  00586

These shortcomings, together with the artifacts demonstrating continued performance issues, establish good cause exists to end Mrs. Stringham's employment.

11.     The Board also finds that the foregoing findings of fact independently show by a preponderance of the evidence that Mrs. Stringham's actions constituted insubordination.

12.     Mrs. Stringham also admitted to yelling at Mrs. Cole on January 28, 2021, a highly inappropriate response, even though Mrs. Cole—her supervisor—asked her to leave and Dr. Oestreich two days earlier instructed her to contact him with any follow up questions.

13.     What is more, Mrs. Stringham at the Board conference admitted that she explicitly disregarded a directive by her Assistant Superintendent. At the Board conference, Mrs. Stringham was asked, "And then did you follow [Dr. Oestreich's] directive on January 28 when you went to Rachel Cole to discuss this matter?" She responded, "No."

14.     Mrs. Stringham's response to these contract cancellation reasons was to argue that Mrs. Cole and CCS were discriminating against her because of her race/ethnicity (Hispanic) and her sexual orientation. Mrs. Stringham's counsel asserted in closing argument that the Administration bears the burden to prove it did not discriminate, but that is incorrect. The Administration bears the burden of proof and persuasion as to whether by a preponderance of the evidence it has shown that Mrs. Stringham's conduct constitutes incompetence, neglect of duty, insubordination, and other good or just cause under Indiana law. However, Mrs. Stringham's claims of discrimination are affirmative defenses to these claims for which Mrs. Stringham bears the burden of proof and persuasion. She did not meet her burden.

15.     "The *McDonnell Douglas* burden-shifting framework requires [Mrs. Stringham] show: (1) she is a member of a protected class, (2) she was meeting [CCS's] legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated

CCS 00587

employees who were not members of her protected class were treated more favorably." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718–19 (7th Cir. 2021) (cleaned up). If Mrs. Stringham's claim meets these elements, then the burden shifts to the Administration "to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to [Mrs. Stringham] to submit evidence that the employer's explanation is pretextual." *Id.* "Pretext" is not "just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389–90 (7th Cir. 2020) (cleaned up).

16.    Here, while Mrs. Stringham is assumed to be a member of a protected class (Hispanic and homosexual), and she likely suffered an adverse employment action, she has not satisfied the second and fourth elements. Mrs. Stringham cannot show she was meeting legitimate expectations any time after the fall semester 2019. And these concerns persisted. Even Mrs. Stringham acknowledged the mistakes, but simply argued that other counselors made similar mistakes. Along those lines, the fourth element is also not met as Mrs. Stringham testified that no other counselor had allowed three students to fall through the cracks in the spring semester 2021. Nor had any other counselor been placed under two improvement plans. And Mrs. Stringham did not point to any other employee or counselor at CHS who yelled at a supervisor, called their supervisor ridiculous, and kept their job.

17.    Moreover, Mrs. Stringham did not show that the reasons for cancellation—her performance issues and the January 28 yelling incident—was a phony reason (*i.e.*, pretextual) and the real reason was her Hispanic heritage or sexual orientation. Indeed, Mrs. Stringham offers this as a pure guess. Mrs. Stringham argued that she, as the only Hispanic and homosexual counselor, is the only counselor receiving more than 60 artifact uploads and two improvement

CCS  00588

plans. But, then again, Mrs. Stringham has been in the office since 2015, and under Mrs. Cole's supervision since January 2017, and her first improvement plan came in September, 2020. The performance concerns surfaced in June 2020 and were the subject of the creation of the 2020 Improvement Plan in June and July, 2020, before Mrs. Cole and Ms. Borto were informed of Mrs. Stringham's race in mid-September, 2020.

18.     Additionally, Mrs. Stringham also argued that disciplinary action was retaliation for her filing complaints of discrimination. However, the facts do not support her claim.

19.     "To make out a prima facie case for retaliation under Title VII, a plaintiff must show that a reasonable jury could find that (1) [s]he engaged in statutorily protected activity; (2) [her] employer took a materially adverse action against [her]; and (3) the adverse action was caused by the protected activity." *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021). Filing a complaint alleging discrimination is a statutorily protected activity. At bottom, "the question for a retaliation claim should always be: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge [or disciplinary action]?" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (cleaned up).

20.     Mrs. Stringham argues that the 2020 Improvement Plan, the 2021 Improvement Plan and now her contract cancellation are in retaliation for her filing her September 2020 and January 2022 complaints of discrimination and harassment.

21.     In regards to the 2020 Improvement Plan, Mrs. Stringham cannot show that the adverse action—the improvement plan—came after the protected activity—the complaint. The undisputed evidence is that the CHS administration team began preparing the 2020 Improvement Plan before Mrs. Stringham filed her complaint. And Mrs. Stringham was put on notice no later

CCS  00589

than June 24, 2020, when Mrs. Cole wrote, in the written comments accompanying Mrs. Stringham's 2019-2020 evaluation, "I want you to know that I am concerned about your performance as a counselor." *Compare* Admin. Ex. 1 p. 7 *with* Teacher Ex. 1. Most importantly, Mrs. Cole and Ms. Borto testified that Mrs. Stringham's complaint played no role in the creation of the 2020 Improvement Plan as both Mrs. Cole and Ms. Borto were unaware that Mrs. Stringham had filed a complaint with Dr. Oestreich's office when they issued the 2020 Improvement Plan.

22.     As for the 2021 Improvement Plan constituting retaliation, that allegation cannot meet the third element—the causal connection between the adverse action and the protected activity. The 2021 Improvement Plan was installed July 2021—at least 10 months after Mrs. Stringham's September 1, 2020, complaint. This 10 month gap is insufficient as courts have held that a two-month span was not a strong enough link. *Igasaki*, 988 F.3d at 959 ("Therefore, the two-month gap between Igasaki's protected activities and his termination cannot show retaliation on its own.").

23.     Finally, Mrs. Stringham's claim that her contract cancellation is caused by her January, 2022, complaint is unsupported by the evidence. Dr. Oestreich testified that the January, 2022, complaint lodged the same allegations as the September 1, 2020, complaint without new evidence. And so, the January, 2022, complaint—a restatement of the September 1, 2020, complaint—is also too attenuated to create a causal connection. Furthermore, the facts demonstrate continued performance concerns justify legitimate, nondiscriminatory reasons for CCS's decision to cancel Mrs. Stringham's contract. We cannot conclude from the evidence that Mrs. Stringham presented that retaliatory motive caused the contract cancellation or discipline as Mrs. Stringham only points to the timing of events and nothing else.

CCS  00590

24.     As a coup de grâce, the same-actor inference is one more thing stacked against Mrs. Stringham's discrimination and retaliation claims. The same-actor inference is a "common sense" theory where courts will infer, when there is insufficient evidence of discrimination, that the same decisionmaker who previously rendered favorable decisions for the employee does not harbor unlawful animus. *See McKinney v. Off. of Sheriff of Whitley Cty.*, 866 F.3d 803, 814 (7th Cir. 2017). This inference can be rebutted, but it is something for the Board to consider since Mrs. Stringham otherwise offered no evidence that Mrs. Cole harbors animus because of her ethnicity, sexual orientation or because she filed complaints.

25.     In the context of her discrimination claims, and sexual orientation claims specifically, the same actor is Mrs. Cole. It is uncontested that Mrs. Cole knew of Mrs. Stringham's sexual orientation since Mrs. Stringham's hiring in 2015. And Mrs. Cole, knowing Mrs. Stringham's sexual orientation, gave her four consecutive years of the highest performance rating. While Mrs. Stringham has argued that Mrs. Cole made a statement approximately six years ago when Mrs. Stringham married her wife—a statement that Mrs. Cole categorically denied, the consistent evidence is that Mrs. Cole gave Mrs. Stringham good evaluations even after that disputed comment. Thus, the Board infers that since Mrs. Cole consistently gave Mrs. Stringham high marks over a long period of time while knowing Mrs. Stringham's sexual orientation, she does not harbor animus based on Mrs. Stringham's sexual orientation.

26.     Dr. Oestreich's involvement is an important consideration under the same-actor inference as it is applied to Mrs. Stringham's retaliation claim. In the fall semester of the 2020-2021 school year, Dr. Oestreich received and thoroughly investigated Mrs. Stringham's complaint, concluding (as we do here) that there is insufficient evidence of race or sexual orientation discrimination or harassment. Later that year, Dr. Oestreich reversed CHS's

24

CCS  00591

recommendation that Mrs. Stringham be rated Needs Improvement as he believed that while there was sufficient verbal warning, he desired more written documentation of performance issues in the form of artifacts uploaded in the SFS system. Later in January, 2022, Dr. Oestreich independently reviewed and supported the recommendation for contract cancellation. This is important to consider when evaluating motive. If CCS sought to retaliate against Mrs. Stringham, then it had its chance with the 2020-2021 evaluation. Alas, it did not. Indeed, CCS (again) gave Mrs. Stringham the benefit of the doubt and a higher performance rating than she deserved for the 2020-2021 school year.

27.    The Administration has demonstrated by a preponderance of the evidence the existence of statutory grounds to cancel Mrs. Stringham's regular teacher's contracts with CCS. And Mrs. Stringham has not established that this recommendation is caused by unlawful discrimination or retaliation.

28.    A finding of fact which states a conclusion of law is hereby adopted as a conclusion of law.

29.    To the extent any of the foregoing conclusions of law are more accurately stated as findings of fact, they are hereby incorporated into the above findings of fact. Likewise, if any of the foregoing conclusions of law are more accurately stated as findings of fact, they are hereby incorporated into the above findings of fact.

## Decision

Based on the preceding findings of fact and conclusions of law, the Board by the vote of _____ of the five (5) members taking part in the consideration of this matter resolve that

CCS  00592

Dianna Stringham's regular teaching contract with Carmel Clay Schools should be and hereby is cancelled as of the date of this decision, which is March 28, 2022.

**ENTERED OF RECORD IN THE MINUTES OF THE BOARD OF SCHOOL TRUSTEES OF CARMEL CLAY SCHOOLS THIS TWENTY-EIGHTY DAY OF MARCH, 2022.**

_____

Katie Browning, President

_____

Louise Jackson, Vice-President

_____

Jennifer Nelson-Williams, Secretary

_____

Layla Spanenberg, Commissioner

_____

Mike Kerschner, Commissioner

4335899_1

CCS  00593

## BEFORE THE BOARD OF SCHOOL TRUSTEES OF
## CARMEL CLAY SCHOOLS

IN THE MATTER OF THE CANCELLATION OF THE CONTRACT OF
DIANNA STRINGHAM:

### Procedural Background

Mrs. Diana Stringham is employed as a Counselor for Carmel Clay Schools (CCS) under a Regular Teacher Contract. (Board Exh. 1). Principal, Dr. Tom Harmas, issued his Preliminary Recommendation for Cancellation on February 4, 2022. (Admin Exh 27). Dr. Harmas issued this recommendation before going on a medical leave that prevented his attendance at the Board conference. Superintendent Dr. Michael Beresford confirmed the authenticity of Dr. Harmas' signature on the Principal Cancellation letter and neither party raised any concern during the subsequent Superintendent Meeting, Pre-Meeting Telephone Conference or initial Meeting discussions with Counsel for the Board regarding the validity of the recommendation as coming from Dr. Harmas.

On February 8, 2022, pursuant to statute, Mrs. Stringham requested a meeting with Superintendent Dr. Beresford. (Admin Exh 28). That Superintendent Meeting then took place on February 24, 2022. On February 28, 2022, Mrs. Stringham requested a meeting with the Carmel Clay School Board of Trustees ("Board"). (Admin Exh 29). Dr. Beresford issued his support of the Principal Recommendation on March 1, 2022. (Admin Exh 30). The parties agreed to set the meeting date with the Carmel Clay Board of School Trustees for March 15, 2022.

1

CCS  00594

This matter is before the Board based on the recommendation of the School Corporation's administration ("Administration") to cancel the regular teacher's contract of Dianna Stringham. The Administration identified four statutory grounds to cancel Mrs. Stringham's contracts:

(1) incompetence,

(2) neglect of duty,

(3) insubordination, and

(4) other good or just cause.

A meeting was held in this matter in the Board Meeting Room in the Educational Services Center located at 5201 E. Main Street Carmel, Indiana, on March 15, 2022. Five members of the Board—President Katie Browning, Vice President Louise Jackson, Secretary Jennifer Nelson-Williams, Member Layla Spanenberg and Member Michael Kerschner—participated in the meeting and consideration of this matter. The meeting lasted approximately four hours from 5:30 pm to 9:40 pm.

The Administration was represented by Jonathan Mayes of Bose McKinney & Evans LLP. Mrs. Stringham was represented by Jamie Maddox and Chad H. Holler of Betz + Blevins. Andrew Manna of Church Church Hittle + Antrim served as Board Counsel and was not a decision-maker in this matter.

The parties stipulated to exhibits and all were admitted into the record without objection. Specifically, Administration Exhibits 1-30 and Teacher Exhibits 1-46 are considered part of the record along with Board Exhibit 1, which was also admitted without objection.

The Board Members confirmed their ability to meet and listen to information presented regarding the recommendation for cancellation. The Board has the authority and jurisdiction to resolve the issue of whether Mrs. Stringham's regular teacher's contract should be cancelled. All

CCS 00595

teacher cancellation procedures required by Indiana law, up to and including the Board consideration of the cancellation of Mrs. Stringham's regular teacher contract under Indiana Code § 20-28-7.5-1, *et seq.* have been followed..

The Parties agreed that the standard for the Board to support the cancellation is a preponderance of the evidence. Any finding of fact which states a conclusion of law is hereby adopted as a conclusion of law. To the extent any of the foregoing conclusions of law are more accurately stated as findings of fact, they are hereby incorporated into the above findings of fact.

### Findings of Fact

1. Mrs. Stringham has been employed with CCS since 2015 as a counselor at Carmel High School (CHS).

2. As a counselor, Mrs. Stringham's responsibilities include advising students on graduation requirements; assisting students with questions regarding class schedules; guiding students towards graduation and career pathways; communicating with families of students on schedules, graduation and career pathway requirements; and collaborating with her fellow counselors.

3. Beginning with the 2016-2017 school year, Mrs. Rachel Cole served as Mrs. Stringham's direct supervisor and primary evaluator in Mrs. Cole's role as Director of Counseling. (Admin. Ex. 1 p. 1).

4. For the 2016-2017 school year, Mrs. Cole gave Mrs. Stringham the evaluation rating of Highly Effective. (Admin. Ex. 1 p. 1).

5. Highly Effective is the highest rating a counselor could achieve. (Admin. Ex. 1 p. 1).

6. Likewise, for the 2017-2018 school year, Mrs. Cole gave Mrs. Stringham the evaluation rating of Highly Effective. (Admin. Ex. 1 p. 3).

CCS 00596

7.  Mrs. Cole also gave Mrs. Stringham the evaluation rating of Highly Effective for the 2018-2019 school year. (Admin. Ex. 1 p. 5).

8.  For the fourth consecutive year, Mrs. Stringham received a Highly Effective evaluation rating for the 2019-2020 school year. (Admin. Ex. 1 p. 7).

9.  However, Mrs. Stringham's performance was not flawless over the course of 2016-2020. Since becoming Director of Counseling, Mrs. Cole recorded concerns each year from 2017 until 2022 regarding Ms. Cole. (Admin. Ex. 2 pp.1-10).

10. These document a list of concerns-growing in severity and frequency- regarding Mrs. Stringham's performance that accelerated and escalated during the spring semester of the 2019-2020 school year. (Admin. Ex. 2 pp.1-10) (Transcript p. 51-52).

11. During this time, the COVID-19 pandemic forced remote learning, and many students were struggling.

12. Mrs. Maureen Borto, Assistant Principal, testified that the  counseling department held weekly meetings during which counselors would present lists of students to discuss. (Transcript p. 20).

13. Counselors brought the names of several students for discussion, but Mrs. Stringham usually had none. (Transcript p. 20).

14. Mrs. Stringham was not connecting with students, reaching out to families, or reaching out to homes to get more information. Mrs. Stringham was also late to several virtual meetings with students and families where plans were being made to comply with CCS's obligations under federal law, specifically Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (as amended). (Transcript p. 20).

4

CCS  00597

15. For the 2019-2020 evaluation, Mrs. Cole identified significant concerns in written comments that were included in the evaluation (Admin. Ex. 1 pp. 8).

16. Mrs. Stringham understood the comment in her 2019-2020 evaluation, and in particular where Mrs. Cole wrote "I want you to know I am concerned about your performance as a counselor", to convey significant performance concerns.

17. Mrs. Stringham received a copy of this evaluation and the written comments on June 24, 2020. (Admin. Ex. 1 pp. 7).

18. Over the 2020 summer, June or July more precisely, Ms. Borto and Ms. Cole, with assistance from Dr. Thomas Harmas, CHS Principal, and Dr. Thomas Oestreich, Assistant Superintendent, began preparing a detailed improvement plan for Mrs. Stringham.

19. As the 2020-2021 school year began, Mrs. Cole identified for Mrs. Stringham more performance issues, like placing students in the wrong cohort groups. (Teacher Ex. 3 pp. 4-5).

20. At this time and as Ms. Borto and Ms. Cole were finalizing the improvement plan for her, Mrs. Stringham, unbeknownst to Mrs. Cole or Mrs. Borto, filed an internal complaint with CCS's Human Resources Department on September 1, 2020. (Teacher Ex. 1).

21. Mrs. Stringham alleged that Mrs. Cole's continued citation of performance issues constituted harassment and discrimination on the basis of her ethnicity or race (Hispanic) and her sexual orientation (homosexual). (Teacher Ex. 1).

22. Mrs. Stringham alleged that the discrimination and harassment began in March 2020, but she did not complain until September 1, 2020. (Teacher Ex. 1).

5

23. Mrs. Stringham submitted a detailed account of events with her complaint. (Teacher Ex. 3).

24. Mrs. Stringham's complaint submission, she acknowledged that she believed in March or April, 2019 that Mrs. Cole was <u>not</u> discriminating against her because of her sexual orientation. (Teacher Ex. 3 p. 2).

25. Mrs. Stringham's complaint submission presents no evidence of whether anyone knew of her ethnicity. (Teacher Ex. 3 p. 2).

26. Mrs. Stringham's complaint was filed after she was informed by Mrs. Cole on June 24, 2020, "I want you to know that I am concerned about your performance as a counselor." (*Compare* Admin. Ex. 1 p. 7 *with* Teacher Ex. 1).

27. The 2020 Improvement Plan outlined three primary areas of concern: (1) "Communication (written and verbal)," (2) "Following procedures, policies and dates," and (3) "Professionalism." (Admin Ex. 3).

28. Each section of the 2020 Improvement Plan contained three parts as well: (1) "Facts" (intended to relay examples of the performance issues), (2) "Rules/Expectations" (the standard applied to the examples) and (3) Impact (how the failure to follow rules or expectations impacts the job performance). (Admin Ex. 3).

29. The 2020 Improvement Plan concludes with "Actions Necessary for Improvement," which further states with specificity the areas of improvement needed by Mrs. Stringham. (Admin Ex. 3).

30. Mrs. Cole and Ms. Borto met with Mrs. Stringham regarding the September 10, 2020 Improvement Plan. Mrs. Stringham had union representation during that meeting that took place on September 10, 2020. (Transcript p. 22).

CCS 00599

31. After that meeting, Dr. Oestreich informed them on or around September 15, 2020, of the complaint and his intent to interview them.

32. Over several weeks, Dr. Oestreich interviewed all witnesses listed by Mrs. Stringham and others—10 witnesses in all.

33. Dr. Oestreich also wrote a detailed, five-page report provided to Mrs. Stringham.

34. Based on his investigation, Dr. Oestreich concluded that there was no evidence of discrimination.

35. Meanwhile, Mrs. Stringham continued her work, but the errors during the 2020-2021 school year accumulated. (Admin. Ex. 2 pp. 4-6).

36. In the spring semester of 2021, Ms. Borto had a heightened focus on graduation.

37. Historically, the focus at CHS is on graduation and getting those who are at-risk of not graduating to meet graduation requirements.

38. In the spring of 2021, the hybrid teaching and learning environment elevated the risk of more students falling short.

39. To combat the heightened risk of students falling short of graduation requirements, Ms. Borto began one-on-one meetings with counselors at the end of March 2021, to talk through each counselor's list of potential seniors who would not graduate.

40. Ms. Borto met with Mrs. Stringham at the end of March 2021 to go over at-risk student status.

41. At the March 2021 meeting between Ms. Borto and Mrs. Stringham identified four of her assigned students as at-risk seniors.

CCS 00600

42. When the end of the semester came, which is when counselors notify the CHS administration of who did not graduate, Mrs. Stringham alerted Mrs. Cole and Ms. Borto of five students who failed to graduate.

43. At most, counselors usually have no more than one (1) student, but usually there are none.

44. Upon further investigation of these five students, Ms. Borto discovered that Mrs. Stringham did not identify any of the five names when she and Mrs. Stringham met in March 2021.

45. Of the five students who did not graduate, three could have graduated through intervention or changes in graduation pathways or classes.

46. Two of the three students who could have graduated through intervention or changes in graduation pathways or classes never graduated from CHS.

47. Mrs. Stringham did not dispute Ms. Borto's recollection of events but described her efforts made to engage the students.

48. Mrs. Stringham discussed these students with Mrs. Cole *after* they had failed to graduate.

49. Ms. Borto reviewed her notes from Student Support Team ("SST") meetings and found insufficient mention of these students by Mrs. Stringham.

50. The SSTs are collaborative venues where counselors bring the names of students that are struggling and need help so the counseling team can brainstorm on ideas to engage and support the students.

51. One of Mrs. Stringham's three students who failed to graduate, but could have, was never mentioned in SST meetings.

52. Another of Mrs. Stringham's three students who failed to graduate was mentioned once in SST meetings. (Admin. Ex. 8).

8

CCS 00601

53. For the 2020-21 school year, Ms. Borto and Mrs. Cole wanted to give Mrs. Stringham a Needs Improvement evaluation rating, which is lower than Highly Effective and Effective but above Ineffective. Mrs. Stringham on multiple occasions provided incorrect information to students and their families; and Mrs. Stringham failed to identify the three at-risk students in the spring semester of the 2020-2021 school year. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31).

54. Dr. Oestreich disagreed with Ms. Borto and Mrs Cole on Mrs. Stringham's 2020-21 evaluation rating.

55. Dr. Oestreich believed that while there was sufficient verbal communication to Mrs. Stringham of her performance concerns, he wanted more written artifacts to relay in writing the concerns within the evaluation system, Standards for Success.

56. Artifacts are used and/or considered as part of a teacher's evaluation process. (Transcript p. 47).

57. The artifacts are also used for performance purposes. (Transcript p. 47).

58. Dr. Oestreich, however, supported the institution of a more stringent improvement plan.

59. Based on the continued performance concerns, Mrs. Stringham began the 2021-2022 under a performance improvement plan ("2021 Improvement Plan"). (Admin. Ex. 4).

60. The 2021-22 Improvement Plan set clear goals, instituted regular meetings with Mrs. Cole and Ms. Borto, and also required that Mrs. Cole (and later added Ms. Borto) be copied on all emails. (Admin. Ex. 4).

61. Mrs. Stringham was again represented by union representation regarding the 2021 Improvement Plan, as she had been during the fall semester meetings. (Admin. Exs. 18, 21, 22 & 24).

CCS 00602

62.  Ms. Cole  was asked, and the parties agreed as part of the Improvement Plan, that she would be copied on emails.  (Transcript p. 134).

63.  The emails led to more recognition regarding performance concerns by Mrs. Stringham and more artifacts being uploads.  (Transcript p. 136-137).

64.  On September 5, 2021, Mrs. Stringham received twenty-four (24) artifacts. (Teacher's Ex. 15; Teacher's Ex. 16 at 1-10).

65.  On September 22, 2021, Mrs. Stringham received two (2) artifacts. (Teacher's Ex. 16 at 11-12).

66.  On September 29, 2021, Mrs. Stringham received three (3) artifacts. (Teacher's Ex. 16 at 13-15).

67.  On October 10, 2021, Mrs. Stringham received two (2) artifacts. (Teacher's Ex. 16 at 16-17).

68.  Thus, in four (4) days, Mrs. Stringham received thirty-one (31) artifacts. (Teacher's Exs. 15-16).

69.  After receiving these thirty-one (31) artifacts, Mrs. Stringham went on medical leave on October 11, 2021. (Transcript p. 70).

70.  Ms. Cole  gave feedback of concerns to other counselors on their annual evaluations. (Transcript p. 135-136).

71.  Mrs. Stringham continued making serious errors such as supplying wrong information to students and did not proactively pursue students' needs. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31).

CCS  00603

72. During the fourth meeting on October 11, 2021, Mrs. Stringham was informed that Mrs. Cole and Ms. Borto would be extending the 2021 Improvement Plan because they did not see sufficient improvement. (Admin. Ex. 24).

73. Mrs. Stringham filed notice of medical leave with Dr. Oestreich's office after the October 11, 2021 meeting (Teacher Exs. 22-24).

74. Mrs. Cole and Ms. Borto were unaware that Mrs. Stringham had requested medical leave until the leave was approved.

75. While Mrs. Stringham was on leave, Ms. Borto observed Mrs. Stringham on CHS video surveillance footage visiting the counseling department offices and cutting her own name out of the plastic inserts on the internal CHS signage.

76. No other CHS employee on leave had before cut their name out of CHS signs.

77. Mrs. Stringham also emptied her office during a weekend within her leave period.

78. Mrs. Stringham went to social media to voice her concerns.

79. Mrs. Stringham complained about CHS in her social media posts, stating that she was being targeted in similar fashion to a social worker who was "not gay" but "pushed out" by Mrs. Cole. (Admin. Ex. 24 p. 2).

80. Explaining this, Mrs. Stringham agreed that she believed Mrs. Cole was mean to everyone—gay and "not gay". (Admin. Ex. 24 p. 2).

81. When she returned from leave in mid-January, 2022, Mrs. Stringham continued on the 2021 Improvement Plan.

82. Mrs. Stringham also sought to have Mrs. Cole and others sign paperwork necessary for her to obtain a mental health counselor license from the State of Indiana.

CCS 00604

83. Originally, she supplied the form to Mrs. Cole, but Mrs. Cole was reluctant to sign the certification because she could not certify that Mrs. Stringham performed the tasks mentioned in the form.

84. Mrs. Cole raised concerns with Dr. Oestreich about the mental health counselor license form.

85. Mrs. Stringham did not meet certain requirements reflected in the form, including failure to complete an internship with CCS, never receiving individual supervision, and never receiving group supervision. (Stringham Testimony, Admin. Ex. 26(A) pgs. 10-11).

86. Dr. Oestreich independently reviewed the mental health form.

87. In a January 26, 2022, email to Mrs. Stringham, Dr. Oestreich identified concerns regarding the form and gave her a directive to contact him with any follow-up.

88. Instead of contacting Dr. Oestreich for further discussion as directed, Mrs. Stringham confronted Mrs. Cole on January 28, 2022. (Transcript p. 120).

89. This was not the first time Mrs. Stringham had been angry and slammed Mrs. Cole's door. It also happened in February 2019. (Transcript p. 101, 102).

90. On January 28, 2022, Mrs. Stringham was visibly angry when she arrived, began yelling and berating Mrs. Cole ("you're being ridiculous" and "you're ridiculous"), and leaning over her desk, waiting arms.

91. Mrs. Stringham did not follow Dr. Oestreich's directive on January 28 when she went to Rachel Cole to discuss this matter.

92. Ms. Borto has never witnessed anyone yelling at their supervisor at CHS.

93. Mrs. Stringham also admitted to yelling.

CCS 00605

94. Mrs. Stringham thinks it was acceptable at Carmel High School for a counselor to yell at their supervisor and say you're being ridiculous in these circumstances.

### Conclusions of Law

1. Incompetence under Indiana Code § 20-28-7.5-1 (e) (3) specifies "incompetence" as a basis for cancelling a regular teacher contract. Incompetence has been defined by *Harrison-Washington Community School Corp. v. Bales,* 450 N.E.2d 559, 564 (Ind. Ct. App. 1983) as "wanting in practical efficiency and discipline."

2. Indiana Code § 20-28-7.5-1(e)(5) specifies "neglect of duty" as a basis for cancelling a regular teacher contract. Neglect of duty has been broadly defined under Indiana case law, including, but not limited to, in *Harrison-Washington Community School Corp. v. Bales,* 450 N.E.2d 559, 564 (Ind. Ct. App. 1983) and *State ex rel. Newton v. Board of School Trustees*, 404 N.E. 2d 47 (Ind. Ct. App. 1980) as:

   a. Sleeping during classroom period
   b. Failure to follow administrative direction in teaching/grading and failure to improve teaching methods after administrative conferences
   c. Failure to make proper classroom preparation
   d. Failure to keep and have control of classroom, maintain proper discipline
   e. Repeatedly reporting late to school
   f. Failing to comply with corporal punishment policy
   g. Failure to issue interim progress reports to students
   h. Failing to make reasonable efforts to implement the principal's improvement plan for bettering relationships with parents and students.

3. Indiana Code § 20-28-7.5-1(e)(2) specifies "[i]nsubordination" as "a willful refusal to obey the state school laws or reasonable rules adopted for the governance of the school building or the school corporation."

CCS  00606

4. Indiana Code § 20-28-7.5-1(e)(7) specifies "other good or just cause" as a basis for cancelling a regular teacher contract. The Indiana Supreme Court has stated that good or just cause is any reason which is put forward in good faith and which is not arbitrary, irrational, unreasonable, or irrelevant to the Board's task of building up and maintaining an efficient school system. *Board of School Trustees of the City of Peru v. Moore*, 218 Ind. 386, 393 (1941).

5. Based on the foregoing findings of fact, the Board determines that the preponderance of the evidence shows that Mrs. Stringham neglected her duties as a counselor.

6. The most significant findings supporting the conclusion that Mrs. Stringham was incompetent include that Mrs. Stringham was warned in her 2019-2020 evaluation (no later than June 24, 2020), in the 2020 Improvement Plan (in September 2020), in her 2021 Improvement Plan (in July 2021), in the four (4) meetings with Mrs. Cole and Ms. Borto (September to October, 2021), and in the extension of her 2021 Improvement Plan (January 2021) that her continued performance issues were a concern. Her overall evaluation rating also dropped. And in the end, her continued shortcomings were not meeting expectations as a counselor at CHS. This also falls into neglect of duty and other good or just cause.

7. Similarly, several findings support the conclusion that Mrs. Stringham has neglected her duties as a counselor, including that three students did not graduate due to her oversight; Mrs. Stringham also on multiple occasions provided incorrect information to students and their families; and Mrs. Stringham failed to identify the three at-risk students in the spring semester of the 2020-2021 school year. (Admin. Exs. 2, 9-24; Teacher Exs. 15, 16, 28-31.) In addition to neglect, this is also incompetence.

CCS 00607

8.  The foregoing findings of fact independently show, by a preponderance of the evidence, that other good or just cause exists to cancel Mrs. Stringham's contract.

9.  Several findings support the conclusion that other good or just cause exists to cancel Mrs. Stringham's contract: in addition to the artifact uploads and other testimonial evidence of Mrs. Stringham's performance issues, it is undisputed that three students did not graduate because of Mrs. Stringham's failure in her job duties. Mrs. Stringham attempts to blame the students, but Mrs. Stringham does not dispute the testimony by Ms. Borto that she failed to sufficiently raise these students in SST meetings or with Ms. Borto in the March 2021 one-one-one meeting. These shortcomings, together with the artifacts demonstrating continued performance issues, establish good cause exists to end Mrs. Stringham's employment.

10. The foregoing findings of fact independently show by a preponderance of the evidence that Mrs. Stringham's actions constituted insubordination.

11. Several findings support the conclusion that other good or just cause exists to cancel Mrs. Stringham's contract, especially Mrs. Stringham's yelling at Mrs. Cole on January 28, 2021, a highly inappropriate response, even though Mrs. Cole—her supervisor—asked her to leave and Dr. Oestreich two days earlier instructed her to contact him with any follow up questions; and explicitly disregarding a directive by her Assistant Superintendent.

12. Mrs. Stringham's argument that Mrs. Cole and CCS were discriminating against her because of her race/ethnicity (Hispanic) and her sexual orientation are unfounded.

13. The Administration bears the burden of proof, by a preponderance of evidence, and the burden of persuasion that Mrs. Stringham's conduct constitutes incompetence, neglect of

CCS 00608

duty, insubordination, and/or other good or just cause under Indiana law, all of which are non-discriminatory bases for employment action.

14. While Mrs. Stringham is assumed to be a member of a protected class (Hispanic and homosexual), and she suffered an adverse employment action, she has not satisfied the second element required to prove unlawful discrimination. Mrs. Stringham cannot show she was meeting legitimate work performance expectations any time after the fall semester 2019, as her performance failures persisted after that time. Mrs. Stringham acknowledged the mistakes, but simply argued that other counselors made similar mistakes.

15. Mrs. Stringham also has not satisfied another element required to prove unlawful discrimination, as Mrs. Stringham testified that no other counselor had allowed three students to fall through the cracks in the spring semester 2021. Nor had any other counselor been placed under two improvement plans. And Mrs. Stringham did not point to any other employee or counselor at CHS who yelled at a supervisor, called their supervisor ridiculous, and kept their job.

16. Mrs. Stringham did not show that the proffered reasons for cancellation—her performance issues and the January 28 yelling incident—were phony (*i.e.*, pretextual) and that the real reason was her Hispanic heritage or sexual orientation. Indeed, Mrs. Stringham offers this as a pure guess. Mrs. Stringham argued that she, as the only Hispanic and homosexual counselor, is the only counselor receiving more than 60 artifact uploads and two improvement plans. But, then again, Mrs. Stringham has been in the office since 2015, and under Mrs. Cole's supervision since January 2017, and her first improvement plan came in September 2020. The performance concerns surfaced in June

CCS 00609

2020 and were the subject of the creation of the 2020 Improvement Plan in June and July, 2020, before Mrs. Cole and Ms. Borto were informed of Mrs. Stringham's race in mid-September 2020.

17. Mrs. Stringham also argued that disciplinary action was retaliation for her filing complaints of discrimination. However, the facts do not support her claim.

18. Mrs. Stringham argues that the 2020 Improvement Plan, the 2021 Improvement Plan and now her contract cancellation are retaliation for her filing her September 2020 and January 2022 complaints of discrimination and harassment.

19. In regards to the 2020 Improvement Plan, Mrs. Stringham cannot show that the adverse action—the improvement plan—came after the protected activity—the complaint. The undisputed evidence is that the CHS administration team began preparing the 2020 Improvement Plan before Mrs. Stringham filed her complaint. And Mrs. Stringham was put on notice no later than June 24, 2020, when Mrs. Cole wrote, in the written comments accompanying Mrs. Stringham's 2019-2020 evaluation, "I want you to know that I am concerned about your performance as a counselor." *Compare* Admin. Ex. 1 p. 7 *with* Teacher Ex. 1. Most importantly, Mrs. Cole and Ms. Borto testified that Mrs. Stringham's complaint played no role in the creation of the 2020 Improvement Plan as both Mrs. Cole and Ms. Borto were unaware that Mrs. Stringham had filed a complaint with Dr. Oestreich's office when they issued the 2020 Improvement Plan.

20. As for the 2021 Improvement Plan constituting retaliation, that allegation cannot meet the third element—the causal connection between the adverse action and the protected activity. The 2021 Improvement Plan was installed July 2021—at least 10 months after Mrs. Stringham's September 1, 2020, complaint. This 10-month gap is insufficient as

CCS 00610

courts have held that a two-month span was not a strong enough link. *Igasaki*, 988 F.3d at 959 ("Therefore, the two-month gap between Igasaki's protected activities and his termination cannot show retaliation on its own.").

21. Mrs. Stringham's claim that her contract cancellation is caused by her January 2022, complaint is unsupported by the evidence. Dr. Oestreich testified that the January 2022, complaint lodged the same allegations as the September 1, 2020, complaint without new evidence. And so, the January 2022, complaint—a restatement of the September 1, 2020, complaint—is also too attenuated to create a causal connection.

22. The facts demonstrate continued performance concerns constituting legitimate, nondiscriminatory reasons for CCS's decision to cancel Mrs. Stringham's contract.

