UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DIANNA STRINGHAM,

        Plaintiff,

  v.

                          Case No. 1:22-cv-00817-TWP-MG

CARMEL CLAY SCHOOLS and BOARD
OF SCHOOL TRUSTEES OF CARMEL
CLAY SCHOOLS,

        Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Dianna Stringham worked as a high school guidance counselor for Defendant Carmel Clay Schools (the "School"). For several years, she received "highly effective" ratings in her annual evaluations, but things changed toward the end of the 2019-2020 school year, as several of her supervisors became concerned about her performance. To help Stringham, they implemented a performance improvement plan, but she failed to show significant progress and also had additional missteps, including an incident toward the end of the 2020-2021 school year where several of her students did not graduate because she failed to identify them as at-risk. Efforts to help Stringham continued into the 2021-2022 school year and included another improvement plan, but an outburst toward one of her supervisors in January 2022 resulted in the School administration initiating termination proceedings. Following a hearing, the School board unanimously decided to terminate Stringham's employment due to her performance deficiencies, failure to show significant improvement, and outburst toward her supervisor–which the Board considered "highly inappropriate."

Against these undisputed facts, Stringham contends that the true reason for her termination was that one of her supervisors, Rachel Cole, harbored discriminatory and retaliatory animus toward

her, which give rise to the claims in her lawsuit. For reasons explained in much more detail below, these claims fail for several independent reasons, among them that Stringham cannot produce evidence of animus, that she overlooks that the School administration initiated termination proceedings without Cole's input, and that there is no evidence whatsoever that the Defendants did not honestly believe the many legitimate reasons they had for initiating termination proceedings and ultimately terminating Stringham's performance.

Accordingly, Defendants respectfully submit that they are entitled to judgment as a matter of law on all of Stringham's claims.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

I.    *The parties the nature of Stringham's claims.*

1.    Defendant Carmel Clay Schools (the "School") is a school corporation located in Carmel, Indiana. [Filing No. 29 at 6, ¶20.]

2.    Defendant Board of School Trustees of Carmel Clay Schools (the "Board") is the School's governing body. [Filing No. 29 at 6, ¶21.]

3.    Plaintiff Dianna Stringham is a former employee of the School, having worked as a guidance counselor at Carmel High School from July 2014 until her termination in March 2022. [Filing No. 29 at 6, ¶23.]; [Filing No. 1-1 at 20.]; [Filing No. 54-1 at 55-56 (Ex. 1 – Board Transcript 53:24-54:2).] Her duties included advising students on graduation requirements, assisting students with questions regarding class schedules, guiding students towards graduation and career pathways, communicating with students' families, and collaborating with her fellow counselors. [Filing No. 1-1 at 3.]

4.    Stringham seeks relief on eight counts. [Filing No. 27 at 9-16.] Her claims fall into four categories:

- First, that the Board's decision to terminate her employment following a hearing violated her constitutional rights (Count 1) and Indiana statutory law (Count 2). [Filing No. 27 at 9-13.]

- Second, that the School violated Title VII when it discriminated against her based on her race (Count 3), national origin (Count 5), and sexual orientation (Count 7). [Filing No. 27 at 13-16.]

- Third, that the School violated Title VII when it subjected her to a hostile work environment based on her race (Count 3), national origin (Count 5), and sexual orientation (Count 7). [Filing No. 27 at 13, 14, 15-16.]

- Fourth, that the School violated Title VII when it retaliated against her based on her internal complaints (Counts 4, 6, and 8). [Filing No. 27 at 14-16.]

5.     Defendants' move for summary judgment on all of these counts. [Filing No. 54 at 1.]

6.     The gravamen of Stringham's claims concerns events toward the end of the 2019-2020 school year until her termination in March 2022. *See infra*, Statement of Material Facts ("SMF") ¶¶7-57. During that time, Rachel Cole was the Director of Counseling at Carmel High School. [Filing No. 54-1 at 116 (Ex. 1 – Board Transcript 114:4-14).] Cole supervised Stringham and fifteen other counselors. [Filing No. 54-1 at 133 (Ex. 1 – Board Transcript 131:17-19).] Cole was a fellow counselor and Stringham's co-worker for several years until she assumed the Director position at the start of the 2016-2017 school year. [Filing No. 54-1 at 116, 55-56 (Ex. 1 – Board Transcript 114:4-24, 53:18-54:8).]

7.     Since the start of the 2020-2021 school year, Stringham's other supervisor was Assistant Principal Maureen Borto, who also oversaw the guidance counselor department. [Filing No. 54-1 at 16 (Ex. 1 – Board Transcript 14:1-18).] Borto's oversight responsibilities included evaluating the counselors. [Filing No. 54-1 at 17 (Ex. 1 – Board Transcript 15:13-16).] Like Cole, Borto had worked previously with Stringham in a non-supervisory capacity when Borto was Chair of the high school's English department. [Filing No. 54-1 at 16-17 (Ex. 1 – Board Transcript 14:20-15:12).]l; [Filing No. 54-2 at 5 (Ex. 2 – Plaintiff Depo. 22:13-23:6).] Stringham's working relationship with Borto

3

was "great" during Borto's tenure as department chair and "okay" when Borto was supervising the counseling department. [Filing No. 54-2 at 5 (Ex. 2 – Plaintiff Depo. 23:7-16).]

8.      Borto's predecessor was Assistant Principal Karen McDaniel, who served in Borto's supervisory capacity over Stringham and the guidance counselor department during the 2019-2020 school year. [Filing No. 54-2 at 5 (Ex. 2 – Plaintiff Depo. 21:8-22:9).] Tom Harmas was Carmel High School's principal during the 2019-2020, 2020-2021, and 2021-2022 school years. [Filing No. 54-2 at 4 (Ex. 2 – Plaintiff Depo. 18:18-24).]

II.     *The School becomes concerned about Stringham's performance toward the end of the 2019-2020 school year and places her on a performance improvement plan as a result.*

9.      During the second semester of the 2019-2020 school year, but before the outset of the pandemic, administrators and counselors conducted bi-weekly "student support team meetings" to identify students who were struggling academically, social-emotionally, or at home. [Filing No. 54-1 at 23 (Ex. 1 – Board Transcript 21:14-23).] When the School shifted to at-home learning due to the pandemic, the counseling department began to notice that students "were struggling quite a bit more than usual" and therefore increased the frequency of the student support team meetings from bi-weekly to weekly. [Filing No. 54-1 at 23-24 (Ex. 1 – Board Transcript 21:14-22-11).] During these weekly meetings, the administration encouraged counselors to collaborate and discuss which students were struggling, all in an effort to better serve their needs. [Filing No. 54-1 at 24 (Ex. 1 – Board Transcript 22:12-21).]

10.     Although these meetings yielded "long lists of students to discuss," Stringham never offered any of her students because "[i]t was evident that she hadn't been connecting with [them], reaching out to families, [or] reaching out to homes to get more information." [Filing No. 54-1 at 24-25 (Ex. 1 – Board Transcript 22:22-23:2).] Moreover, according to Borto, "When we would meet the following week, there wasn't any follow-up on those students." [Filing No. 54-1 at 25 (Ex. 1 – Board Transcript 23:2-4).] Also around this time, Cole observed that Stringham needed improvement with

email communication and phone calls with parents. [Filing No. 54-1 at 117 (Ex. 1 – Board Transcript 115:14-22).]

11.     Assistant Principal McDaniel had similar concerns about Stringham's performance around this time–specifically, in an email to Principal Tom Harmas dated April 29, 2020, McDaniel observed that she and Cole "have seen a steady decline in Dianna Stringham's ability to provide effective and timely counseling services to our students and families." [Filing No. 54-3 at 2 (Ex. 3 at 1).] According to McDaniel, she and Cole met with Stringham to discuss their concerns, and Stringham became "tearful" and "shared she is struggling with the change to virtual learning and some personal family worries . . . ." [Filing No. 54-3 at 2 (Ex. 3 at 1).] McDaniel noted that she and Cole offered an "employee assistance program," which Stringham indicated she would pursue on her own, and that they "set clear expectations for her work moving forward and Rachel is coaching her through with weekly meetings." [Filing No. 54-3 at 2 (Ex. 3 at 1).]