23. The evidence does *not* support a conclusion that any retaliatory motive caused the contract cancellation or discipline as Mrs. Stringham's sole argument is the timing of events.

24. In the context of Mrs. Stringham's discrimination claims, particularly on sexual orientation claims Mrs. Cole is the primary actor. It is uncontested that Mrs. Cole knew of Mrs. Stringham's sexual orientation since Mrs. Stringham's hiring in 2015, and, knowing this, gave Mrs. Stringham four consecutive years of the highest performance rating. While Mrs. Stringham argued that Mrs. Cole made a derogatory statement approximately six years ago when Mrs. Stringham married her wife—a statement that Mrs. Cole categorically denied—the consistent evidence is that Mrs. Cole gave Mrs. Stringham good evaluations even after that disputed comment. Thus, the Board infers that since Mrs. Cole consistently gave Mrs. Stringham high marks over a long period of time

CCS 00611

while knowing Mrs. Stringham's sexual orientation, Mrs. Cole, and by extension, CCS, does not harbor animus based on Mrs. Stringham's sexual orientation.

25. Dr. Oestreich's involvement is an important consideration under the same-actor inference as it is applied to Mrs. Stringham's retaliation claim. In the fall semester of the 2020-2021 school year, Dr. Oestreich received and thoroughly investigated Mrs. Stringham's complaint, concluding (as we do here) that there is insufficient evidence of race or sexual orientation discrimination or harassment. Later that year, Dr. Oestreich reversed CHS's recommendation that Mrs. Stringham be rated Needs Improvement as he believed that while there was sufficient verbal warning, he desired more written documentation of performance issues in the form of artifacts uploaded in the SFS system. Later in January 2022, Dr. Oestreich independently reviewed and supported the recommendation for contract cancellation. This is important to consider when evaluating motive. If CCS sought to retaliate against Mrs. Stringham, then it had its chance with the 2020-2021 evaluation. Alas, it did not. Indeed, CCS (again) gave Mrs. Stringham the benefit of the doubt and a higher performance rating than she deserved for the 2020-2021 school year.

26. Board Policy 9600 states that "[d]isruptive or uncivil behavior includes, but is not limited to: . . . c. Raising one's voice above an appropriate level." (Admin. Ex. 26(B).

27. Mrs. Stringham argued that the Policy 9600 language preferring a progressive discipline approach was not followed, but that paragraph applies to non-employees as it mentions issuance of a no-trespass order. The paragraph explicitly applicable to employees states, "For CCS employees and students who behave in an uncivil or disruptive manner, appropriate disciplinary action will be taken in accord with negotiated agreements, employee handbooks, and the Student Code of Conduct." Nothing in the negotiated

CCS 00612

agreements handbooks or code of conduct mandate progressive discipline in this instance, and if it did, Ms. Borto and Mrs. Cole testified that Mrs. Stringham was well on her way down a progressive discipline path with the multiple improvement plans.

28. The Administration has demonstrated by a preponderance of the evidence the existence of appropriate statutory grounds to cancel Mrs. Stringham's regular teacher's contracts with CCS, and Mrs. Stringham has not established that this recommendation is caused by unlawful discrimination or retaliation or is in any way impermissible.

## Decision

Based on the preceding findings of fact and conclusions of law, the Board by the vote of ___5___ of the five (5) members taking part in the consideration of this matter resolve that Dianna Stringham's regular teaching contract with Carmel Clay Schools should be and hereby is cancelled as of the date of this decision, which is March 28, 2022.

**ENTERED OF RECORD IN THE MINUTES OF THE BOARD OF SCHOOL TRUSTEES OF CARMEL CLAY SCHOOLS THIS TWENTY-EIGHTY DAY OF MARCH, 2022.**

Katie Browning, President

Louise Jackson, Vice-President

Jennifer Nelson-Williams, Secretary

Layla Spanenberg, Member

Mike Kerschner, Member

CCS 00613

# In the Matter Of:

*DIANNA STRINGHAM*

*-v-*

*CARMEL CLAY SCHOOLS*

_____

## Teacher Termination Hearing

*March 15, 2022*

_____



**StewartRichardson**

DEPOSITION SERVICES

800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1

 2

 3

 4                IN RE:   TEACHER TERMINATION HEARING

 5

 6

 7

 8                       DIANNA STRINGHAM

 9                              V.

10                      CARMEL CLAY SCHOOLS

11

12                        March 15, 2022
                            5:30 p.m.
13

14

15

16        Carmel Clay Schools Administration Building
                     5201 East Main Street
17                   Carmel, IN   46033

18

19   TAKEN BEFORE REGINA E. MOSS, RPR, NOTARY PUBLIC
             IN AND FOR THE COUNTY OF HAMILTON,
20                   STATE OF INDIANA

21

22

23

24          STEWART RICHARDSON & ASSOCIATES
            Registered Professional Reporters
25                   (800)869-0873
```

```
1                        APPEARANCES

2

    FOR CARMEL CLAY SCHOOL ADMINISTRATION:
3
         Jonathan L. Mayes, Esq.
4        BOSE MCKINNEY & EVANS, LLP
         111 Monument Circle
5        Suite 2700
         Indianapolis, IN  46204
6

7   FOR DIANNA STRINGHAM:

8        Jamie A. Maddox, Esq.
         Chad Holler, Esq.
9        BETZ & BLEVINS
         One Indiana Square
10       Suite 1660
         Indianapolis, IN 46204
11

12  FOR CARMEL CLAY SCHOOL BOARD:

13       Andrew A. Manna, Esq.
         CHURCH CHURCH HITTLE & ANTRIM
14       Two North Ninth Street
         Noblesville, IN  46060
15

16  CARMEL CLAY SCHOOL BOARD MEMBERS:

17       Jennifer Nelson Williams
         Louise Jackson
18       Katie Browning
         Layla Spanenberg
19       Michael Kerschner

20

21

22

23

24

25
```

```
 1                    INDEX OF WITNESSES

 2
    MAUREEN BORTO
 3        Direct...........................  13
          Cross............................  47
 4        Redirect.........................  51

 5  DIANNA STRINGHAM
          Direct...........................  53
 6        Cross............................  79
          Redirect.........................  98
 7        Recross.......................... 112
          Redirect cont.................... 113
 8
    RACHEL COLE
 9        Direct........................... 114
          Cross............................ 131
10        Redirect......................... 133
          Redirect cont. .................. 141
11        Recross.......................... 141
          Recross cont. ................... 144
12
    THOMAS OESTREICH
13        Direct........................... 144
          Cross............................ 149
14
    MICHAEL BERESFORD
15        Direct........................... 156
          Cross............................ 158
16

17

18

19

20

21

22

23

24

25
```

1        MR. MANNA:  Good evening.  My name is Andrew

2   Manna.  I'm counsel for the Carmel Clay School

3   Board.  We're here this evening regarding a

4   recommendation for administration to cancel the

5   contract of Dianna Stringham.  For administration,

6   Mr. Mayes, could you introduce who you have?

7        MR. MAYES:  Good evening.  John Mayes, partner

8   with Bose McKinney & Evans, here with

9   Dr. Beresford.

10        MR. MANNA:  And Ms. Maddox?

11        MS. MADDOX:  Good evening.  My name is Jamie

12   Maddox.  I'm here with my client, Dianna Stringham,

13   and my associate, Chad Holler.

14        MR. MANNA:  Thank you.  If we could, I believe

15   prior to this evening, we had a discussion about

16   witnesses.  Parties have a good representation of

17   who they're going to call this evening.  So let's

18   go ahead and do our swearing in of our witnesses,

19   if you could have those folks come in.  Who do we

20   have that are potential witnesses, if you could

21   give us those on the record?

22        MR. MAYES:  Sure.  We have Rachel Cole,

23   Dr. Thomas Oestreich, Maureen Borto, and

24   Dr. Michael Beresford.

25        MS. MADDOX:  And Dianna Stringham.

1        (All witnesses sworn in by the Court

2    Reporter.)

3        MR. MANNA:  Witnesses, as you depart, a

4    reminder to keep separated in terms of our

5    proceeding that's going on and not to discuss the

6    matter.  You'll be called in at the appropriate

7    time.  Thank you.

8        Again, for the record, the parties have met

9    previously before the board conference this evening

10   and discussed efficiency of our exhibits and our

11   witnesses.  We have set a tentative guideline of a

12   two-hour proceeding this evening, and I know we'll

13   try to stick to that as best we can.  Thank you for

14   working with each other, counsel for both parties.

15       In advance as well, I want to ask the board

16   members, do all the board members feel that you're

17   here this evening in a capacity in good faith to be

18   able to hear the information presented to you?  You

19   have no bias or objections to proceeding and

20   hearing this information?

21       THE BOARD:  Yes.

22       MR. MANNA:  Thank you, board members.

23       Ms. Maddox and Mr. Mayes, I have a couple of

24   stipulations I'd like to read that we discussed

25   last week just to have some clarity for the record.

```
 1    First of all, do we all agree according to Indiana
 2    statute that the standard for the board is
 3    preponderance of the evidence?
 4         MR. MAYES:  Yes.
 5         MS. MADDOX:  Yes.
 6         MR. MANNA:  Thank you both.  Preliminary
 7    principal's cancellation letter, I went ahead and
 8    just used, Administration number 27 was issued on
 9    February 4.  I'm going to move through these a
10    little bit quickly because I believe they're
11    already stipulated.  So that's our exhibit,
12    Exhibit 27, on administration; and that was issued
13    February 4.  The teacher request for a
14    superintendent conference/meeting with
15    Dr. Beresford is Administration Exhibit 28.  That
16    was February 8 that that was requested.
17         The superintendent conference then took place
18    on February 24.  Ms. Maddox or Mr. Mayes, please
19    slow me down if I get anything incorrect here.
20    Teacher then requests for a board conference
21    following the superintendent conference is
22    Administration number 29, February 28.  The
23    superintendent decision about the principal's
24    recommendation came in Administration number 30.
25    That was March 1.  The parties then by email set
```

1   this board conference for the date of March 15.  We

2   did that back on March 4.

3        The parties set a pre-conference discussion

4   last week where we discussed logistics for this

5   evening, and that was done on March 9.  And the

6   parties agreed to set the exchange date for

7   March 10, which we had by mutual agreement.  Also

8   prior to this evening, parties have discussed and I

9   want to put on the record that we're going to go

10  ahead and have both administration and teacher

11  documents admitted.  And correct me if I'm wrong,

12  but both counsel have agreed that that's

13  appropriate?

14        MR. MAYES:  Yes.

15        MS. MADDOX:  Correct.

16        MR. MANNA:  Thank you all for those

17  preliminary matters.  Anything else as we get

18  moving forward, Mr. Mayes and Ms. Maddox?

19        MS. MADDOX:  Not from me.

20        MR. MAYES:  Nothing from the superintendent.

21        MR. MANNA:  I thought of something.  Unless

22  I'm mistaken, I did not see a copy of

23  Ms. Stringham's contract in either exhibit.

24        MS. MADDOX:  No, I don't think we have a copy.

25        MR. MANNA:  I have asked that a copy be

1    provided.  I have that copy.  Let's see.  How

2    should we mark that?  Stipulated Exhibit --

3         MR. MAYES:  I think we could stipulate that

4    she has an indefinite contract under Indiana

5    statute, and it continued from the initial one.

6    From our side, I don't see a need to have it as an

7    exhibit in this proceeding.

8         MR. MANNA:  I would like to have it as an

9    exhibit, so I'm going to put it down as Board

10   Exhibit 1.  I'll give you both a copy of that

11   during a break, which is her regular teacher

12   contract.  All right.  First up, we have the

13   witnesses sworn.  Administration, if you'd like to

14   give an opening.

15        MR. MAYES:  Yes, we would.  Good evening.

16   Thank you for your time.  As I mentioned briefly

17   before, my name is John Mayes.  I'm a partner with

18   Bose McKinney & Evans and will be presenting the

19   evidence on behalf of Dr. Beresford and his

20   administration.  Tonight we are here on a

21   recommendation to end the employment of a counselor

22   at Carmel High School.

23        So this is about Mrs. Dianna Stringham, that

24   counselor, but it's also about the students at

25   Carmel High School.  This evening you will be

1   hearing about the important role that counselors

2   play in helping students at Carmel High School

3   navigate through high school to their success, and

4   ultimately what we hope for is graduation and that

5   important role that they play as a counselor to

6   support those students to that end.  You'll hear

7   from the team that leads those counselors.

8          You'll hear from Rachel Cole, director of

9   counseling, and her supervisor, Maureen, or Mo,

10  Borto, assistant principal at Carmel High School.

11  You'll hear how they want a proactive approach in

12  the counseling department.  Students, families come

13  with questions.  They want you to not just give

14  information but be proactive.  Get to understand

15  the why behind the question being asked.  Why is

16  the student wanting to transfer classes?  Why are

17  they struggling with that teacher?

18         But if you are supplying information, make

19  sure that it's correct information.  And by all

20  means, don't let students fall through the cracks.

21  You'll hear tonight that Mrs. Cole as

22  Mrs. Stringham's direct supervisor gave her high

23  marks, the highest marks, in 2017, in 2018, and

24  2019, as well as 2020.  But during the '19/'20

25  school year, issues began to surface; and you'll

1  hear about that.

2      That was a challenging year for everybody.

3  But COVID, that COVID year, revealed other issues.

4  The issues weren't there because of COVID.  But

5  COVID revealed and the protocol changes revealed

6  the issues that were there.  Because those issues,

7  those performance issues persisted, the evidence

8  will show that starting with the 2020 to 2021

9  school year Mrs. Stringham was put on an

10  improvement plan.  But that didn't solve the

11  problem.

12      The evidence will also show that in the spring

13  of 2021 after her supervisors asked her to identify

14  students that were at risk of not graduating, that

15  she let three students fall through the cracks.

16  They did not graduate in their fourth year, and two

17  of those three never graduated from Carmel High

18  School.  That performance improvement plan in 2021

19  didn't solve the problem.  Those problems

20  continued.

21      She started the '21/'22 school year on a more

22  stringent improvement plan; this time more frequent

23  meetings, more documentation, more conversations of

24  what she was doing wrong.  But the meetings didn't

25  solve the problem.  The documentation didn't solve

1   the problem.  The second improvement plan didn't

2   solve the problem.

3        Finally after a period of medical leave, she

4   came back to work in January of 2022.  She wanted

5   her supervisor to sign some paperwork dealing with

6   some licensing, and her supervisor didn't do that.

7   She was directed to HR, and you'll hear about the

8   encounter where she was irate and upset that there

9   wasn't this signature even though she was told to

10  go talk to HR.

11       After that incident, the administration at the

12  high school moved forward with contract

13  cancellation; and that's why we're here today.  In

14  summary, all the help didn't help.  And at the end

15  of the day, the students at Carmel High School

16  weren't getting the help that they deserve from

17  Mrs. Stringham.  Mrs. Stringham will point fingers.

18  Everyone else is to blame but herself.  And along

19  the way you'll see the evidence showing that she's

20  alienated everyone who's tried to help.

21       Keep in mind two questions as you hear the

22  evidence:  Who gave her the good evaluations in

23  '17, '18, '19, and '20?  Who gave her those good

24  evaluations, and did these concerns surface before

25  she filed complaints?  When did these concerns

```
 1   first surface?
 2        At the end, Dr. Beresford and his team tried.
 3   They gave Mrs. Stringham plenty of opportunities.
 4   And at the conclusion tonight, we will be asking
 5   you to affirm Dr. Beresford's recommendation that
 6   you cancel Mrs. Stringham's regular teacher's
 7   contract.  Thank you.
 8        MR. MANNA:  Thank you, Mr. Mayes.  Ms. Maddox?
 9        MS. MADDOX:  Thank you, Mr. Manna.  I
10   introduced myself earlier.  I'm Jamie Maddox, a
11   partner with Betz & Blevins.  I'm here with my
12   client, Dianna Stringham.  After performing
13   successfully in her role as counselor for the last
14   eight years, every year receiving highly effective
15   or effective in her evaluations, the Carmel
16   administration is now seeking to cancel her
17   contract.
18        Mrs. Stringham is the only individual in her
19   counseling department that identifies as homosexual
20   and the only employee that is a nonwhite
21   individual.  Mrs. Stringham has been discriminated
22   against based on her sexual orientation and based
23   on her race and ethnicity.  Less than two weeks
24   after Mrs. Stringham filed a complaint of
25   discrimination with Carmel, Mrs. Stringham was
```

1    placed on her first improvement plan, but it didn't

2    stop there.

3         Rachel Cole went on to write Mrs. Stringham up

4    more than 60 times in just over 30 days.  Nearly

5    67 times in just over 30 days she was written up.

6    Mrs. Stringham is now facing the cancellation of

7    her contract after eight years of effective and

8    highly effective evaluations.  The evidence we will

9    present here tonight will show that Mrs. Stringham

10   was discriminated against based on her sexual

11   orientation and based on her race and ethnicity by

12   Mrs. Rachel Cole.  Thank you.

13        MR. MANNA:  Thank you, Ms. Maddox.  I believe

14   we're ready for Administration's first presentation

15   of evidence or witness.

16        MR. MAYES:  Thank you.  We call Maureen Borto.

17        MR. MANNA:  All right.  Thank you, sir.

18        MAUREEN BORTO, called as a witness, having

19   been previously duly sworn by the Court Reporter,

20   was examined and testified as follows:

21   DIRECT EXAMINATION

22   BY MR. MAYES:

23   Q  All right.  Ms. Borto, could you go ahead and

24      introduce yourself and spell your name for the

25      court reporter.

```
 1  A   Yes.  My name is Maureen Borto.  Maureen,
 2      M-A-U-R-E-E-N.  Last name is Borto, B-O-R-T-O.
 3  Q   Ms. Borto, what is your current title?
 4  A   I'm the assistant principal at Carmel High School.
 5      I oversee student services, special services,
 6      counseling, and our Carmel Learning Center.
 7  Q   How many years have you been in that position?
 8  A   In this current position, two.
 9  Q   How many years with CCS altogether?
10  A   A total of 20.
11  Q   Have all 20 years in education been at CCS?
12  A   Yes.
13  Q   How long have you had oversight or supervision of
14      the counselors at CHS?
15  A   Two years.
16  Q   So you started in 2019?
17  A   2020/2021 school year was the first year.
18  Q   You know Mrs. Dianna Stringham, do you not?
19  A   Yes.
20  Q   When did you first meet Mrs. Stringham?
21  A   I met Mrs. Stringham when she was hired as a
22      counselor.  At that time I was the English
23      department chair.
24  Q   And ballpark, how long ago was that?
25  A   Roughly ten years maybe.
```

1  Q  Prior to the '19/'20 school year, can you generally

2     describe for the board your working relationship

3     with Mrs. Stringham?

4  A  So as an English department chair, I worked with

5     counselors on different scheduling issues.  When I

6     moved into administration prior to the current role

7     I'm in, I was a ten-month assistant principal in

8     student services.  I oversaw 504s and attendance.

9     So I worked with Mrs. Stringham on students who had

10    attendance issues, 504s, and then we worked with

11    all counselors during our student support team

12    meetings and our multidisciplinary team meetings.

13 Q  In your supervision of the counselors, do you play

14    a role in evaluations and reviewing evaluations for

15    those counselors?

16 A  Yes.

17 Q  You started that in the, you said, 2020/2021 school

18    year?

19 A  Correct.

20 Q  Prior when you were facing an evaluation in

21    2020/2021, did you ever go back and look at prior

22    evaluations for an employee or do some historical

23    analysis?

24 A  Yes.  I typically go back through previous

25    evaluations to see how those turned out.

1  Q  If you open up the smaller binder -- and for board

2     members, the smaller binder is a compilation of

3     exhibits from the administration -- Tab A, you can

4     see in Tab A in the upper left-hand corner

5     Mrs. Stringham's name.  And underneath that it

6     says, Evaluation Ending June 2017.  Do you see

7     that?

8  A  Yes.

9  Q  And then two lines below that it says, Primary

10    Evaluator:  Rachel Cole.  Do you see that as well?

11 A  Yes.

12 Q  So for the period ending June 2017 -- so this would

13    be for the '16/'17 school year -- would you have

14    been involved in the evaluation here?

15 A  No.

16 Q  You can see here that Mrs. Stringham received a

17    highly effective rating; is that correct?

18 A  Correct.

19 Q  So as supervising over counselors starting in 2020

20    to 2021, you would have been able to look back and

21    see these evaluations over the years?

22 A  Yes.

23 Q  At the bottom of the exhibit on the right-hand

24    side, you'll see a bunch of zeros and then the

25    number one followed by two and so on and so forth.

```
 1      If you go to page 3, you'll see that's for '17/'18.
 2      Do you see that?
 3   A  Yes.
 4   Q  And then page 5 is '18/'19, and then page 6 is
 5      '19/'20.  Do you see that?
 6   A  Yes.
 7   Q  So looking at these, she got highly effective
 8      ratings for all of these; correct?
 9   A  Correct.
10   Q  So if we look at the '19/'20 evaluation, at the end
11      of it on page 8, there are final evaluator
12      comments.  Do you see that?
13   A  Yes.
14   Q  These are uploaded in the evaluation system for
15      that employee; is that correct?
16   A  Yes.
17   Q  So the final evaluator is commenting on various
18      matters.  And if you look about two-thirds of the
19      way down, you'll see a line that says, Email
20      communication was a concern -- it's to the
21      right-hand side -- in some areas.  Do you see that
22      line?
23   A  Yes.
24   Q  It says, Email communication was a concern in some
25      areas and the response back to parents for some
```

```
 1      needs to improve.
 2           Do you recall those issues surfacing as you
 3      encountered Mrs. Stringham in managing her
 4      performance?
 5   A  So this would have ended June -- this would have
 6      been the '19/'20 school year.  So I took over
 7      evaluations right after this.
 8   Q  So you were not involved in this evaluation at all;
 9      correct?
10   A  No.
11   Q  But you were able to look back at this?
12   A  Correct.
13   Q  And then you during your supervision were able to
14      see email communication concerns with regards to
15      Mrs. Stringham?
16   A  Yes.
17   Q  And then it also says here in the following
18      sentence that there was some misinformation given
19      to counselors.  Do you see that?
20   A  Yes.
21   Q  Again, what's the purpose of these evaluator
22      comments being written into an evaluation from your
23      perspective as someone who supervises counselors?
24   A  The purpose is to identify going into -- identify
25      areas of concern that we've seen over the course of
```

1    the year and identify areas that we would like to

2    continue to work on going forward.

3  Q  And then if you move a couple of lines down, it

4    says, I want you to know I am concerned about your

5    performance as a counselor.

6         Do you see that?

7  A  Yes.

8  Q  Again, as someone who supervises employees, when

9    you see that, what are you hoping that supervisor

10    is trying to convey to that counselor?

11  A  My hope would be that they're reflecting on their

12    own work and understanding that it's not meeting

13    the expectations of a Carmel High School counselor

14    and they are going to work on that going forward.

15  Q  Since this was related to the '19/'20 school year,

16    when would this have been conveyed to

17    Mrs. Stringham?

18  A  The end of the school year.

19  Q  If you look on page 7, which is the immediately

20    preceding page, you can see two dates at the

21    bottom.  Are those dates generated in the system?

22  A  Yes.

23  Q  You can see Mrs. Stringham acknowledge electronic

24    receipt of this document on June 24, 2020; correct?

25  A  Yes.

```
 1   Q   And her supervisor, Rachel Cole, marked this
 2       document as complete on May 19, 2020.  Do you see
 3       that?
 4   A   Yes.
 5   Q   So both page 7 and page 8 would have been sent to
 6       Mrs. Stringham on June 24, 2020?
 7   A   Yes.
 8   Q   Now, moving forward to page 9, we've got the
 9       2020/2021 school year.  You were involved in this
10       evaluation; correct?
11   A   Yes.
12   Q   Tell the board what involvement you had with this
13       evaluation process.
14   A   In this evaluation process, I did the extended
15       observation for Mrs. Stringham; and then Mrs. Cole
16       did the short observations.
17   Q   So how many observations are done each school year
18       for an evaluation?
19   A   If a teacher in the prior year is effective or
20       highly effective and they're not within the first
21       two years, it is one extended and two shorts that
22       are required.
23   Q   So in the 2020 to 2021, her rating dropped?
24   A   Yes.
25   Q   And it dropped to effective.  Do you see that?
```

```
 1   A   Yes.
 2   Q   So we had a series of highly effective to
 3       effective.  What happened?
 4   A   At that point prior to the 2021 school year after
 5       the evaluation from '19/'20, Rachel Cole and I had
 6       put Dianna on an improvement plan identifying areas
 7       in which she needed to improve.  So during the
 8       course of that school year, we did not see the
 9       growth that we wanted to see.
10   Q   Did you have interactions with Mrs. Stringham
11       during the '19/'20 school year, particularly the
12       second semester?
13   A   Yes.
14   Q   Tell the board about those experiences with
15       Mrs. Stringham.
16   A   So during second semester of that school year was
17       when we moved to stay at home due to COVID.  So as
18       administrators and counselors, we typically -- and
19       student services, administrators, and counselors,
20       we meet every other week with counselors to do
21       student support team meetings where we are
22       identifying students who are in need academically,
23       social-emotionally.  Is something going on at home?
24           Once we went to stay at home, our students
25       were struggling quite a bit more than usual.  So
```

1    counselors became the point person -- they always

2    are that point person -- for teachers regarding

3    students.  Our students were struggling quite a bit

4    more.  We saw that on an administrative side as

5    well as a counseling side.

6         So we moved our student support team meetings

7    to every week with every counselor.  So in addition

8    to those meetings, we were still interacting with

9    Mrs. Stringham via our multidisciplinary team

10   meeting that was meeting every other week as well

11   as doing 504 conferences throughout that time.

12 Q Explain to the board in those meetings

13   Mrs. Stringham's involvement, preparation, and

14   presentation.

15 A So we had a big concern of Dianna's performance

16   during our student support team meetings where the

17   expectation is that our counselors bring students

18   to the table to discuss that they're working on and

19   have communicated with.  We are doing the same in

20   administration and looking at data, attendance,

21   grades, feedback from everyone.

22        While we had long lists of students to

23   discuss, when Dianna would come to those meetings,

24   she did not have lists of students to discuss.  It

25   was evident that she hadn't been connecting with

```
 1      her students, reaching out to families, reaching
 2      out to homes to get more information.  When we
 3      would meet the following week, there wasn't
 4      follow-up on those students.
 5   Q  You mentioned 504 involvement, that you were
 6      overseeing 504 plans.  During that time period, was
 7      Mrs. Stringham involved in those 504 meetings?
 8   A  For her assigned students, yes.
 9   Q  Any concerns in the context of those meetings?
10   A  Yes, there were two concerns.  There was one 504 I
11      remember having to track Dianna down for to be
12      present at via Zoom, and there was also the
13      expectation at that time that -- it's always the
14      expectation that counselors are working with our
15      administrative assistant who schedules those
16      conferences to make sure they meet the deadline to
17      meet within their required deadline within that
18      school year.
19          And in going through the students we had left
20      and knowing Dianna's students hadn't been scheduled
21      yet for those conferences, I had to reach out to
22      her to remind her to be setting up those
23      conferences with our administrative assistant.
24   Q  So as a result of those concerns in the second
25      semester of '19/'20, you mentioned earlier there
```

```
 1     was a performance improvement plan at the start of
 2     the 2020 school year or early on in the 2020 school
 3     year?
 4  A  Yes.
 5  Q  Do you recall when you started working on that
 6     performance improvement plan, the first one?
 7  A  Yes.  We started working on that over the summer.
 8  Q  So June or July roughly?
 9  A  Yes.
10  Q  If you could turn to Tab C in the administration
11     exhibits, is this that first improvement plan that
12     went into effect in 2020?
13  A  Yes.
14  Q  Now, if you flip to the page where there's
15     signatures, which is page 4, you'll see several
16     different signature dates there as to when this was
17     signed.  Do you see that?
18  A  Yes.
19  Q  And then a meeting date that is back on page 1.  Do
20     you see that?
21  A  Yes.
22  Q  So you mentioned you were preparing it over the
23     summer, but when did you meet with Mrs. Stringham
24     to go over this performance improvement plan?
25  A  We met on September 10, 2020.
```

1  Q  Do you recall who was present at that meeting?

2  A  Present at the meeting, myself, Rachel Cole, our

3     director of counseling, Dianna, and Mark Wien, who

4     was the CTA representative.

5  Q  So the teacher's association representative?

6  A  Yes.

7  Q  So what we have here on page 1, section one is

8     communication, written and verbal.  You see that

9     there's 1(a) that says facts.  B says rules and

10    expectations.  For example, B(ii), respond with

11    professionalism within 24 to 48 hours; iii, stay

12    current on guidelines and information regarding

13    student graduation status; and then impact is in

14    subsection C.  So with each of these sections you

15    have throughout this facts, rules and expectations,

16    and impact.  Explain to the board why you

17    structured it this way.

18 A  We structured it this way to identify those facts

19    are examples of the concerns that we had seen in

20    the '19/'20 school year as well as through the

21    start of that 2021 school year.  We then wanted to

22    connect that into the expectations of our Carmel

23    High School counselors and rules and expectations

24    any of our Carmel High School counselors should

25    follow.

```
 1              And then C is helping to understand, what does
 2        that impact when those expectations are not
 3        followed?  That impacts our students.  That impacts
 4        their families that go with that.  So helping to
 5        hopefully understand why those areas need to be
 6        improved upon.
 7   Q    Those rules and expectations were there to be
 8        explicit?
 9   A    Yes.
10   Q    If you go to page 4, there's a section at the end.
11        If you could explain the purpose behind page 4 at
12        the very -- go back one page, I think.  The actions
13        necessary for improvement, again, explain to the
14        board the purpose behind that.
15   A    So those were, then, as we headed into that school
16        year, that is what we needed to see happening in
17        order for improvement within each of those areas.
18   Q    So there was timeliness in Section 1 and the
19        approach in Mrs. Stringham's communications.
20        Number two, showing grace, seeking to understand
21        and listening in that Section 2.  Section 3,
22        understanding CHS guidelines and information.  And
23        if there's any information needed, reaching out in
24        Section 4 to you or DC, which is who?
25   A    Rachel Cole, department chair.
```

```
 1  Q  She's director of counseling?

 2  A  Yes.

 3  Q  After that improvement plan during the 2020 to '21

 4     school year, did Mrs. Stringham's performance

 5     improve?

 6  A  It did not.

 7  Q  I want to fast-forward to second semester at Carmel

 8     High School.  Take the board, if you would, into

 9     what it's like second semester for the Carmel High

10     School counseling team.  What's your focus?

11  A  The focus second semester becomes graduation.  Our

12     goal for any of our students is to help get them

13     where they want to go when they're done at Carmel

14     High School, and a high school diploma is a

15     requirement for whatever they want to do.

16         So our focus in counseling becomes ensuring

17     all of our students have met their graduation

18     requirements, they're in their current courses they

19     need to graduate, they've met any testing

20     requirements, they've had any outside hours that

21     they've needed to complete, and they're currently

22     passing the courses that are needed for graduation.

23         And if they aren't we're problem-solving, how

24     do we get them to pass?  Any conversation we have

25     about a student in that spring semester is, what do
```

```
 1       they need for graduation?  How do we get them
 2       there?  What do we put into place now to help them
 3       get there to graduate on time?
 4   Q   If you could walk the board through the start of
 5       the year to the end of the year, how do counselors
 6       make sure that students don't fall through the
 7       cracks?
 8   A   So counselors are expected when they return in the
 9       summer to audit all of their students' schedules.
10       So they're auditing that student's schedules no
11       matter the year for their graduation requirements
12       and their checklist.  What courses do they have?
13       What do they need?  What have they maybe taken over
14       the summer?  What do their grades look like?  What
15       are they currently scheduled for?  Do any changes
16       in that schedule need to happen in order to meet
17       possibly a graduation requirement that has not been
18       yet met?
19            If they passed the required testing, that they
20       have it.  If they have, great.  If they haven't,
21       are they signed up for those tests?  How are
22       parents aware, are kids aware?  And then that is
23       the conversation throughout the year.  They meet
24       with our senior students in the fall.  They do
25       senior meetings with our students to review all
```

```
 1        that information with them.
 2            They're also talking about what their plans
 3        are for next year.  And any time throughout the
 4        course of a year we are discussing a student,
 5        whether that's in our student support team meetings
 6        or even informally if a student is struggling.  As
 7        a senior, we zone in right focused on, what are the
 8        courses they need for graduation?  How do we ensure
 9        they get those as the priority?  And how do we help
10        them get there?
11   Q    How throughout the year is there collaboration
12        among the team to help troubleshoot, problem-solve
13        the students that may be at risk?
14   A    So the formal structure we have in place is our
15        student support teams that we as student service
16        administrators meet with our counselors.
17        Counselors meet with us every other week.  We're
18        there every week with the social workers.  They're
19        bringing students to the table who, again, need
20        academic help, social-emotional support.  We're
21        seeing something on an administrative side.
22            Every week we have a multidisciplinary team
23        that focuses on our Tier 3 interventions.  So
24        that's the formal structure.  The informal
25        structure is, something is going on with this kid.
```

```
 1        We need to talk about them, whether that's to the
 2        department chair, Rachel Cole, whether that's one
 3        of us as administrators.  If it's a student or
 4        family we've been working on, those conversations
 5        can happen at any point in time as well.
 6   Q    That's the typical year at Carmel High School?
 7   A    Correct.
 8   Q    Which it's been a few since we've had a typical
 9        year.
10   A    Yes.
11   Q    Take us back to spring semester 2021.  What was
12        unique about that in particular as it related to
13        graduation?
14   A    So it was unique because we were in the hybrid
15        schedule as well as having students who were all
16        virtual learners.  So our access to students was
17        somewhat limited in terms of when they were in the
18        building, and we had a lot of students who whether
19        they chose to be all virtual or they were hybrid
20        were struggling with that structure and that
21        learning.
22            So we had students failing courses they may
23        not have typically failed because they were
24        struggling quite a bit.  So we had a larger amount
25        of students we were concerned about going into that
```

```
 1      graduation time frame.
 2  Q   To get the focus on that graduation priority, what
 3      did you do?
 4  A   So we set out towards the end of March knowing we
 5      still had two months before students graduated.  I
 6      set up time with each counselor individually.  I
 7      sent them all an email and let them know I was
 8      going to come by and talk with each of them to talk
 9      through their seniors.  Which ones were failing
10      courses they needed to graduate?  What did we need
11      to put in immediately to help them?  Did we need to
12      move them from an in-person course to possibly an
13      online course to get them started with that so they
14      would not have to do summer school classes?  They
15      wouldn't have to come back for a fifth year.
16          We know the longer we put that out, the more
17      they struggle and the less motivated they get.  So
18      we wanted to identify interventions we could put in
19      place right now.  So I went to each counselor and
20      spent time with them going through their students
21      and determined what changes we needed to make to
22      their schedule immediately.
23          The counselors were expected to understand
24      their students' grades, feedback from the students,
25      feedback from teachers to know what, then, we
```

1    needed to do right then because it was the end of
2    March.  So we still had two months.
3  Q  Did you meet with Mrs. Stringham?
4  A  Yes.
5  Q  Do you recall how many students she brought to your
6    meeting?
7  A  It was roughly four students that were brought.
8  Q  So the rest of the school year ends.  At the end of
9    the year, what happens when there's a student that
10   fails to graduate?
11 A  When a student fails to graduate, we're then
12   looking at courses they can take in the summer or
13   we're planning on them being with us in a fifth
14   year at our Carmel Learning Center, which is across
15   the street.  It's our alternative learning program.
16 Q  Do you receive notification of those fifth year
17   seniors?
18 A  I do, yes.  Counselors are expected to email
19   myself, Rachel Cole, and then Jill Grimes, who's
20   our director of the Carmel Learning Center, to know
21   who is expected to be there in a fifth year that
22   following fall.
23 Q  Despite the best efforts of the entire
24   administration, roughly how many per counselor do
25   you see in terms of high school students that just

```
 1     don't graduate?
 2  A  Rarely any.  One maybe out of the whole.
 3  Q  Maybe one per counselor?
 4  A  Maybe.
 5  Q  At the end of the 2021 school year, how many did
 6     Mrs. Stringham notify you about?
 7  A  She sent us an email of five students --
 8  Q  Five students?
 9  A  -- who were not going to graduate on time and would
10     need a fifth year.
11  Q  Were any of those five students on that list of
12     four at the end of March when you met with her?
13  A  No.
14  Q  So at the end of March, there should have been nine
15     on that list?
16  A  Yes.
17  Q  Tell the board, what did you think when you got
18     that email telling you of five students that
19     wouldn't be graduating and never had been mentioned
20     before?
21  A  I was angry to say the least.  These are students
22     we knew the last -- well, for those students, the
23     last four semesters for them had been so hard.  And
24     our whole focus was we knew that was hard.  We
25     needed to get them graduated, which is why I went
```

1    counselor to counselor to get them interventions in
2    place immediately so we could get that in.
3         So to know we missed students that we could
4    have gotten across the finish line to graduation
5    was devastating for those kids, devastating for
6    those kids and for those families.  And I was upset
7    that we took time to do that and we missed those
8    kids.
9  Q  You mentioned getting them across the line.  Did
10    you go back and look at those five students and see
11    who we could have gotten across the line that year?
12 A  Yes.
13 Q  How many of those five do you think, we could have
14    gotten this done?
15 A  There were three.
16 Q  Of those three, how many never graduated from
17    Carmel High School?
18 A  Two.
19 Q  If you look at Tabs E, F, and G, these are the
20    records that Mrs. Stringham sent in.  These are the
21    three that could have graduated but fell through
22    the cracks?
23 A  Yes.
24 Q  Did you also in looking at this go back and -- let
25    me back up.

1          You mentioned earlier SST.  What does that

2     stand for?

3  A  Student support teams.

4  Q  So your student support teams were the regular team

5     collaboration among counselors; is that correct?

6  A  Yes.

7  Q  Do you take notes from those SST meetings on

8     various students that are mentioned in there?

9  A  Yes, we do.

10 Q  When you got this list of these five students and

11    in particular these three, did you go back through

12    your SST notes?

13 A  Yes.

14 Q  With student did you find him mentioned in your SST

15    notes anywhere?

16 A  Not that I recall.

17 Q  If you go to Tab H, are those the SST notes?

18 A  Yes.

19 Q  These are the SST notes as to Mrs. Stringham's

20    students?

21 A  Yes.

22 Q  So you have notes per counselor from SST?

23 A  Yes.

24          MR. MANNA:  Mr. Mayes, one second.  Board

25     members and parties, prior to this evening, the

```
 1        parties agreed that any student names are going to

 2        be kept basically under seal; meaning that if

 3        there's privacy issues, both parties have agreed

 4        we're keeping that name as part of the record, not

 5        to be disclosed outside of this proceeding.  I

 6        wanted to make sure we put that on the record.