12.     Cole noted these concerns and others in Stringham's evaluation for the 2019-2020 school year, concluding that although Stringham's "overall observations when . . . working with a student are highly effective," she needed improvement in other areas. [Filing No. 54-4 at 13 (Ex. 4 at 2).] Those areas for improvement included the following:

- "[A]dministration has asked you to do something like set a 504[1] up or contact them back and it simply wasn't done . . . because you don't understand . . . ." [Filing No. 54-4 at 13 (Ex. 4 at 2).]

- "Email was a concern in some areas and the response back to parents for some needs to improve." [Filing No. 54-4 at 13 (Ex. 4 at 2).]

- When I had you do the ASVAB[2] scoresheets you gave the counselors some misinformation and we went over it together, when you sent out the email a few

---

[1] This is in reference to a "504 plan," which is an individualized plan designed to accommodate a disability and provide the student with a free appropriate public education in compliance with Section 504 of the Rehabilitation Act.

[2] This acronym stands for "Armed Services Vocational Aptitude Battery." It "measures developed abilities and helps predict future academic and occupational success in the military." *See https://www.officialasvab.com* (last accessed July 24, 2023).

weeks ago you shared the information about fifth year seniors and it simply wasn't true . . ." [Filing No. 54-4 at 13 (Ex. 4 at 2).]

13.     Cole also noted in her comments that "[t]he Rise framework does show Highly Effective but moving forward I do want to work on improvement in your role as a counselor overall." [Filing No. 54-4 at 13 (Ex. 4 at 2).]

14.     According to Borto, Cole provided these concerns to help Stringham understand that she was not meeting expectations and that she needed to show improvement in these areas. [Filing No. 54-1 at 20-21 (Ex. 1 – Board Transcript 18:21-19:14).]

15.     Stringham's 2019-2020 evaluation differed from previous ones Cole had conducted in that in each of the previous ones, Stringham's overall rating was "highly effective" or "effective," but those evaluations lacked comments that indicated significant concerns about aspects of her performance. [Filing No. 29 at 7, ¶24.]

16.     Additional concerns about Stringham's performance surfaced after the 2019-2020 school year–for example, in June 2020, a parent reported to McDaniel that her son had received a diploma in the mail even though he had not graduated. [Filing No. 54-5 at 3 (Ex. 5 at 2).] Cole confirmed that the student was Stringham's and that she failed to remove him from the graduation list. [Filing No. 54-5 at 2-3 (Ex. 5 at 1-2).] Stringham had made the same mistake with another student the year before. [Filing No. 54-5 at 3 (Ex. 5 at 2).] McDaniel noted that the error needed to be added to Stringham's "paperwork for documentation of her improvement plan." [Filing No. 54-5 at 2 (Ex. 5 at 1).]

17.     In an email dated June 23, 2020, Cole notified Stringham of her oversight and reminded her that she needed to pay better attention, especially since Stringham had known the student would be completing summer school and it had happened with another student the previous year. [Filing No. 54-6 at 2 (Ex. 6 at 1).]

18.     Based on Stringham's need for improvement, during the Summer of 2020 Cole, Borto, and others began developing a performance improvement plan for the upcoming 2020-2021 school year. [Filing No. 54-1 at 25-26, 50-51 (Ex. 1 – Board Transcript 23:24-24:9, 48:21-49:3).]; [Filing No. 54-1 at 116-117 (Ex. 1 – Board Transcript 115:14-116:11).] In the plan, Cole and Borto detailed concerns regarding communication, following procedures and policies, and professionalism. [Filing No. 54-7 at 2-4 (Ex. 7 at 1-3).] Cole and Borto also provided suggestions on how Stringham might show improvement. [Filing No. 54-7 at 5 (Ex. 7 at 4).] For example, regarding communication they encouraged Stringham to respond to parents within twenty-four to forty-eight hours and "[i]f you don't have the exact answer, follow up to say you are working on it." [Filing No. 54-7 at 5 (Ex. 7 at 4).] They also encouraged Stringham to "show grace"–specifically, "[c]all a parent on the phone or see a student in person so they know they have been heard. By seeking to understand and listening, you can focus your conversations on what we can do to assist. All of this will build a trust between you and the family." [Filing No. 54-7 at 5 (Ex. 7 at 4).]

19.     In the performance improvement plan, Cole and Borto reminded Stringham that they had discussed these concerns during her year-end conference in May 2020, that "there must be immediate and sustained improvement in your job as your position at Carmel Clay Schools is in jeopardy," and that they would schedule follow-up meetings "when necessary" and at the end of each semester to review her performance. [Filing No. 54-7 at 5 (Ex. 7 at 4).] On September 22, 2020, Stringham signed the performance improvement plan to acknowledge receipt, but also noted that she "may not agree with all that is written." [Filing No. 54-7 at 5 (Ex. 7 at 4).]

III.    *Stringham makes her first internal complaint of discrimination against Cole, and the School investigates and determines it is not substantiated.*

20.     On September 1, 2020, Stringham filled out and signed a "Report of Discrimination and/or Harassment" form alleging that Cole had discriminated against her based on her national origin and her sexual orientation. [Filing No. 58-8 at 2 (Ex. 8 at 1).]; [Filing No. 54-2 at 8 (Ex. 2 – Plaintiff

Depo. 50:6-11).] Stringham did not allege that anyone other than Cole had discriminated against her. [Filing No. 54-2 at 8 (Ex. 2 – Plaintiff Depo. 50:12-15).] Stringham also included a timeline of events that she perceived supported her allegations against Cole. [Filing No. 54-8 at 3-10 (Ex. 8 at 1-8).]

21.     In a report dated October 16, 2020, Assistant Superintendent Dr. Tom Oestreich detailed his investigation, including the witnesses he interviewed and a summary of the information they provided. [Filing No. 54-9 at 2-5 (Ex. 9 at 1-4).] Dr. Oestreich indicated in his report that "Dianna's lack of being able to keep up falls on the rest of the counseling team" and that "Dianna's mistakes are much more frequent compared to the other counselors." [Filing No. 54-9 at 3 (Ex. 9 at 2).] Dr. Oestreich determined that these legitimate performance concerns, and not animus, "are resulting in Mrs. Cole having to provide additional follow up that Dianna views as harassment and ultimately discrimination due to her sexual orientation and race." [Filing No. 54-9 at 5-6 (Ex. 9 at 4-5).]

22.     Dr. Oestreich also noted that there "is no evidence or anything shared throughout the investigation that point to Mrs. Cole discriminating against Dianna due to her race" and that "no one interviewed, other tha[n] Dianna and Dianna's spouse, Missy Stringham, who supported Dianna's position, indicated that they have ever been harassed or discriminated against by Rachel Cole or observed Rachel harass or discriminate against any other individual." [Filing No. 54-9 at 6 (Ex. 9 at 5).] Based on these observations and others in his report, Dr. Oestreich concluded "that Mrs. Rachel Cole is not responsible for the alleged conduct of Mrs. Dianna Stringham's formal report of discrimination and harassment." [Filing No. 54-9 at 6 (Ex. 9 at 5).]

*IV.     Stringham performance deficiencies persist throughout the 2020-2021 school year and, as a result, the School implements a second performance improvement plan for the 2021-2022 school year.*

23.     According to Borto, Stringham's performance did not improve during the 2020-2021 school year. [Filing No. 54-1 at 29 (Ex. 1 – Board Transcript 27:3-6).] Her most prominent performance deficiency during this time involved failing to identify several senior students who might

not graduate–specifically, toward the end of March 2021, Borto met with each counselor individually to identify such seniors and develop strategies to get them on the right track. [Filing No. 54-1 at 33-34 (Ex. 1 – Board Transcript 31:2-32:2).] When Borto met with Stringham to review her at-risk seniors, Stringham identified approximately four students. [Filing No. 54-1 at 34 (Ex. 1 – Board Transcript 32:3-7).] Later on, at the end of the Spring 2021 semester, Stringham notified Borto that five of her students would not graduate and would instead require further instruction in an alternative learning program over the summer. [Filing No. 54-1 at 34-35 (Ex. 1 – Board Transcript 32:8-33:10).] None of these five students was among the ones that Stringham identified when she met with Borto at the end of March. [Filing No. 54-1 at 35, 71 (Ex. 1 – Board Transcript 33:11-16, 69:15-25).] In addition, other counselors would report "[r]arely any" or at most one student at the end of the Spring semester who failed to graduate. [Filing No. 54-1 at 34-35 (Ex. 1 – Board Transcript 32:23-33:4).] Again, Stringham reported five. [Filing No. 54-1 at 34-35 (Ex. 1 – Board Transcript 32:8-33:10).]