 7             MR. MAYES:  That will also be reflected in any

 8        transcript as well just so board members know that

 9        as well.

10   Q    So in looking at Tab H, page 2, in the third from

11        the bottom, do you see student mentioned?

12   A    Yes.

13   Q    And that's on January 26?

14   A    Yes.

15   Q    And then if you go to page 3, halfway down the page

16        you'll see student and student  Do you see those two

17        names?

18   A    Yes.

19   Q    So student and student  those are two of the three that

20        could have graduated but did not?

21   A    Yes.

22   Q    If you look here, I didn't see student mentioned at

23        all.  Do you?

24   A    I do not.

25   Q    Did you talk to Mrs. Stringham about that, about
```

1    why these names weren't mentioned to you in March?

2  A  I believe we emailed about it at that point because

3    it was summer.

4  Q  So the problems weren't fixed by the improvement

5    plan.  So what happened next starting with the

6    '21/'22 school year?

7  A  So we then put in another improvement plan that was

8    more structured with expectations of her job.  We

9    tried in the previous school year to walk alongside

10    Mrs. Stringham, help her out, go through the

11    progressive discipline.  But when we saw these

12    students not graduate and not seeing the

13    improvement, we put together another improvement

14    plan for her to start the following school year

15    with.

16  Q  That is Tab D if you could turn to that.  Is this

17    that second improvement plan that you mentioned?

18  A  Yes.

19  Q  On page 1 under professional responsibilities in

20    that first bullet point, you can see where you

21    mentioned student student and student  Do you see that?

22  A  Yes.

23  Q  It says, student was never discussed at SST.

24      Does that refresh your memory as to when you

25    reviewed and saw he wasn't mentioned at all?

1   A   Yes.

2   Q   And then if you go to page 2 of the plan, the

3       second bullet point says, You need to be proactive

4       in working with students.

5           Why did you put that in the performance

6       improvement plan?

7   A   That's one of our biggest concerns is the proactive

8       approach.  It's our expectation that our counselors

9       are working with our students, catching things for

10      our students academically, socially, what's

11      happening at home to best help them.

12      Mrs. Stringham's approach was very reactive.

13      Someone had to bring her something.  A student had

14      to email her something in order for an action to

15      happen.

16  Q   If you go to page 3, there's a section that says

17      Meetings and Observations.  Do you see that?

18  A   Yes.

19  Q   Tell the board about the cadence of meetings under

20      this performance improvement plan that you were

21      going to have with Mrs. Stringham.

22  A   So during the course of the plan, we met with

23      Mrs. Stringham three different times face-to-face

24      before a review of the plan would come up where we

25      would determine whether she would come off the

1    plan, continue along on the plan, or we would

2    recommend termination of her contract.

3  Q  And then on page 4 there's a section called

4    Communication.  Right before the section on

5    professionalism, it mentions email correspondence.

6    Do you see that?

7  A  Yes.

8  Q  Tell the board about that provision and why that

9    provision was added.

10 A  That provision was added because we would not

11   discover issues with students, with their

12   schedules, with concerns from parents until

13   something got brought to us or we found it as we

14   were reviewing schedules or a parent would reach

15   out to our principal to get to us.

16       So we were requiring Dianna to copy -- first

17   semester was Rachel Cole on the emails, and then

18   second semester it was adding me to the emails so

19   we could see that correspondence was proactive, was

20   professional, was addressing the students' needs in

21   a timely matter, was addressing a student or

22   parent's questions in a timely manner and

23   proactively helping our students.

24 Q  Along the way, explain to the board how the

25   evaluation system, SFS, would use to communicate

1     with Mrs. Stringham how she was doing.

2  A  So we would meet those assigned times that we had.

3     It was always myself, Rachel Cole, Dianna

4     Stringham, and a CTA representative.  We would

5     discuss what has happened within that course of

6     time, what had come across our desk, what we had

7     seen in emails, concerns we had had.  And then

8     those concerns that we had were documented as

9     artifacts in SFS and then tagged accordingly based

10     on the rubric that's in there, based on the rubric

11     that's in SFS.

12  Q  When I hear "artifact," I think of archaeology.

13     Explain maybe in kind of a system or form for the

14     board to understand exactly what is being

15     communicated to the employee with that artifact.

16  A  The artifact is evidence of job performance.  So

17     that can be an email.  In this case it might have

18     been an email communication from Mrs. Stringham to

19     a parent.  It might have been a student email.  It

20     may have been a student's transcript.  It may have

21     been a student's schedule in which we saw a concern

22     or an error in one of the areas in which we had

23     identified within the plan.  So evidence of

24     performance.

25  Q  If you go to Tab B, page 11, is this a summary that

```
 1      an employee would see of those artifact uploads in

 2      SFS?

 3   A  Yes.

 4   Q  And then you click on these individual items, and

 5      it reveals more information?

 6   A  Yes.

 7   Q  And that more information, if you go to Tab I, is

 8      an example of what that more information looks

 9      like?

10   A  Yes.

11   Q  So there would be this artifact cover sheet.  And

12      then in Tab I, page 2, you can see the actual

13      email?

14   A  Yes.

15   Q  So the employee is getting this cover sheet and the

16      email uploaded into the system?

17   A  Yes.

18   Q  Then they get notified when that upload occurs?

19   A  Yes.

20   Q  In Tab I under Title, new artifact, there's a

21      little narrative.  Do you see that?  It says,

22      Student email indicates you would select a good

23      method, et cetera.

24           Who would write that narrative?

25   A  That would be Rachel Cole.
```

1   Q   An explanation of a supervisor writing a comment on
2       that particular email and why it's being uploaded?
3   A   Yes.
4   Q   Throughout the '21 into 2022, there were a number
5       of artifacts uploaded for Mrs. Stringham?
6   A   Yes.
7   Q   Are these considered write-ups?
8   A   No.  They are considered evidence of performance.
9   Q   Do you recall off the top of your head how many
10      were uploaded?
11  A   I don't.  I know it was a large amount.
12  Q   Going back, apart from the artifact uploads, you
13      mentioned you had regular meetings with her.  If
14      you look at Tab R, this is an email after one of
15      those meetings; is that correct?
16  A   Yes.
17  Q   And you're copied on that email; correct?
18  A   Yes.
19  Q   So after there was a meeting with Mrs. Stringham,
20      Mrs. Cole would, then, summarize what happened in
21      that meeting.  And then there would also be in
22      addition to that artifacts that were uploaded
23      letting her know how she's doing?
24  A   Yes.
25  Q   If we go to Tab U, another email following meeting

```
 1      two is what that says in the subject?

 2  A   Yes.

 3  Q   And then the same with Tab V?

 4  A   Yes.

 5  Q   After the last meeting, do you recall what occurred

 6      after the fourth meeting with Mrs. Stringham?

 7  A   So the fourth meeting was the final meeting of that

 8      improvement plan where we were discussing whether

 9      Mrs. Stringham would stay on the plan -- be taken

10      off the plan, continue on the plan, or recommend

11      for termination of contract.  At that point we

12      recommended her continuing on the improvement plan.

13  Q   How did Mrs. Stringham respond?

14  A   Not well.  She was very angry.

15  Q   At some point were you made aware that she was

16      going on medical leave?

17  A   Yes.

18  Q   Tell us about how you were informed about the

19      medical leave.

20  A   Our human resource department, Dr. Oestreich,

21      informed us.

22  Q   Did something happen while she was on medical leave

23      to her office?

24  A   Yes.  So Dianna came in and cleaned out her office,

25      at which time she cut the name plate out of --
```

```
 1      there's a counselor name plate in the hallway, and

 2      she cut her name out of that name plate.  It's

 3      permanent.

 4   Q  If you go to Tab Y, is that a photo of the name

 5      plate with her name cut out of it?

 6   A  Yes.

 7   Q  Ms. Borto, how do you know that it was

 8      Mrs. Stringham that cut the name out of the name

 9      plate?

10   A  We're able to see that on cameras in the counseling

11      office.

12   Q  When did that occur?

13   A  I believe it was the Sunday -- end of fall break

14      Sunday.

15   Q  So roughly when did she come back from medical

16      leave?

17   A  It was January.  I'd have to look at the date.  It

18      was the start of second semester.

19   Q  You mentioned that she would be continuing her

20      performance improvement plan?

21   A  Yes.

22   Q  I want to then move to an incident in January that

23      you got called into.  Do you recall that incident?

24   A  Yes.

25   Q  Tell the board what you remember about that
```

```
 1      incident.

 2    A  I was in my office meeting with another staff

 3      member.  And a counselor came to my office, knocked

 4      on the door, came in, pulled me out in the hall to

 5      talk to me and said, you need to go to Rachel's

 6      office.  Dianna is in her office yelling at her.

 7      You need to go help Rachel.

 8           So I immediately went from our office into

 9      counseling.  When I was about three offices away

10      from Rachel's office, I could hear Dianna yelling

11      at Rachel.  When I walked into the office, Rachel

12      was behind her desk.  Dianna was in front of her

13      desk leaning over, yelling at Rachel to sign

14      papers, not understanding why she wasn't signing

15      those papers.

16           Rachel wasn't saying anything at that point.

17      I informed Dianna this had already been shared with

18      Dr. Oestreich.  He would be responding to her.  She

19      needed to direct all questions to him.  Then I

20      removed Rachel Cole from the office.

21    Q  Have you ever in your experience here at Carmel

22      Clay been able to see, witness an employee yelling

23      at their supervisor in their place of employment?

24    A  No.

25    Q  I want you to turn to Tab AA.  This is Board Policy
```

```
 1      9600, and you can see a paragraph starting with,
 2      Disruptive or uncivil behavior includes but is not
 3      limited to.
 4           Do you see that?
 5  A  Yes.
 6  Q  It says, Raising one's voice above an appropriate
 7      level.
 8           Do you think Mrs. Stringham was raising her
 9      voice above appropriate levels in this interaction?
10  A  Yes.
11  Q  If you turn the page, the second to last paragraph
12      says, For CCS employees and students who behave in
13      an uncivil or disruptive manner, appropriate
14      disciplinary action will be taken in accord with
15      negotiated agreements, employee handbooks, and the
16      Student Code of Conduct.
17           Do you see that?
18  A  Yes.
19  Q  Do you think that this behavior by Ms. Stringham
20      constituted professional behavior?
21  A  No.
22  Q  As a result of this, did you recommend to
23      Dr. Harmas that contract cancellation be pursued?
24  A  Yes.
25  Q  Explain to the board why you think it's necessary.
```

```
 1   A   It's necessary because we have progressively gone
 2       through disciplinary action to the point where it
 3       was clear that her performance wasn't improving,
 4       our kids were still suffering and struggling
 5       because of her performance, and it was clear
 6       through all of our meetings and through this action
 7       she did not understand what was wrong with her
 8       performance in order to improve it.
 9   Q   Those artifacts that you mentioned, the many
10       artifacts that were uploaded, do you support those
11       artifacts being uploaded during the '21/'22 school
12       year?
13   A   Yes.
14           MR. MAYES:  No further questions.
15           MR. MANNA:  Ms. Maddox?
16   CROSS-EXAMINATION
17   BY MS. MADDOX:
18   Q   Just a few follow-up questions for you, Ms. Borto.
19       You've been at Carmel Clay Schools for 20 years; is
20       that correct?
21   A   Yes.
22   Q   Have you ever seen someone have 60-plus artifacts
23       uploaded within about 35 days?
24   A   No.  I'd have to look that up.  Not that I recall.
25   Q   Was Mrs. Stringham on the improvement plan before
```

```
 1      or after she filed her complaint of discrimination?
 2   A  I would have to look up the date of filing of
 3      discrimination.
 4   Q  If you look at in the white binder Tab 1, that is
 5      Mrs. Stringham's report of discrimination or
 6      harassment; and the date of the report is
 7      September 1, 2020.  Do you see that?
 8   A  Yes.
 9   Q  If you look at Tab 4, the improvement plan, which
10      is the same improvement plan Mr. Mayes discussed,
11      you met with her on September 10, 2020, about that?
12   A  Yes.
13   Q  During any of the SST meetings that you discussed,
14      did Mrs. Stringham explain to you during these
15      meetings that she had already checked in with these
16      students and she was keeping track of them?
17   A  No.
18   Q  Did you ask her about any students during those SST
19      meetings?
20   A  Yes.
21   Q  You stated previously that the improvement plan had
22      started -- the draftings had started over the
23      summer; is that correct?
24   A  Yes.
25   Q  Who drafted that?
```

1    A   So I worked with Rachel Cole and Karen McDaniel,

2        our associate principal, and Dr. Harmas, our

3        principal, with guidance from Dr. Oestreich.

4    Q   Why did it take so long to draft it before being

5        presented to Mrs. Stringham?

6    A   We usually present those when the staff member

7        returns for their contracted time.

8    Q   When did Mrs. Stringham return for her contracted

9        time for the 2021 school year?

10   A   They usually return end of August.

11   Q   And you discussed previously out of these five

12       students of Mrs. Stringham's that two never

13       graduated; is that correct?

14   A   Yes.

15   Q   Did any of these students move?

16   A   We have them transferred out of the system.

17   Q   Did any of these students finish in summer school?

18   A   No.

19   Q   As far as student are you aware that Mrs. Stringham

20       spoke directly to Rachel Cole regarding student

21   A   I'd have to look that up.

22   Q   Do you know, prior to the 2020/2021 school year and

23       the '21/'22 school year, how many artifacts did

24       Mrs. Stringham receive in, say, 2018?

25   A   I'd have to look that up.

```
 1   Q   Would you know 2019?
 2   A   I'd have to look that up.  I'm sorry.
 3   Q   Would you be surprised to learn that she had zero
 4       in those times?
 5   A   No.
 6   Q   And you distinguished that these weren't write-ups
 7       but evidence of performance.  Why do you
 8       distinguish that?
 9   A   Because an artifact is -- that is what it is.  It's
10       an evidence of performance in terms of, how are we
11       seeing that staff member perform in a certain
12       aspect of their job?
13   Q   So what would a write-up be?
14   A   When we used that in the past, a write-up goes into
15       a teacher's permanent file.
16   Q   Do these artifacts go toward a teacher's
17       evaluation?
18   A   Yes.
19   Q   And the evaluation is used for disciplinary or
20       performance purposes; correct?
21   A   Performance purposes.
22   Q   You discussed at the meeting number four that
23       Mrs. Stringham was very angry.  She didn't yell
24       during that meeting, did she?
25   A   Yes, she did.
```

```
 1  Q  How loud did she yell?
 2  A  We were sitting around the table.  Loud enough it
 3     was jarring.
 4  Q  Did she cry during that meeting?
 5  A  I believe so.
 6  Q  Did she seem upset?
 7  A  Yes.
 8  Q  She didn't scream, did she?
 9  A  She yelled.
10  Q  Is it true that the walls in the counseling
11     department, they're so thin that each counselor was
12     given a white machine to drown out any noise?
13  A  Yes.
14           MS. MADDOX:  That's all I have.
15           MR. MAYES:  Just one follow-up question.
16  REDIRECT EXAMINATION
17  BY MR. MAYES:
18  Q  Ms. Borto, did the administration team at Carmel
19     High School prepare the improvement plan in 2020 in
20     response to the complaint that she filed?
21  A  No.
22  Q  Did that complaint play any role in the preparation
23     of that improvement plan?
24  A  No.  We did not know there was a complaint at that
25     time.
```

```
 1   Q   When did you find out about the complaint?
 2   A   I believe it was September 15 Dr. Oestreich came to
 3       Carmel High School.
 4   Q   So you were not made aware of that complaint before
 5       you met with her about the performance improvement
 6       plan?
 7   A   Correct.
 8           MR. MAYES:  No further questions.
 9           MS. MADDOX:  Nothing further.
10   BY MR. MANNA:
11   Q   Ms. Borto, in any of the communications that you
12       had from parents or students regarding
13       Ms. Stringham, did anyone ever mention anything
14       about her racial status or gender status, anything
15       of that nature?
16   A   No.
17           MR. MANNA:  One second.
18   Q   Did you yourself view the video where the name
19       plate was cut out?
20   A   Yes.
21   Q   Did you view Mrs. Stringham doing that?
22   A   Yes.
23   Q   How did you interpret the cleaning of her office
24       and removing the name plate?
25   A   That she was not coming back.
```

1        MR. MANNA:  Anything else?  Mr. Mayes?

2    Mrs. Maddox?

3        MR. MAYES:  No.

4        MS. MADDOX:  No.

5        MR. MANNA:  Thank you, ma'am.  I'll remind you

6    to keep separated from any other witnesses.

7        MR. MAYES:  Since her testimony is done, is

8    she able to sit in the back?

9        MS. MADDOX:  We prefer that they don't stay.

10       MR. MANNA:  All right.  Thank you.

11       MR. MAYES:  Next we're going to call Dianna

12    Stringham.

13       DIANNA STRINGHAM, called as a witness, having

14    been previously duly sworn by the Court Reporter,

15    was examined and testified as follows:

16  DIRECT EXAMINATION

17  BY MR. MAYES:

18  Q  Ms. Stringham, can you state and spell your name

19    for the court reporter and introduce yourself to

20    the board.

21  A  Sure.  I am Dianna Farias Stringham.  The way you

22    spell my name:  D-I-A-N-N-A F-A-R-I-A-S

23    S-T-R-I-N-G-H-A-M.

24  Q  Mrs. Stringham, what is your title?

25  A  Counselor.  School counselor.

1   Q   How long have you been in that position?

2   A   Almost eight years.  Under eight years.

3   Q   Mrs. Rachel Cole became your supervisor during the

4       '16/'17 school year; is that correct?

5   A   That is correct.

6   Q   Before that time she was a colleague of yours;

7       correct?

8   A   Yes.

9   Q   For the '16/'17 school year, Mrs. Cole was your

10      primary evaluator?

11  A   I'm sorry.  What year?

12  Q   '16/'17.

13  A   Yes.

14  Q   And gave you a highly effective rating; is that

15      correct?

16  A   That is correct.

17  Q   And highly effective is the highest rating?

18  A   Yes.

19  Q   And she gave you the same rating for '17/'18 as

20      well?

21  A   Yes.

22  Q   And, again, in '18/'19, Mrs. Cole gave you the

23      highest rating?

24  A   Yes.

25  Q   Highly effective?

```
 1   A  Highly effective.
 2   Q  And in '19/'20 for the fourth consecutive year,
 3      Mrs. Cole gave you the highest rating of highly
 4      effective; is that correct?
 5   A  That's correct.
 6   Q  But in '19/'20 Mrs. Cole became concerned about
 7      your performance as a counselor?
 8   A  Yes.
 9   Q  That was told to you at the end of the '19/'20
10      school year?
11   A  Yes.
12   Q  So you knew in June of 2020 that your primary
13      evaluator was concerned about your performance as a
14      counselor?
15   A  Yes.
16   Q  In fact, during the 2019/'20 school year, there
17      were concerns about email communications between
18      you and parents?
19   A  Yes.
20   Q  In '19/'20 Mrs. Cole caught misinformation that you
21      had sent to students and families?
22   A  No.
23   Q  I'm going to turn, if you could, in the smaller
24      binder to Tab A, page 8.
25   A  Did you mean page 8?
```

```
 1   Q  So Tab A, page 8.  So in the lower right-hand

 2      corner --

 3   A  I'm sorry.  I was in B.

 4         MR. MANNA:  I'm sorry.  Which tab are you on?

 5         MR. MAYES:  Tab A, page 8.  This is

 6      Administration Exhibit 1.

 7   Q  This is the final evaluator comment for your

 8      '19/'20 evaluation; is that correct?

 9   A  Yes.

10   Q  So you would have received this June 24, 2020?

11   A  Yes.

12   Q  You can see here it says -- there's a sentence in

13      the lower third of this paragraph that says, When I

14      had you do the ASVAB score sheets.

15         Do you see that?

16   A  Uh-huh.

17   Q  It says, You gave the counselors some

18      misinformation, and we went over it together.  When

19      you sent out the email a few weeks ago, you shared

20      that information about fifth year seniors; and it

21      simply wasn't true.

22         Do you see that?

23   A  Yes.

24   Q  There was wrong information about fifth year

25      seniors in '19/'20 that she notified you of?
```

```
 1   A   Yes.
 2   Q   So the end of the '19/'20 school year.  You come
 3       back to work 2020/2021; correct?
 4   A   Yes.
 5   Q   There were issues at the start of the 2020 school
 6       year that Mrs. Cole was bringing to your attention?
 7   A   Yes.
 8   Q   There were quite a few issues that she was bringing
 9       to your attention?
10   A   Can you define "quite a few"?  I don't understand.
11       Were there some issues that she brought to my
12       attention?  Yes.
13   Q   You were irritated about the number of issues she
14       was bringing to your attention?
15   A   I wouldn't say irritated.  I would say
16       disheartened.
17   Q   You were irritated by the end of August.  You said
18       that you were going to go talk to an attorney about
19       it?
20   A   Yes.
21   Q   Did you know that during the summer -- and you
22       heard Ms. Borto testify -- that she and Dr. Harmas
23       and Dr. Oestreich met to work on your improvement
24       plan?  Did you know that was happening?
25   A   Yes.
```

```
 1   Q   You knew that over summer they were meeting to
 2       discuss your performance improvement plan?
 3   A   No.  I'm sorry.  I take that back.
 4   Q   So you got fed up at the end of August and went and
 5       talked to an attorney?
 6   A   No.
 7           MS. MADDOX:  Objection.  Don't discuss any
 8       meetings with attorneys; nothing about attorneys.
 9       No communications.  No dates.
10           MR. MANNA:  I'll sustain the objection to the
11       extent she already answered earlier that she met
12       with an attorney, but we won't talk about the
13       conversation.
14   A   I did not meet with an attorney.  I said I wanted
15       to meet with an attorney.
16           MR. MANNA:  For the record, I'm trying to
17       point out that you shouldn't answer anything else
18       about the conversation with the attorney.
19   Q   If you could, go to the larger binder, Tab 3.  This
20       is a document you wrote?
21   A   Yes.
22   Q   If you go to page 8, under August 28, 2020, there's
23       a paragraph, He was going to meet with someone from
24       human resources.  I tell him that I am hiring an
25       attorney and that I can't take the slow water drip.
```

```
 1              So you went out at the end of August and hired
 2      an attorney?
 3              MS. MADDOX:  Again, objection.
 4    A  Incorrect.
 5    Q  You did not?
 6    A  No.
 7    Q  Without saying the communication with your
 8      attorney, did you hire an attorney before your
 9      September 1, 2020, complaint?
10              MS. MADDOX:  Again, as to any dates that you
11      hired attorneys, don't answer that.
12              MR. MANNA:  Hold on.  Let me make sure I
13      understand what the question was, first of all.
14    Q  The question is did you talk to an attorney --
15      without saying what was said, did you talk to an
16      attorney before September 1, 2020?
17              MR. MANNA:  Mr. Mayes, where are you pointing
18      her to on page 8?
19              MR. MAYES:  The bottom paragraph.
20              MR. MANNA:  All right.  My ruling is
21      overruled, Ms. Maddox, only because that's your
22      exhibit that you entered.
23              MS. MADDOX:  Sure.  But I'm just saying as far
24      as any dates that she may or may not have hired an
25      attorney would be privileged.
```

```
 1            MR. MAYES:  I would dispute that.  When an
 2      attorney is hired is not privileged information.
 3      That is not attorney-client privileged.
 4            MR. MANNA:  Mr. Mayes, if we could, let's
 5      focus in on page 8 given that it's in Ms. Maddox's
 6      document exchange.  That may focus the question.
 7   Q  Mrs. Stringham, you say, I tell him I am hiring an
 8      attorney.
 9            So what you represented at that time was not
10      true?
11   A  Can you rephrase that?
12   Q  You said, I'm hiring an attorney, and then you just
13      testified here that you did not hire an attorney.
14      When did you hire an attorney?
15            MS. MADDOX:  Objection.
16            MR. MANNA:  Overruled.
17   A  I did not hire an attorney at that time.
18   Q  Did you hire an attorney or talk to an attorney
19      before September 1, 2020?
20   A  No.
21   Q  If we go to Tab 1 in that big binder there, this is
22      the complaint that you filed?
23   A  Yes.
24   Q  On September 1, 2020?
25   A  Yes.
```

```
 1   Q   If you go down to name of accused, it says Rachel
 2       Cole?
 3   A   Yes.
 4   Q   Is Rachel Cole the person that you believe is
 5       discriminating against you?
 6   A   Yes.
 7   Q   Date of incident, it says March 2020.  Do you see
 8       that?
 9   A   Uh-huh.
10   Q   Is that your handwriting?
11   A   It is my handwriting, yes.
12   Q   So you believe you experienced discrimination and
13       harassment in March of 2020?
14   A   Approximately.
15   Q   Did you file a complaint in March of 2020?
16   A   No.
17   Q   Did you file a complaint in April of 2020?
18   A   No.
19   Q   What about May?
20   A   No.
21   Q   Is September 1 the first time you filed a complaint
22       alleging discrimination and harassment?
23   A   Yes.
24   Q   And you waited six months before filing a
25       complaint?
```

1   A   Yes.

2   Q   You allege that you were discriminated against

3       because of your ethnicity?

4   A   Correct.

5   Q   Being Hispanic?

6   A   Yes.

7   Q   When did Rachel Cole learn that you were Hispanic?

8   A   No idea.

9   Q   If Rachel testifies that she learned when you filed

10      this complaint in September of 2020, do you have

11      any reason to doubt her?

12  A   I'm sorry.  It's two parts.  It's that she also

13      knew that I was a homosexual.

14  Q   I'm not asking you about that.

15  A   I don't know when she knew.

16  Q   I asked a different question.  My question is if

17      Rachel Cole's testimony is that she didn't know

18      until this complaint was filed that you were

19      Hispanic, do you have any reason or evidence to

20      doubt that?

21  A   No.

22  Q   Why do you believe that Mrs. Cole discriminates

23      against you because of your ethnicity?

24  A   I am the only non-Caucasian person in that

25      department, the only one.  And she put a target on

```
 1      my back.  That's what I have.

 2   Q  Any other evidence?

 3   A  No.

 4   Q  You also allege that you're being discriminated

 5      against because of your sexual orientation?

 6   A  Yes.

 7   Q  Did Rachel Cole know that you were a lesbian prior

 8      to becoming director of counseling in '17?

 9   A  Yes.

10   Q  Did Rachel Cole know your sexual orientation when

11      she gave you the highest performance rating in

12      2017?

13   A  Yes.

14   Q  Did she know your sexual orientation when she gave

15      you the highest performance rating in 2018?

16   A  Yes.

17   Q  And in 2019?

18   A  Yes.

19   Q  And in 2020?

20   A  Yes.

21   Q  In fact, four consecutive years she knew your

22      sexual orientation and gave you the highest

23      performance rating; correct?

24   A  Yes.

25   Q  Later you posted on social media that you thought
```

```
 1      she also targeted another social worker?
 2  A   Uh-huh.
 3  Q   A social worker who you described as not being gay?
 4  A   Can you be more specific on who you're referring
 5      to?  I'm sorry because I make reference to two
 6      different people.
 7  Q   Well, if you go to Tab X of the smaller binder,
 8      page 2, there's a paragraph that says, It happened
 9      again this year with another social worker.
10          And these are your words?
11  A   Uh-huh.
12  Q   And you posted this on Facebook?
13  A   Yes.
14  Q   But you've since taken this post down, haven't you?
15  A   Yes.
16  Q   So you said, It happened again this year with
17      another social worker.  She is not gay.  She is
18      conservative.  She posted something online and was
19      shunned for it.  Later she was reprimanded for a
20      post.  Very unfair she was pushed out as well.
21  A   Yes.
22  Q   And you wrote those words?
23  A   Yes.
24  Q   So you think that Mrs. Cole targeted another
25      counselor who was not gay?
```

```
 1   A   Yes.

 2   Q   And your assessment is Mrs. Cole is just mean?

 3   A   Yes.

 4   Q   And she's mean to, in your words, not gay

 5       counselors; correct?

 6   A   I think this is a reach because it was a specific

 7       social worker, and it's not all counselors.

 8   Q   She's mean to not-gay employees?

 9   A   No.  There's a reason for that.  I mean, there's

10       more to that.

11   Q   Do you think that she's mean to this not-gay

12       employee, this social worker, that you mentioned?

13   A   Yes.

14   Q   And now you're alleging that she's mean to you

15       because of your sexual orientation?

16   A   Yes.

17   Q   So she's mean to a lot of people?

18   A   That's an ambiguous question.

19   Q   Well, you've worked with her.  Would you say that's

20       a fair assessment?

21   A   Yes.

22   Q   Going forward, we've got in Tab C, if you could, in

23       the smaller binder, this is the performance

24       improvement plan at the start of the 2020/2021

25       school year.  Do you remember this plan?
```

```
 1   A   Yes.
 2   Q   In your career at Carmel High School, how many
 3       improvement plans had you been put on before this
 4       one?
 5   A   Zero.
 6   Q   This was your first?
 7   A   Yes.
 8   Q   Getting a performance improvement plan, what did
 9       that tell you as an employee?
10   A   Why me?
11   Q   Anything else?
12   A   She wants me to change some things, but why me
13       specifically?
14   Q   So Section 1 dealt with communication.  Do you see
15       that?
16   A   Uh-huh.
17   Q   And there's examples, expectations, and impact.  Do
18       you see that?
19   A   Of course.
20   Q   If you turn the page, procedures, policies, and
21       dates and examples, expectations, and impact as
22       well.  Do you see that?
23   A   Yes.
24   Q   And then professionalism, examples, expectations,
25       and impact as well?
```

```
 1  A  Uh-huh.  Yes.

 2  Q  Now, your association representative was with you

 3     in this meeting?

 4  A  Yes.

 5  Q  And your association representatives were with you

 6     in all of the meetings that you had with Mrs. Cole

 7     and Ms. Borto along the way?

 8  A  No.

 9  Q  Were they with you in any disciplinary meetings?

10  A  No.

11  Q  Were they not with you in the performance

12     improvement plan meetings?

13  A  No.  When I got the new improvement plan, they were

14     not there.  They were not present for the new one.

15     Not this one.

16  Q  In '21.  Okay.  We'll get to it.  But when this

17     plan went into effect, an association

18     representative was there with you?

19  A  Yes.

20  Q  Now, for the four consecutive years of highest

21     ratings that Mrs. Cole gave you, were you under an

22     improvement plan for any of those four years?

23  A  No.

24  Q  And you knew when you got this that there were

25     performance concerns?
```

```
 1   A  Yes.
 2   Q  Now, you sat here and you heard Ms. Borto explain
 3      how three students fell through the cracks and
 4      didn't graduate at the end of this school year,
 5      2020 to 2021; correct?
 6   A  Yes.
 7   Q  student  student  and student were never discussed with
 8      Ms. Borto, were they?
 9   A  I'm not sure.  I disagree, but I think we did
10      discuss them.
11   Q  You think you did discuss them, but you don't
12      recall?
13   A  I'm not sure is my answer.  I'm not sure.
14   Q  So are you telling the board that Ms. Borto's
15      testimony is incorrect?
16   A  Parts of it, yes.
17   Q  As to this?
18   A  As to which part?
19   Q  As to whether you told Ms. Borto about student  student
20      and student
21   A  I don't know that I talked to her specifically, but
22      I did talk to Rachel Cole about all three of them
23      and any other student that would have been in
24      jeopardy.  student he did not do any virtual work at
25      all.  And I called his stepmother, his father who
```

1   he lived with, and, actually, ███████  I called them

2   repeatedly, but no one would return my calls; and

3   ███████ did zero work.

4       As far as ███████ is concerned, ███████ didn't fall

5   off until, like, the last month of school.  And

6   then ███████ was a move-in her senior year.  She moved

7   in.  She had a lot of -- she did not go to school

8   for her junior year the whole year, and one of the

9   conversations when she was enrolled was that she

10  would not be able to graduate on time.  So that was

11  already known.  And then at the end of 2020 when

12  the school year was up, she moved back to where she

13  came from.  So, no, she did not graduate from

14  Carmel High School.

15  Q  But Ms. Borto set a meeting with you in March 2021

16     to talk about those students that were at risk?

17  A  Yes.

18  Q  And you were at that meeting?

19  A  I was.

20  Q  And you didn't mention ███████

21  A  I don't recall.

22  Q  And you didn't mention ███████

23  A  I don't recall.

24  Q  And you didn't mention ███████

25  A  Again, I don't recall.

1   Q   Are you aware of any other counselors at Carmel
2       High School who have failed to identify students at
3       risk of graduating, letting three fall through the
4       cracks, and able to keep their jobs?
5   A   I'm not sure.
6   Q   Go to Tab D, if you could.  That's the 2021
7       performance improvement plan.  Do you see that?
8   A   Yes.
9   Q   This is the one that was extended into second
10      semester of '21/'22; is that correct?
11  A   Yes.
12  Q   This was your second improvement plan in two years;
13      correct?
14  A   Yes.
15  Q   Are you aware of any other counselors at Carmel
16      High School having two improvement plans in two
17      years?
18  A   I am not.
19  Q   And union representation was at this meeting where
20      they discussed this plan; correct?
21  A   Correct.
22  Q   If we go down the list, you can see here in this
23      first page, first bullet point, where it documents
24      how ███████ ███████ and ███████ weren't mentioned below.
25      And ███████ never discussed an SST.  Do you see that?

CCS 00684

```
 1   A   I do.
 2   Q   On page 2 under 4.2 there was improvement
 3       objectives regarding communicating with families
 4       listed there.  Do you see that?
 5   A   Yes.
 6   Q   As part of that right there above 4.2 is a bullet
 7       point that starts with, You need to be proactive in
 8       working with students to meet all the requirements
 9       and deadlines.
10           Do you see that?
11   A   Yes.
12   Q   You remember reading that, don't you?
13   A   Yes.
14   Q   And then over time the administration team,
15       specifically Ms. Borto and Mrs. Cole, met with you
16       periodically?
17   A   Are you referring to the dates on this?
18   Q   They met with you in September 2021 periodically,
19       didn't they?
20   A   Are you referring to the dates on the improvement
21       plan?
22   Q   No.  I'm --
23   A   No, they did not.
24   Q   If you look at Tab R, which is our Exhibit 18, do
25       you see that email?
```

```
 1   A   Yes.
 2   Q   This was the first meeting, and it references a
 3       follow-up to our meeting last Monday, August 30.
 4       Do you see that?
 5   A   Yes.
 6   Q   And union representation was at this meeting with
 7       you?
 8   A   No.   Invited.
 9   Q   It says here, Mo Borto, Jill Grimes, you and I met
10       in my office to give you feedback.
11           Do you see that?
12   A   Oh, I'm sorry.  I was thinking this was the initial
13       date of the improvement plan, of this new
14       improvement plan.  So the initial improvement plan,
15       no one was there with me.  August 30 was when we
16       had our first meeting.
17   Q   And the association rep was with you?
18   A   Yes, she was.
19   Q   Then if you go to Tab U, again, meeting number two,
20       a couple weeks later, union representation is with
21       you again?
22   A   Yes.
23   Q   In another meeting where they gave you feedback on
24       how you were doing?
25   A   Yes.
```

1  Q  Along the way artifacts are being uploaded to the

2     evaluation system?

3  A  Yes.

4  Q  At the end of these meetings after the fourth

5     meeting or in the fourth meeting, they relayed to

6     you that the performance improvement plan would be

7     continuing; isn't that correct?

8  A  October 11, yes.

9  Q  And you didn't like that?

10 A  I was sad.  Of course I didn't like it.  I was very

11    sad.

12 Q  Did you yell?

13 A  No.  I cried.

14 Q  So what you're saying to the board, when Ms. Borto

15    said that you yelled, you're telling the board that

16    Ms. Borto is lying?

17 A  Yes.

18 Q  You didn't yell?

19 A  I did not yell.

20 Q  But you were upset?

21 A  Yes, I was in tears.

22 Q  Very upset?

23 A  Well, crying, yes.

24 Q  After that you went on medical leave?

25 A  Yes.