24.     Borto was "angry to say the least" to learn that five of Stringham's students would not be graduating and that she failed to identify any of them during their end-of-March meeting. [Filing No. 54-1 at 35 (Ex. 1 – Board Transcript 33:19-21).] Borto added, "[T]o know we missed students that we could have gotten across the finish line to graduation was devastating for those kids . . . and for those families. And I get upset that we took time to do that and we missed those kids." [Filing No. 54-1 at 36 (Ex. 1 – Board Transcript 34:3-8).] In Borto's view, of the five students Stringham identified belatedly, three could have graduated if she identified them sooner, and two of those three never graduated from Carmel High School. [Filing No. 54-1 at 36 (Ex. 1 – Board Transcript 34:9-18).]

25.     Based on Stringham's failure to identify at-risk seniors, as well as her other performance deficiencies during the 2020-2021 school year, Borto and Cole determined that an additional improvement plan for the upcoming 2021-2022 school year was warranted. [Filing No. 54-1 at 39 (Ex. 1 – Board Transcript 37:4-7).] Borto explained her and Cole's reasons for the plan:

[O]ne of our biggest concerns is the proactive approach. It's our expectation that our counselors are working with our students, catching things for our students academically, socially, what's happening at home to best help them. Mrs. Stringham's approach was very reactive. Someone had to bring her something. A student had to email her something in order for action to happen.

[Filing No. 54-1 at 40 (Ex. 1 – Board Transcript 38:5-15).]

26.     The plan addressed Stringham's failure to identify at-risk seniors. [Filing No. 54-10 at 2-3 (Ex. 10 at 1-2).] It also addressed issues that persisted since Stringham's last plan, such as responding to emails in a timely manner. [Filing No. 54-10 at 4-5 (Ex. 10 at 3-4).] To address ongoing concerns with her communication, the plan required that Stringham copy Cole (and later Borto) on all email communications to students and parents. [Filing No. 54-10 at 5 (Ex. 10 at 4).]; [Filing No. 54-1 at 41 (Ex. 1 – Board Transcript 39:3-23).] The plan also contemplated periodic meetings during the Fall 2021 semester to assess Stringham's progress, culminating in a meeting during the week of October 11, 2021, where "it will be determined if Dianna will come off the plan, if the plan will be extended or if Mrs. Cole and Ms. Borto recommend non-renewal of Dianna's contract." [Filing No. 54-10 at 5-6 (Ex. 10 at 4-5).]

27.     To address Stringham's concerns that she was not receiving written feedback, Cole uploaded "artifacts" to help Stringham better understand the issues she was seeing. [Filing No. 54-11 at 4 (Ex. 11 – Oestreich Depo. 23:20-24:3).] "Artifacts" are not write-ups, but rather written communication from supervisors to subordinates that give subordinates feedback and help supervisors measure performance. [Filing No. 54-1 at 41-44 (Ex. 1 – Board Transcript at 39:24-42:8).]

28.     During their Fall 2021 meetings, Cole and Borto shared with Stringham that she was showing improvement in some areas, but not in others. [Filing No. 54-12 at 2 (Ex. 12 at 1).]; [Filing No. 54-13 at 2 (Ex. 13 at 1).]; [Filing No. 54-14 at 2 (Ex. 14 at 1).] For example, following their August 30, 2021, meeting, Cole noted that Stringham was "staying on top of action items from the improvement plan and it is evident you are trying," but also emphasized there were "still major areas

of concern," such as communication and professionalism. [Filing No. 54-12 at 2 (Ex. 12 at 1).] Following their September 14, 2021, meeting, Cole indicated that she and Borto "did not have as many items to address specifically," but still had some concerns, including how Stringham interacts with co-workers when they raise an issue involving one of her students. [Filing No. 54-13 at 2 (Ex. 13 at 1).] Following their September 27, 2021, meeting, Cole provided Stringham with feedback on how she could have better handled a situation with a student and praised Stringham for her observation that she needs "to slow down and get more organized . . . ." [Filing No. 54-14 at 2 (Ex. 14 at 1).]

29.     Based on these meetings and Stringham's overall performance during the Fall 2021 semester, Cole and Borto decided that her performance improvement plan should continue. [Filing No. 54-1 at 45 (Ex. 1 – Board Transcript 43:5-12).] When they met with Stringham to announce their decision, Stringham became upset and started crying and, shortly thereafter, sought and received FMLA leave. [Filing No. 54-1 at 75 (Ex. 1 – Board Transcript 73:4-25).]

*V.     Stringham makes her second internal complaint against Cole and returns from FMLA leave.*

30.     When Stringham returned from FMLA leave in January 2022, Cole and Borto met with her to discuss continuing the performance improvement plan. [Filing No. 54-1 at 46 (Board Transcript 44:15-21).]

31.     Just before returning from FMLA leave, Stringham filled out and signed her second "Report of Discrimination and/or Harassment" form complaining that Cole had "targeted," "harassed," and retaliated against her from April 2021 to October 2021. [Filing No. 54-15 at 2 (Ex. 15 at 1).] In a handwritten document accompanying her complaint, Stringham indicated that she thought Cole acted unlawfully toward her based on her evaluation for the 2020-2021 school year, as well as the current school year's performance improvement plan and Stringham's perception that Cole was scrutinizing her performance excessively and unfairly. [Filing No. 54-15 at 3 (Ex. 15 at 2).] Stringham did not allege that anyone other than Cole had treated her unlawfully. [Filing No. 54-2 at 12 (Ex. 2 –

Plaintiff Depo. 85:5-23).]; [Filing No. 54-15 at 2 (Ex. 15 at 1).] She also identified several witnesses to

support her allegations. [Filing No. 54-15 at 2 (Ex. 15 at 1).]

 32. When Dr. Oestreich's office received Stringham's second complaint, he assigned

Shelley Coover, Assistant Director of Human Resources, to investigate. [Filing No. 54-1 at 149 (Ex.

1 – Board Transcript 147:6-18).]

*VI.* *Stringham raises her voice at Cole and accuses her of "being ridiculous" when Cole refuses to sign licensure forms that would have required her to certify inaccurate information and, as a result, the School places Stringham on paid administrative.*

 33. In late January 2022, Stringham requested that Cole sign two forms that were part of

Stringham's application for licensure as a mental health counselor associate and a mental health

counselor with the State of Indiana. [Filing No. 54-2 at 12-13 (Ex. 2 – Plaintiff Depo. 85:25-89:12).]

These licenses were not required for Stringham to work as a counselor with the School, but part of a

more general effort for her to obtain additional credentialing and otherwise improve herself. [Filing

No. 54-2 at 18 (Ex. 2 – Plaintiff Depo. 110:16-111:8).]

 34. The first form was titled, "Verification of Practicum for Licensure as a Mental Health

Counselor (LMHC) or a Mental Health Counselor Associate (LMHCA)." [Filing No. 54-16 at 9 (Ex.

16 at 8).] The section that Stringham wanted Cole to fill out and sign stated that it "must be completed

by an official of the institution that has granted you the academic credit for this supervised clinical

experience." [Filing No. 54-2 at 13 (Ex. 2 – Plaintiff Depo. 89:13-23).]; [Filing No. 54-16 at 9 (Ex. 16

at 8).] The section also required Cole to certify that Stringham "had completed at least a one hundred

(100) hour practicum that enabled the applicant to develop basic counseling skills" and "a minimum

of forty (40) hours of direct service with clients during this practicum." [Filing No. 54-16 at 9 (Ex. 16

at 8).]

 35. The second form was titled, "Verification of Internship for Licensure as a Mental

Health Counselor (LMHC) or a Mental Health Counselor Associate (LMHCA)." [Filing No. 54-16 at

10 (Ex. 16 at 9).] The section that Stringham wanted Cole to fill out and sign required Cole to certify

that Stringham completed a 600-hour internship with the School. [Filing No. 54-2 at 13-14 (Ex. 2 –

Plaintiff Depo. 92:21-93:3).]; [Filing No. 54-16 at 10 (Ex. 16 at 9).] The section also required Cole to

certify that during "the completion of this internship, the applicant did receive the following total

number of hours of face-to-face supervision," with Cole filling in those hours. [Filing No. 54-16 at 10

(Ex. 16 at 9).] Stringham was never an intern for the School. [Filing No. 54-2 at 14 (Ex. 2 – Plaintiff

Depo. 95:15-17).]