```
 1   Q   During that period of leave, you emptied your
 2       office?
 3   A   I emptied my office on -- let's see.  That was
 4       Monday, the 11th.  I think on October 18, which is
 5       a Sunday.
 6   Q   And you cut your name out of the sign?
 7   A   Yes.
 8   Q   Why did you do that?
 9   A   To protect my namesake because I knew they would
10       have a sub in there, and I didn't want anybody to
11       believe that that sub was Dianna Stringham.
12   Q   You filed a new complaint of discrimination the end
13       of '21, early 2022; is that correct?
14   A   That is correct.
15   Q   And came back to work in January of 2022?
16   A   Yes.
17   Q   And wanted Mrs. Cole to sign some paperwork dealing
18       with some licensing?
19   A   Yes.
20   Q   You had emailed Dr. Oestreich about that paperwork
21       because he had reached out to you?
22   A   I responded to Dr. Oestreich's email.  I did not
23       reach out to Dr. Oestreich.  He reached out to me.
24       I had given the paperwork to Rachel Cole, and she
25       said, we'll discuss this later.  We didn't have a
```

```
 1      discussion when I handed her the paperwork.  She
 2      just sat it on her desk.  That was not January 28.
 3   Q  January 28 was when that incident that Ms. Borto
 4      mentioned occurred?
 5   A  Yes.
 6   Q  January 26 Dr. Oestreich told you by email, contact
 7      me directly for further discussion?
 8   A  And I did.
 9   Q  And you did?
10   A  Uh-huh.  I responded to his email.
11   Q  And then did you follow his directive on January 28
12      when you went to Rachel Cole to discuss this
13      matter?
14   A  No.
15   Q  So you were upset that Rachel Cole wasn't signing
16      this form?
17   A  Yes.
18   Q  And you were very upset?
19   A  Confused but upset, yes.
20   Q  And you raised your voice?
21   A  Yes, I did.
22   Q  And you were yelling at her?
23   A  Yes.  I mean, no and yes.  I was upset about the
24      fact that I was asking her to do something that was
25      very simplistic and rational, which was just
```

1    confirming my time at Carmel High School as a

2    professional licensed school counselor.  And she

3    was very adamant in saying, no, I'm not doing that.

4         She wouldn't hear me out.  She wouldn't

5    listen.  She was yelling at me, and I was just

6    confused to the fact that, why would she not sign

7    that?  It's for professional development.  It's to

8    improve myself as a counselor.  And she said no.

9    She was like, this conversation is over, and she

10   was upset with me more.  I was upset, yes.  I'm not

11   going to say I wasn't upset.  I was confused.

12   Like, why would you not sign this?  I don't

13   understand.  And I think I said that.

14        And I said it that, this is ridiculous, which

15   it was ridiculous.  And I did say, you're being

16   ridiculous.  Then I asked her to do it on

17   letterhead.  And she said, no, I'm not going to do

18   it.

19 Q  Do you think it's acceptable at Carmel High School

20   for a counselor to yell at their supervisor and

21   say, you're being ridiculous?  Is that acceptable?

22 A  In the circumstances, yes.

23 Q  Through this process, you had a superintendent's

24   conference with Dr. Beresford?

25 A  Yes.

1   Q   You had about an hour with him --

2   A   Yes.

3   Q   -- where you presented your side.  You felt like

4       you were able to say everything you wanted to say?

5   A   Yes.

6   Q   But before he even made his recommendation to the

7       board, you went ahead and asked for a board

8       hearing?

9           MS. MADDOX:  Objection.  Calls for a legal

10      conclusion.  There's clearly a statute that says we

11      have five days in order to request a board

12      conference.  She doesn't understand the statutes

13      and how it works.  So I object to any questions

14      about the timing of it.

15          MR. MANNA:  Mr. Mayes, I recall that set of

16      correspondence.  Can you help me clarify where

17      you're going with this one?

18          MR. MAYES:  Well, it's simply chronological.

19      The superintendent's conference, I think we had

20      that stipulated; but I'm trying to find it.

21          MR. MANNA:  We did.

22          MS. MADDOX:  I think it's back toward the

23      Administrator 27, 28, 29.

24          MR. MAYES:  I'm trying to find the exact date.

25          MR. MANNA:  The superintendent conference was

```
 1    February 24, 2022.
 2         MR. MAYES:  Right.
 3  Q  If you look at Tab DD, Ms. Stringham, in the other,
 4    February 28 is the date that you requested a
 5    conference with the board?
 6         MR. MANNA:  Before you answer, Ms. Stringham,
 7    so you're clarifying the dates that we stipulated
 8    to?
 9         MR. MAYES:  I'm clarifying the date on the
10    letter.  February 28 is the date that she requested
11    the board conference.
12         MR. MANNA:  So, again, Ms. Stringham, my
13    directive to you is you're not to discuss your
14    conversation with Ms. Maddox.  The exhibit has
15    already been admitted and we've stipulated.  So I
16    think you can answer whether you submitted for the
17    superintendent conference on that date.  You can
18    answer that.
19  A  What is the question?
20  Q  February 28 is the date when your counsel requested
21    on your behalf a conference with the board, and
22    that's what this is here?
23  A  Yes.
24  Q  It says here in the second paragraph, Although
25    Mrs. Stringham has not yet received Dr. Beresford's
```

1    recommendation.

2         Do you see that?

3  A  Yes.

4  Q  So you were making this request despite even

5     knowing how Dr. Beresford would recommend?

6         MS. MADDOX:  Again, objection.  It calls for a

7     legal conclusion.  The document speaks for itself

8     where it says in the event, Dr. Beresford --

9         MR. MANNA:  I'll sustain that.  Thank you.

10        MR. MAYES:  If I could respond, it's not a

11    conclusion of law.  We're talking about fact.

12        MR. MANNA:  I understand.  We're two hours in.

13    I'm going to sustain that so we can move on.

14 Q  Ms. Stringham, again, are you aware of any other

15    counselors with two performance improvement plans

16    in two years?

17 A  No.

18        MR. MAYES:  No further questions.

19        MR. MANNA:  Thank you, sir.

20 CROSS-EXAMINATION

21 BY MS. MADDOX:

22 Q  Mrs. Stringham, how long have you been in

23    education?

24 A  Since 1992.  And I was a teacher before I was a

25    counselor, and I've been a counselor for 19 years.

1  Q  Did there come a time when you filed an internal

2     complaint at Carmel?

3  A  Yes.

4  Q  Do you recall the date of that?

5  A  September 1, 2020.

6  Q  Why did you file that complaint?

7  A  I felt that Rachel Cole was targeting me.  She was

8     coming down on me and writing me up, and it wasn't

9     happening to anyone else in our department that was

10    making similar errors.

11 Q  Did you believe there was a reason that Mrs. Cole

12    was targeting you?

13 A  Yes.

14 Q  And what was that reason?

15 A  Because I was a homosexual Hispanic woman.

16 Q  Who is Abby Cartwright?

17 A  Abby Cartwright was a ninth grade social worker

18    that worked for the freshman center.

19 Q  Did Abby have any concerns about Rachel Cole that

20    she relayed to you?

21       MR. MAYES:  Objection.  Hearsay.  Abby is not

22    on the witness list.  If we want to hear what Abby

23    has to say about something, then we should have

24    Abby come in and give the testimony to the board.

25    As you know, the board can't rely on hearsay

1     evidence alone in its ruling, and Mrs. Stringham is

2     wanting this board to reach a conclusion that there

3     was discrimination based on Ms. Stringham's sexual

4     orientation based solely on this hearsay evidence.

5            MR. MANNA:  Ms. Maddox, to clarify, your

6     question was, did Ms. Cole have concerns?

7            MS. MADDOX:  Did Ms. Cartwright have concerns

8     about Mrs. Cole?

9            MR. MANNA:  Mrs. Cartwright, we don't have her

10    as a witness?

11           MS. MADDOX:  Correct.  We don't have subpoena

12    powers to subpoena a teacher.  That would be great

13    if we did.

14           MR. MANNA:  I understand nobody asked me for

15    Ms. Cartwright.  If you could just rephrase to ask

16    her, what was her understanding of concerns about

17    her performance?

18  Q  What was your understanding of the concerns?

19           MR. MAYES:  Same objection.

20           MR. MANNA:  Okay.  I think we need to just

21    understand what Mrs. Stringham knew was being told

22    to her about her performance concerns.  I don't

23    need you to quote anybody, but what was your

24    understanding about your performance concerns?

25           THE WITNESS:  Are we talking about myself?  Or

```
 1    are we talking about Abby?
 2         MS. MADDOX:  If you take a look at Teacher
 3    Exhibit 3, page 2, which is an exhibit that's been
 4    stipulated to, it discusses Ms. Cartwright.  Do you
 5    see that, Exhibit 3, page 2?
 6         THE WITNESS:  Yes.
 7         MR. MANNA:  Ms. Maddox, could you help me
 8    clarify what is Teacher Exhibit 3?
 9         MS. MADDOX:  That is the complaint that
10    Mrs. Stringham filed on September 1, 2020.
11         MR. MAYES:  So, Jamie, you're saying the
12    testimony she's giving as to Abby is contained
13    within this paragraph only?
14         MS. MADDOX:  Yes.
15         MR. MANNA:  That would be helpful.  If you're
16    going to use that document, go ahead.
17  Q  On Teacher Exhibit 3, page 2, it says, Abby
18    Cartwright, freshman social worker, came to my
19    office to talk.  She was terrified.  She didn't
20    want Rachel to know that she was in my office
21    talking to me.
22         Do you see that?
23  A  Yes.
24  Q  It says in the next line, She asked me if I thought
25    Rachel was targeting me or treating me differently
```

 1  because I am gay.  I told her at the time that I

 2  didn't think so, although we, Rachel and I, have

 3  had words.

 4      Do you see that?

 5      MR. MANNA:  I'm sorry.  I'm going to interrupt

 6  you.  This passage, I understand you have it as an

 7  exhibit.  This is about Ms. Stringham or about

 8  Ms. Cartwright?

 9      MS. MADDOX:  It's about Ms. Cartwright and

10  Mrs. Cole.

11      MR. MANNA:  To clarify, the question for

12  Ms. Stringham is what?

13      MS. MADDOX:  What Mrs. Cartwright relayed to

14  Mrs. Stringham about Mrs. Cole and her derogatory

15  comments towards Mrs. Cartwright.

16      MR. MANNA:  For that, then, I'm going to

17  sustain Mr. Mayes' objection.  You've got this

18  document admitted.  So that's there for the board

19  to review.  I'll ask you to kind of get to your

20  other questions.

21  Q  Previously it was discussed about various students.

22     Do you know a student ███

23  A  Do I know him?

24  Q  Yes.

25  A  Yes.

1  Q  Who is he?

2  A  He's a student.  He was a student.

3  Q  What occurred with student

4  A  It was during the 2020 school year, and we were

5     told different things at different times that the

6     state was going to graduate anyone that was in that

7     cohort.  And we were also told that -- at the time

8     he was a CLC student.  And if they were just a few

9     credits shy, one or two credits shy, that we were

10     just going to graduate him; and he was just a

11     couple of credits short.  So I said that, yes, he

12     was going to graduate.  But that's all I said.  I

13     had not mailed out his diploma.  I had nothing to

14     do with the diploma making it to his home.

15  Q  Were you blamed for mailing out his diploma?

16  A  Yes.

17  Q  Were any other employees blamed for this?

18  A  No.

19  Q  Was there a time when you were called into

20     Mrs. Cole's office for making a few scheduling

21     errors?

22  A  Yes.

23  Q  Do you know of any other counselors that were

24     called into her office for making errors?

25  A  No.

CCS  00698

1   Q   You were placed on an improvement plan on

2       September 10, 2020; correct?

3   A   Yes.

4   Q   So it was after you filed a complaint with the

5       school about Mrs. Cole?

6   A   Yes.

7   Q   Did you agree with this improvement plan?

8   A   No.

9   Q   Why didn't you agree with it?

10  A   I'd been highly effective every single year.

11  Q   If you look at Teacher Exhibit 6 through Exhibit 11

12      in the big white binder, are those your evaluations

13      from 2014 to 2020?

14  A   Yes.

15  Q   If you look at Exhibit 12, the evaluation for the

16      2020/2021 school year, do you see that?

17  A   Yes.

18  Q   Did Mrs. Cole initially give you a needs

19      improvement?

20  A   Yes.

21  Q   Did you disagree with that?

22  A   Yes.

23  Q   Why did you disagree with that?

24  A   I was marked highly effective and effective.  And

25      if you look at the documents, you can see right

```
 1      there that I'm highly effective in most categories.
 2           MR. MANNA:  Ms. Maddox, could you help me get
 3      to the right spot?
 4           THE WITNESS:  It's in the middle of
 5      Exhibit 12.
 6           MS. MADDOX:  Teacher's Exhibit 12, page 9.
 7   A  I didn't agree with it, no, and it was turned over.
 8   Q  What was it turned over to?
 9   A  Effective.
10   Q  Did you receive any write-ups during the fall
11      semester of the 2020/2021 academic year?
12   A  No.  Wait.  I'm sorry.  What was the question?
13   Q  For the 2020/2021 academic year.
14   A  No, no write-ups.
15   Q  You didn't receive 38 write-ups?
16   A  No, that was this year.  That was 2021/2022.
17   Q  Do you recall the 2021/2022 school year receiving
18      write-ups?
19   A  Yes.
20   Q  Do you recall how many you received, let's say, in
21      the fall of 2021?
22   A  Right around 36.
23   Q  What occurred after you received these
24      36 write-ups?
25           MR. MANNA:  Can I clarify?  I think earlier we
```

```
 1     referred to those as artifacts or evidence.  Are
 2     you asking about those same items?
 3          MS. MADDOX:  Yes.
 4          MR. MANNA:  So the testimony earlier was that
 5     they were artifacts.  You're referring to them as
 6     write-ups.  I think the board is going to have to
 7     take a look at those to determine the right
 8     vocabulary word, but I just wanted to clarify what
 9     we're looking at.
10  Q  Any write-up or artifact, as has been referred to?
11  A  Right.
12  Q  So what happened after you received these
13     36 artifacts?
14  A  I took a leave of absence.
15  Q  Why?
16  A  My blood pressure was up.  My stress level was up.
17     My anxiety was up.  At one point I was suicidal.  I
18     was so stressed and depressed.
19  Q  What was causing the high blood pressure and
20     suicidal thoughts?
21  A  The way that Rachel was treating me.
22  Q  When did you return to school?
23  A  January 11.
24  Q  When you returned, were you put on an improvement
25     plan?
```

```
 1   A   Yes.
 2   Q   Did you believe you needed to be placed on an
 3       improvement plan?
 4   A   No.
 5   Q   After your return on January 11, did you receive
 6       any more artifacts or write-ups?
 7   A   Yes.
 8   Q   How many did you receive?
 9   A   About 30 more.
10   Q   Did you receive these all in the span of one day?
11   A   Yes.
12   Q   These came after you filed two complaints of
13       discrimination; is that correct?
14   A   Yes.
15   Q   Do you know if an investigation was done relating
16       to the second report of discrimination?
17   A   No.
18   Q   Was a decision ever made by Carmel relating to your
19       second complaint of discrimination?
20   A   No.
21   Q   So you received approximately 65-ish artifacts or
22       write-ups after making two complaints of
23       discrimination?
24   A   Yes.
25   Q   Have you also filed an EEOC charge?
```

```
 1   A   Yes.

 2   Q   That's contained in Teacher Exhibit 41; is that

 3       correct?

 4   A   Yes.

 5   Q   Do you recall when you filed your initial EEOC

 6       charge?

 7   A   Sometime in January.

 8   Q   Of 2022?

 9   A   Of 2022.

10   Q   Are you currently taking any classes?

11   A   Yes.

12   Q   What classes are you taking?

13   A   I'm taking classes to get my mental health license.

14   Q   Were there certain forms that needed to be signed?

15   A   When I go to get my license, yes.

16   Q   What were those forms?

17   A   The state requires probably about 15 pages, and it

18       is put together for someone who has not earned

19       their master's degree in counseling or counseling

20       education.  So it has practicum and internship in

21       it, which I had done 19 years ago when I earned my

22       master's.  When I called the state of Indiana and I

23       asked them about that, they said that all I had to

24       do was have verification that I was a professional

25       licensed counselor.
```

1          MR. MANNA:  Ms. Maddox, the board has asked,

2     do you have those forms in the evidence?

3          MS. MADDOX:  I believe the administration used

4     them as Administration Exhibit 26A, which is Tab Z.

5     I believe they're included in there.

6  A  Yes.  So that would be -- I can't read the page

7     number; I'm sorry -- page 10 and 11.

8  Q  So that's the form you asked Mrs. Cole to sign?

9  A  Yes.

10 Q  Did she agree to sign it?

11 A  No.

12 Q  Did Dr. Oestreich sign it?

13 A  No.

14 Q  So what happened next after Mrs. Cole initially

15    didn't sign it?

16 A  On January 28 I had the forms put back into my

17    office.  I looked them over, and nothing was signed

18    by Dr. Oestreich or by Rachel Cole.  So I was like,

19    well, maybe I'll just ask her about it and see what

20    she says.  Maybe she's got an explanation about why

21    they're back in my office and not with

22    Dr. Oestreich since he had sent me the email on the

23    26th.

24          So I knocked on her door, and I said, can I

25    talk to you about these forms?  And she just nodded

1    like, okay, come in.  She was at her computer.  She

2    was sitting at her computer.  There is a desk

3    between us, and there's two chairs; and I never sat

4    down.  I stood there, and I explained to her that

5    the state needs verification that I have been an

6    acting professional school counselor for the past

7    seven and a half years at Carmel High School.

8         She listened to what I said.  She didn't

9    respond, and she said, I'm not signing that.  And I

10   was taken aback from it.  I said, I don't

11   understand.  I just explained there's a number on

12   this form, and you can call the state; and you can

13   ask the professional board the same question.  She

14   said, I'm not comfortable with signing this form.

15   What is it?

16        I said, you can call the state.  And she said,

17   no, I'm not doing that.  I'm not calling the state.

18   I was taken aback like, wait a minute.  Why

19   wouldn't you sign that?  I still to this day don't

20   understand why it was a very adamant, no,

21   absolutely not.

22 Q  Did she explain why she wouldn't sign it?

23 A  She said she didn't feel comfortable signing forms,

24   and then I requested that she put it on letterhead;

25   and she said, absolutely not.  I called her --

```
 1    well, I called her ridiculous; but I said, this is
 2    ridiculous.  I said, you're being ridiculous.  I'm
 3    asking you for something rational, and you're being
 4    irrational.  She was like, this conversation is
 5    over, and she snapped at me.  Then Mo Borto came
 6    in.
 7  Q  Would you describe Mrs. Cole's tone as aggressive?
 8  A  Yes.
 9  Q  Just so the board understands, you mentioned where
10    her desk was located.  So between Mrs. Cole and
11    you, there was a desk and two chairs; and you were
12    on the other side of the chairs?
13  A  Yes.
14  Q  So there was no way for you to lean over her at
15    that point?
16  A  No.
17  Q  You mentioned previously that you may have raised
18    your voice.  Can you show the board what you think
19    is a raised voice?
20  A  Sure.  I said to Rachel, I don't understand.  I
21    don't understand why you won't sign these
22    documents.  I have explained to you what the
23    purpose of this is.  I don't understand why you
24    wouldn't sign them.  And she said, no, I'm not
25    signing them.  And I said, this is ridiculous.  I
```

```
 1      don't understand why you wouldn't sign these
 2      documents.  How about if you do it on letterhead?
 3      What if you do it on letterhead?
 4           All I need is verification, and I'll explain
 5      to the state that you didn't want to sign these
 6      forms but that I have been an employee and have
 7      acted as a professional school counselor.  So this
 8      is how I talk.  And, yes, like the way that I'm
 9      speaking right now is the way that I did talk to
10      her.  Did I think it was appropriate?  Yes.  I was
11      so confused why she wouldn't do it.  I am still --
12      like I said, I don't understand why you wouldn't
13      want to support a counselor moving forward and
14      getting an education, more education and going to
15      school.  I don't.
16  Q   So that's the highest your voice went?
17  A   Yes.  I mean, if that's considered yelling . . .
18  Q   Do you think others heard your conversation?
19  A   Yes.
20  Q   Why do you think they heard your conversation?
21  A   If you were sitting at your desk and even where my
22      office is in location to Rachel's, I'm down the
23      hall and then down another hallway all the way on
24      the end.  I can hear what happens in Rachel's
25      office.  If there is no noise, like if you're at
```

```
 1        your computer and you're just typing and there's
 2        not a lot of milling about, you can hear everything
 3        everyone says.  That's why they bought us these
 4        white noise makers so that you can have a private
 5        conversation and maybe someone else can't hear you.
 6   Q    So it's likely that even a normal conversation
 7        could have been overheard?
 8   A    You can hear people sneeze.
 9   Q    So what happened after Mrs. Cole refused to sign
10        the form?
11   A    On the following Monday after school I was given --
12        I was told ten minutes until 4:00 that we would be
13        meeting with Dr. Oestreich, and I wasn't told what
14        it was about.  And I got into the meeting and was
15        given, like, a manila envelope, and in it was my
16        administrative leave.  And then he says, we're
17        putting you on administrative leave beginning
18        today, beginning February 1.
19   Q    If you'll look at Administration Exhibit 26B, it's
20        at Tab AA.  At the bottom it says -- bottom of the
21        first page.
22             MR. MANNA:  I apologize.  What number?
23             MS. MADDOX:  It's Administration Exhibit 26B.
24        It's Tab AA.  It's the Carmel Clay School policy on
25        civility and decorum.
```

```
 1              MR. MANNA:  Got it.
 2   Q  If you look at the bottom, Mrs. Stringham, it
 3      states, CCS will address disruptive and uncivil
 4      behavior in a progressive manner.  Usually CCS will
 5      first remind the individual to remain civil and be
 6      respectful and courteous to others.
 7              Assuming the school believed you were being
 8      disruptive, were you ever reminded to be civil and
 9      be respectful and courteous to others?
10   A  No.
11   Q  Did the school ever attempt to progressively
12      discipline you with a verbal reminder or a warning?
13   A  No.
14   Q  So after you were placed on administrative leave,
15      what happened next?
16   A  On February 4 I received my discontinuance of my
17      contract.  Or that it was a --
18   Q  Cancellation?
19   A  Notice of cancellation.
20   Q  So there was no progression of discipline as
21      referenced in Administration Exhibit 26B?
22   A  No.
23   Q  And you requested a conference with the
24      superintendent?
25   A  Yes.
```

1  Q  You also requested a board conference on

2     February 8, 2022?

3  A  Yes.

4  Q  I believe Mr. Mayes asked you about that

5     conference.  Do you recall in that letter

6     requesting a conference with the board stating that

7     depending -- if the superintendent decided not to

8     recommend cancellation, you were fine with that.

9     But in other words, in case he was recommending a

10    cancellation, you wanted a board conference;

11    correct?

12 A  Correct.

13 Q  So if he had not recommended cancellation of the

14    contract, we wouldn't be here today; is that

15    correct?

16 A  That's correct.

17 Q  Now, this form that you asked both Mrs. Cole and

18    Dr. Oestreich to sign but they refused, did it ever

19    get signed?

20 A  No.  I received a letterhead from Dr. Beresford

21    after our superintendent meeting.

22 Q  So it ended up resolving itself, and someone from

23    Carmel was willing to handle that; correct?

24 A  Right.

25 Q  Just a few follow-up questions on what Mr. Mayes

```
 1      asked you about.  You previously testified that at
 2      this point you have no reason to doubt Mrs. Cole --
 3      is that correct? -- as far as when she knew your
 4      race or ethnicity?
 5   A  Can you ask that again?
 6   Q  Sure.  You testified in response to Mr. Mayes'
 7      question that if you had any reason to doubt
 8      Mrs. Cole that she didn't even know your race or
 9      ethnicity until you filed your complaint.  Do you
10      recall that?
11   A  That she doesn't know my ethnicity?  Are you asking
12      me, am I okay with her not -- I'm sorry.
13   Q  No.  You stated before that you had no reason to
14      doubt Mrs. Cole that she didn't know your race or
15      ethnicity until you filed a complaint on
16      September 1.  Do you recall that?
17   A  Yes.
18   Q  But you don't have any access to communications to
19      Mrs. Cole about your ethnicity or race; correct?
20   A  Correct.
21   Q  And you don't have any access to communications
22      from Mrs. Cole about your race or ethnicity?
23   A  No.
24   Q  So you may learn that she knew you were Hispanic
25      prior to September 1; is that correct?
```

```
 1   A   Yes.
 2   Q   Administration Tab X where you've referenced this,
 3       quote, non-gay social worker, do you recall if that
 4       non-gay social worker was written up 20-plus times?
 5   A   She was not.
 6   Q   Did this non-gay social worker ever file complaints
 7       of discrimination that you're aware of?
 8   A   She did not.
 9           MS. MADDOX:   That's all I have.
10           MR. MAYES:   Just a few follow-up on that.
11   REDIRECT EXAMINATION
12   BY MR. MAYES:
13   Q   If you could go in this large binder to Tab 3,
14       page 2, under March/April 2019, that section
15       dealing with Abby Cartwright, do you see that
16       section that we addressed earlier?
17   A   Yes.
18   Q   You wrote in here starting at the third line down,
19       She asked me, she being Abby Cartwright, asked you
20       if I, Dianna Stringham, thought that Rachel Cole
21       was targeting me, Dianna, or treating me, Dianna
22       Stringham, differently because I, Dianna Stringham,
23       am gay.
24           Is that what you wrote there?
25   A   I did.
```

1   Q   You told Abby at that time, At the time I didn't

2       think so.

3           Is that what you wrote there?

4   A   That is correct.

5   Q   So Mrs. Cole gave you the highest ratings four

6       consecutive years in a row; correct?

7   A   Yes.

8   Q   Knowing your sexual orientation?

9   A   Yes.

10  Q   And March and April 2019, again, you didn't think

11      that she was targeting you because of your sexual

12      orientation?

13  A   I had had no negative run-ins with Rachel during

14      that time or previous to it.

15  Q   But she knew your sexual orientation at that time?

16  A   Yes.

17  Q   She had known it for years?

18  A   Yes.

19  Q   And yet you never felt targeted by her?

20  A   No.

21  Q   The second complaint that you filed with the

22      district in early 2022, you had mentioned there had

23      been no investigation?

24  A   No.

25  Q   Do you recall being interviewed by someone from the

```
 1      HR office?
 2   A  Yes.
 3   Q  So they interviewed you?
 4   A  They interviewed me.
 5   Q  So there was a response to what you filed?
 6   A  I received no follow-up from that whatsoever.
 7   Q  But they investigated it by meeting with you?
 8   A  They did meet with me.  Well -- yes.
 9   Q  And then you mentioned after the superintendent's
10      conference that Dr. Beresford got you connected
11      with someone who got you something on letterhead?
12   A  Correct.
13   Q  That wasn't the signed application that you were
14      looking for; correct?
15   A  That's correct.
16   Q  It was simply just confirmation of your dates of
17      employment; correct?
18   A  Correct.
19   Q  So something that's routinely given to employees?
20   A  I don't know that.
21   Q  Very different from the signed application that you
22      were looking for?
23   A  I had asked for it on letterhead as well.
24   Q  But the application was a certification of hours
25      worked in certain capacities and things like that;
```

```
 1    right?
 2  A  Correct.
 3  Q  Very different from years of service?
 4  A  Yes.
 5         MR. MAYES:  I have no further questions.
 6         MS. MADDOX:  Just two quick follow-up
 7    questions.
 8  RECROSS-EXAMINATION
 9  BY MS. MADDOX:
10  Q  Mr. Mayes asked you about Exhibit 3.  In
11    March/April 2019 you didn't think at that time you
12    were being targeted because you were gay or being
13    treated differently because you were gay; correct?
14  A  Correct.
15  Q  But that changed; correct?
16  A  Yes.
17  Q  So according to Exhibit 1, by March 2020, you
18    believe you were being targeted because of your
19    sexual orientation?
20  A  Yes.
21  Q  Mr. Mayes asked you about the letterhead.  You
22    asked Mrs. Cole to put that information on Carmel
23    letterhead; correct?
24  A  Yes.
25  Q  And she refused?
```

```
1    A   Yes.

2            MS. MADDOX:   That's all I have.

3    BY MR. MANNA:

4    Q   Ms. Stringham, the exhibit that's in your exhibits,

5        Teacher Exhibit 3, page 1, Ms. Maddox took you to

6        that earlier.  Can you help the board understand

7        again, what is that exhibit document?

8    A   This was my attachment to my complaint on

9        September 1.  I wrote an addendum on Exhibit 1, it

10       says, on a separate page.

11   Q   This was an attachment to your September 1, 2020,

12       complaint?

13   A   Yes.

14   Q   Mr. Mayes, I think, asked you some questions about

15       Ms. Cole and whether she was mean to a variety of

16       people.  Do you remember when he asked you that?

17   A   Yes.

18   Q   There at the beginning of your document, you said

19       in the middle page of page 1, I thought she was

20       innocuous while my fellow counselors howled at the

21       fact that she became the director?

22   A   Yes.

23   Q   So did that reflect she wasn't very popular at the

24       time?

25   A   Yes.
```

1  Q  Who would have been those other fellow counselors?

2  A  Do you want me to name them?

3  Q  Yes, ma'am.

4  A  Bettina Cool, Kris Hartman, Emily Clark, Kelly

5     Wernke, and -- she left.  Give me a second.  She

6     left right after Rachel was hired, and I'm drawing

7     a blank on her name.  Cathy Patane.

8  Q  Ms. Maddox asked you if you knew if Ms. Cole had

9     access to your background, your race, and your

10    ethnicity.  Do you remember that question that she

11    asked you?

12 A  Yes.

13 Q  Did you have access to any of those other

14    counselors' personnel files?

15 A  No.

16 Q  So you would not have had access to know if they

17    had artifacts in their personnel file?

18 A  I don't know, but I asked them personally.

19 Q  Is that list of the names you just named off the

20    same list of individuals that are currently the

21    counselors?

22 A  Yes, except for Cathy Patane.

23 Q  So when did you ask them all about their personnel

24    file and write-ups?

25 A  I didn't ask all those counselors.  You asked me

```
 1        about the innocuous statement and who were the
 2        counselors that were upset about that, and those
 3        were the names of the counselors that were upset.
 4   Q    Let me clarify.  My question was, did you have
 5        access to their personnel file to know if they had
 6        write-ups or artifacts in their personnel file?
 7   A    And my answer is no.
 8   Q    And then you said you asked them personally?
 9   A    Meaning I've asked counselors when they had the
10        same infringement, did you get a write-up for that
11        same infraction?  And the answer would be no.  Why
12        would I?
13             MR. MAYES:  I'm going to object to the extent
14        we're getting into hearsay evidence here.  Those
15        counselors could have been asked to come testify.
16             MR. MANNA:  I think that's my point as well,
17        Mr. Mayes.
18   Q    You can't testify here under oath that you know of
19        all the write-ups in all those counselors' files?
20   A    I don't know about their files.
21   Q    In your document right here it says at the
22        beginning, I met Rachel in August of 2014.
23             Is that when you first knew or worked with
24        Rachel Cole?
25   A    That's when I met Rachel Cole.
```

1  Q  And began working with her?

2  A  She was in the freshman center.

3  Q  So when did you first start working with her?

4  A  Not until she was the director.  I mean, the

5     freshman center and the 10/12 have meetings

6     together.  So I had met her previous to.

7  Q  So in terms of the working relationship, was that

8     January of '18?

9  A  Yes.  But I had had conversations with her previous

10    to that.

11 Q  I understand.  In terms of her being, I guess, a

12    supervisor, it was January of '18?

13 A  I believe so.

14          MR. MAYES:  January of '17.

15          MR. MANNA:  Look at Teacher Exhibit 3, page 1.

16    Is that an error then, Counsel?

17          MR. MAYES:  If you look at our Exhibit 1, you

18    can see that the evaluation for the '16/'17 school

19    year was Rachel Cole's primary evaluator.  So

20    second semester, Ms. Cole took over.

21          MR. MANNA:  Thank you for clarifying that.

22 BY MR. MANNA:

23 Q  Ms. Stringham, prior to your complaint in September

24    of 2020, had you ever been angry with Ms. Cole in

25    her office before?

1   A   Yes.

2   Q   And you slammed the door of her office?

3   A   Yes.

4   Q   When did that take place?

5   A   I don't know the exact date.  Sometime in 2018.

6   Q   Look at your Exhibit 3, page 1 over to page 2.  It

7       says February 2019, and you describe slamming the

8       door and being angry at her?

9   A   Yes.

10  Q   That's the incident you're referring to?

11  A   Yes.

12  Q   Did you testify earlier that you never had an

13      explanation from Dr. Oestreich about why nobody

14      would sign the forms?

15  A   Correct.

16  Q   Go to --

17  A   Well, from Dr. Oestreich?

18  Q   Yes.

19  A   So Dr. Oestreich sent me an email on January 26.  I

20      responded to his email, and then there was nothing

21      after that.

22  Q   Did you have a deadline to turn in those forms?

23  A   No.

24  Q   Let's go to --

25  A   Well, I guess deadline meaning I'm going to apply

```
 1      for my license probably the end of August.  So
 2      timely.
 3   Q  Let me clarify.  End of August of what year?
 4   A  Of this year, '22.
 5   Q  So go to Administration Exhibit 26, Exhibit Z 26,
 6      page 11 of that document.  Ms. Stringham, I have
 7      taken some questions from the board, and I'm trying
 8      to get some clarifications.  So in the middle of
 9      that form, is that one of the forms that was being
10      asked to be signed off on?
11   A  I must be on the wrong page.  Oh, yes.  Sorry.  I
12      needed to turn the page.  Yes, that's the form.
13   Q  So at the time, had you completed an internship
14      with Carmel?
15   A  I completed an internship and a practicum 19 years
16      ago when I received my master's degree in school
17      counseling.
18   Q  Where was that?
19   A  My practicum was with St. Vincent's day school, and
20      it no longer exists.  And the second one was at
21      St. Monica in Indianapolis.
22   Q  I want to make sure we're clear because I know it's
23      getting a little late.  My question was had you
24      ever completed an internship with Carmel?
25   A  No.  But I have worked here as a professional
```

```
 1     school licensed counselor for the past seven and a
 2     half years.
 3  Q  I know.  And for efficiency, let's try to answer
 4     just the question I ask.  Did you ever have
 5     individual supervision?  As it says there,
 6     Applicant received a minimum of one hour per week
 7     individual supervision and a minimum of one
 8     half-hour's week of group supervision throughout
 9     the internship.
10  A  No.
11  Q  And the last one:  For the purposes of this
12     certification, it says, the individual supervision
13     is defined as supervision . . .
14          The rest of that sentence, do you see that
15     there?
16  A  Yes.
17  Q  So you mentioned a second ago -- if you can flip
18     back to Administration Exhibit 26, page 2, is that
19     the email that you said you got from Dr. Oestreich?
20  A  Give me just a second.  26 in the big binder?
21  Q  Administration Exhibit 26, page 1 and 2 under Z.
22  A  I'm sorry.  I haven't found it yet.
23  Q  Behind Z.  It's page 1 and 2.
24  A  Yes.
25  Q  The email at the bottom going over to page 2,
```

```
 1      that's the email that you received?