 36.  Cole did not feel comfortable signing the forms and, in an email dated January 24,

2022, expressed her concerns to several colleagues. [Filing No. 54-1 at 127 (Ex. 1 – Board Transcript

125:16-25).]; [Filing No. 54-17 at 2 (Ex. 17 at #).] Specifically, she listed representations on each form

that she thought were inaccurate for her to certify, asked if she could refuse to sign them, and further

explained, "I don't feel the criterion listed is something I can sign-off on since this didn't happen, nor

is it something that I feel comfortable signing off on professionally." [Filing No. 54-17 at 2 (Ex. 17 at

#).]

 37.  In an email to Stringham dated January 26, 2022, Dr. Oestreich wrote:

> I am in receipt of your request that CCS fill out a form representing that you have
> completed certain requirements for licensure as a mental health counselor or mental
> health counselor associate. It does not appear that CCS can validly attest to the
> information that has been requested. Among other requirements, the form requires a
> person filling it out to represent you have completed an internship, received academic
> credit, and performed supervised clinical experience. As far as your employment with
> CCS is concerned, none of these is true.
>
> If you think I have misinterpreted this form or what you are requesting, then I
> recommend you contact me directly for further discussion.

[Filing No. 54-18 at 2 (Ex. 18 at 1).]

 38.  In her reply to Dr. Oestreich, Stringham explained that "[t]he state told me that I just

have to have my employer sign the practicum and internship hours because I have worked as a licensed

school counselor" but did not otherwise attempt to reconcile Dr. Oestreich's point that some of the

certifications were not true as far as far as Stringham's employment with the School was concerned. [Filing No. 54-18 at 2 (Ex. 18 at 1).] Stringham also stated, "I can actually have any of the schools that I have worked for complete this form because I have already been working as a licensed school counselor," but did not explain whether she contacted those schools to complete the forms or planned to do so. [Filing No. 54-18 at 2 (Ex. 18 at 1).] Aside from her email exchange with Dr. Oestreich, Stringham did not have any further discussion with him about the forms. [Filing No. 54-2 at 17 (Ex. 2 – Plaintiff Depo. 105:6-14).]

39.     Upset that Cole would not complete the forms, on January 28, 2022, Stringham went into Cole's office to discuss the matter further, explaining that they were just a "formality" and that she completed her internship and practicum before working for the School. [Filing No. 54-1 at 77 (Ex. 1 – Board Transcript 75:15-19).]; [Filing No. 54-2 at 17 (Ex. 2 – Plaintiff Depo. 105:18-107:22).] By going to Cole instead of Dr. Oestreich, Stringham understood that she was not following Dr. Oestreich's directive to discuss the matter with him. [Filing No. 54-1 at 77 (Ex. 1 – Board Transcript 75:11-14).]

40.     When Cole stated that she was not signing the forms, Stringham said, "[t]his is ridiculous," raised her voice at Cole, and accused Cole of "being ridiculous." [Filing No. 54-1 at 77-78 (Ex. 1 – Board Transcript 75:20-76:18).]; [Filing No. 54-2 at 17-18 (Ex. 2 – Plaintiff Depo. 107:23-109:2, 111:14-112:4).] Cole tried to defuse the situation by reiterating to Stringham that she would not sign and telling her to address the matter with Dr. Oestreich instead. [Filing No. 54-1 at 129 (Ex. 1 – Board Transcript 127:1-6).] When Stringham refused and told Cole to contact the State, Cole became uncomfortable. [Filing No. 54-1 at 129 (Ex. 1 – Board Transcript 127:6-10).]

41.     During this interaction, Borto was in her office with another employee when a counselor interrupted to report that Stringham was yelling at Cole and that Borto should help her. [Filing No. 54-1 at 46-47 (Ex. 1 – Board Transcript 44:22-45:7).] When she arrived at Cole's office,

Borto observed Stringham leaning over Cole's desk and "yelling at Rachel to sign papers . . . ." [Filing No. 54-1 at 47, 129 (Ex. 1 – Board Transcript 45:8-15, 127:21-25).] This was the first time Borto had seen a School employee yell at a supervisor. [Filing No. 54-1 at 47 (Ex. 1 – Board Transcript 45:21-24).] Borto defused the situation by telling Stringham to direct any questions about the forms to Dr. Oestreich and removing Cole from the office. [Filing No. 54-1 at 47 (Ex. 1 – Board Transcript 45:16-20).]

42.     This was not the first time that Stringham behaved this way toward Cole–in February 2019, she became angry with Cole, yelled at her, and slammed her office door. [Filing No. 54-1 at 107-108, 112 (Ex. 1 – Board Transcript 105:23-106:9, 110:19-24).] In her written account of that incident, Stringham admitted that she called Cole "ridiculous" and acknowledged that "[i]t is not a moment that I'm proud of doing." [Filing No. 54-8 at 4 (Ex. 8 at 3).] Other than these two incidents, no other employee had acted this way toward Cole. [Filing No. 54-1 at 130 (Ex. 1 – Board Transcript 128:5-9).]

43.     In an email to Borto dated January 28, 2022, Cole summarized her encounter with Stringham from earlier that day. [Filing No. 54-19 at 2 (Ex. 19 at 1).] In her reply, Borto told Cole that she had shared the summary with Dr. Oestreich and that he was following up with the School's counsel "as to next steps." [Filing No. 54-19 at 2 (Ex. 19 at 1).]

44.     In a letter dated January 31, 2022, Dr. Oestreich informed Stringham that the School was placing her on paid administrative leave. [Filing No. 54-11 at 7 (Ex. 11 – Oestreich Depo. 34:16-25).] Dr. Oestreich decided that such leave was appropriate "[b]ecause of the nature of the incident that took place between [Stringham] and Rachel Cole" and because he wanted to have an opportunity to discuss the incident with witnesses "and also talk to Mo Borto and Dr. Harmas before making any decisions on what next steps may look like." [Filing No. 54-11 at 8 (Ex. 11 – Oestreich Depo. 35:7-15).]

VII.  *The School interviews several witnesses regarding Stringham's encounter with Cole and, based on that incident and ongoing concerns with her performance, Principal Harmas makes a preliminary determination to cancel Stringham's regular teacher's contract.*

45.     Shortly after receiving Cole's summary, Dr. Oestreich interviewed several employees who witnessed Cole's encounter with Stringham. [Filing No. 54-11 at 5 (Ex. 11 – Oestreich Depo. 26:13-27:2).] Each employee emailed a written summary of their observations about the encounter, and Dr. Oestreich compiled their summaries in an email to the School's counsel and the Superintendent, Dr. Michael Beresford. [Filing No. 54-20 at 2 (Ex. 20 at #).]

46.     After speaking with the employees, Dr. Oestreich discussed the matter with Borto and Principal Harmas to decide how they wanted "to move forward and address the concern." [Filing No. 54-11 at 5 (Ex. 11 – Oestreich Depo. 27:3-6).] Dr. Oestreich shared the January 28th incident between Stringham and Cole, as well as "[c]ontinued concerns with Mrs. Stringham," "[c]ontinued errors in her performance," "the totality of working with Mrs. Stringham," and "having her on improvement plans." [Filing No. 54-11 at 5 (Ex. 11 – Oestreich Depo. 27:11-19).] Based on the information Dr. Oestreich provided, Principal Harmas decided to recommend cancellation of Stringham's regular teacher's contract, and Borto concurred. [File 54-11 at 5 (Ex. 11 – Oestreich Depo. at 27:20-24).]

47.     Borto thought that Stringham's behavior toward Cole was unprofessional and was part of the reason she concurred with Principal Harmas. [Filing No. 54-1 at 47-48 (Ex. 1 – Board Transcript 45:25-46:24).] She further explained that recommending Stringham's termination was appropriate because:

> we have progressively gone through disciplinary action to the point where it was clear that her performance wasn't improving, our kids were still suffering and struggling because of her performance, and it was clear through all of our meetings and through this action she did not understand what was wrong with her performance in order to improve it.

[Filing No. 54-1 at 48-49 (Ex. 1 – Board Transcript 46:25-47:8).]