 2  A   Yes.

 3  Q   In that email Dr. Oestreich explained to you why

 4      they're not able to sign off on the form?

 5  A   Yes.  And he says, Correct me if I'm wrong.

 6  Q   The paragraph where he says, among other

 7      requirements, The form requires the person filling

 8      it out to represent you have completed an

 9      internship, et cetera; and he says, None of those

10      are true with Carmel?

11  A   That's correct.  But the state said that I needed

12      to just have verification that I was a professional

13      school licensed counselor, that I had been actively

14      using my license as a school counselor.

15  Q   I understand, ma'am.  I'm just pointing out to you

16      that Dr. Oestreich explained to you why -- he was

17      giving you an explanation why they couldn't sign

18      off on January 26.

19  A   Yes.

20  Q   And then you went into Ms. Cole's office on

21      January 28?

22  A   Yes.

23  Q   You testified earlier you didn't understand why

24      Ms. Cole wouldn't sign the form?

25  A   Correct, after I explained it to her.
```

1    Q   But Dr. Oestreich had explained that to you two

2        days prior?

3    A   And I responded with my explanation to him about

4        why I needed it to be signed.

5    Q   So am I to understand you didn't accept

6        Dr. Oestreich's explanation?

7    A   He said, if you think I have misinterpreted this

8        form or what you are requesting, then I recommend

9        that you contact me directly for further

10       discussion.  I responded, yes, you are interpreting

11       this -- you are not interpreting this correctly.

12   Q   From that point you didn't receive another email

13       from Dr. Oestreich, but you went to Ms. Cole again?

14   A   Yes, because the form showed up in my office

15       unsigned.

16   Q   For an application that you were submitting for

17       August of 2022?

18   A   Yes.

19   Q   The incident that you talked about where you

20       slammed the door and yelled at Ms. Cole previously,

21       did you receive a reprimand for that?

22   A   No.  A conversation.

23   Q   A conversation from who?

24   A   Rachel Cole.

25   Q   Had you known any other employees in your

```
 1     department or in the building that had gone on
 2     leave?
 3  A  Yes.
 4  Q  Did you ever know of any other employee who cut the
 5     name plate out of their office when they went on
 6     leave?
 7  A  Not that I know of.
 8  Q  Did you also clean out items from your office?
 9  A  Yes.  I didn't know when I would be returning.
10  Q  Ms. Stringham, I think I'm getting down to my last
11     question.  The noise machines that you mentioned
12     outside the office, how long had those been there?
13  A  We remodeled two years ago, and that's when they
14     were purchased.  It was when we returned from
15     COVID.
16  Q  So the noise machines had been there outside the
17     offices for a while?
18  A  No.  They were purchased for every counselor after
19     the reconstruction of the building because the
20     walls are paper thin.
21  Q  Do people normally rush into your office when
22     there's a volume level issue going on?
23  A  I would say yes.  If there was something going on,
24     would they run in and say, what's going on?  Yes.
25     You could hear kids crying through the walls.
```

```
 1      Like, if a student was upset, you could hear them.
 2      And if they were angry, you could hear them as
 3      well.  Like, if they were yelling about a teacher
 4      or they were yelling about a circumstance, you
 5      could hear them through the walls.
 6  Q   What was the purpose of those machines?
 7  A   To drown that out so that people can't hear you
 8      talking.
 9  Q   Was that a mental health initiative?
10  A   I don't know.
11          MR. MANNA:  Attorneys?
12          MR. MAYES:  No follow-up.
13          MS. MADDOX:  Just one follow-up.
14  RECROSS-EXAMINATION
15  BY MS. MADDOX:
16  Q   Did you know of any other counselors or employees
17      that would clear out their office when they left
18      for leave?
19  A   I don't know.  I don't know how many people.  I
20      only know of one person that went on leave.
21  Q   Were you just concerned about your personal items?
22  A   Yes.  Sure.  Of course.  That's all that I took was
23      only my personal stuff.
24          MS. MADDOX:  That's all.
25          MR. MAYES:  I have a follow-up to that.
```

```
 1  REDIRECT EXAMINATION (CONTINUING)

 2  BY MR. MAYES:

 3  Q  Ms. Stringham, did you unplug computers and move

 4     things around in your office?

 5  A  No.  I had a lamp.  I took my lamp.  I brought my

 6     own mouse, one of those ergonomic ones.  I had my

 7     own.  I also had speakers so I could listen to

 8     music.  I did take my speakers and mouse.  So I

 9     unplugged those from the computer.  I took my lamp.

10     I took my paintings.  Just personal stuff.  And

11     anything that belonged to Carmel I did not take.

12  Q  You were concerned people would take the paintings?

13  A  They might.

14          MR. MAYES:  No further questions.

15          MR. MANNA:  Ms. Maddox?

16          MS. MADDOX:  No more.

17          MR. MANNA:  Thank you, Ms. Stringham.

18          MR. MAYES:  We've got three more witnesses but

19     far shorter.  I think we've got 20 to 30 minutes

20     left.

21          MR. MANNA:  We'll do a five-minute break.

22     Please get back as quickly as you can.

23          (A brief recess was taken.)

24          RACHEL COLE, called as a witness, having been

25     previously duly sworn by the Court Reporter, was
```

```
 1        examined and testified as follows:
 2    DIRECT EXAMINATION
 3    BY MR. MAYES:
 4    Q   Ms. Cole, could you please introduce yourself to
 5        the board and spell your name for the court
 6        reporter.
 7    A   Rachel Cole, R-A-C-H-E-L C-O-L-E, the director of
 8        counseling at Carmel High School.
 9    Q   How long have you been in that position?
10    A   A little over four years.  Started in December.
11        Prior to that I was a freshman counselor at Carmel
12        for 12 years.  So a little over 16 years.
13    Q   You started as director in the '16/'17 school year?
14    A   Correct.
15    Q   How many years in education?
16    A   Twenty-seven, actually.  Ten in Kentucky before we
17        moved to Indiana.  I was a high school teacher,
18        biology ICP, and a guidance counselor for nine
19        through twelve.  Then I stayed home for three years
20        there, in three years we moved here to Indiana, and
21        then I started working at Carmel High School.
22    Q   So you were a coworker of Mrs. Stringham when she
23        arrived in the counseling department?
24    A   Correct.
25    Q   And then starting in the '16/'17 school year, you
```

```
 1      started evaluating her?
 2  A  Yes.
 3  Q  In '16/'17 do you recall what rating you gave her?
 4  A  Highly effective.
 5  Q  Was that the same for '17/'18?
 6  A  Yes.
 7  Q  And '18/'19?
 8  A  Yes.
 9  Q  And '19/'20 as well?
10  A  Yes.
11  Q  And in '19/'20 did you start to see some
12      performance concerns with her?
13  A  Yes.
14  Q  Just briefly give the board a summary of what those
15      types of concerns were that you saw in the '19/'20
16      school year.
17  A  There was the graduation of some students, credit
18      recovery, getting kids back on track, some
19      communication with emails and even phone calls with
20      parents that we needed to work on, and following
21      really some procedures we have in our department or
22      school, some different areas.
23  Q  So at the start of the following school year, did
24      you put something into place to help turn things
25      around?
```

 1   A   Yes.

 2   Q   What was that?

 3   A   We did an improvement plan.  That was pretty

 4       informal.  We were going to meet to discuss when we

 5       had concerns and kind of laid out and targeted

 6       those areas that we wanted to address.

 7   Q   When did you begin work on that performance

 8       improvement plan?

 9   A   It was August, and I want to say it was when the

10       students came back for school.  It was in between

11       that window but there in August, I remember.

12   Q   Who else did you work with?  Tell the board, who

13       else did you work with in creating that performance

14       improvement plan?

15   A   Mo Borto, Dr. Harmas, and I want to say -- I think

16       that was it.  We may have also talked with Dr. O.

17       Actually, I believe we did to make sure we were

18       following a professional approach to improvement

19       plans.

20   Q   So that was for the '20 to '21 school year?

21   A   Yes.

22   Q   I want you to fast-forward to spring semester 2021.

23       There were concerns about graduating students

24       during that spring semester.  Do you recall that?

25   A   Yes.

1    Q   Do you recall Ms. Borto meeting with counselors to
2        focus in on those students?
3    A   Yes.  I clearly remember that.
4    Q   If you could turn to Tab D in the smaller binder,
5        on that first page, the first bullet point, you'll
6        see in the middle names of student  student  student  as
7        three students that should not have been on the
8        fifth year track.  Do you see those names?
9    A   I do.
10   Q   Do you remember those names being discussed?
11   A   Yes, I do.
12   Q   Ms. Stringham testified that she recalled talking
13       to you about these students.  Do you recall talking
14       to Ms. Stringham about these students?
15   A   I do when I was handed the fifth year paperwork for
16       the following year.
17   Q   So this would have been after graduation?
18   A   Yes.  Or it could have been the day before when
19       counselors were putting in papers for those to make
20       sure next year we had them set up.
21   Q   So Ms. Stringham talked to you after graduation
22       essentially after the ship was out of port on their
23       fifth year?
24   A   Correct.
25   Q   There was nothing to do at that point to save them?

CCS 00731

1  A  No.

2  Q  Did she talk to you about them at any point before

3     that?

4  A  As far as graduating on time, Ms. Borto and I had

5     talked.  And she said, I'm going to handle it.  I'm

6     going to go around to everybody's office.  Any

7     seniors -- and we actually were focusing on

8     freshman because we wanted to keep them on track.

9     I'm going to go to each individually, get those

10    names, and then we look at some creative ways to

11    put some interventions in to help kids.  She was

12    handling that.

13 Q  Other than the May or almost June time period of

14    having a conversation with Ms. Stringham, do you

15    recall before that having any conversation with

16    Ms. Stringham about those three students?

17 A  No.

18 Q  Now, during the '21 to '22 school year, you

19    uploaded a bunch of artifacts into SFS; is that

20    correct?

21 A  Yes.

22 Q  And ballpark during '21/'22, do you recall roughly

23    how many you uploaded for Mrs. Stringham?

24 A  I believe it was 60-something.

25 Q  We're not going to go through all 60-something

```
 1        tonight.  But to get a flavor, go to, if you could,
 2        Tab L in that binder there.  So this was an
 3        artifact that you uploaded with an accompanying
 4        email.  Do you see that?
 5   A    Yes.
 6   Q    This was a situation where Ms. Stringham wrote you
 7        Sunday, August 15, middle of the page, that says
 8        that -- she was saying, My social worker did not
 9        inform me about the new roles regarding Chromebook.
10        So I'm sorry I didn't know.  It's difficult to know
11        something when you are not told.  It's just
12        frustrating not to receive information.
13           Do you see that?
14   A    Yes.
15   Q    You responded up at the top, informing
16        Ms. Stringham where you copied and pasted from
17        RollingNotes department notes section there.  And
18        that section was in the "stuff you need to read"
19        section, wasn't it?
20   A    Yes.
21   Q    So in the RollingNotes department notes for your
22        counselors, you let them see the logs of those
23        meetings.  Are those the SST meetings?
24   A    No.  They are our department meetings, and I would
25        put the agenda for the meeting.  But then if it was
```

 1     straightforward information I didn't need to take

 2     time to cover, then right under my agenda would be

 3     stuff you need to read.  The expectation was you

 4     would look that over.  If you have any questions,

 5     follow up with me.

 6  Q  It's the stuff you need to read section that

 7     Mrs. Stringham did not read?

 8  A  Correct.

 9  Q  And that's what instructed her on the students that

10     are free and reduced lunch.  Here when they're

11     asking for a Chromebook, to reach out to a social

12     worker; here's how you need to handle that as a

13     counselor; correct?

14  A  Yes.

15  Q  And then moving to Tab M, the next one, this is an

16     artifact in regards to a TCP program.  Can you

17     explain to the board what a TCP program is?

18  A  It's our senior transition to college program that

19     students have to turn in an application for.  We

20     tag that in their schedule so you see they're a TCP

21     student, and they'll have four weighted or APIB

22     courses in their schedule or more for senior year.

23  Q  So if you get an inquiry for a student and you look

24     them up in PowerSchool, you'll see if they're in

25     TCP or not?

```
 1   A   You would see that tag right there in their
 2       schedule, yes.
 3   Q   Here Mrs. Stringham sent a TCP program application
 4       to this student?
 5   A   Correct.
 6   Q   And the student informed her and said, I'm already
 7       in the program?
 8   A   Yes.
 9   Q   What did this communicate to you as a supervisor?
10   A   She wasn't taking time to actually pull that
11       student's schedule up when she said she'd like to
12       drop the course.  She wasn't really involved with
13       that student.  And to just assume she needed that
14       application, you just need to slow down, take a few
15       more minutes, and pull the student up before
16       responding.
17   Q   Let's go to Tab O.  In looking at this email on the
18       second page, do you remember this correspondence?
19   A   Yes.
20   Q   What was the issue here?
21   A   You have two options:  To take the ISTEP and pass
22       or do the Pathways.  You can not pass ISTEP and we
23       can do a waiver.  And with Pathways, there's really
24       multiple options that you can do.
25   Q   So if you go back to the artifact, that's what you
```

1 had there when you said the student can take ISTEP

2 and not pass?

3 A Correct.

4 Q So she gave incomplete information to the student

5 there?

6 A Correct.

7 Q Going to Tab Q, can you explain to the board this

8 email?

9 A Yes.  This was a student, an ENL student, I

10 believe, who reached out and was nervous and

11 thought she might be misplaced in her French

12 section and was actually inquiring maybe her level

13 needed to be -- to get some guidance on maybe she

14 needed to be moved to a different level.  We can

15 always change a level of the student.  If we don't

16 have them placed appropriately, we definitely want

17 to take a second look at that and see if we do need

18 to move it.

19  With this young lady, it was just, we don't

20 change schedules; sharing that policy but not

21 looking in or really listening to the student.  I

22 felt like she dismissed her, nor did we reach out

23 to the teacher to let her know the student has

24 concerns.  We definitely want to take an

25 opportunity to let them know what's going on and

```
 1      maybe pull that department chair in.

 2          I actually ended up looking up what we did

 3      with this student, and we did move her to an ENL

 4      section of chemistry with a department chair's

 5      approval; and she was successful.  But those take a

 6      few more steps, and it's really the counselor that

 7      needs to guide that.  Not the student going and

 8      advocating all of this for themselves.

 9   Q  Exhibit P, Tab P, if you could go to the second

10      page there, in reference to the ASVAB, can you

11      summarize for the board what ASVAB is?

12   A  ASVAB is one test in the Pathways that could

13      qualify a student to graduate if they make a

14      minimum of 31 or above.  We typically give that to

15      our students who have not passed ISTEP and we think

16      they do have a chance to pass ASVAB.  But it isn't

17      required by the state to take.  We typically give

18      it to a couple hundred, but not everyone is going

19      to take it.

20          It's not like ISTEP, for example, that's

21      required by the state for graduation on the

22      traditional way to graduate.  Everyone needs to

23      take the ISTEP.  That's part of graduation whether

24      you pass or don't pass.  We would have a waiver in

25      there if they didn't.  You don't have to take the
```

```
 1        ASVAB to graduate.  It's one option.
 2    Q   And yet Ms. Stringham said this test is required by
 3        the state for graduation.  Do you see that?
 4    A   Correct.  And that was my concern.
 5    Q   That was incorrect information that she's giving to
 6        a student?
 7    A   Yes.
 8    Q   Would you expect a counselor of 19 years to have
 9        known that information?
10    A   Yes.
11    Q   These are just examples of the 62 artifacts;
12        correct?
13    A   Yes.
14    Q   This is not all of them?
15    A   Correct.
16    Q   These examples and the others, how did this impact
17        you as director of counseling knowing that three
18        students had fallen through the cracks the last
19        year?  Did these alleviate those concerns?
20    A   No.  It was exhausting.  I was constantly worried
21        about students on our caseload to be honest.
22    Q   Along the way, in addition to the artifact, you
23        were in those meetings with Mrs. Stringham, weren't
24        you?
25    A   Uh-huh.  Yes.
```

1  Q  How did she receive the feedback she was getting?

2  A  Not very well.  On some of the conversations we

3     would have, if I would just stop by, address it

4     just like I would any counselor if there was a

5     concern, on some of those, it seemed to be

6     understood and, yes, I get that; and, yes, I'll do

7     that the next time.  But in the meetings, she was

8     very upset that they were documented in SFS.

9  Q  I want to fast-forward into January of this year,

10    January 28 of this year.  Do you recall that

11    interaction with Mrs. Stringham?

12 A  Yes.

13 Q  She presented a form for you to sign.  Do you

14    recall that?

15 A  Yes.  It was actually before that date, but yes.

16 Q  If you go to Tab Z, starting on page 3, is that the

17    form that she wanted you to sign?

18 A  Yes.

19 Q  You had concerns about this form?

20 A  I did.

21 Q  And what were those?

22 A  I did not feel I could sign off on this document.

23    I didn't supervise this.  She didn't do some of the

24    things detailed in this document, and I did not

25    feel comfortable signing it.

```
 1  Q  You were copied on that email from Dr. Oestreich,
 2     which starts at page 1 of that same exhibit, same
 3     tab, and into page 2?
 4  A  Yes.
 5  Q  And you think that accurately reflects the concerns
 6     that you had with the form?
 7  A  Yes.
 8  Q  Tell us about that interaction with Mrs. Stringham
 9     on the 28th regarding the form.
10  A  I was actually surprised because it had been a
11     couple days, and I knew that email had come from
12     Dr. O; and I thought we had moved past that.  She
13     had also referenced that another school district
14     could sign.  So in my mind it was like, she's going
15     to have to go to another school district.  I was
16     literally typing an email, and she came in; and I
17     could tell visibly she was upset about something.
18         At first I didn't know, and then she had the
19     forms in her hand.  And she's like, why won't you
20     sign this?  Why won't you sign this?  You're just
21     making this hard on me.  I said, you need to take
22     the questions to Dr. O.  I saw he was copied on the
23     email, and I was trying to be calm.  Sometimes in
24     past meetings it escalates.  Even when I'm trying
25     to be calm with my voice, it tends to escalate.
```

 1          But she escalated a little bit more, and she
 2     said, the state doesn't care.  It doesn't care that
 3     I didn't do these things.  They said you could sign
 4     it.  I said, I am not comfortable signing this, and
 5     I am not going to sign it.  You need to take your
 6     questions to Dr. O.  And then she told me I was
 7     ridiculous a few times and leaned over and was
 8     like, call them.  Just call them now.  She wanted
 9     me to call someone with the state.
10          At that point I was uncomfortable.  My office
11     is in between counselors and the front.  It's where
12     kids walk by.  I said, I'm not going to do that.
13     I'm done.  Then she's like, will you write a letter
14     and will you sign?  Honestly, I wasn't even
15     listening at that point.  I was done.  I said, I am
16     done.  Then Ms. Borto actually came around the
17     door, which I later learned that I think -- I don't
18     know if it was my counselor or my administrative
19     assistant that reached out to her, and that's when
20     it ended.
21  Q  Was Ms. Stringham yelling at you?
22  A  Yes.
23  Q  Was she leaning over the desk that was in between
24     the two of you?
25  A  Yes.

1  Q  And pointing fingers and waving her hands about?

2  A  Yes.  She was upset.

3  Q  Very animated?

4  A  Yes.

5  Q  Have you ever had that happen at Carmel High

6     School?

7  A  No.  Not by another adult, no, or student.

8  Q  It's never happened?

9  A  Never happened.

10 Q  Ms. Stringham alleges that you were targeting her

11    because of her ethnicity.  When did you learn of

12    her ethnicity?

13 A  When I had my interview with Dr. O with the

14    complaints she filed, I always thought honestly she

15    was Caucasian.  I didn't know that she was Latino

16    or Hispanic.

17 Q  And the approximate time frame of when that

18    interview occurred?

19 A  I know it was fall of last year.

20 Q  Fall of '21 or fall of 2020?

21 A  Of 2021.

22 Q  Was it after she filed her first complaint?

23 A  Let me think about this.  I didn't know -- no.  I

24    didn't know that she had filed a complaint until

25    the 15th, I think it was, that I had a meeting with

```
 1      Dr. O.
 2   Q  The 15th of what month?
 3   A  I think it was October.
 4   Q  If you go to the big binder in front of you, Tab 1,
 5      September 1, 2020, was when she filed her first
 6      complaint.  Do you see that?
 7   A  Okay.
 8   Q  Does that refresh your memory as to when you think
 9      that interview with Dr. Oestreich was?
10   A  Actually, he told me on September 15 that a
11      complaint had been filed.  So that's the timeline.
12      We had had a meeting, and she was really upset at
13      the meeting.  We were going over some of my
14      concerns and different situations.  She got really
15      upset quickly and said, are you doing this because
16      I reached out to ESC?  And at the time we had a new
17      department, and we weren't --
18   Q  Let me back up.  September 1, 2020, she filed the
19      complaint.  When did you learn of her status as a
20      Hispanic Latino?
21   A  I think it was October.
22   Q  It was sometime --
23   A  Because on September 15 I didn't know either.  He
24      was just telling me a complaint has been filed.
25   Q  So it was even after September 15 that you learned
```

```
 1      of her --
 2   A  Right.  It was when he did the investigation.  On
 3      September 15 he met with me to say, a compliant has
 4      been filed.  This will be the process.
 5   Q  So you did not know before September 1, 2020, that
 6      she was Hispanic?
 7   A  No.
 8   Q  She also alleges that you were targeting her
 9      because of sexual orientation.  Are you targeting
10      her because of her sexual orientation?
11   A  No.
12   Q  Did you know of her sexual orientation when you
13      gave her the highest rating for the '16/'17 school
14      year?
15   A  Yes.
16   Q  And '18/'19?
17   A  Yes.
18   Q  And '19/'20?
19   A  Yes.
20   Q  And also '17/'18?
21   A  Yes.
22   Q  Do you support the recommendation from Carmel High
23      School to cancel her contract?
24   A  Yes.
25   Q  Please tell the board why.
```

```
 1   A   After multiple meetings, multiple conversations,

 2       multiple modeling, coaching, and even multiple

 3       improvement plans, I don't feel the students on her

 4       caseload were getting the care and guidance they

 5       deserved.  Students weren't getting their credits

 6       recovered.  Some didn't graduate.

 7           I felt like the communication to parents and

 8       students was becoming a problem.  And I felt like

 9       the energy was not being poured into improving, and

10       it was affecting the services that students and

11       parents were receiving.

12           MR. MAYES:  I have no further questions.

13           MR. MANNA:  Ms. Maddox?

14           MS. MADDOX:  I just have a few questions.

15   CROSS-EXAMINATION

16   BY MS. MADDOX:

17   Q   Mrs. Cole, how many counselors do you supervise?

18   A   Fifteen that have caseloads and another counselor

19       that's a college career counselor.

20   Q   How many artifacts on average do you think you have

21       entered into SFS for those other counselors?

22   A   Probably the most another counselor has is two or

23       three.

24   Q   So no one has ever received 60-plus artifacts?

25   A   Correct.
```

```
 1   Q   Have any other counselors ever been placed on an
 2       improvement plan?
 3   A   No.
 4   Q   Have any other counselors made any errors?
 5   A   Yes.
 6   Q   Have you ever made any errors?
 7   A   Yes.
 8   Q   Do you submit artifacts each time an error is made?
 9   A   No.
10   Q   Have any parents ever made complaints about you?
11   A   As director?
12   Q   Sure, as director.
13   A   I'm not aware of it if they have.
14   Q   Have any other staff besides Mrs. Stringham made
15       any complaints about you?
16   A   I'm really not sure.
17   Q   You mentioned previously you were concerned about
18       Mrs. Stringham's students and getting the services?
19   A   Uh-huh.
20   Q   Besides the two or three you mentioned earlier,
21       were there any other issues with other students
22       this year as far as concerns about not completing
23       the year, not being able to graduate?  Or were they
24       all doing fine?
25   A   Yes.
```

1    Q   How many?

2    A   I couldn't give you a specific number, but I could

3        share some examples.

4    Q   Sure.  Give me one example.

5    A   A senior didn't have health in their schedule that

6        we saw, which is a graduation requirement, near the

7        end of first semester.  Another senior didn't have

8        the two PE credits and health credit audited

9        correctly on their transcript to graduate.

10   Q   Have any other counselors made errors such as this,

11       had any issues with their audits?

12   A   Yes.

13   Q   Were those individuals placed on an improvement

14       plan?

15   A   No.

16           MS. MADDOX:   That's all I have.

17   REDIRECT EXAMINATION

18   BY MR. MAYES:

19   Q   Just one follow-up.  With those that had errors in

20       their audits, were they on the scale of the errors

21       that Mrs. Stringham had?

22   A   They were not.

23   Q   Were they as consistent in producing errors as

24       Mrs. Stringham had been?

25   A   They were not.

```
 1   Q   Did three students fail to graduate because of the
 2       actions of that counselor?
 3   A   Yes.
 4   Q   No, of the counselor previously that had audit
 5       errors.
 6   A   No.
 7           MR. MAYES:  No further questions.
 8           MR. MANNA:  Ms. Cole, I want to clarify that.
 9       The testimony you just gave to that last question
10       is, there were other counselors that did not have
11       students who failed to graduate because of their
12       counselor issue?  I need to clarify that.
13   BY MR. MAYES:
14   Q   Let me say it this way:  Is Ms. Stringham the only
15       counselor to have had students not graduate because
16       of her lack of oversight?
17   A   Yes.
18           MR. MANNA:  Thank you.
19   BY MR. MANNA:
20   Q   Ms. Cole, the forms that you were asked about in
21       terms of signing off, can you go to those in the
22       black binder, I believe Z?  A question from the
23       board:  Have you had occasion where anyone else has
24       asked you to sign those forms?
25   A   No.
```

```
 1   Q   If you go to that Z, Exhibit 26, page 11, in the
 2       middle box, Section B, did you find that page?
 3   A   Yes.
 4   Q   It says, As an official of the school named above,
 5       I certify that the above-named applicant did
 6       receive the following supervision during the
 7       completion of the internship; and then it lists
 8       some criteria.  Do you see that?
 9   A   Yes.
10   Q   Did that happen for Ms. Stringham at Carmel Clay
11       Schools?
12   A   No, it did not.
13   Q   Is that the reason you felt uncomfortable
14       certifying it?
15   A   That was one of the reasons.  There was also
16       somewhere in these forms where it says ran
17       600 hours of groups; and social workers do groups
18       in our building.  There's a part that says on
19       page 10, able to develop basic counseling skills
20       and integrate professional knowledge.  Group work
21       is underneath there.
22           When hours are documented, somewhere in here
23       it says supervised hours as well.  Really, this is
24       more of a social work mental health counseling
25       form.  I do have social workers who do something
```

```
 1       similar like this, and they're getting their
 2       licensure; and they have supervised planned
 3       meetings with someone who's licensed.  Then they
 4       discuss that family or those students, and it is a
 5       set time.  You bring things to that meeting, and
 6       it's discussed.  That's not what happened.
 7   Q   I don't want to get too far off the course here.
 8       So in the box, Section B, it says, I further
 9       certify that the supervision for this internship
10       was conducted by either a program faculty member or
11       a supervisor working under the supervision of a
12       program faculty member.
13             That paragraph as well, none of that was true;
14       is that correct?
15   A   Correct.
16   Q   So you can't certify something that's not true?
17   A   I cannot, no.
18   Q   I think either Ms. Maddox or Mr. Mayes or both
19       asked you about a number of other counselors that
20       you supervised.  Did I hear correctly the artifacts
21       that were uploaded that you went over, some of
22       those were generated from concerns from parents?
23   A   Yes.
24   Q   And some of those were generated from concerns with
25       students?
```

```
 1   A   Correct.

 2   Q   Of those that were not submitted in the binders,

 3       what would be an example of those other artifacts

 4       so the board has an understanding of what those

 5       other artifacts were?

 6   A   Well, an artifact is just something that you're

 7       uploading in SFS.  So I can upload a flyer they

 8       made that we used for mental wellness week.

 9       Typically I will load those for other counselors as

10       part of the observation.  Counselors can upload

11       artifacts if they want to add things to their SFS.

12           I was using artifacts on this last year's

13       improvement plan to visually show the concerns that

14       we were talking about because the year prior when

15       we met and talked about it, it seemed to -- at the

16       end of the year it was, like, out of sight, out of

17       mind.  I said, we need to consider that as part of

18       the evaluation.  So are you asking, did I upload

19       every concern I had as an artifact?  No.  Is that

20       what you're asking me?

21   Q   No.  Ms. Cole, I think I had a question from a

22       board member that there's been representation that

23       there's been a certain number of artifacts uploaded

24       for Ms. Stringham?

25   A   Yes.
```

```
 1  Q  We have some of those.  Of those that are not here,
 2     what would have been those other artifacts that
 3     would have been issues of performance or concern?
 4  A  So are these artifacts that weren't pulled as an
 5     exhibit?
 6         MR. MAYES:  62 artifacts have been uploaded.
 7     We've got 15 or so in the binders here.
 8         MS. MADDOX:  Actually, I think all 62 we
 9     provided.
10         MR. MANNA:  They're in your binder?
11         MS. MADDOX:  Yes.
12         MR. MANNA:  Thank you.  That helps expedite
13     this.  Do you know which tab, Jamie?
14         MS. MADDOX:  That's what I was just pulling
15     out.  I believe 15 and 16, but let me confirm that.
16     There may have been another one as well.  15, 16,
17     28, 29, 30, and 31.
18  BY MR. MANNA:
19  Q  Ms. Cole, at one point, had you or someone else
20     asked to be copied on emails or artifacts regarding
21     Ms. Stringham?
22  A  Yes.  On this year's improvement plan.
23  Q  So as a result of the improvement plan, you were
24     being copied on what?
25  A  Any emails that she sent.
```

```
 1   Q   So that was part of the improvement plan?
 2   A   Yes.
 3            MR. MANNA:  I just want to make sure I've
 4       gotten the questions the board may have.
 5   Q   How many students does a counselor work with?
 6   A   The 10 through 12 counselors, roughly about 360,
 7       maybe 340.  About 110 each 10, 11, and 12.  Roughly
 8       we might have 113 in one.  Seniors, 115.
 9       Juniors -- it's by alpha.  So it's by last name.
10       But 10 through 12 counselors have each grade of the
11       same alphabet similar.  So they might have the same
12       family.
13   Q   So 300 to 340 is the total?
14   A   Yeah.  I would say, like, 330 to 350 depending on
15       what counselor you pulled.
16   Q   Do those counselors have the same students year
17       after year?
18   A   They start off with -- we have four freshman
19       counselors.  And then when they move from the
20       freshman side to the 10 through 12 side, they have
21       that 10 through 12 counselor.  And they stay with
22       that counselor 10, 11, and 12.
23   Q   If you could briefly, who are the current
24       counselors?
25   A   Freshman are Dave Schleper, Leslie Brown, Kate
```

```
 1      Barsten, and Cary Schwartz.  The 10 through 12 is
 2      Dave Mikesell, Bettina Cool, Kelly Wernke, Aly
 3      Harbor, Becky Stuelpe, Casey Danubio, Kris Hartman,
 4      Emily Clark, Stephanie Payne, Kevin McDonough, and
 5      then Ms. Shook is currently covering
 6      Ms. Stringham's caseload.
 7   Q  Do you happen to know any of the diversity makeup
 8      of those counselors?  Do you know their race?
 9   A  I think I do.
10   Q  Any that you can remember in terms of being
11      Hispanic or Latino?
12   A  No.
13   Q  Have you given verbal counseling in the past to any
14      of those counselors?
15   A  Have I given verbal counseling?
16   Q  Verbal discussion of their performance.
17   A  Yes.  At the end of each year we discuss their
18      evaluations.
19   Q  Have any of them received improvement feedback or
20      negative feedback?
21   A  I would say no.  They may have heard concerns or I
22      would like them to strengthen an area.  I wouldn't
23      call that -- again, I don't call that negative.
24   Q  In the past do you recall an incident in February
25      of '19 where you gave Ms. Stringham verbal feedback
```

```
 1      or communication regarding her being angry and
 2      slamming your door?
 3  A   I think so, yes.
 4          MR. MANNA:  Counsel, any questions on my
 5      questions?
 6          MR. MAYES:  Yes, a follow-up.
 7  REDIRECT EXAMINATION (CONTINUING)
 8  BY MR. MAYES:
 9  Q   Ms. Cole, in the requirement in the performance
10      improvement plan for this school year that she
11      copied you on all emails, did that enhance your
12      visibility of her work performance?
13  A   It did.
14  Q   Because you were actually seeing every email, did
15      it raise additional concerns for you?
16  A   Yes.
17  Q   And it led to additional artifacts to upload?
18  A   Yes.
19          MR. MAYES:  No further questions.
20          MS. MADDOX:  One follow-up I have.
21  RECROSS-EXAMINATION
22  BY MS. MADDOX:
23  Q   Out of all these counselors you named,
24      Mrs. Stringham is the only one that has received
25      negative feedback?
```

```
 1   A   Specifically what are you calling negative
 2       feedback?
 3   Q   You answered Mr. Manna's question saying that these
 4       verbal counseling or discussions at the end of the
 5       year, you don't recall giving anyone negative
 6       feedback of all these counselors previously named?
 7   A   I don't think I gave Mrs. Stringham negative
 8       feedback.
 9   Q   You put it on her improvement plan.  That's not
10       negative?
11   A   Not if it's going to make you a better counselor.
12   Q   Uploading 62 artifacts to SFS that affects her
13       evaluation isn't negative feedback?
14   A   No.  I think it can help her see where improvement
15       needs to happen so we aren't on an improvement
16       plan.
17   Q   So agreeing that a teacher's contract should be
18       canceled isn't negative feedback either?
19   A   That would be negative, yes.
20           MS. MADDOX:  That's all I have.
21   BY MR. MANNA:
22   Q   Ms. Cole, those artifacts that Ms. Maddox just
23       asked you about, were some of those, again, parent
24       or student emails with concerns about her
25       performance?
```

```
 1   A   Yes.
 2   Q   Some of those emails being negative feedback from
 3       parents and students?
 4   A   Correct.
 5   Q   What about during the '19/'20 school year?  Was
 6       there any change in the metrics for the evaluation
 7       on how a counselor was evaluated?
 8   A   Well, that year was COVID, and in the spring we all
 9       went home.  Students went home.  Employees would
10       work from home.  That year, it was tough on all of
11       us.  It was tough on my counselors.  We went from
12       the BigBlueButton to Zooming to pulling data from
13       places that not everybody was comfortable pulling
14       from, and I did not want that time period to
15       reflect on someone's -- I wanted to give people the
16       benefit of the doubt.  So when you asked me, was
17       that year a little different, I would say, yes,
18       that year was a little different from my
19       perspective at the year-end evaluations.
20   Q   Thank you.  The question is -- I know it's getting
21       late -- did the evaluation standard or evaluation
22       tool change?
23   A   No.
24           MR. MANNA:  Okay.  Thank you.
25           MS. MADDOX:  I think I just have one follow-up
```

```
 1      to Mr. Manna's question.
 2   RECROSS-EXAMINATION (CONTINUING)
 3   BY MS. MADDOX:
 4   Q   Have any other counselors received any sort of
 5       negative comments from parents or students?
 6   A   Yes.
 7   Q   Were these uploaded as artifacts for those
 8       counselors?
 9   A   No.
10           MS. MADDOX:   That's all.
11           MR. MANNA:   Anything further?
12           MR. MAYES:   No.
13           MR. MANNA:   Thank you, Ms. Cole.
14           MR. MAYES:   The next witness is Dr. Oestreich.
15       I'll go get him.
16           THOMAS OESTREICH, called as a witness, having
17       been previously duly sworn by the Court Reporter,
18       was examined and testified as follows:
19   DIRECT EXAMINATION
20   BY MR. MAYES:
21   Q   If you could, introduce yourself to the board and
22       spell your name for the court reporter.
23   A   Dr. Tom Oestreich, assistant superintendent, staff
24       and student services, with Carmel Clay Schools.
25       Last name:   O-E-S-T-R-E-I-C-H.
```

```
 1   Q   In your role as assistant superintendent you
 2       receive complaints from employees on discrimination
 3       and harassment?
 4   A   Yes.
 5   Q   In September 2020 you received a complaint from
 6       Mrs. Stringham; is that correct?
 7   A   Correct.
 8   Q   It alleged race and sexual orientation
 9       discrimination?
10   A   Correct.
11   Q   In response, please tell the board what you did.
12   A   As soon as I received the board complaint, I met
13       with Mrs. Stringham and immediately investigated
14       the complaint.  And in that process of the
15       investigation, I interviewed ten people that were
16       listed on the complaint.  And in addition to that,
17       at the conclusion of my investigation, I submitted
18       a five-page report of my findings.
19   Q   What was your conclusion as to race discrimination?
20   A   I found no evidence of race discrimination.  In
21       fact, most of the candidates did not know that
22       Dianna was Hispanic.
23   Q   And then as to sexual orientation discrimination,
24       what were your conclusions there?
25   A   No evidence of sexual orientation discrimination.
```

```
 1        There was one comment made six-plus years ago,
 2        allegedly made, by Rachel Cole with regards to, are
 3        you surprised Dianna is married to a woman because
 4        she was previously married to a man?  Rachel denied
 5        that, and I found no other evidence other than what
 6        was shared with me through interviewing through
 7        that process.
 8    Q   And then that was first semester of 2021, that
 9        investigation; correct?
10    A   Correct.
11    Q   At the end of 2021, were you involved in
12        Mrs. Stringham's evaluation?
13    A   Yes.
14    Q   Tell the board your involvement in that.
15    A   So at the end of 2021 when Mrs. Cole conducted the
16        summative evaluation, she had Dianna rated as needs
17        improvement.  However, I did review that as part of
18        my job as assistant superintendent.  And although
19        they met and verbally had conversations with
20        Mrs. Stringham, I did not find enough written
21        documentation or artifacts to show that
22        Mrs. Stringham should have been evaluated at needs
23        improvement.  So based upon that review, she was
24        evaluated as effective that school year.  And then
25        in the comments I know that they shared some
```

```
 1     concerns there.
 2  Q  So you overturned the building recommendation on
 3     needs improvement, and she received an effective
 4     evaluation?
 5  A  Correct.
 6  Q  And then fast-forward to January of 2022.  Did you
 7     receive a second complaint from Mrs. Stringham?
 8  A  Yes.  Our office received a second complaint, and
 9     it was very similar to the first complaint.
10  Q  Tell the board how you responded to that one.
11  A  So with that complaint, that formal board
12     complaint, I didn't think it was fair for me to
13     investigate it since I investigated the one in
14     2020.  So I assigned Shelley Coover, assistant
15     director of human resources.  She investigated the
16     complaint.  She interviewed all of the witnesses
17     that were provided on the complaint; and then she
18     provided findings.
19  Q  Tell the board the allegations and how they
20     compared in 2022 to the allegations that you
21     received in 2020.
22  A  They were exactly the same.
23  Q  Was there new evidence in the 2022 allegations
24     presented?
25  A  No.
```

1    Q   Were there different conclusions reached?

2    A   No.   The same conclusion was reached.

3    Q   Were you involved in the process to evaluate

4        contract cancellation?

5    A   Yes.

6    Q   What role did these complaints play in that

7        determination?

8    A   No role at all.

9    Q   Do you support the recommendation for contract

10       cancellation in this matter?

11   A   Yes.

12   Q   Explain to the board why.

13   A   Because there have been a number of errors,

14       mistakes that have continually been made that's

15       affecting students.   And my number one priority in

16       this district is protecting our students and

17       ensuring that they are receiving the guidance

18       needed from a school counselor.   In addition, the

19       unprofessional behavior that was exhibited towards

20       Rachel Cole is not acceptable in my eyes as a

21       professional, and it wasn't the first time that

22       that had been shared with me that she was

23       unprofessional in the educational setting.

24           MR. MAYES:   I have no further questions.

25           MS. MADDOX:   Just a few quick follow-ups.