48.     In a letter dated February 4, 2022, Principal Harmas informed Stringham that he had made the preliminary decision to cancel her regular teacher's contract. [Filing No. 54-21 at 2 (Ex. 21 at 1).] He provided the following reasons for his preliminary decision:

- Your unprofessional behavior directed towards your supervisor on January 28, 2022, where you were yelling loudly at her about a form you demanded she sign, when the assistant superintendent already communicated with you that any questions should be addressed to him about the topic.

- You[r] continued job performance that falls below what we expect out of our counselors at Carmel High School. You continue to make errors in your role as a counselor that impacts other staff and students.

[Filing No. 54-21 at 2 (Ex. 21 at 1).]

49.     Principal Harmas also stated that "[t]hese reasons constitute . . . insubordination, incompetence, neglect of duty and other good and just cause within the meaning of Indiana Code section 20-28-7.5-1(b)(6)." [Filing No. 54-21 at 2 (Ex. 21 at 1).]

*VIII.   The School completes its investigation of Stringham's second internal complaint, and the Superintendent recommends that the Board cancel Stringham's regular teacher's contract.*

50.     On February 15, 2022, Coover reported that she met with each witness that Stringham identified in her second complaint against Cole and provided a summary of each witnesses' responses to her questions. [Filing No. 54-22 at 2-4 (Ex. 22 at 1-3).] None was able to substantiate that Cole acted unlawfully toward her. [Filing No. 54-22 at 2-4 (Ex. 22 at 1-3).]

51.     In a letter to the School Board President dated March 1, 2022, Superintendent Beresford reported that he conducted a private conference with Stringham at her request. [Filing No. 54-23 at 2 (Ex. 23 at 1).] Dr. Beresford summarized the reasons for Principal Harmas' preliminary determination, as well as his discussion with Stringham during the private conference. [Filing No. 54-23 at 2-3 (Ex. 23 at 1-2).] Based on these observations, Dr. Beresford recommended that the Board cancel Stringham's regular teacher's contract. [Filing No. 54-23 at 3 (Ex. 23 at 2).]

IX.   *The Board conducts a hearing and cancels Stringham's regular teacher's contract.*

52.   The Board conducted a hearing on March 15, 2022, with the School administration, Stringham, and the Board each represented by counsel. [Filing No. 1-1 at 3.] The School administration and Stringham examined and cross-examined witnesses and stipulated to the admissibility of seventy-six exhibits, plus one Board exhibit. [Filing No. 1-1 at 2.]; [Filing No. 54-1 at 6-9 (Ex. 1 – Board Transcript at 4-7).]

53.   On March 28, 2022, the Board issued findings of fact and conclusions of law, deciding by a 5-0 vote to cancel Stringham's regular teacher's contract immediately. [Filing No. 1-1 at 20.] In reaching this decision, the Board concluded that the School administration had proved by a preponderance of the evidence four separate statutory bases for cancellation–incompetence, neglect of duty, insubordination, and other good or just cause. [Filing No. 1-1 at 14-15.] Proving any of these was sufficient to cancel Stringham's regular teacher's contract. *See* Ind. Code § 20-28-7.5-1(b).

54.   The Board rejected Stringham's claims that the School administration's true motivation for terminating her was animus based on her race/ethnicity or her sexual orientation. [Filing No. 1-1 at 15.] The Board reasoned that Stringham was an outlier in terms of her performance deficiencies and thus could not show that similarly-situated counselors were treated more favorably; that she offered nothing more than a "pure guess" to support her claim that the School administration's proffered reasons for canceling her contract were a pretext; and that it was illogical to infer that Cole harbored animus based on Stringham's sexual orientation because Cole gave her "the highest performance rating" for four consecutive years despite knowing her sexual orientation. [Filing No. 1-1 at 16-18.]

55.   The Board also rejected Stringham's retaliation claim, noting that the School administration had expressed concerns about her performance before she made her first internal complaint and that all Stringham offered to support causation between her protected activity and the

School administration's decision to recommend termination was her perception that the timing was suspicious. [Filing No. 1-1 at 17-18.]

X.    *Additional undisputed material facts relevant to this Motion.*

56.    Stringham does not allege in this lawsuit that anyone other than Cole discriminated or retaliated against her. [Filing No. 54-2 at 21 (Ex. 2 - Plaintiff Depo. 129:22-130:9).]

57.    Borto recommended that Principal Harmas cancel Stringham's regular teacher's contract based on her own independent observations of Stringham's performance, lack of improvement under the performance improvement plans, and Stringham's "highly inappropriate" behavior toward Cole on January 28, 2022. [Filing No. 54-24 at # (Borto Dec. at 2, ¶7).]

58.    Principal Harmas made his preliminary determination to cancel Stringham's regular teacher's contract based on feedback from Borto and Dr. Oestreich, and Cole did not participate or provide information related to Principal Harmas' preliminary determination. [Filing No. 54-24 at # (Borto Dec. at 2-3, ¶8).]

59.    Stringham never heard Cole make derogatory comments about any person's national origin or ethnicity. [Filing No. 54-2 at 9 (Ex. 2 – Plaintiff Depo. 54:19-55:7).]

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). The Seventh Circuit has described summary judgment as the "'put up or shut up' moment in litigation," which means "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, [the court] mean[s] evidence on which a reasonable

jury could rely." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal citations omitted). In conducting this review, the court construes all relevant facts and reasonable inferences in the non-moving party's favor. *Porter v. City of Chicago*, 700 F.3d 944, 950 (7th Cir. 2013).

ARGUMENT

As indicated above, Stringham's Amended Complaint fall into four categories. All of Stringham's claims are foreclosed as a matter of law.

I.      *Summary judgment is appropriate on Stringham's Constitutional and Statutory Claims.*

Stringham wedges several different constitutional and statutory claims into Counts 1 and 2 of her Amended Complaint. [Filing No. 29 at 20-26.] None has merit, and each is addressed below in turn.

a.      *Section 1983 claim.*

Stringham alleges that the School Board's decision to terminate her employment was arbitrary and capricious and therefore violated her rights under the Fourteenth Amendment to the United States Constitution. [Filing No. 29 at 20, ¶94.] The Seventh Circuit has instructed that for a Section 1983 claim based on an alleged arbitrary and capricious termination,

> it has long been our precedent that a plaintiff who challenges the substance of a government decision on substantive due process grounds (as opposed to challenging the process the decision-makers used on procedural due process grounds) must show (1) that the decision was arbitrary and irrational, and (2) that the decision-makers either committed another substantive constitutional violation or that state remedies are inadequate.

*Strasburger v. Bd. of Educ., Hardin Cty. Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 357 (7th Cir. 1998).

Stringham does not allege that any Board member committed a substantive constitutional violation, nor does she allege that the statutory termination proceeding she received was inadequate. Although these deficiencies are enough to foreclose her claim, there was nothing arbitrary or irrational about the Board's decision. For over four hours, Stringham had the opportunity to make her case to the Board, and she did that by cross-examining witnesses and admitting exhibits into evidence. [Filing

No. 1-1 at 1-3.] But the Board also heard from the School administration's witnesses that Stringham's performance was deficient, that her supervisors tried to help her improve, and that Stringham repaid those efforts with an outburst toward one of them. The Board, having considered the evidence and each party's arguments on how to decide the matter, concluded that the School administration had proved by a preponderance of the evidence that cancelation of Stringham's regular teacher's was appropriate. As a matter of law, there is nothing arbitrary or capricious about the process Stringham was afforded or the conclusion the Board reached.

      *b.*      *Article I, Section 12 claim.*

Stringham alleges that because the Board's decision to terminate her employment was arbitrary and capricious, that decision also violated Article I, Section 12 of the Indiana Constitution. [Filing No. 29 at 20, ¶96.] Although the foregoing establishes as a matter of law that the Board's decision was not arbitrary and capricious, Stringham's claim is additionally meritless because Article I, Section 12 provides is that "[a]ll courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law," which the Indiana Supreme Court has interpreted as prescribing "procedural fairness," *McIntosh v. Melroe Co., a Div. of Clark Equipment Co., Inc.*, 729 N.E.972, 975 (Ind. 2000), though it "does not specify any particular remedy for any particular wrong." *Cantrell v. Morris*, 849 N.E.2d 488, 499 (Ind. 2006). Again, Stringham received a termination hearing that was consistent with statutory requirements. As such, she cannot legitimately claim that she was deprived of Article I, Section 12's "procedural fairness" guarantee.