```
 1   CROSS-EXAMINATION
 2   BY MS. MADDOX:
 3   Q   What's your background with Title VII?
 4   A   So as the HR director, I've been an HR director or
 5       assistant superintendent of human resources or
 6       staff and student services for ten years now.  So
 7       I've had experience with Title VII, Title IX,
 8       whether it's an investigation, whether it's working
 9       with district counsel as part of my role in the
10       district.  Currently we have a DEI officer that now
11       handles that.
12   Q   Did you receive any training relating to Title VII?
13   A   I did in my previous district, yes.
14   Q   How long ago was that training?
15   A   I don't recall.  More than five years ago.
16   Q   As far as Mrs. Stringham's evaluation that was
17       needs improvement, did you ask Mrs. Cole why she
18       rated her as needs improvement?
19   A   Yes.
20   Q   What was her reasoning for that?
21   A   Continued errors made, dropping the ball quite a
22       bit on assigned tasks on her job responsibilities,
23       and not meeting expectations as a counselor.
24   Q   But there was no evidence of that; is that correct?
25   A   There was evidence.  It was primarily verbal.  I
```

```
 1      did not feel there was enough evidence at the time
 2      to garner a needs improvement.  So that's why I
 3      recommended that it be effective for that year, and
 4      then they could continue to work with
 5      Mrs. Stringham.
 6   Q  These findings you discussed from January 2022,
 7      were these findings ever given to Mrs. Stringham?
 8   A  No.
 9   Q  I have one last question; a couple of questions.
10      Did you interview Abby Cartwright as a part of the
11      September 2020 investigation?
12   A  Yes.
13   Q  Did she raise concerns about Rachel Cole and
14      discriminating against individuals based on sexual
15      orientation?
16   A  Not so much.  She had concerns with Rachel in her
17      role, but she did not provide any evidence other
18      than the one comment that I shared earlier.
19   Q  So that one comment came from Abby Cartwright?
20   A  Abby shared that as part of the investigation, yes.
21   Q  In your role here with Carmel, have you ever heard
22      of anyone receiving 60-plus artifacts in a matter
23      of 35 days?
24   A  Not in my role here in Carmel.
25           MS. MADDOX:  That's all I have.
```

```
 1        MR. MAYES:  Nothing further.
 2   BY MR. MANNA:
 3   Q  Dr. Oestreich, is there a social media policy for
 4      Carmel Clay Schools with respect to employees
 5      posting information about their job?
 6   A  I believe there is, yes.
 7        MS. NELSON WILLIAMS:  So is there a policy
 8      that would fall under appropriate behavior on
 9      social media sharing?  I saw some policies with
10      regards to staff and students interacting, but is
11      there any policies about decorum on social media
12      for staff as a professional under professional
13      guidelines?
14        MS. MADDOX:  I'm going to object as far as
15      Mrs. Stringham receiving a notice of any issues
16      with social media.  There's nothing contained in
17      the notice relating to violation of any social
18      media policy.  So we would object that she received
19      no notice, and it would violate her due process
20      rights.
21        MR. MANNA:  Let me review this.
22        Mr. Mayes, could you help me?  You have an
23      exhibit regarding a social media post?
24        MR. MAYES:  Yes.
25        MR. MANNA:  Which document is that?
```

```
 1        MR. MAYES:  It is Exhibit X beginning on
 2   page 2.
 3        MR. MANNA:  Earlier this evening Mr. Mayes
 4   asked Ms. Stringham about that document, and she
 5   acknowledged posting this document on letter X,
 6   page 2.
 7        MS. MADDOX:  We don't disagree that she posted
 8   anything, but I'm just saying the notice of
 9   principal's preliminary decision is a place where
10   any issues with her employment are to be listed for
11   Mrs. Stringham so that she can create a defense in
12   order to discuss these.  The two that are included
13   in the notice do not relate to social media posts
14   at all.
15        So we would object to any discussion of
16   violations of any social media policies.  I haven't
17   seen any social media policies in any of the
18   exhibits, and nothing is listed in the notice
19   relating to social media.  So we would object that
20   it violates her due process rights under the
21   Indiana Teacher Protection Act.
22        MR. MANNA:  Give me one second.  So to
23   clarify, in the notice from the principal's
24   preliminary decision, there are two bullet points.
25   In the second bullet point it lists two reasons:
```

```
 1        The continued job performance that falls below what
 2        we expect out of our counselors at Carmel High
 3        School.  Second sentence:  You continue to make
 4        errors in your role as a counselor that impacts
 5        other staff and students.
 6            Now, certainly I understand if you wanted more
 7        clarity on what that first sentence says, but we
 8        didn't have that request until right now.  We had a
 9        line of questions earlier regarding Exhibit X that
10        you did not cross examine Ms. Stringham on.  So I
11        understand your objection.  I think we'll keep it
12        on the record, of course.  But I overrule it to the
13        extent the board member would like more information
14        about what our social media policy is.
15            So if you want to answer that question,
16        Dr. Oestreich.
17            THE WITNESS:  I'm sorry.  Could you repeat the
18        question for me?
19            MR. MANNA:  Go ahead.
20   BY MS. NELSON WILLIAMS:
21   Q  Yes.  I'm just wondering about if there are any
22        policies that govern how our staff members interact
23        about their professional work on social media, and
24        is there a level of decorum or any indication of
25        how one should act?  I see that there is some
```

```
 1        guidelines to interacting with students, but is
 2        there anything that says how one should behave
 3        online?
 4   A    I believe there are.  I can't point to it off the
 5        top of my head.  I can share with you that I've had
 6        conversations with staff members before about
 7        certain social media posts.  We did not have a
 8        conversation with Mrs. Stringham regarding this
 9        social media post due to the fact that there were
10        numerous other concerns that we wanted to focus on
11        as a district.
12             MR. MANNA:  Thank you, sir.
13             Any follow-up on that about the social media?
14        I have a couple others.
15             MR. MAYES:  No.
16   BY MR. MANNA:
17   Q    Do you encourage evaluators to provide evidence to
18        support their decision?
19   A    If there are concerns, then, yes.  If someone is
20        doing exceedingly well, typically I ask them to
21        include that in the comments.  But if someone is
22        going to be evaluated as needs improvement or
23        ineffective, then, yes, that is encouraged.
24   Q    Dr. Oestreich, we're looking at certified employees
25        as a class.  And the board has a question of, do
```

```
 1      other employees have improvement plans across the
 2      district where artifacts are uploaded to SFS?
 3   A  Our certified teachers, counselors, social workers
 4      are all a part of the SFS evaluation system.  In
 5      the event that an administrator was on a plan of
 6      assistance or a classified staff member, they're
 7      not on standard for success.  They're evaluated in
 8      another manner.  So we would include artifacts with
 9      those evaluations, but they wouldn't be uploaded
10      because they're not on the SFS system.
11   BY MS. JACKSON:
12   Q  When are artifacts loaded into -- if the employee
13      is in SFS, what constitutes when they are loaded
14      and when they are not if there are comments to be
15      made?
16   A  They can be loaded at any time either by the
17      teacher or counselor or by the evaluator.  So
18      oftentimes teachers and counselors will upload
19      their own artifacts to support one of the
20      indicators.  Or because an evaluator may not have
21      the opportunity to observe every single indicator,
22      oftentimes a teacher will upload an artifact to
23      support that indicator that may not have been
24      observed.  Or the evaluator can upload that
25      artifact at any time if they have concerns that may
```

```
 1     be outside of the observation period.
 2  BY MR. MANNA:
 3  Q  So a teacher has the ability to upload artifacts as
 4     well?
 5  A  Yes.
 6  Q  Or a certified staff member?
 7  A  Yes.
 8          MR. MANNA:  Any other questions for
 9     Dr. Oestreich?  Counsel?
10          MR. MAYES:  None.
11          MS. MADDOX:  None.
12          MR. MANNA:  Thank you, sir.
13          THE WITNESS:  Thank you.
14          MR. MAYES:  We'll call Dr. Beresford as our
15     last witness.
16          MICHAEL BERESFORD, called as a witness, having
17     been previously duly sworn by the Court Reporter,
18     was examined and testified as follows:
19  DIRECT EXAMINATION
20  BY MR. MAYES:
21  Q  Dr. Beresford, I don't think you need to introduce
22     yourself, but please spell for the court reporter
23     your name.
24  A  Michael Beresford, Superintendent at Carmel Clay
25     Schools.  It's Michael, the traditional spelling,
```

```
 1      M-I-C-H-A-E-L; Beresford, B-E-R-E-S-F-O-R-D.
 2   Q  I just have a couple of questions for you,
 3      Dr. Beresford.  You reviewed the recommendation
 4      from Dr. Harmas?
 5   A  Correct.
 6   Q  Dr. Harmas isn't with us tonight because he's on
 7      medical leave; is that correct?
 8   A  That's correct.
 9   Q  You heard from Mrs. Stringham at the
10      superintendent's conference?
11   A  Correct.
12   Q  Did you hear anything at the superintendent's
13      conference that caused you to doubt the principal's
14      preliminary decision?
15   A  No.
16   Q  How long roughly did you meet with Mrs. Stringham
17      at the superintendent's conference?
18   A  I believe it was about an hour.
19   Q  After that conference you sent a recommendation to
20      the board?
21   A  Correct.
22   Q  That recommendation was or is to cancel
23      Mrs. Stringham's contract; correct?
24   A  That's correct.
25   Q  Explain to the board why you are presenting that
```

1   recommendation.

2 A   After reviewing, my recommendation was based on

3   primarily three things:  One is that she had

4   multiple opportunities to get better.  They did two

5   improvement plans, and there was no significant

6   improvement.  Secondly was that she made a lot of

7   mistakes, a lot of errors, which was like a lot of

8   other folks who have sat at this table tonight.

9   The students are paying the price of those errors.

10   And then finally, of course, was the incident on

11   the 28th was completely unacceptable, and that kind

12   of behavior is not something we can support.

13        MR. MAYES:  No further questions.

14        MS. MADDOX:  Just a few follow-up.

15 CROSS-EXAMINATION

16 BY MS. MADDOX:

17 Q   Do you know if Dr. Harmas met with Mrs. Stringham

18   regarding the notice to cancel Mrs. Stringham's

19   contract?

20 A   I don't know that.  He's been out for quite a

21   while.

22 Q   Was he out on February 4, 2022, when the notice was

23   sent?

24 A   I don't have that information at my fingertips.

25 Q   So it's possible that he didn't even issue this

```
 1    notice?
 2  A  I don't know that either way.
 3         MS. MADDOX:  I think that's all I have.
 4         MR. MAYES:  Nothing further.
 5         MR. MANNA:  One second, Doctor.  Thank you,
 6    sir.
 7  BY MR. MANNA:
 8  Q  Dr. Beresford, could you go to the Administration
 9    binder BB, page 2 of Exhibit 37?
10  A  Yes.
11  Q  As superintendent are you familiar with your high
12    school principal's signature?
13  A  Yes, I am.
14  Q  Is that his signature on February 4?
15  A  Yes, it is.
16  Q  Then on back to EE, what is this document,
17    Dr. Beresford?
18  A  Pardon me?
19  Q  The document that is EE, what is that?
20  A  That's the superintendent's recommendation.
21  Q  That's signed and executed by your signature?
22  A  Yes.
23  Q  In that summary or in that meeting, I should say,
24    did Ms. Stringham attend with counsel?
25  A  Counsel attended via phone.
```

1   Q   Did either Ms. Stringham or her counsel bring up

2       any issues about the letter signed by Dr. Harmas?

3   A   No, they did not.

4           MR. MANNA:   That's all I have.

5           MS. MADDOX:   I just have a quick follow-up.

6   CROSS-EXAMINATION (CONTINUING)

7   BY MS. MADDOX:

8   Q   Does Dr. Harmas have a stamp of his signature that

9       individuals can use?

10  A   No.

11  Q   Did you discuss this matter with Dr. Harmas?

12  A   I did not discuss it with him directly.

13  Q   When you say "directly," who did you discuss it

14      with then?

15  A   I discussed it with counsel and with Dr. Oestreich,

16      assistant superintendent.

17          MS. MADDOX:   That's all I have.

18  BY MR. MANNA:

19  Q   Dr. Beresford, did you also review this

20      documentation submitted by your counsel or

21      Ms. Maddox?

22  A   I reviewed documentation from counsel and

23      Dr. Oestreich.

24          MR. MANNA:   Thank you, sir.   Mr. Mayes?

25      Ms. Maddox?

1        MR. MAYES:  Nothing further.

2        MS. MADDOX:  Nothing further.

3        MR. MANNA:  Thank you, Doctor.  Counsel, are

4    we at the conclusion?

5        MR. MAYES:  We are at the end.

6        MR. MANNA:  Clarifications.  Board members,

7    anything else?  We tried to ask questions as we go.

8    Anything else?  If we could, a brief summary by

9    Administration.

10        MR. MAYES:  Sure.  The four reasons presented

11    in the principal's preliminary decision for

12    contract cancellation, these are four of the

13    enumerated statutory reasons for contract

14    cancellation:  Insubordination, incompetence,

15    neglect of duty, other good and just cause.

16    Tonight we heard testimony of the documented

17    shortcomings by Mrs. Stringham that demonstrate the

18    incompetence, neglect in her duty as a counselor,

19    and other cause to justify ending her employment.

20        At the end of the 2019/2020 school year, her

21    evaluation stated that there were significant

22    concerns regarding her performance.  She knew that.

23    She started the year in 2020 on an improvement

24    plan, an improvement plan that began before her

25    September 1 complaint.  Had no relation; was not in

1   response to any complaint.  They were working on

2   that unbeknownst to her over the summer.  The

3   complaint revealed no evidence of discrimination.

4   Most of the individuals interviewed didn't even

5   know she was Hispanic.

6        There isn't anything in here in this huge

7   thick binder of information that they've provided

8   showing evidence of discrimination based on her

9   ethnicity.  Similarly, the statements as to sexual

10  orientation don't jive with the facts.  Mrs. Cole,

11  knowing her sexual orientation, gave her four

12  consecutive years the highest rating.

13  Mrs. Stringham even acknowledged in 2019 to a

14  coworker in her own notes that she didn't feel like

15  she was being targeted.  So what changed?

16       Documents here show Mrs. Stringham's attention

17  to detail, her knowledge of what it takes to be a

18  counselor, her understanding of graduation

19  requirements, and her professionalism in responding

20  to her supervisor, that's what changed.  That's

21  what changed.  The artifact uploads, those came to

22  help her, to help her understand more of the

23  shortcomings.  That didn't help.  The meetings

24  didn't help.  She didn't respond well to those

25  meetings.  It wasn't working.

```
 1        In January the straw that broke the camel's
 2   back, she wanted a form signed.  You heard from
 3   Mrs. Cole.  There was no way she was going to sign
 4   something where she couldn't attest to what the
 5   form was asking her to attest to, a state form.
 6   Mrs. Stringham went ballistic, completely
 7   unprofessional.  And that --
 8        MS. MADDOX:  I'm going to object to the word
 9   "ballistic."  No one testified that Mrs. Stringham
10   went, quote, ballistic.  So we would object to
11   using that language.
12        MR. MANNA:  I understand.  This is our
13   closing, for lack of a better word, and we'll just
14   make sure the board is aware of making sure you
15   check the record on what was testified to in terms
16   of her behavior.
17        MR. MAYES:  Thank you.  That came after being
18   told by Dr. Oestreich, here's the concerns we have.
19   If you want to discuss this, discuss it with me.
20   Unhappy with that, she decided to take it up
21   contrary to what Dr. Oestreich told her, again,
22   constituting insubordination and even in that
23   meeting.  Rachel Cole told her, I'm done.  We're
24   done.  Go on.  She didn't stop.  She didn't follow
25   the direct command of her supervisor and persisted.
```

1    So Mrs. Stringham's response:  Brush it all
2  aside.  Pay no attention to the false information
3  that she's giving to students about graduation
4  requirements.  Don't pay any attention to the three
5  students that didn't graduate.  None of that
6  matters.  It's all because she's the only Hispanic
7  that nobody knew was Hispanic and all because of
8  her sexual orientation.  The evidence shows that is
9  not true because Rachel Cole knew all that
10  information when she gave her high ratings.
11    If she would have discriminated against her
12  because of sexual orientation, why wouldn't she
13  have done it earlier?  Also, why would they be
14  retaliating against her because of the complaint?
15  Dr. Oestreich, who investigated the complaint,
16  overruled the building's decision to give her a
17  needs improvement and said, no, we need to give her
18  more of a runway.  We need to do more to make sure
19  we can salvage this employee's career.  If he had
20  it out for her, why not intervene then?  Why not
21  just let her go with the needs improvement?
22    It's because they were doing the right thing.
23  They were trying to give her a chance.  They gave
24  her multiple chances.  And in the end, all the help
25  didn't help.  The students need counselors to help

 1   them.  She wasn't giving that help.  Remember the

 2   two questions that I asked you at the outset of

 3   this.  Who gave good evaluations in 2017 to 2020?

 4   Mrs. Cole.  Did concerns surface long before she

 5   filed complaints of discrimination?  Yes.

 6        You can look at June 2020.  She got

 7   notification that there were serious concerns about

 8   her performance.  This was before her September 1

 9   complaint that came six months after she said she

10   started experiencing harassment.  In the end the

11   board should be proud at how the administration

12   handled this situation.  There's no rush to

13   judgment here.  This is years of work working with

14   an employee trying to get the employee on the right

15   track, bending over backwards, two improvement

16   plans, multiple meetings with them, only to not

17   have it be a success.

18        And now after all of that, they have to bring

19   it to you.  So she's alienated her support along

20   the way.  No one here heard from the association

21   tonight.  Anybody who supported her in the past has

22   not supported her here tonight.  Her supervisor,

23   who previously gave her high ratings, not

24   supporting her.  Dr. Harmas, not supporting her.

25   Her assistant principal, not supporting her.  And

1   neither is Dr. Oestreich and Dr. Beresford.  As a

2   result, Dr. Beresford believes contract

3   cancellation is all we have left with here and that

4   the board should support that recommendation.

5   Thank you.

6           MR. MANNA:  Thank you, sir.

7           Ms. Maddox?

8           MS. MADDOX:  Mr. Mayes made a big deal about

9   in all of these documents there's no evidence of

10  discrimination.  The burden is not on us.  The

11  burden is on the administration to show why

12  Mrs. Stringham's contract should be canceled.  At

13  this point in proceedings, it's not our burden to

14  show she was definitively discriminated against on

15  the basis of her sexual orientation or the basis of

16  her race.  The burden is on them to show why her

17  contract should be canceled, and they failed in

18  that burden.

19          The findings that we will submit next week

20  will show even more so that they failed in that

21  burden.  Mr. Mayes made much about the association

22  is not here.  Her supporters aren't here.  I would

23  love to be able to subpoena individuals to have

24  them here to testify.  I don't have that power.

25  That power was taken away from teachers back in

```
 1   2011.  Who we have here is who we have here, who we
 2   requested to voluntarily show.  We can't even
 3   request individual school employees be here.
 4        So who isn't here shouldn't be held against
 5   Mrs. Stringham because she doesn't have the ability
 6   to force people to come.  But the evidence did show
 7   that Mrs. Stringham is the only nonwhite counselor.
 8   She's the only homosexual counselor.  She's the
 9   only counselor to receive improvement plans,
10   multiple improvement plans.  She's the only
11   counselor to have 60-plus artifacts where others
12   maybe had two.  She's the only one to receive
13   negative feedback out of all the counselors.
14        Based on that, we believe -- and to the
15   administration's point of we got these great
16   reviews back in '17, '18, but why don't we have
17   them now?  People's beliefs change.  People change.
18   Political beliefs change.  The political climate
19   changes.  People can change.  That may have
20   happened here.  But, again, the burden is on the
21   administration.  So we request that
22   Mrs. Stringham's contract not be canceled.  Thank
23   you.
24        THE COURT:  Thank you, Mr. Mayes and
25   Ms. Maddox, for working professionally and
```

1   cooperatively as we've set up tonight's meeting.  A

2   couple of things as housekeeping.  We did have a

3   conversation between the attorneys about having a

4   rough draft from our court reporter that will come

5   to my office and then go to the attorneys tomorrow.

6        And then we set a Wednesday, March 23, at noon

7   deadline for Mr. Mayes and Ms. Maddox to submit

8   proposed findings to my office.  The board will

9   reconvene on the 28th of March for a vote on the

10  determination.  I will remind the board, as I said

11  at the beginning, the standard is preponderance of

12  the evidence, as the counsel all agreed.

13       Again, we are in a different type of setting.

14  We're not in a trial setting.  However, from the

15  Indiana Model Civil Jury Instructions,

16  preponderance is the evidence that convinces you

17  more strongly of its truthfulness.  It is evidence

18  that convinces you that something is more probable

19  true than not true.

20       Thank you, everyone, thank you to our court

21  reporter, and we will adjourn.

22       (The hearing was concluded at 9:40 p.m.)

23

24

25

```
 1   STATE OF INDIANA

 2   COUNTY OF HAMILTON

 3          I, Regina E. Moss, a Notary Public in and for

 4   said county and state, do hereby certify that the

 5   foregoing hearing was taken at the time and place

 6   heretofore mentioned between 5:30 p.m. and 9:40 p.m.;

 7          That said hearing was taken down in stenograph

 8   notes and afterwards reduced to typewriting under my

 9   direction; and that the typewritten transcript is a

10   true record of the testimony given;

11          I do further certify that I am a disinterested

12   person in this cause of action; that I am not a

13   relative of the attorneys for any of the parties.