      *c.*      *Substantive due process claim.*

Stringham alleges that because the Board's decision to terminate her employment was arbitrary and capricious, it violated her substantive due process rights under the Fourteenth Amendment to the United States Constitution. [Filing No. 29 at 20, ¶97.] But again, the foregoing establishes as a matter of law that there was nothing arbitrary and capricious about the Board's decision. Beyond that,

Stringham does not appear to allege that she was deprived of any other substantive due process right. As such, this claim fails.

        *d.*       *Equal protection claim.*

Stringham alleges that "she was treated differently than other non-homosexual Carmel employees" in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. A prima facie case under the equal protection clause requires Stringham to show that (1) she is otherwise similarly situated to members of the unprotected class; (2) she was treated differently from members of the unprotected class; and (3) the School acted with discriminatory intent. *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000).

For all the reasons explained below in the arguments addressing Stringham's Title VII unlawful discrimination claims, each of these elements is lacking as a matter of law. To state those arguments succinctly here, in making this claim, Stringham overlooks that she was an extreme outlier regarding various performance deficiencies and that those deficiencies, and not her sexual orientation, were the true reasons the School terminated her employment.

        *e.*       *Article I, Section 23 claim.*

Stringham also alleges that her perceived disparate treatment based on her sexual orientation violates Article I, Section 23 of the Indiana Constitution, which provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." But Article I, Section 23 does not extend to employment decisions–rather, it "govern[s] . . . state statutes [and] the enactments and actions of county, municipal, and other governmental agencies and their equivalents." *Dvorak v. City of Bloomington*, 796 N.E.2d 236, 238 (Ind. 2003). Lack of applicability aside, for all the reasons stated above regarding her equal protection claim, and for all the reasons stated below regarding her Title VII unlawful discrimination

claims, as a matter of law Stringham cannot show that her termination or the events leading up to it were motivated by her sexual orientation.

       *f.*        *Administrative Orders and Procedures Act claim.*

In Count 2 of her Amended Complaint, Stringham asks the Court to overturn the Board's termination decision under Indiana's Administrative Orders and Procedures Act because it "was arbitrary, capricious, an abuse of discretion; contrary to constitutional right, power, privilege, or immunity; and unsupported by substantial evidence." [Filing No. 29 at 21.]; *see also* Ind. Code § 4-21.5-5-14. The Board's decision was none of these.

The Indiana Supreme Court has stated that a reviewing court must apply the "'substantial evidence' standard when reviewing the *evidentiary* support behind a school board's decision." *Stewart v. Ft. Wayne Comm. Schs.*, 564 N.E.2d 274, 277 (Ind. 1990) (emphasis in original). Under that standard, the reviewing court "may vacate a board's decision only if the evidence, when viewed as a whole, demonstrates that the conclusions reached by the board are clearly erroneous." *Id.* "If the procedural requirements are followed, including the assignment of a legal cause for cancellation [of the contract], and if there is substantial evidence presented which tends to support the legal cause, and if the hearing is, in fact, fair, the proceeding is lawful." *Id.* (citation omitted).

Here, the Board found four separate bases to cancel Stringham's regular teacher's contract–incompetence, neglect of duty, insubordination, and other good and just cause. [Filing No. 1-1 at 14-16.] As a matter of law, Stringham cannot show that any of these is clearly erroneous.

Regarding incompetence, the Board concluded that the School administration had met its burden based on Stringham's many performance deficiencies and failure to show significant improvement. *See supra*, SMF ¶54. Most jarring, Stringham made serious missteps that resulted in several of her students not graduating. *See supra*, SMF ¶¶23-24. The Board reasoned that "in the end, [Stringham's] continued shortcomings were not meeting expectations as a counselor at [Carmel High

School]." *See supra*, SMF ¶54. There is nothing clearly erroneous about the Board's decision. In her Amended Complaint, Stringham alleges that the definition of incompetence under the statute requires proof of a certain number of negative evaluations [Filing No. 29 at 23, ¶107.], but that is not the case– all the statute says is that one way of showing incompetence is if a teacher receives a certain number of negative evaluations over a prescribed period. *See* Ind. Code 20-28-7.5-1(b)(3) (2022). It does not prohibit a finding of incompetence for other reasons, including what the Board found here.

Regarding neglect of duty, the Board relied on many of the same findings that supported termination for incompetence. *See supra*, SMF ¶54. In *State ex. rel. Newton v. Board of School Trustees of M.S.D. of Wabash County*, 460 N.E.2d 533, 546 (Ind. Ct. App. 1984), a school board's determination of "neglect of duty" was upheld where a teacher failed to issue timely progress reports to students. In *Harrison-Washington Community School Corp. v. Bales*, 450 N.E.2d 559 (Ind. Ct. App. 1983), a school board's determination of "neglect of duty" was upheld where a teacher failed to follow administrative direction with respect to teaching and grading of students. Here, among other deficiencies, Stringham failed to recognize that several of her students were at risk of not graduating and, had she identified them sooner, they likely would have graduated. *See supra*, SMF ¶¶23-24. Although that is one instance of Stringham neglecting her duties, when coupled with all the other evidence before the Board, it becomes apparent that its decision was not clearly erroneous. In her Amended Complaint, Stringham focuses on her January 28th interaction with Cole as proof that she did not neglect her duties. [Filing No. 29 at 24, ¶109.] Although the designated evidence does not support her characterization of that interaction, Stringham overlooks that the evidence must be considered as a whole, *see Stewart*, 564 N.E.2d at 277, and there were many other instances where she neglected her duties.

Regarding insubordination, the Board found that Stringham "did not follow Dr. Oestreich's directive on January 28 when she went to Rachel Cole to discuss" her concerns with the forms. [Filing No. 1-1 at 12.] The Board also found that during her outburst at Cole, Stringham did not leave Cole's

office "even though Mrs. Cole–her supervisor–asked her to leave . . . ." [Filing No. 1-1 at 15.] Moreover, Stringham conceded at the Board hearing that she knew she was disregarding Dr. Oestreich's directive when she went to Cole's office. *See supra*, SMF ¶39. These findings plainly support insubordination, which the statute defines as "willful refusal to obey the state school laws or reasonable rules adopted for the governance of the school building or the school corporation." Ind. Code § 20-28-7.5-1(b)(2). In her Amended Complaint, Stringham alleges that she did not act willfully [Filing No. 29 at 22-23, ¶105.], but the above demonstrates otherwise. She also alleges that the School administration failed to identify the rule she violated [Filing No. 29 at 23, ¶106], but again, the above establishes that Dr. Oestreich instructed her to address her concerns about the forms with him, and Cole told Stringham to leave her office. As such, the Board's decision was not clearly erroneous.

Regarding other good and just cause, the Board found that some of Stringham's deficiencies mentioned above, as well as her behavior toward Cole on January 28, 2022, which it considered "highly inappropriate," met this standard. *See supra*, SMF ¶55. Other good and just cause is "any ground which is put forward in good faith, and which is not arbitrary, irrational, unreasonable, or irrelevant to the school board's task of building up and maintaining an efficient school system." *Bd. of Sch. Trustees, Sch. City of Peru v. Moore*, 33 N.E.2d 114, 116 (Ind. 1941). It was not clearly erroneous for the Board to conclude that a subordinate who confronts her supervisor in the manner Stringham did, and in a context where she was so clearly in the wrong–that is, asking Cole to sign forms that were inaccurate on their face–has plainly provided other good and just cause for her termination.

The Court should grant summary judgment in Defendants' favor on Stringham's constitutional and statutory claims (Counts 1 and 2).

III.     *Summary judgment is appropriate in the School's favor on Stringham's Title VII unlawful discrimination claims because she cannot make out a prima facie case or show pretext.*

In her Amended Complaint, Stringham alleges that the School violated Title VII when it discriminated against her based on her race (Count 3), national origin (Count 5), and sexual orientation

(Count 7). [Filing No. 27 at 13-16.] There are several deficiencies with these claims, any of which is sufficient for the Court to grant summary judgment in the School's favor. As detailed below, Stringham cannot establish several elements of a prima facie case, and even if she could, she cannot clear the high bar of demonstrating that the School's legitimate, non-discriminatory reasons for its actions are a pretext.