14          IN WITNESS WHEREOF, I have hereunto set my

15   hand and affixed my notarial seal this 29th day of

16   March, 2022.

17

18

19

20   My Commission expires:
     November 8, 2029

21

22   Job No. 170579

23

24

25
```

*Regina E. Moss*

Regina E. Moss
NOTARY PUBLIC SEAL
STATE OF INDIANA
Commission No. NP064817
My Commission Expires Nov. 8, 2029

Index: 1..60-plus

---

**1**

**1**  6:25 8:10 24:19 25:7 26:18 37:19 48:4,7 56:6 59:9,16 60:19, 21,24 61:21 66:14 80:5 82:10 94:18 97:16,25 101:17 102:5,9, 11,19 105:15,17 106:6 108:21,23 126:2 129:4,5,18 130:5 161:25

**1(a)**  25:9

**10**  7:7 24:25 48:11 85:2 90:7 135:19 139:6,7,10,20,21,22 140:1

**10/12**  105:5

**11**  40:25 73:8 85:11 87:23 88:5 90:7 107:6 135:1 139:7,22

**110**  139:7

**113**  139:8

**115**  139:8

**11th**  74:4

**12**  85:15 86:5,6 114:12 139:6,7, 10,20,21,22 140:1

**15**  7:1 52:2 89:17 119:7 129:10, 23,25 130:3 138:7,15,16

**15th**  128:25 129:2

**16**  114:12 138:15,16

**16/'17**  16:13 54:4,9,12 105:18 114:13,25 115:3 130:13

**17**  11:23 63:8 105:14

**17/'18**  17:1 54:19 115:5 130:20

**18**  11:23 71:24 74:4 105:8,12

**18/'19**  17:4 54:22 115:7 130:16

**19**  11:23 20:2 79:25 89:21 107:15 124:8 140:25

**19/'20**  9:24 15:1 17:5,10 18:6 19:15 21:5,11 23:25 25:20 55:2,6, 9,20 56:8,25 57:2 115:9,11,15 130:18 143:5

**1992**  79:24

---

**2**

**2**  26:21 36:10 38:2 41:12 64:8 71:2 82:3,5,17 98:14 106:6 108:18,21,23,25 126:3 152:2,6 159:9

**20**  11:23 14:10,11 47:19 113:19 116:20

**20-plus**  98:4

**2014**  85:13 104:22

**2017**  9:23 16:6,12 63:12

**2018**  9:23 49:24 63:15 106:5

**2019**  9:24 14:16 50:1 63:17 98:14 99:10 101:11 106:7 162:13

**2019/'20**  55:16

**2019/2020**  161:20

**2020**  9:24 10:8 16:19 19:24 20:2, 6,23 24:2,12,25 27:3 48:7,11 51:19 55:12 56:10 57:5 58:22 59:9,16 60:19,24 61:7,13,15,17 62:10 63:19 68:5 69:11 80:5 82:10 84:4 85:2,13 101:17 102:11 105:24 128:20 129:5,18 130:5 145:5 147:14,21 150:11 161:23

**2020/2021**  14:17 15:17,21 20:9 49:22 57:3 65:24 85:16 86:11,13

**2021**  10:8,13,18 16:20 20:23 21:4 25:21 30:11 33:5 49:9 68:5 69:15 70:6 71:18 86:21 116:22 128:21 146:8,11,15

**2021/2022**  86:16,17

**2022**  11:4 42:4 74:13,15 78:1 89:8,9 96:2 99:22 110:17 147:6, 20,23 150:6 158:22

**21**  27:3 42:4 67:16 74:13 116:20 118:18 128:20

**21/'22**  10:21 37:6 47:11 49:23 70:10 118:22

**22**  107:4 118:18

**24**  6:18 19:24 20:6 25:11 56:10 78:1

**26**  36:13 75:6 106:19 107:5 108:18,20,21 109:18 135:1

**26A**  90:4

**26B**  94:19,23 95:21

**26th**  90:23

**27**  6:8,12 77:23

**28**  6:15,22 58:22 75:2,3,11 77:23 78:4,10,20 90:16 109:21 125:10 138:17

**28th**  126:9 158:11

**29**  6:22 77:23 138:17

---

**3**

**3**  17:1 26:21 29:23 36:15 38:16 58:19 82:3,5,8,17 98:13 101:10 102:5 105:15 106:6 125:16

**30**  6:24 13:4,5 72:3,15 88:9 113:19 138:17

**300**  139:13

**31**  123:14 138:17

**330**  139:14

**340**  139:7,13

**35**  47:23 150:23

**350**  139:14

**36**  86:22,24 87:13

**360**  139:6

**37**  159:9

**38**  86:15

---

**4**

**4**  6:9,13 7:2 24:15 26:10,11,24 39:3 48:9 95:16 158:22 159:14

**4.2**  71:2,6

**41**  89:2

**48**  25:11

**4:00**  94:12

---

**5**

**5**  17:4

**504**  22:11 23:5,6,7,10

**504s**  15:8,10

---

**6**

**6**  17:4 85:11

**60**  13:4

**60-plus**  47:22 131:24 150:22

Index: 60-something..approach

**60-something** 118:24,25

**600** 135:17

**62** 124:11 138:6,8 142:12

**65-ish** 88:21

**67** 13:5

---

**7**

**7** 19:19 20:5

---

**8**

**8** 6:16 17:11 20:5 55:24,25 56:1,5
58:22 59:18 60:5 96:2

---

**9**

**9** 7:5 20:8 86:6

**9600** 46:1

---

**A**

**AA** 45:25 94:20,24

**aback** 91:10,18

**Abby** 80:16,17,19,21,22,24 82:1,
12,17 98:15,19 99:1 150:10,19,20

**ability** 156:3

**above-named** 135:5

**absence** 87:14

**absolutely** 91:21,25

**academic** 29:20 86:11,13

**academically** 21:22 38:10

**accept** 110:5

**acceptable** 76:19,21 148:20

**access** 30:16 97:18,21 103:9,13,
16 104:5

**accompanying** 119:3

**accord** 46:14

**accurately** 126:5

**accused** 61:1

**acknowledge** 19:23

**acknowledged** 152:5 162:13

**act** 152:21 153:25

**acted** 93:7

**acting** 91:6

**action** 38:14 46:14 47:2,6

**actions** 26:12 134:2

**actively** 109:13

**actual** 41:12

**adamant** 76:3 91:20

**add** 137:11

**added** 39:9,10

**addendum** 102:9

**adding** 39:18

**addition** 22:7 42:22 124:22
145:16 148:18

**additional** 141:15,17

**address** 95:3 116:6 125:3

**addressed** 98:16

**addressing** 39:20,21

**administration** 4:4,5 6:8,12,15,
22,24 7:10 8:13,20 11:11 12:16
15:6 16:3 22:20 24:10 32:24
51:18 56:6 71:14 90:3,4 94:19,23
95:21 98:2 107:5 108:18,21 159:8
161:9

**Administration's** 13:14

**administrative** 22:4 23:15,23
29:21 94:16,17 95:14 127:18

**administrator** 77:23 155:5

**administrators** 21:18,19 29:16
30:3

**admitted** 7:11 78:15 83:18

**adult** 128:7

**advance** 5:15

**advocating** 123:8

**affecting** 131:10 148:15

**affects** 142:12

**affirm** 12:5

**agenda** 119:25 120:2

**aggressive** 92:7

**agree** 6:1 85:7,9 86:7 90:10

**agreed** 7:6,12 36:1,3

**agreeing** 142:17

**agreement** 7:7

**agreements** 46:15

**ahead** 4:18 6:7 7:10 13:23 77:7
82:16 153:19

**alienated** 11:20

**allegations** 147:19,20,23

**allege** 62:2 63:4

**alleged** 145:8

**allegedly** 146:2

**alleges** 128:10 130:8

**alleging** 61:22 65:14

**alleviate** 124:19

**alongside** 37:9

**alpha** 139:9

**alphabet** 139:11

**alternative** 32:15

**altogether** 14:9

**Aly** 140:2

**ambiguous** 65:18

**amount** 30:24 42:11

**analysis** 15:23

**Andrew** 4:1

**angry** 33:21 43:14 50:23 105:24
106:8 112:2 141:1

**animated** 128:3

**anxiety** 87:17

**APIB** 120:21

**apologize** 94:22

**applicant** 108:6 135:5

**application** 100:13,21,24 110:16
120:19 121:3,14

**apply** 106:25

**approach** 9:11 26:19 38:8,12
116:18

CCS  00785

**appropriately** 122:16

**approval** 123:5

**approximate** 128:17

**approximately** 61:14 88:21

**April** 61:17 99:10

**archaeology** 40:12

**area** 140:22

**areas** 17:21,25 18:25 19:1 21:6 26:5,17 40:22 115:22 116:6

**arrived** 114:23

**artifact** 40:12,15,16 41:1,11,20 42:12 50:9 87:10 119:3 120:16 121:25 124:22 137:6,19 155:22, 25 162:21

**artifacts** 40:9 42:5,22 47:9,10, 11,22 49:23 50:16 73:1 87:1,5,13 88:6,21 103:17 104:6 118:19 124:11 131:20,24 132:8 136:20 137:3,5,11,12,23 138:2,4,6,20 141:17 142:12,22 144:7 146:21 150:22 155:2,8,12,19 156:3

**aspect** 50:12

**assessment** 65:2,20

**assigned** 23:8 40:2 147:14 149:22

**assistance** 155:6

**assistant** 9:10 14:4 15:7 23:15, 23 127:19 144:23 145:1 146:18 147:14 149:5 160:16

**associate** 4:13 49:2

**association** 25:5 67:2,5,17 72:17

**assume** 121:13

**Assuming** 95:7

**ASVAB** 56:14 123:10,11,12,16 124:1

**attachment** 102:8,11

**attempt** 95:11

**attend** 159:24

**attendance** 15:8,10 22:20

**attended** 159:25

**attention** 57:6,9,12,14 162:16

**attest** 163:4,5

**attorney** 57:18 58:5,12,14,15,18, 25 59:2,8,14,16,25 60:2,8,12,13, 14,17,18

**attorney-client** 60:3

**attorneys** 58:8 59:11 112:11

**audit** 28:9 134:4

**audited** 133:8

**auditing** 28:10

**audits** 133:11,20

**August** 49:10 57:17 58:4,22 59:1 72:3,15 104:22 107:1,3 110:17 116:9,11 119:7

**average** 131:20

**aware** 28:22 43:15 49:19 52:4 70:1,15 79:14 98:7 132:13 163:14

---

**B**

---

**B(ii)** 25:10

**B-E-R-E-S-F-O-R-D** 157:1

**B-O-R-T-O** 14:2

**back** 7:2 11:4 15:21,24 16:20 17:25 18:11 24:19 26:12 30:11 31:15 34:10,24,25 35:11 42:12 44:15 52:25 53:8 57:3 58:3 63:1 69:12 74:15 77:22 90:16,21 108:18 113:22 115:18 116:10 121:25 129:18 159:16 163:2

**background** 103:9 149:3

**ball** 149:21

**ballistic** 163:6,9,10

**ballpark** 14:24 118:22

**Barsten** 140:1

**based** 12:22 13:10,11 40:9,10 81:3,4 146:23 150:14 158:2 162:8

**basic** 135:19

**basically** 36:2

**BB** 159:9

**Becky** 140:3

**began** 9:25 105:1 161:24

**begin** 116:7

**beginning** 94:17,18 102:18 104:22 152:1

**behalf** 8:19 78:21

**behave** 46:12 154:2

**behavior** 46:2,19,20 95:4 148:19 151:8 158:12 163:16

**believed** 95:7

**belonged** 113:11

**benefit** 143:16

**Beresford** 4:9,24 6:15 8:19 12:2 76:24 79:5,8 96:20 100:10 156:14,16,21,24 157:1,3 159:8,17 160:19

**Beresford's** 12:5 78:25

**Bettina** 103:4 140:2

**Betz** 12:11

**bias** 5:19

**big** 22:15 60:21 85:12 108:20 129:4

**Bigbluebutton** 143:12

**biggest** 38:7

**binder** 16:1,2 48:4 55:24 58:19 60:21 64:7 65:23 85:12 98:13 108:20 117:4 119:2 129:4 134:22 138:10 159:9 162:7

**binders** 137:2 138:7

**biology** 114:18

**bit** 6:10 21:25 22:3 30:24 127:1 149:22

**black** 134:22

**blame** 11:18

**blamed** 84:15,17

**blank** 103:7

**Blevins** 12:11

**blood** 87:16,19

**board** 4:3 5:9,15,16,21,22 6:2,20 7:1 8:9 15:2 16:1 20:12 21:14 22:12 25:16 26:14 27:8 28:4 33:17 35:24 36:8 38:19 39:8,24 40:14 44:25 45:25 46:25 53:20 68:14 73:14,15 77:7,11 78:5,11, 21 80:24,25 81:2 83:18 87:6 90:1 91:13 92:9,18 96:1,6,10 102:6

stud

**classes**  9:16 31:14 89:10,12,13

**classified**  155:6

**Clay**  4:2 45:22 47:19 94:24
135:10 144:24 151:4 156:24

**CLC**  84:8

**clean**  111:8

**cleaned**  43:24

**cleaning**  52:23

**clear**  47:3,5 107:22 112:17

**click**  41:4

**client**  4:12 12:12

**closing**  163:13

**coaching**  131:2

**Code**  46:16

**cohort**  84:7

**Cole**  4:22 9:8,21 13:3,12 16:10
20:1,15 21:5 25:2 26:25 30:2
32:19 39:17 40:3 41:25 42:20
45:20 49:1,20 54:3,9,22 55:3,6,20
57:6 61:2,4 62:7,22 63:7,10 64:24
65:2 67:6,21 68:22 71:15 74:17,
24 75:12,15 80:7,11,19 81:6,8
83:10,14 85:5,18 90:8,14,18
92:10 94:9 96:17 97:2,8,14,19,22
98:20 99:5 101:22 102:15 103:8
104:24,25 105:20,24 109:24
110:13,20,24 113:24 114:4,7
131:17 134:8,20 137:21 138:19
141:9 142:22 144:13 146:2,15
148:20 149:17 150:13 162:10
163:3,23

**Cole's**  62:17 84:20 92:7 105:19
109:20

**collaboration**  29:11 35:5

**colleague**  54:6

**college**  120:18 131:19

**comfortable**  91:14,23 125:25
127:4 143:13

**command**  163:25

**comment**  42:1 56:7 146:1
150:18,19

**commenting**  17:17

**comments**  17:12 18:22 83:15
144:5 146:25 154:21 155:14

**communicate**  39:25 121:9

**communicated**  22:19 40:15

**communicating**  71:3

**communication**  17:20,24 18:14
25:8 39:4 40:18 59:7 66:14
115:19 131:7 141:1

**communications**  26:19 52:11
55:17 58:9 97:18,21

**compared**  147:20

**compilation**  16:2

**complaint**  12:24 48:1 51:20,22,
24 52:1,4 59:9 60:22 61:15,17,21,
25 62:10,18 74:12 80:2,6 82:9
85:4 88:19 97:9,15 99:21 102:8,
12 105:23 128:22,24 129:6,11,19,
24 145:5,12,14,16 147:7,8,9,11,
12,16,17 161:25 162:1,3

**complaints**  11:25 88:12,22 98:6
128:14 132:10,15 145:2 148:6

**complete**  20:2 27:21

**completed**  107:13,15,24 109:8

**completely**  158:11 163:6

**completing**  132:22

**completion**  135:7

**compliant**  130:3

**computer**  91:1,2 94:1 113:9

**computers**  113:3

**concern**  17:20,24 18:25 22:15
40:21 124:4 125:5 137:19 138:3

**concerned**  19:4 30:25 55:6,13
69:4 112:21 113:12 132:17

**concerns**  11:24,25 18:14 23:9,
10,24 25:19 38:7 39:12 40:7,8
55:17 67:25 80:19 81:6,7,16,18,
22,24 115:12,15 116:5,23 122:24
124:19 125:19 126:5 129:14
132:22 136:22,24 137:13 140:21
141:15 142:24 147:1 150:13,16
154:10,19 155:25 161:22 163:18

**conclusion**  12:4 77:10 79:7,11
81:2 145:17,19 148:2 161:4

**conclusions**  145:24 148:1

**Conduct**  46:16

**conducted**  136:10 146:15

**conference**  5:9 6:17,20,21 7:1
76:24 77:12,19,25 78:5,11,17,21
95:23 96:1,5,6,10 100:10 157:10,
13,17,19

**conference/meeting**  6:14

**conferences**  22:11 23:16,21,23

**confirm**  138:15

**confirmation**  100:16

**confirming**  76:1

**confused**  75:19 76:6,11 93:11

**connect**  25:22

**connected**  100:10

**connecting**  22:25

**consecutive**  55:2 63:21 67:20
99:6 162:12

**conservative**  64:18

**considered**  42:7,8 93:17

**consistent**  133:23

**constantly**  124:20

**constituted**  46:20

**constitutes**  155:13

**constituting**  163:22

**contact**  75:6 110:9

**contained**  82:12 89:2 151:16

**context**  23:9

**continually**  148:14

**continue**  19:2 39:1 43:10 150:4
153:3

**continued**  8:5 10:20 149:21
153:1

**continuing**  43:12 44:19 73:7
113:1 141:7 144:2 160:6

**contract**  4:5 7:23 8:4,12 11:12
12:7,17 13:7 39:2 43:11 46:23
95:17 96:14 130:23 142:17 148:4,
9 157:23 158:19 161:12,13

**contracted**  49:7,8

**contrary**  163:21

**conversation**  27:24 28:23
58:13,18 76:9 78:14 92:4 93:18,

20 94:5,6 110:22,23 118:14,15
154:8

**conversations** 10:23 30:4 69:9
105:9 125:2 131:1 146:19 154:6

**convey** 19:10

**conveyed** 19:16

**Cool** 103:4 140:2

**Coover** 147:14

**copied** 42:17 119:16 126:1,22
138:20,24 141:11

**copy** 7:22,24,25 8:1,10 39:16

**corner** 16:4 56:2

**correct** 7:11,15 9:19 15:19
16:17,18 17:8,9,15 18:9,12 19:24
20:10 30:7 35:5 42:15,17 47:20
48:23 49:13 50:20 52:7 54:4,5,7,
15,16 55:4,5 56:8 57:3 62:4 63:23
65:5 68:5 70:10,13,20,21 73:7
74:13,14 81:11 85:2 88:13 89:3
96:11,12,15,16,23 97:3,19,20,25
99:4,6 100:12,14,15,17,18 101:2,
13,14,15,23 106:15 109:5,11,25
114:14,24 117:24 118:20 120:8,
13 121:5 122:3,6 124:4,12,15
131:25 136:14,15 137:1 143:4
145:6,7,10 146:9,10 147:5 149:24
157:5,7,8,11,21,23,24

**correctly** 110:11 133:9 136:20

**correspondence** 39:5,19 77:16
121:18

**counsel** 4:2 5:14 7:12 78:20
105:16 141:4 149:9 156:9 159:24,
25 160:1,15,20,22 161:3

**counseling** 9:9,12 12:19 14:6
22:5 25:3 27:1,10,16 44:10 45:9
51:10 63:8 89:19 107:17 114:8,23
124:17 135:19,24 140:13,15
142:4

**counselor** 8:21,24 9:5 12:13
14:22 19:5,10,13 22:7 31:6,19
32:24 33:3 34:1 35:22 44:1 45:3
51:11 53:25 55:7,14 64:25 76:2,8,
20 79:25 89:25 91:6 93:7,13
108:1 109:13,14 111:18 114:11,
18 120:13 123:6 124:8 125:4
127:18 131:18,19,22 134:2,4,12,
15 139:5,15,21,22 142:11 143:7
148:18 149:23 153:4 155:17
161:18 162:18

**counselors** 9:1,7 14:14 15:5,11,
13,15 16:19 18:19,23 21:18,19,20
22:1,17 23:14 25:23,24 28:5,8
29:16,17 31:23 32:18 35:5 38:8
56:17 65:5,7 70:1,15 79:15 84:23
102:20 103:1,21,25 104:2,3,9,15
112:16 117:1,19 119:22 127:11
131:17,21 132:1,4 133:10 134:10
136:19 137:9,10 139:6,10,16,19,
24 140:8,14 141:23 142:6 143:11
144:4,8 153:2 155:3,18

**counselors'** 103:14 104:19

**couple** 5:23 19:3 72:20 84:11
123:18 126:11 150:9 154:14
157:2

**courses** 27:18,22 28:12 29:8
30:22 31:10 32:12 120:22

**court** 5:1 13:19,25 53:14,19
113:25 114:5 144:17,22 156:17,
22

**courteous** 95:6,9

**cover** 41:11,15 120:2

**covering** 140:5

**COVID** 10:3,4,5 21:17 111:15
143:8

**coworker** 114:22 162:14

**cracks** 9:20 10:15 28:7 34:22
68:3 70:4 124:18

**create** 152:11

**creating** 116:13

**creative** 118:10

**credit** 115:17 133:8

**credits** 84:9,11 131:5 133:8

**cried** 73:13

**criteria** 135:8

**cross** 153:10

**CROSS-EXAMINATION** 47:16
79:20 131:15 149:1 158:15 160:6

**cry** 51:4

**crying** 73:23 111:25

**CTA** 25:4 40:4

**current** 14:3,8 15:6 25:12 27:18
139:23

**cut** 43:25 44:2,5,8 52:19 74:6
111:4

**D**

**D-I-A-N-N-A** 53:22

**Danubio** 140:3

**data** 22:20 143:12

**date** 7:1,6 24:19 44:17 48:2,6
61:7 72:13 77:24 78:4,9,10,17,20
80:4 106:5 125:15

**dates** 19:20,21 24:16 58:9 59:10,
24 66:21 71:17,20 78:7 100:16

**Dave** 139:25 140:2

**day** 11:15 88:10 91:19 107:19
117:18

**days** 13:4,5 47:23 77:11 110:2
126:11 150:23

**DC** 26:24

**DD** 78:3

**deadline** 23:16,17 106:22,25

**deadlines** 71:9

**dealing** 11:5 74:17 98:15

**dealt** 66:14

**December** 114:10

**decided** 96:7 163:20

**decision** 6:23 88:18 152:9,24
154:18 157:14 161:11

**decorum** 94:25 151:11 153:24

**defense** 152:11

**define** 57:10

**defined** 108:13

**degree** 89:19 107:16

**DEI** 149:10

**demonstrate** 161:17

**denied** 146:4

**depart** 5:3

**department** 9:12 12:19 14:23
15:4 26:25 30:2 43:20 51:11
62:25 80:9 111:1 114:23 115:21
119:17,21,24 123:1,4 129:17

**depending** 96:7 139:14

**depressed** 87:18

**derogatory** 83:14

**describe** 15:2 92:7 106:7

**deserve** 11:16

**deserved** 131:5

**desk** 40:6 45:12,13 75:2 91:2 92:10,11 93:21 127:23

**detail** 162:17

**detailed** 125:24

**determination** 148:7

**determine** 38:25 87:7

**determined** 31:21

**devastating** 34:5

**develop** 135:19

**development** 76:7

**Dianna** 4:5,12,25 8:23 12:12 14:18 21:6 22:23 23:11 25:3 39:16 40:3 43:24 45:6,10,12,17 53:11,13,21 74:11 98:20,21,22 145:22 146:3,16

**Dianna's** 22:15 23:20

**differently** 82:25 98:22 101:13

**difficult** 119:10

**diploma** 27:14 84:13,14,15

**direct** 9:22 13:21 45:19 53:16 114:2 144:19 156:19 163:25

**directed** 11:7

**directive** 75:11 78:13

**directly** 49:20 75:7 110:9 160:12,13

**director** 9:8 25:3 27:1 32:20 63:8 102:21 105:4 114:7,13 124:17 132:11,12 147:15 149:4

**disagree** 68:9 85:21,23 152:7

**disciplinary** 46:14 47:2 50:19 67:9

**discipline** 37:11 95:12,20

**disclosed** 36:5

**discontinuance** 95:16

**discover** 39:11

**discriminated** 12:21 13:10 62:2 63:4

**discriminates** 62:22

**discriminating** 61:5 150:14

**discrimination** 12:25 48:1,3,5 61:12,22 74:12 81:3 88:13,16,19, 23 98:7 145:2,9,19,20,23,25 162:3,8

**discuss** 5:5 22:18,23,24 40:5 58:2,7 68:10,11 74:25 75:12 78:13 116:4 136:4 140:17 152:12 160:11,12,13 163:19

**discussed** 5:10,24 7:4,8 37:23 48:10,13 49:11 50:22 68:7 70:20, 25 83:21 117:10 136:6 150:6 160:15

**discusses** 82:4

**discussing** 29:4 43:8

**discussion** 4:15 7:3 75:1,7 110:10 140:16 152:15

**discussions** 142:4

**disheartened** 57:16

**dismissed** 122:22

**dispute** 60:1

**disruptive** 46:2,13 95:3,8

**distinguish** 50:8

**distinguished** 50:6

**district** 99:22 126:13,15 148:16 149:9,10,13 154:11 155:2

**diversity** 140:7

**Doctor** 159:5 161:3

**document** 19:24 20:2 58:20 60:6 79:7 82:16 83:18 102:7,18 104:21 107:6 125:22,24 151:25 152:4,5 159:16,19

**documentation** 10:23,25 146:21 160:20,22

**documented** 40:8 125:8 135:22 161:16

**documents** 7:11 70:23 85:25 92:22 93:2 162:16

**door** 45:4 90:24 106:2,8 110:20

127:17 141:2

**doubt** 62:11,20 97:2,7,14 143:16 157:13

**draft** 49:4

**drafted** 48:25

**draftings** 48:22

**drawing** 103:6

**drip** 58:25

**drop** 121:12

**dropped** 20:23,25

**dropping** 149:21

**drown** 51:12 112:7

**due** 21:17 151:19 152:20 154:9

**duly** 13:19 53:14 113:25 144:17 156:17

**duty** 161:15,18

**E**

**earlier** 12:10 23:25 35:1 58:11 86:25 87:4 98:16 102:6 106:12 109:23 132:20 150:18 152:3 153:9

**early** 24:2 74:13 99:22

**earned** 89:18,21

**education** 14:11 79:23 89:20 93:14 114:15

**educational** 148:23

**EE** 159:16,19

**EEOC** 88:25 89:5

**effect** 24:12 67:17

**effective** 12:14,15 13:7,8 16:17 17:7 20:19,20,25 21:2,3 54:14,17, 25 55:1,4 85:10,24 86:1,9 115:4 146:24 147:3 150:3

**efficiency** 5:10 108:3

**efforts** 32:23

**electronic** 19:23

**email** 6:25 17:19,24 18:14 31:7 32:18 33:7,18 38:14 39:5 40:17, 18,19 41:13,16,22 42:2,14,17,25 55:17 56:19 71:25 74:22 75:6,10

90:22 106:19,20 108:19,25 109:1,
3 110:12 119:4 121:17 122:8
126:1,11,16,23 141:14

**emailed** 37:2 74:20

**emails** 39:17,18 40:7 115:19
138:20,25 141:11 142:24 143:2

**Emily** 103:4 140:4

**employee** 12:20 15:22 17:15
40:15 41:1,15 45:22 46:15 65:12
66:9 93:6 111:4 155:12

**employees** 19:8 46:12 65:8
84:17 100:19 110:25 112:16
143:9 145:2 151:4 154:24 155:1

**employment** 8:21 45:23 100:17
152:10 161:19

**emptied** 74:1,3

**encounter** 11:8

**encountered** 18:3

**encourage** 154:17

**encouraged** 154:23

**end** 8:21 9:6 11:14 12:2 17:10
19:18 26:10 28:5 31:4 32:1,8
33:5,12,14 44:13 49:10 55:9 57:2,
17 58:4 59:1 68:4 69:11 73:4
74:12 93:24 107:1,3 133:7 137:16
140:17 142:4 146:11,15 161:5,20

**ended** 18:5 96:22 123:2 127:20

**ending** 16:6,12 161:19

**ends** 32:8

**energy** 131:9

**English** 14:22 15:4

**enhance** 141:11

**ENL** 122:9 123:3

**enrolled** 69:9

**ensure** 29:8

**ensuring** 27:16 148:17

**entered** 59:22 131:21

**entire** 32:23

**enumerated** 161:13

**envelope** 94:15

**ergonomic** 113:6

**error** 40:22 105:16 132:8

**errors** 80:10 84:21,24 132:4,6
133:10,19,20,23 134:5 148:13
149:21 153:4 158:7,9

**ESC** 129:16

**escalate** 126:25

**escalated** 127:1

**escalates** 126:24

**essentially** 117:22

**ethnicity** 12:23 13:11 62:3,23
97:4,9,11,15,19,22 103:10
128:11,12 162:9

**evaluate** 148:3

**evaluated** 143:7 146:22,24
154:22 155:7

**evaluating** 115:1

**evaluation** 15:20 16:6,14 17:10,
14 18:8,22 20:10,13,14,18 21:5
39:25 50:17,19 56:8 73:2 85:15
105:18 137:18 142:13 143:6,21
146:12,16 147:4 149:16 155:4
161:21

**evaluations** 11:22,24 12:15 13:8
15:14,22,25 16:21 18:7 85:12
140:18 143:19 155:9

**evaluator** 16:10 17:11,17 18:21
54:10 55:13 56:7 105:19 155:17,
20,24

**evaluators** 154:17

**Evans** 4:8 8:18

**evening** 4:1,3,7,11,15,17 5:9,12,
17 7:5,8 8:15,25 35:25 152:3

**event** 79:8 155:5

**everybody's** 118:6

**evidence** 6:3 8:19 10:7,12 11:19,
22 13:8,15 40:16,23 42:8 50:7,10
62:19 63:2 81:1,4 87:1 90:2
104:14 145:20,25 146:5 147:23
149:24,25 150:1,17 154:17 162:3,
8

**evident** 22:25

**exact** 77:24 106:5

**EXAMINATION** 13:21 51:16
53:16 98:11 113:1 114:2 133:17

141:7 144:19 156:19

**examine** 153:10

**examined** 13:20 53:15 114:1
144:18 156:18

**examples** 25:19 66:17,21,24
124:11,16 133:3

**exceedingly** 154:20

**exchange** 7:6 60:6

**executed** 159:21

**exhausting** 124:20

**exhibit** 6:11,12,15 7:23 8:2,7,9,
10 16:23 56:6 59:22 71:24 78:14
82:3,5,8,17 83:7 85:11,15 86:5,6
89:2 90:4 94:19,23 95:21 101:10,
17 102:4,5,7,9 105:15,17 106:6
107:5 108:18,21 123:9 126:2
135:1 138:5 151:23 152:1 153:9
159:9

**exhibited** 148:19

**exhibits** 5:10 16:3 24:11 102:4
152:18

**exists** 107:20

**expect** 124:8 153:2

**expectation** 22:17 23:13,14 38:8
120:3

**expectations** 19:13 25:10,15,22,
23 26:2,7 37:8 66:17,21,24
149:23

**expected** 28:8 31:23 32:18,21

**expedite** 138:12

**experience** 45:21 149:7

**experienced** 61:12

**experiences** 21:14

**explain** 22:12 25:16 26:11,13
39:24 40:13 46:25 48:14 68:2
91:22 93:4 120:17 122:7 148:12
157:25

**explained** 91:4,11 92:22 109:3,
16,25 110:1

**explanation** 42:1 90:20 106:13
109:17 110:3,6

**explicit** 26:8

**extended** 20:14,21 70:9

**extent** 58:11 104:13 153:13

**eyes** 148:20

---

**F**

**F-A-R-I-A-S** 53:22

**face-to-face** 38:23

**Facebook** 64:12

**facing** 13:6 15:20

**fact** 55:16 63:21 75:24 76:6 79:11 102:21 145:21 154:9

**facts** 25:9,15,18 162:10

**faculty** 136:10,12

**fail** 134:1

**failed** 30:23 70:2 134:11

**failing** 30:22 31:9

**fails** 32:10,11

**fair** 65:20 147:12

**faith** 5:17

**fall** 9:20 10:15 28:6,24 32:22 44:13 69:4 70:3 86:10,21 128:19, 20 151:8

**fallen** 124:18

**falls** 153:1

**familiar** 159:11

**families** 9:12 23:1 26:4 34:6 55:21 71:3

**family** 30:4 136:4 139:12

**Farias** 53:21

**fast-forward** 27:7 116:22 125:9 147:6

**father** 68:25

**February** 6:9,13,16,18,22 78:1,4, 10,20 94:18 95:16 96:2 106:7 140:24 158:22 159:14

**fed** 58:4

**feedback** 22:21 31:24,25 72:10, 23 125:1 140:19,20,25 141:25 142:2,6,8,13,18 143:2

**feel** 5:16 91:23 125:22,25 131:3 150:1 162:14

**fell** 34:21 68:3

**fellow** 102:20 103:1

**felt** 77:3 80:7 99:19 122:22 131:7, 8 135:13

**Fifteen** 131:18

**file** 50:15 61:15,17 80:6 98:6 103:17,24 104:5,6

**filed** 11:25 12:24 48:1 51:20 60:22 61:21 62:9,18 74:12 80:1 82:10 85:4 88:12,25 89:5 97:9,15 99:21 100:5 128:14,22,24 129:5, 11,18,24 130:4

**files** 103:14 104:19,20

**filing** 48:2 61:24

**filling** 109:7

**final** 17:11,17 43:7 56:7

**finally** 11:3 158:10

**find** 35:14 52:1 77:20,24 135:2 146:20

**findings** 145:18 147:18 150:6,7

**fine** 96:8 132:24

**fingers** 11:17 128:1

**fingertips** 158:24

**finish** 34:4 49:17

**five-minute** 113:21

**five-page** 145:18

**fixed** 37:4

**flavor** 119:1

**flip** 24:14 108:17

**flyer** 137:7

**focus** 27:10,11,16 31:2 33:24 60:5,6 117:2 154:10

**focused** 29:7

**focuses** 29:23

**focusing** 118:7

**folks** 4:19 158:8

**follow** 25:25 75:11 120:5 163:24

**follow-up** 23:4 47:18 51:15 72:3 96:25 98:10 100:6 101:6 112:12, 13,25 133:19 141:6,20 143:25 154:13 158:14 160:5

**follow-ups** 148:25

**form** 40:13 75:16 90:8 91:12,14 94:10 96:17 107:9,12 109:4,7,24 110:8,14 125:13,17,19 126:6,9 135:25 163:2,5

**formal** 29:14,24 147:11

**forms** 89:14,16 90:2,16,25 91:23 93:6 106:14,22 107:9 126:19 134:20,24 135:16

**forward** 7:18 11:12 19:2,14 20:8 65:22 93:13

**found** 39:13 108:22 145:20 146:5

**fourth** 10:16 43:6,7 55:2 73:4,5

**frame** 31:1 128:17

**free** 120:10

**French** 122:11

**frequent** 10:22

**freshman** 80:18 82:18 105:2,5 114:11 118:8 139:18,20,25

**front** 45:12 127:11 129:4

**frustrating** 119:12

---

**G**

**garner** 150:2

**gave** 9:22 11:22,23 12:3 54:14, 19,22 55:3 56:17 63:11,14,22 67:21 72:23 99:5 115:3 122:4 130:13 134:9 140:25 142:7 162:11

**gay** 64:3,17,25 65:4 83:1 98:23 101:12,13

**gender** 52:14

**generally** 15:1

**generated** 19:21 136:22,24

**give** 4:21 8:10,14 9:13 72:10 80:24 85:18 103:5 108:20 115:14 123:14,17 133:2,4 143:15 152:22

**giving** 82:12 109:17 124:5 142:5

**goal** 27:12

**good** 4:1,7,11,16 5:17 8:15 11:22,23 41:22 161:15

**govern** 153:22

stud

stu



CCS 00795

**machines** 111:11,16 112:6

**Maddox** 4:10,11,12,25 5:23 6:5,
18 7:15,18,19,24 12:8,9,10 13:13
47:15,17 51:14 52:9 53:2,4,9 58:7
59:3,10,21,23 60:15 77:9,22
78:14 79:6,21 81:5,7,11 82:2,7,9,
14 83:9,13 86:2,6 87:3 90:1,3
94:23 98:9 101:6,9 102:2,5 103:8
112:13,15,24 113:15,16 131:13,
14,16 133:16 136:18 138:8,11,14
141:20,22 142:20,22 143:25
144:3,10 148:25 149:2 150:25
151:14 152:7 156:11 158:14,16
159:3 160:5,7,17,21,25 161:2
163:8

**Maddox's** 60:5

**made** 43:15 52:4 77:6 88:18
132:4,6,8,10,14 133:10 137:8
146:1,2 148:14 149:21 155:15
158:6

**mailed** 84:13

**mailing** 84:15

**make** 9:18 23:16 28:6 31:21 36:6
59:12 64:5 107:22 116:17 117:19
123:13 139:3 142:11 153:3
163:14

**makers** 94:4

**makeup** 140:7

**making** 79:4 80:10 84:14,20,24
88:22 126:21 163:14

**man** 146:4

**managing** 18:3

**manila** 94:15

**Manna** 4:1,2,10,14 5:3,22 6:6
7:16,21,25 8:8 12:8,9 13:13,17
35:24 47:15 52:10,17 53:1,5,10
56:4 58:10,16 59:12,17,20 60:4,
16 77:15,21,25 78:6,12 79:9,12,
19 81:5,9,14,20 82:7,15 83:5,11,
16 86:2,25 87:4 90:1 94:22 95:1
102:3 104:16 105:15,21,22
112:11 113:15,17,21 131:13
134:8,18,19 138:10,12,18 139:3
141:4 142:21 143:24 144:11,13
151:2,21,25 152:3,22 153:19
154:12,16 156:2,8,12 159:5,7
160:4,18,24 161:3,6 163:12

**Manna's** 142:3 144:1

**manner** 39:22 46:13 95:4 155:8

**March** 6:25 7:1,2,5,7 31:4 32:2
33:12,14 37:1 61:7,13,15 69:15
99:10 101:17

**March/april** 98:14 101:11

**mark** 8:2 25:3

**marked** 20:1 85:24

**marks** 9:23

**married** 146:3,4

**master's** 89:19,22 107:16

**matter** 5:6 28:11 39:21 75:13
148:10 150:22 160:11

**matters** 7:17 17:18

**Maureen** 4:23 9:9 13:16,18 14:1

**Mayes** 4:6,7,22 5:23 6:4,18 7:14,
18,20 8:3,15,17 12:8 13:16,22
35:24 36:7 47:14 48:10 51:15,17
52:8 53:1,3,7,11,17 56:5 59:17,19
60:1,4 77:15,18,24 78:2,9 79:10,
18 80:21 81:19 82:11 96:4,25
98:10,12 101:5,10,21 102:14
104:13,17 105:14,17 112:12,25
113:2,14,18 114:3 131:12 133:18
134:7,13 136:18 138:6 141:6,8,19
144:12,14,20 148:24 151:1,22,24
152:1,3 154:15 156:10,14,20
158:13 159:4 160:24 161:1,5,10
163:17

**Mayes'** 83:17 97:6

**Mcdaniel** 49:1

**Mcdonough** 140:4

**Mckinney** 4:8 8:18

**meaning** 36:2 104:9 106:25

**means** 9:20

**media** 63:25 151:3,9,11,16,18,23
152:13,16,17,19 153:14,23 154:7,
9,13

**medical** 11:3 43:16,19,22 44:15
73:24 157:7

**meet** 14:20 21:20 23:3,16,17
24:23 28:16,23 29:16,17 32:3
40:2 58:14,15,23 100:8 116:4
157:16

**meet all** 71:8

**meeting** 19:12 22:10 24:19 25:1,
2 32:6 42:19,21,25 43:5,6,7 45:2
50:22,24 51:4 58:1 67:3 69:15,18
70:19 72:2,3,6,16,19,23 73:5
94:13,14 96:21 100:7 117:1
119:25 128:25 129:12,13 136:5
149:23 159:23 163:23

**meetings** 10:23,24 15:12 21:21
22:6,8,12,16,23 23:7,9 28:25 29:5
35:7 38:17,19 42:13,15 47:6
48:13,15,19 58:8 67:6,9,12 73:4
105:5 119:23,24 124:23 125:7
126:24 131:1 136:3 162:23,25

**member** 45:3 49:6 50:11 136:10,
12 137:22 153:13 155:6 156:6

**members** 5:16,22 16:2 35:25
36:8 153:22 154:6 161:6

**memory** 37:24 129:8

**mental** 89:13 112:9 135:24 137:8

**mention** 52:13 69:20,22,24

**mentioned** 8:16 23:5,25 24:22
33:19 34:9 35:1,8,14 36:11,22
37:1,17,21,25 42:13 44:19 47:9
65:12 70:24 75:4 92:9,17 99:22
100:9 108:17 111:11 132:17,20

**mentions** 39:5

**met** 5:8 14:21 24:25 27:17,19
28:18 33:12 38:22 48:11 52:5
57:23 58:11 71:15,18 72:9
104:22,25 105:6 130:3 137:15
145:12 146:19 158:17

**method** 41:23

**metrics** 143:6

**Michael** 4:24 156:16,24,25

**middle** 86:4 102:19 107:8 117:6
119:7 135:2