        *a.*        *Stringham's prima facie case fails as a matter of law.*

The Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 766 (7th Cir. 2016), dispensed with the "rat's nest of surplus 'tests'" that courts have applied to employment discrimination claims, focusing instead on the singular dispositive question of "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." Under this approach evidence must be considered "as a whole, rather than asking whether any particular piece of evidence proves the case by itself–or whether just the 'direct' evidence does so, or the 'indirect' evidence.'" *Id.*

"Nothing in *Ortiz,* however, displaced the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is sometimes referred to as the 'indirect' method of proof." *Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017). The *McDonnell Douglas* framework remains a nonexclusive means for a plaintiff to prove unlawful discrimination. *David v. Bd. of Trustees of Comm. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

To establish prima facie case of disparate treatment under the *McDonnell Douglas* framework, Stringham must show that (1) she is a member of a protected class; (2) she was meeting her employer's legitimate employment expectations; (3) she was subjected to an adverse employment action; and (4) similarly-situated employees received more favorable treatment. *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 939 (7th Cir. 2007).

1.     *Stringham was not meeting the School's legitimate employment expectations.*

Stringham cannot establish that she was meeting the School's legitimate employment expectations. The above facts conclusively establish that the School had legitimate, non-discriminatory reasons for all its actions toward Stringham, including the decision to initiate termination proceedings. *See supra*, SMF ¶¶ 9-51. Under such circumstances, as a matter of law, Stringham cannot establish that she was meeting the School's legitimate expectations.

2.     *Stringham cannot establish that similarly-situated employees received more favorable treatment.*

Stringham was an extreme outlier when it came to performance and how a subordinate should interact with her supervisor. Stringham cannot identify any co-worker who had the same degree of repeated, ongoing performance issues and also received more favorable treatment. Both Cole and Borto noted that no one besides Stringham had repeated, ongoing mistakes. Her serial failures relating to graduation requirements demonstrate this point. For both the 2019-2020 and 2020-2021 school years, Stringham neglected to remove a student from the list of those receiving a diploma. *See supra*, SMF ¶¶16-17. Stringham compounded these failures by neglecting to identify several seniors the next year who were at risk-not to graduate. *See supra* SMF, ¶¶23-24. On this critical issue–shepherding her students toward graduation–Stringham was an outliner when compared to her peers. *Id.*

Stringham cannot identify any other counselor whose failures and performance issues were as substantial as hers. She must show that her claimed comparators are "directly comparable in all material respects." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (explaining that "the similarly situated inquiry is a flexible one that considers all relevant factors, the number of which depends on the context of the case" and that "an employee need not show complete identity in comparing himself to the better treated employee, *but he must show substantial similarity.*" (citations omitted, emphasis added)).

27

Thus, the Court should conclude that Stringham has not demonstrated that similarly-situated employees were treated more favorably than she was.

> b.    *Even granting Stringham a prima facie case for argument's sake, her claims still fail because she cannot demonstrate pretext.*

Even if Stringham could establish a prima facie case for any of her disparate treatment claims, all of them are foreclosed because she cannot clear the high bar of showing pretext.

In this respect, all of Stringham's performance deficiencies and missteps mentioned above–including most prominently her outburst toward Cole–are measured against a pretext analysis that requires Stringham to show that the School did not honestly believe the reasons for recommending her termination. That is a very high bar for her to clear, for "[p]retext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2016) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)). When "assessing a plaintiff's claim that an employer's explanation is pretextual, we do not . . . second-guess[ ] an employer's facially legitimate business decisions." *Id.* (internal quotation marks omitted). An employer's reason can be "foolish or trivial or even baseless," but so long as it is a reason "honestly believed," then pretext has not been established. *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997).

It is undisputed that after Stringham's January 28th outburst at Cole, Borto and Dr. Oestreich discussed the outburst with Principal Harmas and, based on Stringham's behavior and the other ongoing issues with her performance, Principal Harmas concluded that initiating termination proceedings was appropriate. *See supra,* SMF ¶¶45-47. Moreover, it is undisputed that Cole was not involved this decision, and Cole is only administrator who Stringham claims harbored discriminatory animus. *See supra*, SMF ¶¶46, 60. As such, no reasonable person could infer a discriminatory purpose.[3]

---

[3] The Court should not apply the "cat's paw" theory of liability to this case for this reason. The "cats paw" theory applies in the following circumstance: "if a supervisor performs an act motivated by [a discriminatory or retaliatory] animus that

The Court should grant summary judgment in the School's favor on Stringham's Title VII unlawful discrimination claims (Counts 3, 5, and 7).

IV.     *Summary judgment is appropriate in the School's favor on Stringham's Title VII harassment claims under for several independent reasons.*

In her Amended Complaint, Stringham alleges that the School violated Title VII when it subjected her to a hostile work environment based on her race (Count 3), national origin (Count 5), and sexual orientation (Count 7). [Filing No. 27 at 13, 14, 15-16.] In each count, Stringham appears to allege "heightened scrutiny of her work," "being ridiculed and harassed on a daily basis," and "being subjected to unfair disciplinary procedures" as the basis for her hostile work environment claims. [Filing No. 27 at 13, ¶119; 14, ¶128; 15-16, ¶137.] For reasons explained below, summary judgment is appropriate in the School's favor on each of these counts.

A harassment claim based on a hostile work environment requires the plaintiff to show "(1) she was subjected to unwelcome harassment, (2) the harassment was based on [a protected category], (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). "The third factor . . . requires the unwelcome conduct to be severe or pervasive from both a subjective and an objective point of view." *E.E.O.C. v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018).

There are several deficiencies with Stringham's harassment claims:

---

is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable...." *Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 790 (7th Cir. 2012) (quoting *Staub*, 131 S.Ct. at 1194). Thus, it is only appropriate "to impute discriminatory or retaliatory animus to a decisionmaker when the 'party nominally responsible for a decision is, by virtue of her role in the company, totally dependent on another employee to supply the information on which to base that decision.'" *Id.* (quoting *Brewer v. Bd. of Trustees of the Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007). Because Cole was not involved in the decision to initiate termination proceedings, her discriminatory or retaliatory animus—even if the Court finds it did exist—could not be imputed to the School.

First, the conduct Stringham identifies as harassing–"heightened scrutiny of her work," "being ridiculed and harassed on a daily basis," and "being subjected to unfair disciplinary procedures" [Filing No. 27 at 13, ¶119; 14, ¶128; 15-16, ¶137.]–was in response to undisputed and well-documented issues with her performance that the School administration worked hard at to help her improve. Stringham cannot show that any of this conduct was "because of" any of the protected categories that she identifies. There is a dearth of evidence that Cole–who, again, is the only School administrator who Stringham claims was motivated by animus–did anything overt to suggest that her conduct toward Stringham was not an effort to help her improve, but rather "because of" a protected category.

Indeed, the only evidence Stringham offered in this regard is that Cole allegedly once told a colleague, "Can you believe Stringham is married to a woman? That is weird." [Filing No. 27 at 4, ¶32.] But that does not show animus and, moreover, Stringham overlooks that Cole was aware of her sexual orientation well before concerns arose about her performance, and during which time she repeatedly rated Stringham "Highly Effective" in annual reviews. [Filing No. 1-1 at 2-3.] As such, the common thread running through Cole's supervision of Stringham is that Stringham's performance declined and that Cole and other administrators tried to address the decline, not that Cole suddenly decided to harass her "because of" her sexual orientation. Regarding the other protected categories, Stringham conceded that Cole never did anything overt that might indicate she harbored animus toward her national origin or her ethnicity. *See supra*, SMF ¶61. Those harassment claims fail, as there is nothing to suggest any of Cole's conduct was motivated on the basis of Stringham's race or national origin. *See, e.g., Odongo v. Brightpoint N. Am., L.P.*, No. 116CV00685TWPDML, 2018 WL 4539265, at *7 (S.D. Ind. Sept. 21, 2018) (concluding the plaintiff "designated no evidence to raise a reasonable inference that the alleged harassment was based on his race or national origin."). All this falls far short of what is required to make an actionable harassment claim: "Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be *some* connection, for

not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a [protected class]." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022) (citations and quotation marks omitted) (emphasis in original).

Second, Stringham cannot establish that that the alleged harassing conduct was severe or pervasive. This requires Stringham to demonstrate that her work environment was both subjectively and objectively offensive. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007). "[T]he conduct at issue must be sufficiently severe or pervasive such that a reasonable person would find it hostile and [that] the victim [herself] subjectively sees as abusive." *Murray v. Chicago Transit Authority*, 252 F.3d 880, 889 (7th Cir. 2001) (quotations and citations omitted). In evaluating this element, a court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 902 (7th Cir. 2005) (internal quotations omitted).