**Mikesell** 140:2

**milling** 94:2

**mind** 11:21 126:14 137:17

**minimum** 108:6,7 123:14

**minute** 91:18

**minutes** 94:12 113:19 121:15

**misinformation** 18:18 55:20
56:18

**misinterpreted** 110:7

Index: misplaced..oversaw

**misplaced** 122:11

**missed** 34:3,7

**mistaken** 7:22

**mistakes** 148:14 158:7

**Mo** 9:9 72:9 92:5 116:15

**modeling** 131:2

**Monday** 72:3 74:4 94:11

**Monica** 107:21

**month** 69:5 129:2

**months** 31:5 32:2 61:24

**motivated** 31:17

**mouse** 113:6,8

**move** 6:9 19:3 31:12 44:22 49:15
  79:13 113:3 122:18 123:3 139:19

**move-in** 69:6

**moved** 11:12 15:6 21:17 22:6
  69:6,12 114:17,20 122:14 126:12

**moving** 7:18 20:8 93:13 120:15

**multidisciplinary** 15:12 22:9
  29:22

**multiple** 121:24 131:1,2 158:4

**music** 113:8

**mutual** 7:7

---

**N**

**named** 103:19 135:4 141:23
  142:6

**names** 36:1,17 37:1 103:19
  104:3 117:6,8,10 118:10

**namesake** 74:9

**narrative** 41:21,24

**nature** 52:15

**navigate** 9:3

**needed** 21:7 26:16,23 27:21,22
  31:10,21 32:1 33:25 45:19 88:2
  89:14 107:12 109:11 110:4
  115:20 121:13 122:13,14 148:18

**negative** 99:13 140:20,23 141:25
  142:1,5,7,10,13,18,19 143:2
  144:5

**neglect** 161:15,18

**negotiated** 46:15

**NELSON** 151:7 153:20

**nervous** 122:10

**ninth** 80:17

**nodded** 90:25

**noise** 51:12 93:25 94:4 111:11,16

**non-caucasian** 62:24

**non-gay** 98:3,4,6

**nonwhite** 12:20

**normal** 94:6

**not-gay** 65:8,11

**notes** 35:7,12,15,17,19,22
  119:17,21 162:14

**notice** 95:19 151:15,17,19 152:8,
  13,18,23 158:18,22 159:1

**notification** 32:16

**notified** 41:18 56:25

**notify** 33:6

**number** 6:8,22,24 16:25 26:20
  42:4 50:22 57:13 72:19 90:7
  91:11 94:22 133:2 136:19 137:23
  148:13,15

**numerous** 154:10

---

**O**

**O-E-S-T-R-E-I-C-H** 144:25

**oath** 104:18

**object** 77:13 104:13 151:14,18
  152:15,19 163:8,10

**objection** 58:7,10 59:3 60:15
  77:9 79:6 80:21 81:19 83:17
  153:11

**objections** 5:19

**objectives** 71:3

**observation** 20:15 137:10 156:1

**observations** 20:16,17 38:17

**observe** 155:21

**observed** 155:24

**occasion** 134:23

**occur** 44:12

**occurred** 43:5 75:4 84:3 86:23
  128:18

**occurs** 41:18

**October** 73:8 74:4 129:3,21

**Oestreich** 4:23 43:20 45:18 49:3
  52:2 57:23 74:20,23 75:6 90:12,
  18,22 94:13 96:18 106:13,17,19
  108:19 109:3,16 110:1,13 126:1
  129:9 144:14,16,23 151:3 153:16
  154:24 156:9 160:15,23 163:18,
  21

**Oestreich's** 74:22 110:6

**office** 43:23,24 44:11 45:2,3,6,8,
  10,11,20 52:23 72:10 74:2,3
  82:19,20 84:20,24 90:17,21
  93:22,25 100:1 105:25 106:2
  109:20 110:14 111:5,8,12,21
  112:17 113:4 118:6 127:10 147:8

**officer** 149:10

**offices** 45:9 111:17

**official** 135:4

**oftentimes** 155:18,22

**one's** 46:6

**online** 31:13 64:18 154:3

**open** 16:1

**opening** 8:14

**opportunities** 12:3 158:4

**opportunity** 122:25 155:21

**option** 124:1

**options** 121:21,24

**order** 26:17 28:16 38:14 47:8
  77:11 152:12

**orientation** 12:22 13:11 63:5,10,
  14,22 65:15 81:4 99:8,12,15
  101:19 130:9,10,12 145:8,23,25
  150:15 162:10,11

**overheard** 94:7

**overrule** 153:12

**overruled** 59:21 60:16

**oversaw** 15:8

**oversee** 14:5

**overseeing** 23:6

**oversight** 14:13 134:16

**overturned** 147:2

---

**P**

**pages** 89:17

**paintings** 113:10,12

**paper** 111:20

**papers** 45:14,15 117:19

**paperwork** 11:5 74:17,20,24 75:1 117:15

**paragraph** 46:1,11 56:13 58:23 59:19 64:8 78:24 82:13 109:6 136:13

**Pardon** 159:18

**parent** 39:14 40:19 142:23

**parent's** 39:22

**parents** 17:25 28:22 39:12 52:12 55:18 115:20 131:7,11 132:10 136:22 143:3 144:5

**part** 36:4 68:18 71:6 123:23 135:18 137:10,17 139:1 146:17 149:9 150:10,20 155:4

**parties** 4:16 5:8,14 6:25 7:3,6,8 35:25 36:1,3

**partner** 4:7 8:17 12:11

**parts** 62:12 68:16

**pass** 27:24 121:21,22 122:2 123:16,24

**passage** 83:6

**passed** 28:19 123:15

**passing** 27:22

**past** 50:14 91:6 108:1 126:12,24 140:13,24

**pasted** 119:16

**Patane** 103:7,22

**Pathways** 121:22,23 123:12

**paying** 158:9

**Payne** 140:4

**PE** 133:8

**people** 64:6 65:17 94:8 102:16 111:21 112:7,19 113:12 143:15 145:15

**perform** 50:11

**performance** 10:7,18 18:4 19:5 22:15 24:1,6,24 27:4 38:5,20 40:16,24 42:8 44:20 47:3,5,8 50:7,10,20,21 52:5 55:7,13 58:2 63:11,15,23 65:23 66:8 67:11,25 70:7 73:6 79:15 81:17,22,24 115:12 116:7,13 138:3 140:16 141:9,12 142:25 153:1 161:22

**performing** 12:12

**period** 11:3 16:12 23:6 74:1 118:13 143:14 156:1

**periodically** 71:16,18

**permanent** 44:3 50:15

**persisted** 10:7 163:25

**person** 22:1,2 61:4 62:24 109:7 112:20

**personal** 112:21,23 113:10

**personally** 103:18 104:8

**personnel** 103:14,17,23 104:5,6

**perspective** 18:23 143:19

**phone** 115:19 159:25

**photo** 44:4

**place** 6:17 28:2 29:14 31:19 34:2 45:23 106:4 115:24 152:9

**places** 143:13

**plan** 10:10,18,22 11:1 13:1 21:6 24:1,6,11,24 27:3 37:5,7,14,17 38:2,6,20,22,24 39:1 40:23 43:8, 9,10,12 44:20 47:25 48:9,10,21 51:19,23 52:6 57:24 58:2 65:24, 25 66:8 67:12,13,17,22 70:7,12, 20 71:21 72:13,14 73:6 85:1,7 87:25 88:3 116:3,8,14 132:2 133:14 137:13 138:22,23 139:1 141:10 142:9,16 155:5 161:24

**planned** 136:2

**planning** 32:13

**plans** 23:6 29:2 66:3 70:16 79:15 116:19 131:3 155:1 158:5

**plate** 43:25 44:1,2,5,9 52:19,24 111:5

**play** 9:2,5 15:13 51:22 148:6

**plenty** 12:3

**point** 11:17 21:4 22:1,2 30:5 37:2,20 38:3 43:11,15 45:16 47:2 58:17 70:23 71:7 87:17 92:15 97:2 104:16 110:12 117:5,25 118:2 127:10,15 138:19 152:25 154:4

**pointing** 59:17 109:15 128:1

**points** 152:24

**policies** 66:20 151:9,11 152:16, 17 153:22

**policy** 45:25 94:24 122:20 151:3, 7,18 153:14

**popular** 102:23

**port** 117:22

**position** 14:7,8 54:1 114:9

**possibly** 28:17 31:12

**post** 64:14,20 151:23 154:9

**posted** 63:25 64:12,18 152:7

**posting** 151:5 152:5

**posts** 152:13 154:7

**potential** 4:20

**poured** 131:9

**powers** 81:12

**Powerschool** 120:24

**practicum** 89:20 107:15,19

**pre-conference** 7:3

**preceding** 19:20

**prefer** 53:9

**preliminary** 6:6 7:17 152:9,24 157:14 161:11

**preparation** 22:13 51:22

**prepare** 51:19

**preparing** 24:22

**preponderance** 6:3

**present** 13:9 23:12 25:1,2 49:6 67:14

**presentation** 13:14 22:14

**presented** 5:18 49:5 77:3 125:13 147:24 161:10

**presenting** 8:18 157:25

**pressure** 87:16,19

**pretty** 116:3

**previous** 15:24 37:9 99:14 105:6,9 149:13

**previously** 5:9 13:19 48:21 49:11 53:14 83:21 92:17 97:1 110:20 113:25 132:17 134:4 142:6 144:17 146:4 156:17

**price** 158:9

**primarily** 149:25 158:3

**primary** 16:9 54:10 55:12 105:19

**principal** 9:10 14:4 15:7 39:15 49:2,3

**principal's** 6:7,23 152:9,23 157:13 159:12 161:11

**prior** 4:15 7:8 15:1,6,20,21 20:19 21:4 35:25 49:22 63:7 97:25 105:23 110:2 114:11 137:14

**priority** 29:9 31:2 148:15

**privacy** 36:3

**private** 94:4

**privileged** 59:25 60:2,3

**proactive** 9:11,14 38:3,7 39:19 71:7

**proactively** 39:23

**problem** 10:11,19,25 11:1,2 131:8

**problem-solve** 29:12

**problem-solving** 27:23

**problems** 10:19 37:4

**procedures** 66:20 115:21

**proceeding** 5:5,12,19 8:7 36:5

**process** 20:13,14 76:23 130:4 145:14 146:7 148:3 151:19 152:20

**producing** 133:23

**professional** 37:19 39:20 46:20 76:2,7 89:24 91:6,13 93:7 107:25

109:12 116:18 135:20 148:21 151:12 153:23

**professionalism** 25:11 39:5 66:24 162:19

**program** 32:15 120:16,17,18 121:3,7 136:10,12

**progression** 95:20

**progressive** 37:11 95:4

**progressively** 47:1 95:11

**protect** 74:9

**protecting** 148:16

**Protection** 152:21

**protocol** 10:5

**provide** 150:17 154:17

**provided** 8:1 138:9 147:17,18 162:7

**provision** 39:8,9,10

**pull** 121:10,15 123:1

**pulled** 45:4 138:4 139:15

**pulling** 138:14 143:12,13

**purchased** 111:14,18

**purpose** 18:21,24 26:11,14 92:23 112:6

**purposes** 50:20,21 108:11

**pursued** 46:23

**pushed** 64:20

**put** 7:9 8:9 10:9 21:6 28:2 31:11, 16,18 36:6 37:7,13 38:5 62:25 66:3 87:24 89:18 90:16 91:24 101:22 115:24 118:11 119:25 142:9

**putting** 94:17 117:19

**Q**

**qualify** 123:13

**question** 9:15 51:15 59:13,14 60:6 62:16 65:18 78:19 81:6 83:11 86:12 91:13 97:7 103:10 104:4 107:23 108:4 111:11 134:9, 22 137:21 142:3 143:20 144:1 150:9 153:15,18 154:25

**questions** 9:13 11:21 39:22 45:19 47:14,18 52:8 77:13 79:18 83:20 96:25 101:5,7 102:14 107:7 113:14 120:4 126:22 127:6 131:12,14 134:7 139:4 141:4,5,19 148:24 150:9 153:9 156:8 157:2 158:13 161:7

**quick** 101:6 148:25 160:5

**quickly** 6:10 113:22 129:15

**quote** 81:23 98:3 163:10

**R**

**R-A-C-H-E-L** 114:7

**race** 12:23 13:11 97:4,8,14,19,22 103:9 140:8 145:8,19,20

**Rachel** 4:22 9:8 13:3,12 16:10 20:1 21:5 25:2 26:25 30:2 32:19 39:17 40:3 41:25 45:7,11,13,16, 20 49:1,20 54:3 61:1,4 62:7,9,17 63:7,10 68:22 74:24 75:12,15 80:7,19 82:20,25 83:2 87:21 90:18 92:20 98:20 99:13 103:6 104:22,24,25 105:19 110:24 113:24 114:7 146:2,4 148:20 150:13,16 163:23

**Rachel's** 45:5,10 93:22,24

**racial** 52:14

**raise** 141:15 150:13

**raised** 75:20 92:17,19

**raising** 46:6,8

**ran** 135:16

**Rarely** 33:2

**rated** 146:16 149:18

**rating** 16:17 20:23 54:14,17,19, 23 55:3 63:11,15,23 115:3 130:13 162:12

**ratings** 17:8 67:21 99:5

**rational** 75:25 92:3

**reach** 23:21 39:14 65:6 74:23 81:2 120:11 122:22

**reached** 74:21,23 122:10 127:19 129:16 148:1,2

**reaching** 23:1 26:23

**reactive** 38:12

**read** 5:24 90:6 119:18 120:3,6,7

**reading** 71:12

**ready** 13:14

**reason** 62:11,19 65:9 80:11,14 97:2,7,13 135:13

**reasoning** 149:20

**reasons** 135:15 152:25 161:10, 13

**recall** 18:2 24:5 25:1 32:5 35:16 42:9 43:5 44:23 47:24 68:12 69:21,23,25 77:15 80:4 86:17,20 89:5 96:5 97:10,16 98:3 99:25 115:3 116:24 117:1,13 118:15,22 125:10,14 140:24 142:5 149:15

**recalled** 117:12

**receipt** 19:24

**receive** 32:16 49:24 86:10,15 88:5,8,10 110:12,21 119:12 125:1 135:6 145:2 147:7 149:12

**received** 16:16 56:10 78:25 86:20,23 87:12 88:21 95:16 96:20 100:6 107:16 108:6 109:1 131:24 140:19 141:24 144:4 145:5,12 147:3,8,21 151:18

**receiving** 12:14 86:17 131:11 148:17 150:22 151:15

**recess** 113:23

**recommend** 39:2 43:10 46:22 79:5 96:8 110:8

**recommendation** 4:4 6:24 8:21 12:5 77:6 79:1 130:22 147:2 148:9 157:3,19,22 158:1,2 159:20

**recommended** 43:12 96:13 150:3

**recommending** 96:9

**reconstruction** 111:19

**record** 4:21 5:8,25 7:9 36:4,6 58:16 153:12 163:15

**records** 34:20

**recovered** 131:6

**recovery** 115:18

**RECROSS-EXAMINATION** 101:8 112:14 141:21 144:2

**REDIRECT** 51:16 98:11 113:1 133:17 141:7

**reduced** 120:10

**reference** 64:5 123:10

**referenced** 95:21 98:2 126:13

**references** 72:2

**referred** 87:1,10

**referring** 64:4 71:17,20 87:5 106:10

**reflect** 102:23 143:15

**reflected** 36:7

**reflecting** 19:11

**reflects** 126:5

**refresh** 37:24 129:8

**refused** 94:9 96:18 101:25

**regular** 8:11 12:6 35:4 42:13

**relate** 152:13

**related** 19:15 30:12

**relating** 88:15,18 149:12 151:17 152:19

**relation** 161:25

**relationship** 15:2 105:7

**relayed** 73:5 80:20 83:13

**rely** 80:25

**remain** 95:5

**remember** 23:11 44:25 65:25 71:12 102:16 103:10 116:11 117:3,10 121:18 140:10

**remind** 23:22 53:5 95:5

**reminded** 95:8

**reminder** 5:4 95:12

**remodeled** 111:13

**removed** 45:20

**removing** 52:24

**rep** 72:17

**repeat** 153:17

**repeatedly** 69:2

**rephrase** 60:11 81:15

**report** 48:5,6 88:16 145:18

**reporter** 5:2 13:19,25 53:14,19 113:25 114:6 144:17,22 156:17, 22

**represent** 109:8

**representation** 4:16 70:19 72:6, 20 137:22

**representative** 25:4,5 40:4 67:2, 18

**representatives** 67:5

**represented** 60:9

**reprimand** 110:21

**reprimanded** 64:19

**request** 6:13 77:11 79:4 153:8

**requested** 6:16 78:4,10,20 91:24 95:23 96:1

**requesting** 96:6 110:8

**requests** 6:20

**required** 20:22 23:17 28:19 123:17,21 124:2

**requirement** 27:15 28:17 133:6 141:9

**requirements** 27:18,20 28:11 71:8 109:7 162:19

**requires** 89:17 109:7

**requiring** 39:16

**resolving** 96:22

**resource** 43:20

**resources** 58:24 147:15 149:5

**respect** 151:4

**respectful** 95:6,9

**respond** 25:10 43:13 79:10 91:9 162:24

**responded** 74:22 75:10 106:20 110:3,10 119:15 147:10

**responding** 45:18 121:16 162:19

**response** 17:25 51:20 97:6 100:5 145:11 162:1

**responsibilities** 37:19 149:22

**rest** 32:8 108:14

**result** 23:24 46:22 138:23

**return** 28:8 49:8,10 69:2 87:22 88:5

**returned** 87:24 111:14

**returning** 111:9

**returns** 49:7

**revealed** 10:3,5 162:3

**reveals** 41:5

**review** 28:25 38:24 83:19 146:17, 23 151:21 160:19

**reviewed** 37:25 157:3 160:22

**reviewing** 15:14 39:14 158:2

**ridiculous** 76:14,15,16,21 92:1, 2,25 127:7

**right-hand** 16:23 17:21 56:1

**rights** 151:20 152:20

**risk** 10:14 29:13 69:16 70:3

**role** 9:1,5 12:13 15:6,14 51:22 145:1 148:6,8 149:9 150:17,21,24 153:4

**roles** 119:9

**Rollingnotes** 119:17,21

**roughly** 14:25 24:8 32:7,24 44:15 118:22 139:6,7 157:16

**routinely** 100:19

**row** 99:6

**rubric** 40:10

**rules** 25:9,15,23 26:7

**ruling** 59:20 81:1

**run** 111:24

**run-ins** 99:13

**rush** 111:21

**S**

**S-T-R-I-N-G-H-A-M** 53:23

**sad** 73:10,11

**sat** 68:2 75:2 91:3 158:8

**save** 117:25

**scale** 133:20

**schedule** 28:16 30:15 31:22 40:21 120:20,22 121:2,11 133:5

**scheduled** 23:20 28:15

**schedules** 23:15 28:9,10 39:12, 14 122:20

**scheduling** 15:5 84:20

**Schleper** 139:25

**school** 4:2 8:22,25 9:2,3,10,25 10:9,18,21 11:12,15 14:4,17 15:1, 17 16:13 18:6 19:13,15,18 20:9, 17 21:4,8,11,16 23:18 24:2 25:20, 21,23,24 26:15 27:4,8,10,14 30:6 31:14 32:8,25 33:5 34:17 37:6,9, 14 47:11 49:9,17,22,23 51:19 52:3 53:25 54:4,9 55:10,16 57:2,5 65:25 66:2 68:4 69:5,7,12,14 70:2,16 76:1,2,19 84:4 85:5,16 86:17 87:22 91:6,7 93:7,15 94:11, 24 95:7,11 105:18 107:16,19 108:1 109:13,14 114:8,13,17,21, 25 115:16,22,23 116:10,20 118:18 126:13,15 128:6 130:13, 23 135:4 141:10 143:5 146:24 148:18 153:3 159:12 161:20

**Schools** 47:19 135:11 144:24 151:4 156:25

**Schwartz** 140:1

**score** 56:14

**scream** 51:8

**seal** 36:2

**section** 25:7 26:10,18,21,24 38:16 39:3,4 66:14 98:14,16 119:17,18,19 120:6 122:12 123:4 135:2 136:8

**sections** 25:14

**seeking** 12:16 26:20

**select** 41:22

**semester** 21:12,16 23:25 27:7,9, 11,25 30:11 39:17,18 44:18 70:10 86:11 105:20 116:22,24 133:7 146:8

**semesters** 33:23

**senior** 28:24,25 29:7 69:6 120:18,22 133:5,7

**seniors** 31:9 32:17 56:20,25 118:7 139:8

**sentence** 18:18 56:12 108:14 153:3,7

**separate** 102:10

**separated** 5:4 53:6

**September** 24:25 48:7,11 52:2 59:9,16 60:19,24 61:21 62:10 71:18 80:5 82:10 85:2 97:16,25 102:9,11 105:23 129:5,10,18,23, 25 130:3,5 145:5 150:11 161:25

**series** 21:2

**service** 29:15 101:3

**services** 14:5 15:8 21:19 131:10 132:18 144:24 149:6

**set** 5:11 6:25 7:3,6 31:4,6 69:15 77:15 117:20 136:5

**setting** 23:22 148:23

**sexual** 12:22 13:10 63:5,10,14,22 65:15 81:3 99:8,11,15 101:19 130:9,10,12 145:8,23,25 150:14 162:9,11

**SFS** 39:25 40:9,11 41:2 118:19 125:8 131:21 137:7,11 142:12 155:2,4,10,13

**share** 133:3 154:5

**shared** 45:17 56:19 146:6,25 148:22 150:18,20

**sharing** 122:20 151:9

**she'd** 121:11

**sheet** 41:11,15

**sheets** 56:14

**Shelley** 147:14

**ship** 117:22

**Shook** 140:5

**short** 20:16 84:11

**shortcomings** 161:17 162:23

**shorter** 113:19

**shorts** 20:21

**show** 10:8,12 13:9 92:18 137:13 146:21 162:16

**showed** 110:14

**showing** 11:19 26:20 162:8

CCS  00801

**shunned** 64:19

**shy** 84:9

**side** 8:6 16:24 17:21 22:4,5 29:21 77:3 92:12 139:20

**sight** 137:16

**sign** 11:5 45:13 74:6,17 76:6,12 90:8,10,12,15 91:19,22 92:21,24 93:1,5 94:9 96:18 106:14 109:4, 17,24 125:13,17,22 126:14,20 127:3,5,14 134:24 163:3

**signature** 11:9 24:16 159:12,14, 21 160:8

**signatures** 24:15

**signed** 24:17 28:21 89:14 90:17 96:19 100:13,21 107:10 110:4 159:21 160:2 163:2

**significant** 158:5 161:21

**signing** 45:14 75:15 91:9,14,23 92:25 125:25 127:4 134:21

**similar** 80:10 136:1 139:11 147:9

**Similarly** 162:9

**simplistic** 75:25

**simply** 56:21 77:18 100:16

**single** 85:10 155:21

**sir** 13:17 79:19 154:12 156:12 159:6 160:24

**sit** 53:8

**sitting** 51:2 91:2 93:21

**situation** 119:6

**situations** 129:14

**six-plus** 146:1

**skills** 135:19

**slammed** 106:2 110:20

**slamming** 106:7 141:2

**slow** 6:19 58:25 121:14

**smaller** 16:1,2 55:23 64:7 65:23 117:4

**snapped** 92:5

**sneeze** 94:8

**social** 29:18 63:25 64:1,3,9,17 65:7,12 80:17 82:18 98:3,4,6 119:8 120:11 135:17,24,25 151:3, 9,11,16,17,23 152:13,16,17,19 153:14,23 154:7,9,13 155:3

**social-emotional** 29:20

**social-emotionally** 21:23

**socially** 38:10

**solely** 81:4

**solve** 10:10,19,25 11:2

**someone's** 143:15

**sort** 144:4

**span** 88:10

**speakers** 113:7,8

**speaking** 93:9

**speaks** 79:7

**special** 14:5

**specific** 64:4 65:6 133:2

**specifically** 66:13 68:21 71:15 142:1

**spell** 13:24 53:18,22 114:5 144:22 156:22

**spelling** 156:25

**spent** 31:20

**spoke** 49:20

**spot** 86:3

**spring** 10:12 27:25 30:11 116:22, 24 143:8

**SST** 35:1,7,12,14,17,19,22 37:23 48:13,18 70:25 119:23

**St** 107:19,21

**staff** 45:2 49:6 50:11 132:14 144:23 149:6 151:10,12 153:5,22 154:6 155:6 156:6

**stamp** 160:8

**stand** 35:2

**standard** 6:2 143:21 155:7

**start** 24:1 25:21 28:4 37:14 44:18 57:5 65:24 105:3 115:11,23 139:18

**started** 10:21 14:16 15:17 24:5,7 31:13 48:22 114:10,13,21 115:1 161:23

**starting** 10:8 16:19 37:5 46:1 98:18 114:25 125:16

**starts** 71:7 126:2

**state** 53:18 84:6 89:17,22 91:5, 12,16,17 93:5 109:11 123:17,21 124:3 127:2,9 163:5

**stated** 48:21 97:13 161:21

**statement** 104:1

**statements** 162:9

**states** 95:3

**stating** 96:6

**status** 25:13 52:14 129:19

**statute** 6:2 8:5 77:10

**statutes** 77:12

**statutory** 161:13

**stay** 21:17,24 25:11 43:9 53:9 139:21

**stayed** 114:19

**Stephanie** 140:4

**stepmother** 68:25

**steps** 123:6

**stick** 5:13

**stipulate** 8:3

**stipulated** 6:11 8:2 77:20 78:7, 15 82:4

**stipulations** 5:24

**stood** 91:4

**stop** 13:2 125:3 163:24

**straightforward** 120:1

**straw** 163:1

**street** 32:15

**strengthen** 140:22

**stress** 87:16

**stressed** 87:18

**stringent** 10:22

**Stringham** 4:5,12,25 8:23 10:9 11:17 12:3,12,18,21,24,25 13:3,6, 9 14:18,20,21 15:3,9 16:16 18:3, 15 19:17,23 20:6,15 21:10,15 22:9 23:7 24:23 32:3 33:6 34:20

36:25 37:10 38:21,23 40:1,4,18 42:5,19 43:6,9,13 44:8 46:8,19 47:25 48:14 49:5,8,19,24 50:23 52:13,21 53:12,13,18,21,24 60:7 74:11 78:3,6,12,25 79:14,22 81:1, 21 82:10 83:7,12,14 95:2 98:20, 22 102:4 105:23 107:6 111:10 113:3,17 114:22 117:12,14,21 118:14,16,23 119:6,16 120:7 121:3 124:2,23 125:11 126:8 127:21 128:10 132:14 133:21,24 134:14 135:10 137:24 138:21 140:25 141:24 142:7 145:6,13 146:20,22 147:7 150:5,7 151:15 152:4,11 153:10 154:8 157:9,16 158:17 159:24 160:1 161:17 162:13 163:6,9

**Stringham's**  7:23 9:22 12:6 16:5 22:13 26:19 27:4 35:19 38:12 48:5 49:12 81:3 132:18 140:6 146:12 149:16 157:23 158:18 162:16

**structure**  29:14,24,25 30:20

**structured**  25:17,18 37:8

**struggle**  31:17

**struggling**  9:17 21:25 22:3 29:6 30:20,24 47:4

**student**  9:16 14:5 15:8,11 21:19, 21 22:6,16 25:13 27:25 29:4,5,6, 15 30:3 32:9,11 35:3,4 36:1 38:13 39:21 40:19 41:22 46:16 68:23 84:2,8 112:1 120:21,23 121:4,6, 13,15 122:1,4,9,15,21,23 123:3,7, 13 124:6 128:7 142:24 144:24 149:6

**student's**  28:10 40:20,21 121:11

**students**  8:24 9:2,6,12,20 10:14, 15 11:15 15:9 21:22,24 22:3,17, 22,24 23:1,4,8,19,20 26:3 27:12, 17 28:6,24,25 29:13,19 30:15,16, 18,22,25 31:5,20,24 32:5,7,25 33:7,8,11,18,21,22 34:3,10 35:8, 10,20 37:12 38:4,9,10 39:11,23 46:12 48:16,18 49:12,15,17 52:12 55:21 68:3 69:16 70:2 71:8 83:21 115:17 116:10,23 117:2,7,13,14 118:16 120:9,19 123:15 124:18, 21 131:3,5,8,10 132:18,21 134:1, 11,15 136:4,25 139:5,16 143:3,9 144:5 148:15,16 151:10 153:5 154:1 158:9

**students'**  28:9 31:24 39:20

**Stuelpe**  140:3

**stuff**  112:23 113:10 119:18 120:3,6

**subject**  43:1

**submit**  132:8

**submitted**  78:16 137:2 145:17 160:20

**submitting**  110:16

**subpoena**  81:11,12

**subsection**  25:14

**success**  9:3 155:7

**successful**  123:5

**successfully**  12:13

**suffering**  47:4

**suicidal**  87:17,20

**summarize**  42:20 123:11

**summary**  11:14 40:25 115:14 159:23 161:8

**summative**  146:16

**summer**  24:7,23 28:9,14 31:14 32:12 37:3 48:23 49:17 57:21 58:1 162:2

**Sunday**  44:13,14 74:5 119:7

**superintendent**  6:14,17,21,23 7:20 77:25 78:17 95:24 96:7,21 144:23 145:1 146:18 149:5 156:24 159:11 160:16

**superintendent's**  76:23 77:19 100:9 157:10,12,17 159:20

**supervise**  125:23 131:17

**supervised**  135:23 136:2,20

**supervises**  18:23 19:8

**supervising**  16:19

**supervision**  14:13 15:13 18:13 108:5,7,8,12,13 135:6 136:9,11

**supervisor**  9:9,22 11:5,6 19:9 20:1 42:1 45:23 54:3 76:20 105:12 121:9 136:11 162:20 163:25

**supervisors**  10:13

**supplying**  9:18

**support**  9:6 15:11 21:21 22:6,16 29:5,15,20 35:3,4 47:10 93:13 130:22 148:9 154:18 155:19,23 158:12

**surface**  9:25 11:24 12:1

**surfacing**  18:2

**surprised**  50:3 126:10 146:3

**sustain**  58:10 79:9,13 83:17

**swearing**  4:18

**sworn**  5:1 8:13 13:19 53:14 113:25 144:17 156:17

**system**  17:14 19:21 39:25 40:13 41:16 49:16 73:2 155:4,10

---

**T**

**tab**  16:3,4 24:10 35:17 36:10 37:16 40:25 41:7,12,20 42:14,25 43:3 44:4 45:25 48:4,9 55:24 56:1,4,5 58:19 60:21 64:7 65:22 70:6 71:24 72:19 78:3 90:4 94:20, 24 98:2,13 117:4 119:2 120:15 121:17 122:7 123:9 125:16 126:3 129:4 138:13

**table**  22:18 29:19 51:2 158:8

**Tabs**  34:19

**tag**  120:20 121:1

**tagged**  40:9

**takes**  162:17

**taking**  89:10,12,13 121:10

**talk**  11:10 30:1 31:8 36:25 45:5 57:18 58:12 59:14,15 60:18 68:22 69:16 82:19 90:25 93:8,9 118:2

**talked**  58:5 68:21 110:19 116:16 117:21 118:5 137:15

**talking**  29:2 79:11 81:25 82:1,21 112:8 117:12,13 137:14

**target**  62:25

**targeted**  64:1,24 99:19 101:12, 18 116:5 162:15

**targeting**  80:7,12 82:25 98:21 99:11 128:10 130:8,9

**tasks**  149:22

TCP 120:16,17,20,25 121:3

teacher 6:13,20 7:10 8:11 9:17 20:19 79:24 81:12 82:2,8,17 85:11 89:2 102:5 105:15 112:3 114:17 122:23 152:21 155:17,22 156:3

teacher's 12:6 25:5 50:15,16 86:6 142:17

teachers 22:2 31:25 155:3,18

team 9:7 12:2 15:11,12 21:21 22:6,9,16 27:10 29:5,12,22 35:4 51:18 71:14

teams 29:15 35:3,4

tears 73:21

telling 33:18 68:14 73:15 129:24

ten 14:25 94:12 114:16 145:15 149:6

ten-month 15:7

tentative 5:11

termination 39:2 43:11

terms 5:4 30:17 32:25 50:10 105:7,11 134:21 140:10 163:15

terrified 82:19

test 123:12 124:2

testified 13:20 53:15 60:13 97:1, 6 109:23 114:1 117:12 144:18 156:18 163:9,15

testifies 62:9

testify 57:22 104:15,18 106:12

testimony 53:7 62:17 68:15 80:24 82:12 87:4 134:9 161:16

testing 27:19 28:19

tests 28:21

thick 162:7

thin 51:11 111:20

things 38:9 66:12 84:5 100:25 113:4 115:24 125:24 127:3 136:5 137:11 158:3

thinking 72:12

Thomas 4:23 144:16

thought 7:21 63:25 82:24 98:20 102:19 122:11 126:12 128:14

thoughts 87:20

Tier 29:23

time 5:7 8:16 10:22 14:22 22:11 23:6,13 28:3 29:3 30:5 31:1,6,20 33:9 34:7 40:6 43:25 49:7,9 51:25 54:6 60:9,17 61:21 69:10 71:14 76:1 80:1 83:1 84:7,19 99:1,14,15 101:11 102:24 107:13 118:4,13 120:2 121:10 125:7 128:17 129:16 132:8 136:5 143:14 148:21 150:1 155:16,25

timeline 129:11

timeliness 26:18

timely 39:21,22 107:2

times 13:4,5 38:23 40:2 50:4 84:5 98:4 127:7

timing 77:14

title 14:3 41:20 53:24 149:3,7,12

today 11:13 94:18 96:14

told 11:9 55:9 68:19 75:6 81:21 83:1 84:5,7 94:12,13 99:1 119:11 127:6 129:10 163:18,21,23

Tom 144:23

tone 92:7

tonight 8:20 9:21 12:4 13:9 119:1 157:6 158:8 161:16

tool 143:22

top 42:9 119:15 154:5

total 14:10 139:13

tough 143:10,11

track 23:11 48:16 115:18 117:8 118:8

traditional 123:22 156:25

training 149:12,14

transcript 36:8 40:20 133:9

transfer 9:16

transferred 49:16

transition 120:18

treated 101:13

treating 82:25 87:21 98:21

troubleshoot 29:12

true 51:10 56:21 60:10 109:10 136:13,16

turn 24:10 37:16 45:25 46:11 55:23 66:20 106:22 107:12 115:24 117:4 120:19

turned 15:25 86:7,8

twelve 114:19

Twenty-seven 114:16

two-hour 5:12

two-thirds 17:18

types 115:15

typical 30:6,8

typically 15:24 21:18 30:23 123:14,17 137:9 154:20

typing 94:1 126:16

## U

Uh-huh 56:16 61:9 64:2,11 66:16 67:1 75:10 124:25 132:19

ultimately 9:4

unacceptable 158:11

unbeknownst 162:2

uncivil 46:2,13 95:3

uncomfortable 127:10 135:13

underneath 16:5 135:21

understand 9:14 26:1,5,20 31:23 40:14 47:7 57:10 59:13 76:13 77:12 79:12 81:14,21 83:6 91:11,20 92:20,21,23 93:1,12 102:6 105:11 109:15,23 110:5 153:6,11 162:22 163:12

understanding 19:12 26:22 45:14 81:16,18,24 137:4 162:18

understands 92:9

understood 125:6

unfair 64:20

Unhappy 163:20

union 70:19 72:6,20

unique 30:12,14

unplug 113:3

Index: unplugged..years

**unplugged** 113:9

**unprofessional** 148:19,23
163:7

**unsigned** 110:15

**upload** 41:18 137:7,10,18 141:17
155:18,22,24 156:3

**uploaded** 17:14 41:16 42:2,5,10,
22 47:10,11,23 73:1 118:19,23
119:3 136:21 137:23 138:6 144:7
155:2,9

**uploading** 137:7 142:12

**uploads** 41:1 42:12 162:21

**upper** 16:4

**upset** 11:8 34:6 51:6 73:20,22
75:15,18,19,23 76:10,11 104:2,3
112:1 125:8 126:17 128:2 129:12,
15

**usual** 21:25

———————————————

**V**

**variety** 102:15

**verbal** 25:8 95:12 140:13,15,16,
25 142:4 149:25

**verbally** 146:19

**verification** 89:24 91:5 93:4
109:12

**video** 52:18

**view** 52:18,21

**VII** 149:3,7,12

**Vincent's** 107:19

**violate** 151:19

**violates** 152:20

**violation** 151:17

**violations** 152:16

**virtual** 30:16,19 68:24

**visibility** 141:12

**visibly** 126:17

**visually** 137:13

**vocabulary** 87:8

**voice** 46:6,9 75:20 92:18,19
93:16 126:25

**volume** 111:22

———————————————

**W**

**wait** 86:12 91:18

**waited** 61:24

**waiver** 121:23 123:24

**walk** 28:4 37:9 127:12

**walked** 45:11

**walls** 51:10 111:20,25 112:5

**wanted** 11:4 21:9 25:21 31:18
36:6 58:14 74:17 77:4 87:8 96:10
116:6 118:8 125:17 127:8 143:15
153:6 154:10 163:2

**wanting** 9:16 81:2

**warning** 95:12

**water** 58:25

**waving** 128:1

**ways** 118:10

**week** 5:25 7:4 21:20 22:7,10 23:3
29:17,18,22 108:6,8 137:8

**weeks** 12:23 56:19 72:20

**weighted** 120:21

**wellness** 137:8

**Wernke** 103:5 140:2

**whatsoever** 100:6

**white** 48:4 51:12 85:12 94:4

**Wien** 25:3

**WILLIAMS** 151:7 153:20

**window** 116:11

**witnesses** 4:16,18,20 5:1,3,11
8:13 53:6 113:18 147:16

**woman** 80:15 146:3

**wondering** 153:21

**word** 87:8 163:8,13

**words** 64:10,22 65:4 83:3 96:9

**work** 11:4 19:2,12,14 57:3,23
68:24 69:3 74:15 115:20 116:7,
12,13 135:20,24 139:5 141:12
143:10 150:4 153:23

**worked** 15:4,9,10 49:1 65:19
80:18 100:25 104:23 107:25

**worker** 64:1,3,9,17 65:7,12 80:17
82:18 98:3,4,6 119:8 120:12

**workers** 29:18 135:17,25 155:3

**working** 5:14 15:2 22:18 23:14
24:5,7 30:4 38:4,9 71:8 105:1,3,7
114:21 136:11 149:8 162:1,25

**works** 77:13

**worried** 124:20

**write** 13:3 41:24 127:13

**write-up** 50:13,14 87:10 104:10

**write-ups** 42:7 50:6 86:10,14,15,
18,24 87:6 88:6,22 103:24 104:6,
19

**writing** 42:1 80:8

**written** 13:5 18:22 25:8 98:4
146:20

**wrong** 7:11 10:24 47:7 56:24
107:11 109:5

**wrote** 58:20 64:22 98:18,24 99:3
102:9 119:6

———————————————

**Y**

**year** 9:25 10:2,3,9,16,21 12:14
14:17 15:1,18 16:13 18:6 19:1,15,
18 20:9,17,19 21:4,8,11,16 23:18
24:2,3 25:20,21 26:16 27:4 28:5,
11,23 29:3,4,11 30:6,9 31:15
32:8,9,14,16,21 33:5,10 34:11
37:6,9,14 47:12 49:9,22,23 54:4,
9,11 55:2,10,16 56:20,24 57:2,6
64:9,16 65:25 68:4 69:6,8,12 84:4
85:10,16 86:11,13,16,17 105:19
107:3,4 114:13,25 115:16,23
116:20 117:8,15,16,20,23 118:18
120:22 124:19 125:9,10 128:19
130:14 132:22,23 137:14,16
139:16,17 140:17 141:10 142:5
143:5,8,10,17,18 146:24 150:3
161:20,23

**year's** 137:12 138:22

**year-end** 143:19

**years** 12:14 13:7 14:7,9,11,15,25
16:21 20:21 47:19 54:2 63:21
67:20,22 70:12,17 79:16,25 89:21

CCS 00805

Index: yell..Zooming

91:7 99:6,17 101:3 107:15 108:2
111:13 114:10,12,15,19,20 124:8
146:1 149:6,15 162:12

**yell**  50:23 51:1 73:12,18,19 76:20

**yelled**  51:9 73:15 110:20

**yelling**  45:6,10,13,22 75:22 76:5
93:17 112:3,4 127:21

**young**  122:19

--------------------

**Z**

--------------------

**zeros**  16:24

**zone**  29:7

**Zoom**  23:12

**Zooming**  143:12