Put simply, Stringham cannot show that any of Cole's efforts to help her improve, or any other conduct she ascribes to Cole, meets the "severe or pervasive" standard. Nothing about the feedback provided to Stringham was objectively offensive, threatening, or humiliating. Furthermore, the single, isolated statement Stringham has alleged here does not meet the definition of harassment. In *Filipovic v. K & R Exp. Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999), the Seventh Circuit concluded that four national origin-related comments made over the course of a year were not actionable. *Id.* The Court specifically noted that "relatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment." *Id.* (quoting *Ngeunjuntr*, 146 F.3d at 467) (internal quotation omitted). Indeed, the four statements at issue in *Filipovic* were considered "too infrequent to constitute the 'concentrated or insistent barrage' necessary to render [plaintiff's] claim actionable." *Id.* (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir.1995)). So too here. Nowhere in Stringham's

Amended Complaint does she allege that Cole engaged in behavior that rises to the level of harassment under Title VII, nor can she designate such evidence. As such, Stringham's harassment claim fails.

The Court should grant summary judgment in the School's favor on Stringham's Title VII harassment claims.

V.    *Summary judgment is appropriate in the School's favor on Stringham's retaliation claims.*

In her Amended Complaint, Stringham alleges that the School violated Title VII when it retaliated against her based on her internal complaints (Counts 4, 6, and 8). [Filing No. 27 at 14-16.] Stringham claims that the School's retaliatory conduct consisted of "plac[ing] her on a performance improvement plan, paper[ing] her file with sixty (60) artifacts, and terminat[ing] her employment…" [Filing No. 27 at 14, ¶124; 15, ¶133; 16, ¶142.]

Retaliation under Title VII requires the employee to establish the following: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) The adverse employment action element requires the employee to show that the employer's action "would dissuade a reasonable worker from participating in protected activity." *Huri v. Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015). If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions, which the employee must show to be a pretext for unlawful retaliation. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 379-80 (7th Cir. 2020).

For several reasons explained below, Stringham's retaliation claims fall apart upon closer inspection:

First, to the extent Stringham claims that the School retaliated against her based on her first internal complaint by implementing her first improvement plan, the undisputed timing of those events forecloses any such claim. Based on the evaluation and other feedback she received toward the end

of the 2019-2020 school year, Stringham was aware that her performance needed to improve and, to that end, it is undisputed that Borto, Cole, and others began working on her improvement plan in the Summer of 2020–well before she made her first internal complaint in September 2020. *See supra*, SMF ¶¶12-14, 16-20. "It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against [her] for engaging in statutorily protected activity . . . . An employer cannot retaliate if there is nothing for it to retaliate against." *Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003). Any retaliation claim along these lines fails as a matter of law.

Second, to the extent Stringham contends that her improvement plans or the artifacts she received as feedback are proof of retaliation, as matter of law neither would dissuade a reasonable employee from engaging in protected activity. "To rise to the level of an adverse action, a change 'must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Bagwe v. Sedgwick Claims Mgmt. Servs.*, Inc., 811 F.3d 866, 889 (7th Cir. 2016) (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007)). "A [performance improvement plan], without more, does not rise to this level." *Id.* (citing *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, 651 F.3d 664, 677 (7th Cir. 2011). Stringham's performance improvement plans required her to perform tasks that were expected of any high school guidance counselor. Her plans also are consistent with others that the Seventh Circuit has concluded are not actionable. *See, e.g., Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (concluding that a performance improvement plan requiring employee to submit daily and weekly schedules, "become more aware of her tone," and "work[] on becoming a better listener" was not an adverse employment action). The same goes for the "artifacts" feedback that Stringham received. Any subjective discontent Stringham had over receiving them does not amount to an adverse employment action.

Third, granting for argument's sake that the improvement plans and artifacts are adverse employment actions, Stringham cannot demonstrate pretext–that is, she cannot show that the School

administration did not honestly believe its reasons for issuing them. Moreover, Stringham's concession that only Cole retaliated against her, *see supra* SMF ¶58, coupled with undisputed fact that Borto was involved in all aspects of Stringham's performance improvement plans [Filing No. 54-24 at # (Ex. 24 – Borto Dec. at 2, ¶¶4-6)], further vitiates any reasonable inference of retaliation.

Fourth, although Stringham's termination was an adverse employment action, as a matter of law there is no causal connection between her internal complaints and the School administration's decision to initiate the contract cancellation process. When the School administration initiated that process, well over a year had passed since Stringham's first internal complaint, which is far too long to allow a reasonable inference of causation. *See, e.g., Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (concluding that the "inference of causation weakens as the time between the protected expression and the adverse action increases" and that "[i]f the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed." (internal quotations omitted)). Likewise, over three weeks passed between Stringham's second internal complaint and the initiation of termination proceedings, which is too tenuous of a time lapse as well because "[s]uspicious timing alone rarely is sufficient to create a triable issue." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006). Moreover, not only does Stringham lack suspicious timing, but she runs headlong into the well-established rule that the causal chain breaks when "a significant intervening event separates an employee's protected activity from her discharge." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022). Here, the significant intervening event was Stringham's January 28th outburst at Cole. *See supra*, SMF ¶¶39-41, 59. This was the proverbial "straw that broke the camel's back," and it also easily breaks the causal chain, foreclosing any reasonable inference of retaliation.

Fifth, granting for argument's sake that Stringham could establish a prima facie case, her retaliation claims still fail because she cannot show pretext. It is undisputed that after Stringham's

January 28th outburst, Borto, Dr. Oestreich, and Principal Harmas discussed the matter. As Dr. Oestreich testified, he shared Stringham's outburst, "[c]ontinued concerns with Mrs. Stringham," "[c]ontinued errors in her performance," "the totality of working with Mrs. Stringham," and "having her on improvement plans" and based on those reasons Principal Harmas decided that recommending cancellation of Stringham's regular teacher's contract was appropriate. *See supra*, SMF ¶46. In her testimony before the Board, Stringham suggested that her behavior toward Cole on January 28th was appropriate [Filing No. 54-1 at 78 (Ex. 1 – Board Transcript 76:19-22).], but it is undisputed that Borto, Dr. Oestreich, and Principal Harmas thought differently about her behavior. Stringham's disagreement with their assessment has no bearing on her retaliation claim, for in the final analysis she must show they did not honestly believe the reasons for their decision to initiate cancellation proceedings. On that critical point, Stringham cannot designate any evidence whatsoever, which means her claim fails as a matter of law.

Sixth, Stringham's concession that no one other than Cole retaliated against her serves as a separate and independent basis for resolving her retaliation claim. *See supra*, SMF ¶58. Again, the only adverse employment action Stringham suffered was her termination, but it is undisputed that Cole was not involved in that decision. *See supra*, SMF ¶60. Instead, Principal Harmas decided to initiate cancellation proceedings based on feedback from Borto and Dr. Oestreich. *See id.* Stringham's concession is fatal to her retaliation claims.

The Court should grant summary judgment in the School's favor on Stringham's Title VII retaliation claims (Counts 4, 6, and 8).

## CONCLUSION

For reasons stated, Defendants respectfully request that the Court grant summary judgment in their favor on all of Stringham's remaining claims and also enter final judgment in their favor.

Respectfully submitted,

Brent R. Borg
Brent R. Borg, Atty. No. 27415-29
Hannah B. Gahimer, Atty. No. 37630-41
CHURCH CHURCH HITTLE + ANTRIM
10765 Lantern Road, Suite 201
Fishers, IN 46038
bborg@cchalaw.com
hgahimer@cchalaw.com

Jessica Williams Schnelker, Atty. No. 31566-49
Cassie N. Heeke, Atty. No. 36497-49
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
jschnelker@cchalaw.com
cheeke@cchalaw.com

Attorneys for Defendants,
Carmel Clay Schools and
Board of School Trustees of Carmel Clay Schools

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July 2023, a true and exact copy of the foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing was sent to the following persons by operation of the Court's Electronic filing system:

Sandra L. Blevins
Jamie A. Maddox
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, IN 46204
jmaddox@betzadvocates.com
sblevins@betzadvocates.com
litigation@betzadvocates.com

Brent R. Borg
Brent R. Borg, Atty. No. 27415-29