```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF INDIANA
 2                  INDIANAPOLIS DIVISION

 3

 4  DIANNA STRINGHAM,            )
                                 )
 5              Plaintiff,       )
                                 )
 6       -v-                     ) CAUSE NO.
                                 ) 1:22-cv-00817-TWP-MG
 7  CARMEL CLAY SCHOOLS and      )
    BOARD OF SCHOOL TRUSTEES OF  )
 8  CARMEL CLAY SCHOOLS,         )
                                 )
 9              Defendants.      )

10

11

12          The deposition upon oral examination of

13  DIANNA STRINGHAM, a witness produced and sworn before

14  me, Julie A. Nicholson, RPR, CRR, Notary Public in and

15  for the County of Hamilton, State of Indiana, taken on

16  behalf of the Defendants at the offices of

17  Stewart Richardson & Associates, One Indiana Square,

18  Suite 2425, Indianapolis, Indiana, on June 20, 2023,

19  at 8:56 a.m., pursuant to the Federal Rules of Civil

20  Procedure.

21

22

23

24          STEWART RICHARDSON & ASSOCIATES
            Registered Professional Reporters
25                 (800)869-0873
```

**EXHIBIT 102**

```
 1  A  No.  My youngest client is four and my -- it goes
 2     four to adult.  So I deal with domestic violence,
 3     abused children, abused women, foster children.
 4  Q  Thank you for that.  It was anticipating my next
 5     question, the nature of your therapy services.
 6     When did you begin that occupation?
 7  A  April of 2023, last year -- no, wait.  I'm sorry.
 8     2022.
 9  Q  Thank you.  So that would have been shortly
10     after -- weeks or months after the termination of
11     your employment with Carmel; is that correct?
12  A  That is correct.
13  Q  Are you full-time?
14  A  Yes.
15  Q  Let's talk about your work with Carmel Clay
16     Schools.
17  A  I also am an adjunct professor for I- -- Indiana
18     University.
19  Q  Thank you.  What do you teach?
20  A  I teach school counseling classes.
21  Q  How many -- course load?  Number of credits in a
22     given semester?
23  A  Because I'm an adjunct, I teach one course a
24     semester.  And I used to do that for them probably
25     eight years ago and then they've asked me to come
```

| | |
|---|---|
| 1 | back.  And I began teaching this past fall doing a |
| 2 | practicum course that's before an internship for |
| 3 | students that are -- well, they're graduate |
| 4 | students.  They're -- it's graduate courses that -- |
| 5 | so it's before their internship.  So it's a -- like |
| 6 | a partial internship.  So I teach that course.  And |
| 7 | then last semester, I taught a class called |
| 8 | Organization and Development of the School |
| 9 | Counseling Program. |
| 10 | Q  When did you begin teaching as an adjunct? |
| 11 | A  This -- the second time or the first time? |
| 12 | Q  Help me understand what you mean by that. |
| 13 | A  I took a break in between, probably a five-year |
| 14 | break that I did not teach courses at Indiana |
| 15 | University.  I just began again this past fall.  So |
| 16 | August of 2022 was the second time around.  Before |
| 17 | that was 2012 maybe. |
| 18 | Q  To what roughly?  2016? |
| 19 | A  '17, '16, '17.  But it -- I taught for five years |
| 20 | as an adjunct and then I stopped and then I decided |
| 21 | to go back.  They asked me to come back, to |
| 22 | consider coming back and doing it again. |
| 23 | Q  Thank you for that.  For your current tour of duty |
| 24 | that began in the fall of 2022 -- |
| 25 | A  Uh-huh. |

1    Q   -- you taught in the fall semester; correct?

2    A   Yes.

3    Q   Taught in the spring semester; right?

4    A   Yes.

5    Q   Do you teach summer classes?

6    A   I'm not.

7    Q   Will you be back on then again in the fall?

8    A   Yes.

9    Q   Any other work, occupation, job that you do

10       currently that you haven't mentioned?

11   A   No.

12   Q   Let's talk about your employment with Carmel Clay

13       Schools.  Was your position a counselor at the high

14       school the entire time?

15   A   Yes.

16   Q   When did you begin?

17   A   August of 2013, I believe.

18   Q   Do you recall who your supervisor was when you

19       first began?

20   A   Yes.

21   Q   Who was that?

22   A   It was Linda Skafish.

23   Q   Did you have only Linda as your supervisor?  Did

24       you have multiple supervisors?  Help me understand

25       the chain of authority, so to speak.

```
 1  A  Sure.  Linda Skafish was the director of
 2     counseling.  And over Linda was Karen McDaniel.
 3     And over Karen McDaniel was John Williams.
 4  Q  And Karen McDaniel was --
 5  A  Was an assistant principal and John Williams was
 6     the principal.
 7  Q  At some point Rachel Cole became your supervisor;
 8     is that correct?
 9  A  Yes.
10  Q  And I have that as December of 2016.  Does that
11     sound about right?
12  A  That -- yes.
13  Q  Did Rachel succeed Linda?
14  A  Yes.
15  Q  And Karen McDaniel was above Rachel as assistant
16     principal; is that correct?
17  A  Yes.
18  Q  And then Tom Harmas was eventually principal above
19     Karen; is that correct?
20  A  Yes.
21  Q  Did Tom succeed John at some point?
22  A  Yes.
23  Q  Do you recall when that might have been?
24  A  I -- I want to say June of 2017.
25  Q  Tell me what you understood your job
```

```
 1        responsibilities to be as a high school counselor.
 2   A    I had a course load of about 360 students.  I was
 3        responsible for their academics, their graduation
 4        plan, the courses that they took and understood to
 5        take, helping students to have school achievement,
 6        academic success, dealt with some of their
 7        social-emotional issues, collaborated on the
 8        advanced placement team.  I had hallway duty.  I
 9        had -- it was more of a triage when a student would
10        come in to kind of see what their needs were at the
11        time and help them find their -- the answers they
12        needed and console them if they needed consoling.
13   Q    Your course load of approximately 360 students,
14        would you say that stayed pretty steady over time?
15   A    Yes.
16   Q    You mentioned the social-emotional component of
17        your counseling services.  Was that for all your
18        students?  Would it be described as on an as-needed
19        basis?  What?
20   A    I would say as needed.  If the student was upset,
21        they would come in.  But not all students are
22        feeling upset, so they don't all come in.  I mean,
23        it -- you're dealing with -- if they're in crisis
24        mode, yes.  It wouldn't be all students, but it
25        would be whoever chose to come in.  It was a
```

```
 1        voluntary type of thing when we're dealing with
 2        social-emotional issues.
 3    Q   Let's talk about Rachel Cole a little bit more.
 4        Before she became your supervisor in December 2016,
 5        is it fair to say that she was a colleague and
 6        fellow counselor?
 7    A   Yes.
 8    Q   How would you describe your working relationship
 9        with her at that time?
10    A   I didn't work with her.  She was in the freshmen
11        center.  We were on -- so all counselors -- there
12        were 11 in the 10-12 and there were 4 in the
13        freshmen center.  She was part of that quad, but
14        they were -- our buildings were separate.  And so
15        we would just see each other during meetings, but
16        we didn't have a social relationship.  So I would
17        just see her in a meeting when we had meetings.
18    Q   So you worked with -- did you work -- you might
19        have said this.  Correct me if I'm wrong.  You
20        worked with exclusively juniors and seniors?
21    A   Ten, eleven, and twelve.
22    Q   And she worked exclusively with freshmen when she
23        was --
24    A   Correct.
25    Q   -- a counselor?
```

```
 1   A   Correct.
 2   Q   So she would receive a new batch of freshmen every
 3       year?
 4   A   Yes.
 5   Q   And you would have, I guess, your batch of 10, 11,
 6       and 12, and that would cycle through?
 7   A   Right.
 8   Q   Was Maureen Borto also your supervisor at some
 9       point?
10   A   Yes.
11   Q   And that would have been at the time that she
12       became assistant principal; is that correct?
13   A   I don't think so.
14   Q   Then --
15   A   When she started as the assistant principal, she
16       was not over the counseling department.
17   Q   Help me understand what position --
18   A   Like, a -- it was like a -- about a year-ish that
19       she -- when she became an assistant principal that
20       she was just an assistant principal over attendance
21       and 504s, which -- that's what she was over.  And
22       Karen McDaniel was still over the counseling
23       department.  And then Karen moved up and then
24       Maureen moved up --
25   Q   Thank you.
```

```
 1  A   -- and then became over the counseling department.
 2  Q   Thank you for that.  So --
 3  A   But it wasn't immediately when she became an
 4      assistant principal.
 5  Q   So it's fair to say at some point after she became
 6      assistant principal, Ms. Borto's duties changed
 7      such that she had supervision over you and the rest
 8      of the counseling department?
 9  A   At some point.
10  Q   Did you work with Ms. Borto before she became your
11      supervisor?
12  A   Yes.
13  Q   Describe to me your working relationship with her
14      at that time before she became your supervisor.
15  A   Well, when -- so Mo Borto was the English
16      department chair when I started at Carmel.  And so
17      we worked -- the counseling department worked with
18      the department chairs all year on different
19      situations, like, when a student's schedule needed
20      to be changed or questions about new courses
21      coming.  So we worked with the department chairs
22      regularly.
23          Then when she became the assistant principal,
24      she was in charge of attendance and 504s.
25      Counselors write the 504s so I worked with her
```

```
 1        regularly.  And attendance, we -- you know, like,
 2        if there's a student who's missing a lot of days,
 3        we would have conversations about those students.
 4        Then when she moved into the assistant principal
 5        over the counseling department, then I worked with
 6        her in that capacity.
 7   Q    How would you describe your working relationship
 8        with her when she was a department chair?
 9   A    Great.
10   Q    How about when she was assistant principal over
11        504s and attendance but not the counseling
12        department?
13   A    Great.
14   Q    What about when she was supervising the counseling
15        department?
16   A    Okay.
17   Q    During your employment as a counselor with Carmel
18        Clay Schools, did you ever hold any other
19        employment?
20   A    Yes.
21   Q    Tell me about that other employment.
22   A    Well, I worked for Indiana University as an adjunct
23        professor.
24   Q    And we already talked about that; right?
25   A    Yes.
```

```
 1  Q  What else?
 2  A  And I also worked at Westfield Wine Vault as a
 3     server.
 4  Q  Approximately when did you first begin that work?
 5  A  February 2021 to maybe June of 2022.
 6  Q  Do you think you did that work back in 2020?
 7  A  No.
 8  Q  If you can, approximate number of hours a week?  I
 9     imagine as a server, it was as needed?
10  A  Oh, it was one day a week, like a Saturday or a
11     Sunday when -- and that was it.
12  Q  Fair to say it was sporadic?
13  A  Yeah.  It was maybe eight hours a week, four to
14     eight -- I'll say four to eight hours a week.
15  Q  Would that be throughout the year or would it
16     fluctuate?
17  A  No, throughout that year.  I mean, it was -- wasn't
18     very much.
19          (Defendants' Exhibit 1 marked.)
20  Q  Let's look at Defendants' 1.  Defendants' 1 is an
21     e-mail string from February of 2020 regarding
22     proctoring for the upcoming SAT in March; is that
23     correct?
24  A  I'm sorry.  Can you say that again?  I was reading.
25     I wasn't listening.
```

1    my -- me saying that Mo said one thing and Rachel
2    said another was irrelevant to them.
3  Q  Was this like a meeting with the three of you where
4    they brought you in and they said, Hey, Dianna --
5  A  No.
6  Q  Okay.  Help me understand that then.
7  A  It was me talking to Rachel about her saying to not
8    do what Maureen said to do and Maureen kept asking
9    me to do things.  And I said to Rachel, You told me
10   not to do that.  And that was dismissed.
11 Q  There's also a comment in here that says, if we
12   continue down, E-mail communication was a concern
13   in some areas and the response back to parents for
14   some needs to improve.  Do you recall Rachel or
15   anybody else expressing concern about e-mail
16   communication with parents to you?
17 A  No.  I don't recall.
18 Q  Doesn't mean it didn't occur.  You just don't
19   recall one way or the other as you sit here today?
20 A  I don't recall.
21 Q  She also writes, When I had you do the ASVAB score
22   sheets, you gave the counselors some misinformation
23   and we went over it together.  When you sent out
24   the e-mail a few weeks ago, you shared that
25   information about fifth-year seniors and it simply

1   wasn't true.  Do you know what she's referring to

2   there?

3 A  Yes.

4 Q  What's she referring to?

5 A  So the ASVAB, I gave an additional worksheet to the

6   counselors that showed the different ways -- the

7   different pathways, and she did not want that sheet

8   given to them.  It shows them their -- the

9   pathways.  There's a bucket one.  You have to earn

10   a diploma.  Bucket two was employability skills.

11   Bucket three was the academic proficiencies.  And I

12   handed that to counselors in addition to the other

13   paperwork so that they could share that with their

14   students that these are the things that need to be

15   accomplished.  It -- it wasn't misinformation.  It

16   was factual information about what is to come, but

17   she didn't want that shared.

18 Q  She's saying in here that some of the information

19   in the score sheet about fifth-year seniors wasn't

20   true.  Do you disagree with that?

21 A  I'm not sure what she's referring to about -- in

22   that little bit right there.

23 Q  I think you kind of already said it, but just to

24   elaborate so I have it clear, what is an ASVAB

25   score sheet?

```
 1   A   The ASVAB is a military test, and it is something
 2       that students in high school could take in lieu
 3       of -- in that third bucket of the pathway.  They
 4       have to -- they could meet what they needed for
 5       graduation.  It was one of the listed items on
 6       that.  The ASVAB is just -- it's a military
 7       aptitude test.
 8   Q   Thank you.  Based on this paragraph that we're
 9       looking at here, Final Evaluator Comments, did you
10       understand that as a result of this evaluation,
11       Rachel Cole was concerned about your performance as
12       a counselor?
13   A   Yes.
14   Q   In your duties as a counselor, what are your
15       responsibilities as far as issuing diplomas or
16       approving diplomas for the students who are
17       assigned to you?
18   A   Well, it's to make sure that they meet the
19       requirements that the State puts out.
20   Q   So that's things like scheduling on a semester
21       basis, making sure they're on track to meet their
22       goals toward a diploma, those sorts of things?
23   A   Yes.
24           MS. MADDOX:  Object as to form.
25           Go ahead.
```

```
 1  A  Yes.
 2  Q  Do you recall an incident in June of 2020 where you
 3     failed to inform that a student had not completed
 4     the required coursework and, as such, his diploma
 5     should not be mailed to him?
 6        MS. MADDOX:  Object as to form.
 7  A  I don't recall.
 8        (Defendants' Exhibit 4 marked.)
 9  Q  Let's look at Defendants' 4.  Defendants' 4 is an
10     e-mail string that occurred on June 21 and June 22
11     between Karen McDaniel and Rachel Cole; correct?
12  A  Yes.
13  Q  And if we look on page 2, you see that first e-mail
14     there from Sunday, June 21?  Do you see that?
15  A  Yes.
16  Q  I'll represent to you the name's been redacted, but
17     it's from a parent to Karen McDaniel.  The parent
18     writes, Hi, I hope you are doing well.  I am
19     e-mailing you because we got what looks like a
20     diploma in the mail.  I know he has been doing some
21     school work, but does this mean he is done?  Again,
22     I want to thank you for all you have done for him.
23     And then Karen writes to Rachel, Hi, Rachel.  Any
24     idea if this is accurate; right?  That's what it
25     says?
```

```
 1   A   Uh-huh.

 2   Q   And --

 3   A   Oh, yes.

 4   Q   And Rachel responds to Karen.  And this is at the

 5       top of page 2.  She says, Dianna didn't tell Maria

 6       to pull it.  He was on the original list and not

 7       taken off.  I can call her and discuss.  This

 8       happened last year with one of her students.  Do

 9       you know what Rachel's referring to there?

10   A   No.

11   Q   Do you think she's referring to this instance where

12       you identified a student eligible for a diploma

13       when the student was not?

14   A   I'm not sure.

15   Q   What about when she writes, This happened last year

16       with one of her students?  Was there an incident in

17       the previous school year where you identified a

18       student eligible for a diploma when the student was

19       not?

20   A   No.

21   Q   Do you know what student this is referring to in

22       this e-mail?

23   A   No.

24   Q   Do you recall Rachel or Karen or anybody else ever

25       discussing this incident with you?
```

```
 1   A   Yes.

 2   Q   Tell me what you recall.

 3   A   There was some confusion because it was Covid.  And

 4       Karen McDaniel had said that we're graduating all

 5       of the students, and then she said that we weren't.

 6       And then they said that we were going to this -- I

 7       don't remember this student's name but something

 8       about he needed to complete some coursework.  And

 9       there was a time when she said, We're going to

10       graduate them all, so I didn't take him off the

11       list, but then they decided that we are going to

12       make this particular student do more coursework.

13   Q   When you say not taking him off the list, that

14       means the list of students who would graduate and

15       receive a diploma; is that correct?

16   A   Correct.

17   Q   Look on page 1 of Defendants' 4, the second e-mail

18       from the top.  That's Rachel's e-mail to Karen at

19       9:12 a.m.  Toward the end of that second paragraph,

20       Rachel writes, I don't understand this.  It is not

21       acceptable.  Do you know what she's referring to?

22   A   No.

23   Q   Did Rachel or Karen ever meet with you to explain

24       that the incident with this student and the

25       issuance of the diploma was not acceptable?
```

```
 1   A   Not in those words.

 2   Q   What words do you recall?

 3   A   I don't know.

 4           (Defendants' Exhibit 5 marked.)

 5   Q   Defendants' 5 is an e-mail to you from Rachel Cole

 6       dated June 23, 2020; is that correct?

 7   A   Yes.

 8   Q   And blind copied are Karen McDaniel and Maria

 9       Pacalo; right?

10   A   Uh-huh.

11   Q   Who's Maria Pacalo?

12   A   She was the registrar.

13   Q   She writes in the first sentence, Dianna, I just

14       blind copied you on an e-mail that I sent to --

15       it's redacted -- Mom to address that we sent him a

16       diploma when he has not completed the requirements

17       for graduation.  Would this have been the follow-up

18       e-mail that Rachel Cole sent you in relation to the

19       last e-mail that we just looked at?

20   A   This would have been the e-mail.

21   Q   Is this e-mail the extent of your communication

22       with Rachel on this incident or do you recall

23       having discussions with her or anything else like

24       that?

25   A   I don't remember.  I -- I believe we did talk about
```

```
 1       it, but I'm -- I can't recall that conversation.
 2       But I know that this was sent and there was an
 3       e-mail to the mother that was also sent.  But I --
 4       I can't remember if -- I -- it -- the communication
 5       with Rachel may have happened.  I'm not -- I don't
 6       recall the conversation.  It was a while back.
 7    Q  Do you think it's fair to say that she's placing
 8       the blame on you in this e-mail, that you were
 9       responsible for the diploma being issued when the
10       student hadn't completed the required coursework?
11    A  Yes.
12    Q  Do you agree with that?
13    A  No.
14    Q  Why not?
15    A  First of all, there was misinformation given -- or
16       I don't want to say misinformation.  Conflicting
17       information given from Karen McDaniel to the
18       counselors about what the State said during 2020
19       for the graduation class, for the kids that were
20       affected by Covid.  Secondly, there were multiple
21       people involved in this student's world.  He was in
22       a separate building.  The CLC is the Carmel
23       Learning Center.  So he was not in my direct line.
24       Communication with that student was limited.  There
25       was a director at the CLC.  There were teachers at
```

1    the CLC.  There were multiple people that had their

2    hands in it.  Ultimately, yes, I was his counselor,

3    but not the only person with this student.

4  Q  Help me understand how it works when you have a

5    senior approaching graduation -- and I know we

6    talked about a list, which I presume is, here's a

7    list, Ms. Stringham, of your students who are ready

8    for graduation and you review that list and say,

9    Oh, these folks over here, they're set to go, but

10   these folks still have some coursework.  Help me

11   understand that process.

12 A  Well, I think 2020, this particular graduating

13   class was an unusual year because the State was

14   saying we're graduating students and then -- that

15   was the message sent and then the message was

16   changed.  And so yes, this particular student --

17   for the life of me, I can't remember his name, but

18   I know that he had other work that he needed to

19   complete.  So I did not take him off the list

20   because of the previous message that was delivered

21   to counselors.  So I followed that.

22       And then there were other people involved

23   that -- once summer began, I was not working.  And

24   if you notice, this is June 23, 2020.  I -- I had

25   sent my list based on what Karen McDaniel had said

```
 1      to do and I did that.  And then with this
 2      particular student, he had more work to do and they
 3      didn't want him to get his diploma.  So there were
 4      still -- I wasn't in the office.  I'm -- there were
 5      people who did summer -- like, worked a week.
 6      Like, there would be a counselor that would work
 7      that week and, like, it rotated.  And so I -- I
 8      wasn't working when those were delivered out.  So I
 9      wasn't the sole person that -- I wasn't the only
10      person that worked with the student.
11   Q  Let's try to unpack that a little bit.
12   A  Sure.
13   Q  This student you testified was on the list;
14      correct?
15   A  To graduate?
16   Q  Yes.
17   A  He was a senior.  He was on the class of 2020 list,
18      but he had coursework to complete.
19   Q  I'm assuming when you say a student is on the list,
20      that means in this instance they are set to
21      graduate at the end of 2020.  Is that what you
22      mean?
23   A  No.
24   Q  What do you mean?
25   A  He was in -- he was on my caseload.  He was at the
```

1    CLC.  He was in the class of 2020.  There are

2    different diplomas that a student can receive.  In

3    the state of Indiana, it could be academic honors,

4    technical honors, combination of the two, Core 40,

5    general diploma, and then certificate of

6    completion, which has to do with special ed.

7    This -- all those students have a diploma listed by

8    their name, what they're trying to achieve because

9    not all students are trying to achieve the same

10   diploma, but he was in that class of 2020.  Other

11   things would be like what courses does he need to

12   complete.

13       Yes, there were line items next to his name.

14   So when I say a list, yes, he was in the class of

15   2020.  On the graduation list, he was a maybe.

16   When Karen McDaniel sent out -- had this discussion

17   with counselors about the State wants everyone to

18   graduate so we're going to graduate these students,

19   I took that as it was said.  We're going to

20   graduate these students.  So I did not take him off

21   the list.  And when the change happened, when they

22   decided that this particular student, because he

23   had more than two courses to complete, they were

24   not going to graduate him.  They were going to make

25   him stay and finish the work.  So I wasn't

```
 1      communicated that because I wasn't there because I
 2      was home.  I wasn't -- I stopped working -- I think
 3      our contract ended, like, maybe June 1 or May --
 4      like, the end of May, early June.  And I'm not sure
 5      the exact date, but it's, like, the first couple of
 6      days of June.  I'm not sure that year.  Does that
 7      make sense?
 8   Q  I think so.  And I want to try to unpack it again.
 9   A  Okay.
10   Q  You knew that this student needed additional
11      coursework to graduate; correct?
12   A  Yes.
13   Q  But you also received an e-mail from Karen
14      McDaniel; is that right?
15   A  No.
16   Q  What did you receive from --
17   A  It was in a -- it was not an e-mail.  It was a
18      counselor's meeting and it was Karen talking about
19      what we were going to do.
20   Q  And what did she say?
21   A  She said that the State of Indiana wanted the
22      seniors to graduate and that we were graduating the
23      seniors.
24   Q  Regardless of whether they had completed their
25      academic coursework or not?
```

1   A   She said that's what we were doing.

2   Q   And for that reason, this particular instance, even

3       though you knew the student had coursework to

4       complete, you didn't sound the alarm or say

5       anything and say we shouldn't issue a diploma in

6       this instance?

7   A   I did not.  I followed Karen McDaniel's

8       instructions.  And then school let out and then it

9       was no longer in my purview.  And I don't know how

10      often the student is going to school or not going

11      to school or what work he is doing because I am not

12      directly over him.  So some students, they were on

13      a -- I think they were on Plato, could work through

14      three courses in two days because they would push

15      the button -- like, they would move them right

16      along, like, on the programming.

17  Q   Are you aware of any other counselors who had these

18      same type of graduation issues with their students?

19      And I'm focusing on this end of 2020 time period.

20  A   I don't know.

21  Q   And look back real quick.  I think you said it, but

22      if you look back at Defendants' 4 on page 2, Rachel

23      Cole's e-mail at the top, she's writing to Karen

24      McDaniel and she says, This happened last year with

25      one of her students, referring to your students.

```
 1      You don't recall what she's referring to there?
 2   A  I do not.
 3         MR. BORG:  Why don't we take a five-minute
 4      break.
 5         MS. MADDOX:  Okay.
 6         THE WITNESS:  Sure.
 7         (Recess taken.)
 8         (Defendants' Exhibit 6 marked.)
 9   Q  Let's look at Defendants' 6.  Defendants' 6 is the
10      My Story --
11   A  Uh-huh.
12   Q  -- document that you were referring to earlier.
13   A  Yes.
14   Q  And am I correct that you included this with your
15      first internal complaint of discrimination; is that
16      right?
17   A  Yes.
18   Q  And you submitted that in September of 2020.  Does
19      that sound right?
20   A  September 1, 2020.
21   Q  Thank you.  And as I look through this, is it fair
22      to say that this is sort of a rough timeline of
23      events that detail incidents where you think Rachel
24      Cole discriminated against you?
25   A  Yes.
```

```
 1   Q   Is it retaliation, too, at this point or is it just

 2       discrimination?

 3           MS. MADDOX:  Object as to form.

 4   A   I would say this is the discrimination and then

 5       it's retaliation thereafter.

 6   Q   And in this first complaint, it's discrimination on

 7       the basis of your national origin; correct?

 8   A   Yes.

 9   Q   And it's also discrimination on the basis of your

10       sexual orientation?

11   A   Correct.

12   Q   Did you allege in this first complaint that anybody

13       other than Rachel Cole was discriminating against

14       you?

15   A   Just Rachel Cole, I believe.

16   Q   The second page -- there's the numbers at the

17       bottom -- Stringham 000157 --

18   A   Uh-huh.  I mean, yes.

19   Q   -- you have two paragraphs under the heading,

20       March/April 2019.  Do you see that?

21   A   Yes.

22   Q   Take time to read it if you need, but my question

23       is, what are you describing here?

24   A   It's a description of an incident where Abby

25       Cartwright comes to my office to talk to me about
```

```
 1      Rachel discriminating against her for dating women.
 2      She came to me and she was upset about that.
 3   Q  I know it's probably an obvious question, but Abby
 4      would have come to you in March or April of 2019,
 5      hence the heading at the top?
 6   A  Uh-huh, yes.
 7   Q  Other than what you recounted here in this
 8      March/April 2019 heading, at any other time did
 9      Abby report to you other instances where she
10      thought Rachel was singling her out because of her
11      sexual orientation?
12   A  I don't think so.
13   Q  Did you ever hear or witness firsthand Rachel make
14      derogatory comments about Abby that were based on
15      her sexual orientation?
16   A  Not firsthand.
17   Q  Did you ever hear or witness firsthand Rachel make
18      derogatory comments about anyone else that was
19      based on their sexual orientation?
20   A  No.
21   Q  When did Abby --
22   A  Wait.  I'm sorry.  Can I -- can we go back to that
23      question because it just jolted a memory?
24   Q  Sure.  Would you like me to repeat it?
25   A  Yes.
```

```
 1      target on her back and Rachel was writing her up

 2      for all sorts of things.  Is that accurate?

 3   A  Yes.

 4   Q  Do you know if Abby was under a performance

 5      improvement plan --

 6   A  She was not.

 7   Q  -- at any --

 8   A  Sorry.

 9   Q  Let me ask it again.  Do you know if Abby was under

10      a performance improvement plan at any time while

11      Rachel Cole was her supervisor?

12   A  She was not.

13   Q  Do you know what the nature of her write-ups were

14      about?

15   A  I do not.

16   Q  Do you know where Abby went as far as employment is

17      concerned after she resigned from Carmel Clay

18      Schools?

19   A  Yes.  She owns her own business, Cartwright

20      Counseling.

21   Q  You alerted my attention to another statement that

22      you attributed to Rachel that's in your My Story

23      and I've lost it.  You testified earlier that

24      Rachel had made a comment to the effect of Dianna

25      now dates women or likes women.
```

1    A   Uh-huh.

2    Q   Am I right on that?

3    A   Yes.

4    Q   That's something that you heard her say?

5    A   No.

6    Q   Tell me about that.

7    A   I'm sorry.  Can you ask that question again?  Were

8        you talking about Abby or were you talking about

9        me?

10   Q   I'm talking about you.  I think you testified

11       earlier -- and again, correct me if I'm wrong --

12       that Rachel made a comment to the effect that she

13       thought that was weird or odd or unusual that you

14       were now dating women or attracted to women or

15       something along those lines.

16   A   That I was married to a woman.

17   Q   Married to a woman.  Thank you.

18   A   That's okay.

19   Q   Is that something Rachel told you?  Is that

20       something you overheard?  What is it?

21   A   That's something Abby shared with me, Abby

22       Cartwright shared with me.

23   Q   And forgive me.  Is that in this My Story document?

24   A   Yeah, yes, page 8.

25   Q   Thank you.  I'm not seeing it specifically.  Can

```
 1      you help me?
 2   A  Sure.  Later that day, and then it's the fourth --
 3      it looks like the fourth sentence down or fourth
 4      line down.  I'm sorry.  One, two, three, four --
 5      it's -- Abby told me to brace myself for what she
 6      was about to tell me that would be upsetting.
 7   Q  Then it says, She tells me during one of their
 8      meetings that she could not believe that I was
 9      married to a man and then married a woman and isn't
10      that weird.  That's Abby telling you Rachel said
11      that; is that correct?
12   A  Correct.
13   Q  Did Abby indicate whether anybody else heard Rachel
14      say that?
15   A  She did.  She said that Leslie -- I can't think of
16      what -- Brown.  Sorry.  I couldn't think of her
17      last name.  That Leslie Brown was often in
18      conversations with Rachel; also, Lori Lynch, who is
19      the secretary in the freshmen center.
20   Q  Thank you.  And Ms. Brown, what did she do?
21   A  She is a freshmen counselor.
22   Q  Did Abby share whether anybody else observed -- or
23      heard Rachel make that statement?
24   A  Lori Lynch.
25   Q  Okay.  Thank you.
```

```
 1   A   And she's a secretary for the freshmen center.
 2   Q   Did you ever have conversations with any of these
 3       other folks about whether they heard that?
 4   A   No, I did not.
 5   Q   Did you have conversations with Rachel about it?
 6   A   No, I did not.
 7   Q   What made you file your first internal complaint?
 8   A   In our department, there are no other gay people or
 9       Hispanic people.  And other counselors would make
10       the same errors or similar errors that I would
11       make, but I seemed to be getting picked on
12       continuously.  When it happened -- when Abby came
13       to me and mentioned it, like, said, Is this
14       happening to you, I was like, No, it is not because
15       at the time, I didn't feel like this -- I was being
16       a target.  And when it happened to Abby and then
17       Abby left, it -- it seemed to start with me.  Like,
18       then it happened to me, so -- and it was
19       continuous.
20            And backing up to when I started at Carmel, my
21       first year there, within the first week or two,
22       Bettina Cool said to me, Don't tell people you're
23       gay because that could be trouble for you.  So
24       there -- did Rachel say that?  No.  But all the
25       actions show it over time.  And I was the only one
```

```
 1        who was being written up.  I was the only one who
 2        had a performance improvement plan.  And I'm the
 3        only one that is gay and Hispanic.
 4   Q    Forgive me.  You testified earlier that you married
 5        your current spouse when?
 6   A    Nine years ago.
 7   Q    So the entire time you've been married to your
 8        current spouse -- well, I think we also established
 9        that Rachel Cole became your supervisor in December
10        of 2016.  Does that sound about right?
11   A    Uh-huh, yes.
12   Q    And help me.  Was it common knowledge, I would
13        assume, with your spouse being also employed within
14        Carmel Clay Schools that she was your spouse?
15   A    No.  I would not say it was common knowledge
16        because we -- even though we share the same last
17        name, there's about 400 employees in the Carmel
18        High School.  Our departments are not anywhere
19        connected to each other.  I was on the first floor.
20        She was on the third floor of the building.  In
21        fact, we would even rarely see each other through
22        the day.  It would only be shared friends that
23        would know or in -- within our departments that
24        would know that we were married.  So was it common
25        knowledge?  I would say, no, it was not common
```

```
 1      knowledge.
 2   Q  You don't ever recall having discussions about --
 3      or discussions with Rachel in particular about just
 4      married life, personal conversations, just your
 5      personal background, anything like that?
 6   A  Sure.  I had conversations with her about my
 7      personal stuff.
 8   Q  Okay.
 9   A  Sure, of course.
10   Q  Including that you were married to another Carmel
11      Clay employee?
12   A  Yes.
13   Q  When do you think --
14   A  In fact, there was a time -- you asked me
15      previously to talk about, why did I think that I
16      was discriminated against.  When Missy's
17      grandmother died, there was no card or anything.
18      Like, the department didn't do a card, you know,
19      like, I'm sorry about your wife's grandma, you
20      know, that kind of thing.
21   Q  Sure.
22   A  The same thing happened to Becky Stuelpe, who also
23      was a counselor and her husband also worked in the
24      school and I believe his father died or -- might
25      have been his father, but there was a card, you
```

```
 1      know, an e-mail to -- for the condolences of that,
 2      but nothing for me.  And I asked her about that.  I
 3      asked Rachel about it.  I can't give you a time
 4      frame.  I would have to go back and think about
 5      when did Missy's grandmother die.
 6            But I do remember I asked her -- I said, My
 7      feelings were hurt because you didn't even
 8      recognize that that was my grandmother, too,
 9      because I'm married to Missy.
10            And she was like, Oh, yeah.
11  Q   In the instance where there were condolences and a
12      card for another employee's in-law passing --
13  A   Uh-huh, yes.
14  Q   -- did Rachel spearhead that effort or was that
15      somebody else?
16  A   It was Rachel.
17  Q   And you said that included an e-mail of condolences
18      and folks passed around a card and signed?
19  A   Yes.  And nothing happened for Missy's grandmother.
20  Q   And you --
21  A   No e-mail, no card, no recognition.
22  Q   And you told Rachel about it; right?
23  A   And I asked Rachel why that wasn't recognized.
24  Q   And her response was, Oh?
25  A   Oh, sorry.
```

```
 1  Q  When do you think that would have occurred?  Do you
 2     remember when she passed?
 3  A  I would -- I have to ask Missy.  It was within the
 4     time frame that I worked there.  And Rachel was in
 5     charge, so...
 6  Q  Do you think it was before the pandemic?
 7  A  Yes, it was before the pandemic, I think.  I'm
 8     not -- date, I'm not sure.
 9  Q  Do you think it was a year --
10  A  But I think it was.
11  Q  Do you think it was more than a year before the
12     pandemic?
13  A  No.  I don't know that.
14  Q  Do you think that's the earliest instance where you
15     would have shared directly with Rachel that your
16     spouse was employed at Carmel Clay Schools?
17  A  I don't recall there being a conversation about
18     Missy being my wife with Rachel.  I don't remember
19     if there was, like, a formal conversation about it.
20     I think when Missy was hired on, some people knew,
21     but I -- I don't know how Rachel came to know that
22     I'm gay and that Missy is my wife.
23  Q  Right.
24  A  I don't know.
25  Q  Well, I mean, you agree with me, right, there -- on
```

```
 1       the one hand, every organization has sort of a
 2       grapevine and Rachel could have known from the
 3       grapevine.  We all know some details about our
 4       coworkers' personal lives via the grapevine.  Is
 5       that fair; right?
 6   A   Yes.
 7   Q   But Rachel also could have known about Missy being
 8       your spouse through a direct conversation between
 9       you and her; right?
10   A   Possibly.
11   Q   Right.  I mean, you kind of already --
12   A   I mean, it's -- it is possible.  I just don't
13       remember having a formal conversation with her.  I
14       don't remember sitting down and saying, My wife's
15       going to be teaching in the math department.  I
16       think it was something that was just -- maybe Karen
17       McDaniel or Tom Harmas or somebody else who hired
18       Missy might have said, Dianna's her wife.  I don't
19       know.
20   Q   Right.  But she certainly knew as of the time you
21       shared with her that, Hey, Missy's relative passed
22       and there were no condolences or anything, and you
23       told Rachel, By the way, Missy's my wife?
24   A   Yes.
25   Q   So it would have been at that point, I guess, at
```

```
 1      the latest, but possibly earlier.  Is that fair?
 2  A   Yes, possibly earlier.  I just don't know when.
 3  Q   And she would have passed at some point before the
 4      pandemic?
 5  A   I think so.
 6  Q   What about your national origin?  My question is,
 7      were there ever any conversations with Rachel or
 8      other people in the department where you shared
 9      that you were Hispanic?
10  A   Yes, but I don't know -- I don't know when that
11      would have been shared.  I feel like it would have
12      been a lunchtime conversation.  I don't know if
13      Rachel would have been present because she wasn't
14      in that lunchroom often.  Like, she didn't sit down
15      with the counselors and eat lunch.  But I'm sure it
16      came up.
17  Q   But I would think --
18  A   But I --
19  Q   That would be a tough thing to pinpoint as far as
20      when that might have occurred.  Fair?
21  A   That is fair.  I can't remember.
22          (Defendants' Exhibit 7 marked.)
23  Q   Let's look at Defendants' 7.  Defendants' 7 is your
24      first performance improvement plan; correct?
25  A   Yes.
```

```
 1   Q   And at the top it says, Date of Meeting:
 2       September 10, 2020.  Do you think that's accurate
 3       as far as the date you met to go over this plan?
 4   A   No.
 5   Q   When do you think that meeting occurred if one
 6       occurred at all?
 7   A   It -- a meeting did occur, but I don't -- I think
 8       this is the date that she typed it, but I feel like
 9       it was days after that.
10   Q   So if we go -- oh, where did it go?
11   A   Yeah, so September 22, October 2.
12   Q   So if we go -- go to Stringham 006796.  It's
13       numbered there in the bottom right.  You're looking
14       at it.  That's what I'm getting at.  There's a
15       signature page on Stringham 006796; correct?
16   A   Uh-huh.
17   Q   And it looks like you signed it September 22, 2020;
18       correct?
19   A   Yes.
20   Q   And it looks like Rachel Cole and Maureen Borto
21       both signed October 2, 2020; is that correct?
22   A   Yes.
23   Q   So does that help you?  Does that mean you would
24       have met to go over this plan on September 22 or
25       October 2?  Is that jogging your memory at all?
```

1    A   I believe it would be around that date, that time

2        frame.

3    Q   Fair enough.  And the folks you met with were

4        Rachel and Maureen; is that right?

5    A   Yes.

6    Q   Did anybody else participate in this meeting?

7    A   I believe Mark Wien was in that meeting, but I -- I

8        don't recall.  But I'm going to say that he was

9        probably there.

10   Q   And we haven't mentioned Mark Wien yet today.  What

11       is his position?

12   A   He is the -- the president of the teachers' union.

13   Q   Tell me what you recall from this meeting.  Did you

14       guys go over this plan?  Did they get some feedback

15       for you?  Help me understand how that unfolded.

16   A   I was told that we were going to have a meeting and

17       then I was presented with this information and told

18       that I was going to sign it.

19            And then I said, I'm going to read it over and

20       I'll get back to you.  And I added an addendum --

21       an addendum to it.

22   Q   And we see that begins after the signature page; is

23       that right?

24   A   Correct.

25   Q   So starting at Stringham 006797 and then 6798,

```
 1      that's a document you prepared?
 2   A  The -- I produced the addendum and that's -- yes,
 3      6797, 6798.
 4   Q  And then 6799, we already talked about that, I
 5      think.  That's the final evaluator comments from
 6      your evaluation for the previous school year;
 7      right?
 8   A  Yes.
 9   Q  Did you attach that as well or --
10   A  No.
11   Q  And then go back to your signature page.  I think
12      you wrote in here with your signature, I may not
13      agree with all that is written.  However, I am
14      signing because I have received this.
15   A  Correct.
16   Q  Tell me what things you didn't agree with in this
17      performance improvement plan.
18   A  I --
19   Q  And I want to know all of them so go one by one.
20   A  I didn't agree with -- I -- pretty much all of it.
21      I added an addendum where it -- the first one that
22      she has on there is -- so they're supposed to line
23      up.  Like, I goes with the I goes with the I.  I --
24      they're supposed to somehow correlate.  So it says
25      here, '19-'20, parent was upset about
```

1  communications regarding JEL placement and

2  scheduling.  See e-mail to Dr. Harmas.  And I

3  said -- my response to that was I was rated highly

4  effective in '19 -- 2019-2020.  So she was bringing

5  the -- the things that she was bringing to the

6  table were old and I had already been evaluated.

7 Q  Well, let me ask you something there.  And I'm

8  sorry to interrupt.

9 A  Sure.

10 Q  I thought we established earlier -- and correct me

11  if I'm wrong -- that your highly effective rating

12  for 2019 and 2020 was based on an extended

13  observation and two short observations; is that

14  correct?

15 A  My overall rating for that school year was highly

16  effective.

17 Q  Don't you think it's possible for your supervisor

18  to have concerns about your performance such as if

19  there's an e-mail complaint from a parent even if

20  you received a highly effective rating?

21    MS. MADDOX:  Object as to form.

22 A  Ask your question again.

23 Q  We'll move on.  So keep on.  I think you were

24  explaining kind of your --

25 A  The reason that --

```
 1  Q  I'm sorry.  I interrupted you.  Your addendum and
 2     sort of your response to this and more generally
 3     the aspects of the plan that you disagreed with.
 4  A  Correct.  So each little -- like, the Is go with
 5     the Is go with the Is is my understanding when she
 6     explained how she did this.  So I responded with
 7     the way that she had it set up.  So I -- for the
 8     one, two, three, and five on the communication,
 9     I -- my response to that was I was rated highly
10     effective in 2019-2020.
11         It looks like the only one that I have
12     different is four where it says, Blank reached out
13     multiple times to change P155 to another English
14     class.  Your response was, We are not doing
15     schedule changes and you need to talk to your
16     teacher.  Parent then reached out to me upset that
17     the student was dismissed and wanted a counselor
18     change.  Shared her son felt the same way.
19         And I put here, Rachel told us not to change
20     schedules unless it fell under the reasons to
21     change a schedule.  She also told all the
22     counselors to tell the students to work with their
23     teacher.  All counselors should have been following
24     this.
25  Q  Are there any aspects of this performance
```

```
 1   A   Yes.

 2   Q   You disagreed with that rating.  That's correct?

 3   A   Yes.

 4   Q   Let's see.  First, second, third -- fourth

 5       paragraph, last sentence, you say, The last seven

 6       months I have done everything in my power to

 7       improve.  What did you mean by that?

 8   A   Following the improvement plan and all the

 9       stipulations that it had in it.

10   Q   Anything else?

11   A   No.

12   Q   You went on FMLA leave in the fall of 2021?

13   A   Yes.

14   Q   How many weeks was that?

15   A   It -- I -- weeks, I don't -- I'm not sure, but it

16       was October 11 to January 11.

17   Q   Were you working anywhere else during that FMLA

18       leave period?

19   A   Yes, at the Wine Vault.

20   Q   Same schedule as before?  I think you testified

21       earlier that it was roughly once a week?

22   A   Yeah, yes.

23   Q   What about your adjunct professorship?

24   A   No.

25   Q   How many times do you think you would have worked
```

```
 1        at the Wine Vault while you were on FMLA leave?
 2        Fair to say once a week for however many weeks you
 3        were on leave?
 4   A    Correct.  Nine to twelve times.
 5   Q    You filed your second internal complaint of
 6        discrimination in January 2022; is that correct?
 7   A    Yes.
 8   Q    And in that complaint, you alleged that Rachel Cole
 9        had discriminated against you; is that right?
10   A    Yes.
11   Q    And the same bases for discrimination, your
12        national origin and your sexual orientation;
13        correct?
14   A    Correct.
15   Q    You also alleged that she retaliated against you?
16   A    Yes.
17   Q    And that would have been for filing the first
18        internal complaint?
19   A    Yes.
20   Q    In the second internal complaint, did you allege
21        that anyone else had discriminated against you or
22        retaliated against you?
23   A    No.
24             (Defendants' Exhibit 12 marked.)
25   Q    There was an incident, I guess, incidents in
```

```
 1        January of 2022 between you and Rachel Cole
 2        involving this Defendants' Exhibit 12 that we're
 3        looking at; right?
 4    A   Yes.
 5    Q   Tell me what Defendants' Exhibit 12 is.
 6    A   This is an application for my mental health
 7        license.
 8    Q   I understand that you presented it to Rachel Cole
 9        in January of 2022; is that right?
10    A   Yes.
11    Q   The first three pages, am I correct that this is
12        all your handwriting that you filled out and then
13        you signed at the end of page 3?
14    A   Yes.
15    Q   And you wanted Rachel Cole to fill out, I think,
16        some aspects of this form; is that right?
17    A   Yes.
18    Q   Correct me if I'm wrong, but I think you wanted her
19        to fill out Form P, as in Paul.  And that's -- if
20        you look at the bottom right number, that's
21        Stringham 015091; is that right?
22    A   Yes.
23    Q   Okay.  And then flip to 015092.  That's Form I.
24        You wanted her to fill out the information that's
25        at the bottom there as well; right?
```

```
 1   A   Yes.

 2   Q   And on those two pages, that's your handwriting at

 3       the top under Section A of each; right?

 4   A   Yes.

 5   Q   And then it goes on and it has a Form E2, another

 6       Form E2, a Form S-2, and another Form S-2.  Are

 7       those identical?  No, they're not.  It doesn't look

 8       to me like you wanted her to fill out any of that.

 9       Am I right?

10   A   That's correct.

11   Q   Let's go back to Form P.  Under Section B, it says,

12       Verification of completion of the 100-hour

13       practicum.  Do you see that?

14   A   Yes.

15   Q   Or I'm sorry.  Let me back up.  Why did you -- is

16       this Form P and this Form I -- why did you want

17       Rachel Cole to fill those out?

18   A   When I called the licensing board for this, they

19       said because it had been 19 years since I did my

20       practicum and internship and since then I had been

21       a practicing professional school counselor, that I

22       did not have to do a practicum and internship

23       because this had been already completed 19 years

24       ago.

25           And I said, I -- I don't know how to go back
```

```
 1        19 years and get those signatures because one of
 2        those places doesn't exist anymore, which was the
 3        St. Vincent Day Center, which was -- it was kind of
 4        a crossroads between inpatient and outpatient.  It
 5        was an alternative school for alternative schools.
 6        It was just kind of a holding place for students.
 7        So they told me that because I was a professional
 8        school counselor, I could have my employer sign off
 9        on that.
10   Q  And they gave you this form that's Defendants'
11        Exhibit 12?
12   A  It was -- it's online.
13   Q  Did they confirm to you that, like -- did they tell
14        you just, Hey, go online and grab the form, or
15        confirm to you that this is the form your employer
16        could fill out?
17   A  Yes, Form P and I.
18   Q  And this -- back up a little more.  This is for
19        licensure as a mental health counselor or a mental
20        health counselor associate; right?
21   A  Correct.
22   Q  And you were seeking licensure as a mental health
23        counselor?
24   A  Well, you have to -- you have to be a mental health
25        counseling associate before you can be a licensed
```

```
 1      clinical mental health counselor.
 2   Q  And at this point in time, part of the reason for
 3      filling out this form was so you could receive
 4      licensure as the associate?
 5   A  Yes, but it's -- it's a -- my coursework would
 6      finish in June of that year, but I was just trying
 7      to get everything in order.
 8   Q  You were doing several things to achieve the
 9      licensure, some of which you had done in the past.
10      Getting these forms filled out was a piece to a
11      larger puzzle.  Is that fair?
12   A  Yes.
13   Q  Back to Section B on Form P, it says, Verification
14      of completion of the 100-hour practicum; right?
15   A  Correct.
16   Q  And then it says, Section B must be completed by an
17      official of the institution that has granted you
18      the academic credit for this supervised clinical
19      experience; right?
20   A  Yes.
21   Q  And you requested to Rachel that she fill out this
22      Section B?
23   A  Yes.
24   Q  And that would have required her to fill out the
25      boxes that we see at the bottom of the page; right?
```

1   It says things like program faculty supervisor,

2   site supervisor, name of institution, and so on?

3 A  Yes.

4 Q  And you agree with me that if Rachel Cole filled

5   those boxes out and signed, she would have been

6   certifying certain things as correct -- she would

7   have been certifying certain things; right?

8 A  Yes.

9 Q  Do you agree with me that as far as your employment

10   with Carmel Clay Schools was concerned, none of the

11   things listed in Section B were true?

12 A  No, I don't agree with you.

13 Q  Do you agree with me that there are some things

14   listed in Section B that were not true as far as

15   your employment with Carmel Clay Schools is

16   concerned?

17 A  No, I would not agree with you.

18 Q  Do you agree with me it would have been

19   inaccurate -- well, look under -- I'm right at the

20   top immediately under Section B.  It says, As an

21   official of the school named above, I certify that

22   the above named applicant has completed at least

23   the following experience during the completion of

24   the practicum:  One, applicant has completed at

25   least a 100-hour practicum that enabled the

```
 1      applicant to develop basic counseling skills and to
 2      integrate professional knowledge and skills
 3      appropriate to the applicant's program emphasis.
 4      You did not complete a practicum for Carmel Clay
 5      Schools; right?
 6   A  I was performing as a professional school counselor
 7      that was already licensed, and this was just a
 8      formality for the State.  They just needed it to be
 9      signed off that my practicum and internship had
10      already occurred, which they had, which was
11      19 years ago at that time.  And they -- I -- I
12      already had done all of this.  This is -- this form
13      is in regards to somebody who hasn't even began
14      their career, and I was already a professional
15      school counselor.  I was licensed in the state of
16      Indiana at that point for probably 19 years.
17   Q  As far as your employment with Carmel Clay Schools
18      is concerned, did you complete a 100-hour
19      practicum?
20   A  Every school year, yes.  I -- I did more than
21      100 hours every year.
22   Q  What do you think practicum means?
23   A  I teach the practicum course at Indiana University,
24      and I know what the practicum is.  It is the short
25      one-semester course that a student is getting a
```

```
 1      glimpse of what their job responsibilities will be
 2      as a school counselor.  So they perform duties that
 3      school counselors would do, which I was already
 4      doing in a professional manner.  I was already
 5      licensed in the state of Indiana.
 6   Q  But you were not doing it as a practicum for Carmel
 7      Clay Schools; correct?
 8   A  I was performing as a professional school
 9      counselor, a licensed professional school
10      counselor.  P and I had already been done.
11   Q  As far as your employment with Carmel Clay Schools
12      was concerned or earlier on in your career?
13   A  I performed -- so this is like a dress rehearsal
14      for someone.  When you do a practicum and
15      internship, you are doing the -- you are performing
16      as a professional school counselor.  You are doing
17      the duties that a school counselor would do.  I was
18      already -- had been doing that for 19 years.  It
19      was just a formality.  They told me she just had to
20      sign off on it.
21   Q  Look at Form I.  If you look at Section B, that
22      refers to completion of a 600-hour internship;
23      correct?
24   A  Yes.
25   Q  And Rachel Cole -- or you asked Rachel Cole to fill
```

```
 1      in the information and the boxes that appear at the
 2      end of Section B; right?
 3  A   I asked her to fill out Section B, yes.
 4  Q   And she would have been required to certify, among
 5      other things, As an official of the school named
 6      above, I certify that the above-named applicant has
 7      completed at least the following experience during
 8      the completion of the internship:  One, applicant
 9      has completed at least a 600-hour internship that
10      enabled the applicant to refine and enhance basic
11      counseling skills, to develop more advanced
12      counseling skills, and to integrate professional
13      knowledge and skills appropriate to the student's
14      initial post-graduation professional placement.  As
15      far as your employment with Carmel Clay Schools was
16      concerned, that is not accurate; correct?
17  A   I performed -- I performed as a professional school
18      counselor, and I did these things over and over
19      every single year as a licensed professional school
20      counselor.  The -- my -- this was a formality that
21      just needed to be signed off on.  It was not asking
22      her to sign off on me being a mental health
23      counselor.  This was just a requirement that the
24      practicum and the internship as a licensed school
25      counselor had occurred.  And since then, it has
```

1   been signed off on by Indiana University and

2   it's -- and it's done.

3 Q You agree with me that you weren't in an internship

4   with Carmel Clay Schools and that instead you were

5   in an employment relationship with Carmel Clay

6   Schools?

7 A I would agree that I was -- I was a professional

8   school licensed counselor at Carmel High School and

9   that all of these things happened every year with

10   the professional school counselor.  And it -- this

11   was just a formality.  This was not saying I was

12   doing an internship.  I had done an internship

13   19 years ago.

14 Q Well, it does say you completed an internship;

15   right?  We just read that.

16 A Yes.  But as I said, I called the State.  This is

17   what they told me, that I just needed -- because I

18   had been a professional school counselor for the

19   past 19 years, I just needed to have my employer

20   sign off on it.

21 Q I understand that and what the State told you.  I

22   understand that you communicated that to Rachel

23   Cole; right?

24 A Correct.

25 Q But as far as this Form I is concerned, it would

1  have required Rachel Cole to certify, among other

2  things, one, applicant has completed at least a

3  600-hour internship; correct?  She would have had

4  to certify that?

5  A  She would have needed to sign it, yes.

6  Q  And signing was certifying that those things are

7  true?

8  A  I worked more than 600 hours a year.  And an

9  internship is when a student -- a college student

10  is trying to complete their degree and they go to a

11  school and they work so many days and so many hours

12  and have to complete that.  In their role, they

13  behave as a school counselor doing the duties that

14  a school counselor would do.

15  Q  Do you agree with me that you were never an intern

16  for Carmel Clay Schools?

17  A  I was never an intern, correct.

18  Q  And you were instead an employee?

19  A  I was an employee, yes.

20  Q  And, therefore, it would have been inaccurate for

21  Rachel Cole to certify as far as your employment

22  with Carmel Clay Schools was concerned that you

23  completed a 600-hour internship?

24  A  False, because the State of Indiana told me -- gave

25  me the directive that I could have my employer sign

```
 1     it.
 2  Q  But the State of Indiana didn't write in the margin
 3     some sort of different thing.  It says, What's
 4     required on this form is applicant has completed at
 5     least the 600-hour internship.  And as far as
 6     Rachel Cole knew as your supervisor and as your
 7     employment --
 8  A  Right.
 9  Q  -- relationship with Carmel Clay Schools, that was
10     not true; correct?
11  A  I behaved as a professional school counselor with
12     Carmel High School.  I was employed by them and I
13     did the -- you could say I did all the duties of a
14     practicum and internship student every single year.
15     I did the number of hours, but all the State was
16     saying is because in that capacity as a
17     professional school counselor, I just needed to get
18     it signed off on by my employer because I had
19     already done my practicum and internship 19 years
20     ago.
21  Q  Do you agree with me that what the State told you
22     is different than what's on this form?
23  A  Yes.
24  Q  Look a little bit further down under Section B.  It
25     says, During the completion -- it's in that first
```

```
 1      box, second to last paragraph.  During the
 2      completion of this internship, the application did
 3      receive the following number of hours of
 4      face-to-face supervision.  And then there's a
 5      blank; right?
 6   A  Yes, there's a blank.
 7   Q  And Rachel Cole would have had to fill in that
 8      blank with the number of hours of face-to-face
 9      supervision; right?
10   A  I would say yes.
11   Q  Don't you think it's reasonable for her to refuse
12      to fill that out because you're not in an
13      internship with Carmel Clay Schools?  You're in an
14      employment relationship?
15   A  I was following the directives of the State when I
16      called them and what they had said on how to fill
17      out this form because my case is unique where I
18      already had done a practicum and internship and
19      earned my master's degree at that point.  I had
20      been employed and was working as a professional
21      school counselor.  So I was following what they
22      told me what should be done.  How to fill that
23      out -- there is a phone number on the front of this
24      form that they could have -- she could have called
25      and asked them, Well, what am I supposed to put in
```

1    this area, or ask the State questions like, How am

2    I supposed to fill this out if she isn't doing a

3    practicum and internship?  But that was -- that was

4    not even something that she was willing to do at

5    all.

6  Q  I don't think you answered my question.

7         MR. BORG:  Would you repeat it?

8         (Record read.)

9  A  No.

10  Q  I'm still on Form I.  If you look right above

11    Section A, it says, Section B must be completed by

12    an official of the institution that has granted you

13    the academic credit for this supervised criminal --

14    criminal -- pardon me, clinical experience.  CCS

15    did not give you academic credit based on your

16    employment; correct?

17  A  Yes.

18  Q  So you agree with me that it would have been

19    inaccurate for Rachel Cole to fill out Section B?

20  A  I was following the directives of what I was told

21    to do.  So I thought it was reasonable for Rachel

22    to sign off on this since the State gave

23    instructions on that is what needs to happen.

24  Q  Do you think it's reasonable for Rachel Cole to

25    look at that language that I just read to you and

```
 1      say, Dianna, I'm sorry.  I can't fill this out.  It
 2      says, Section B must be completed by an official of
 3      the institution that has granted you the academic
 4      credit?
 5   A  I think for her to have a knee-jerk reaction and
 6      say, I don't know if I can do this, I think that is
 7      reasonable, but there is a telephone number on
 8      there and she could talk to somebody on the
 9      licensing board and ask them, How am I supposed to
10      fill this out as her supervisor?
11   Q  Do you think it also would be reasonable for her to
12      tell you to get some more clarification or for you
13      to follow up on your own as opposed to having her
14      do it on her own?
15   A  I already had had my directives from the State of
16      Indiana.
17   Q  When you presented her with this Defendants' 12
18      that we've been talking about, the upshot after
19      initially presenting it to her was that she refused
20      to sign it; correct?
21   A  What do you mean by upshot?
22   Q  I'm sorry.  That's a bad word.  The end result was
23      after that initial dialogue that you had with
24      Rachel, she more or less said, I refuse to sign it.
25      Is that fair?
```

```
 1  A  The initial conversation I had with her?

 2  Q  Yes.

 3  A  Yes.

 4  Q  Did she give any more detail?  Let me ask a better

 5     question.  How did the conversation end?  Where did

 6     it go from there?

 7  A  I -- she refused to sign it.

 8  Q  And what did you do next?

 9  A  I went to my office.

10          (Defendants' Exhibit 13 marked.)

11  Q  Let's look at Defendants' 13.  At some point after

12     your initial meeting where Rachel refused to sign

13     the forms we just looked at, you received this

14     e-mail from Tom Oestreich dated January 26, 2022;

15     right?

16  A  Uh-huh, yes.

17  Q  And he writes that he's in receipt of a request

18     that CCS fill out a form.  And he says, It does not

19     appear that CCS can validly attest to the

20     information that has been requested.  Among other

21     requirements, the form requires a person filling it

22     out to represent you have completed an internship,

23     received academic credit, and performed supervised

24     clinical experience.  As far as your employment

25     with CCS is concerned, none of these is true.  If
```

```
 1      you think I have misinterpreted this form or what
 2      you are requesting, then I recommend you contact me
 3      directly for further discussion.  And then you
 4      replied to that e-mail, it looks like, later that
 5      evening; right?
 6   A  Yes.
 7   Q  Your third sentence -- I'm sorry, fourth sentence
 8      to Dr. Oestreich is -- you say, This is just saying
 9      that I have completed the hours.  What did you mean
10      by that?
11   A  Hold on.  I'm not -- where do you -- where did you
12      find this?
13   Q  I'm sorry.  Let me pinpoint that for you better.
14      It's the fourth sentence in your reply, basically
15      the second and third line from the top.
16   A  Which -- read the sentence.  Which one are you
17      wanting me to look at?
18   Q  You say, This --
19   A  Oh.
20   Q  -- is just saying that I have completed the hours.
21   A  The hours that it lists in here.
22   Q  My question is just, what did you mean by that?
23   A  The hours listed in the application.
24   Q  Then look at the last sentence of the first
25      paragraph.  You say, I can actually have any of the
```

```
 1        schools that I have worked for complete this form
 2        because I have already been working as a licensed
 3        school counselor.  Do you see that?
 4     A  Yes, I see it now.
 5     Q  And I think you gave some testimony.  Maybe just
 6        elaborate on it.  Did you eventually get these
 7        forms filled out by somebody else or their
 8        equivalent?
 9     A  Indiana University.
10     Q  And did they fill out both the Form I and the
11        Form P?
12     A  Yes.
13     Q  And then help me understand that because I think
14        earlier you mentioned that a St. Vincent entity
15        that was no longer in existence --
16     A  Indiana University signed both the P and the I.
17     Q  Okay.  Fair enough.
18     A  St. Vincent's no longer -- the day school no longer
19        exists.
20     Q  I think there was testimony, too, from your board
21        termination hearing.  Do you recall testifying,
22        too, that you told Rachel she could just provide
23        your dates of employment?  Do you recall any
24        testimony about that?
25     A  I -- yes.  I -- I do recall that conversation.
```

```
 1      When I spoke to her, I asked her if she would be
 2      willing to just put on letterhead that I was a
 3      professional school counselor and that I had been
 4      employed by Carmel High School.
 5  Q   Okay.  And notwithstanding the forms, was the State
 6      telling you that would have been sufficient for
 7      Form I and Form P?
 8  A   The person that I spoke to said that that would --
 9      in lieu of her not signing, would be acceptable.
10  Q   And did you eventually receive those dates of
11      employment on letterhead from Tom Oestreich?
12  A   Yes.
13  Q   How did that come about?  Did you have to request
14      it from him or did he --
15  A   I did.  I requested it from him but received it
16      from Dr. Beresford after my meeting with
17      Dr. Beresford.
18  Q   Why didn't you submit that to the State as opposed
19      to having Indiana University fill out Form I and
20      Form P?
21  A   When I called the State, that was the instructions
22      that they gave me.  And then I submitted the
23      application -- well, let me back up.  They also
24      told me that I could use letterhead to say that I
25      worked as a professional school counselor.  I
```

```
 1        received that before the board hearing from
 2        Dr. Beresford but was signed by Dr. Oestreich.  I
 3        didn't submit my -- I had all that together,
 4        uploaded it into my application, and then they came
 5        back and someone else said something different,
 6        that I needed to have them signed by Indiana
 7        University.  So then they were signed by Indiana
 8        University and sent in.
 9   Q    So at some point the State told you that dates of
10        employment was not sufficient to cover Form I and
11        Form P?
12   A    It was -- okay.  So I finished my last class July 1
13        of last year and then I submitted my application
14        for -- you have to submit an application to get --
15        to take the exam for your license, like, all the
16        information has to be uploaded and submitted into
17        the application.  Then they review it all.  Then
18        they will tell you if you can sit for the exam or
19        not based on your credentials.  Like, it's not just
20        an -- automatically you get to sit down for the
21        exam.  You have to go through this process.
22             During that process, I had the letter from
23        Dr. Oestreich and uploaded it, and they came back
24        and said, We want P and I signed.  That's not
25        sufficient enough.  We want P and I signed by
```

1    Indiana University because I kept going back and

2    forth with -- I already have the professional

3    letter.  What I was told back when I asked Rachel

4    for it was that that was sufficient.  What I was

5    told in July was different.

6  Q  Okay.  I understand now.  Thank you.  Still on 13.

7    I read it already, but Dr. Oestreich's last line,

8    If you think I have misinterpreted this form or

9    what you are requesting, then I recommend that you

10    contact me directly for further discussion.  Other

11    than replying to his e-mail, did you have any other

12    further discussion with Dr. Oestreich about the

13    form?

14  A  None at all.

15       MR. BORG:  Why don't we take a break.  We can

16    go off the record.

17       (Recess taken.)

18  Q  After your e-mail with Dr. Oestreich that we just

19    looked at, at some point you went to Rachel Cole's

20    office to discuss this issue with the forms again;

21    is that right?

22  A  So my recollection of the event that happened on

23    that day was I had a file folder with the

24    application in it.  I had given it to Rachel days

25    earlier.  I'm not sure what day.  And I said, I

 1   would like to talk about this, you know, like, what
 2   this is and talk about this.  And she -- it was --
 3   our first conversation about it was just very
 4   brief.  Like, okay, we'll talk about it later.
 5   Like, it was not talked about at the time that I
 6   handed it to her.
 7          I received an e-mail from Tom, this e-mail,
 8   and then I said, No, that's not -- that's not what
 9   I'm trying to do here.  Then it ended up -- I think
10   in here I mentioned something about, like, I'm not
11   sure how you got this.  I gave this to Rachel to
12   sign and she never spoke to me about it as she
13   doesn't speak to me much of -- about anything.
14          So then it ended up on my desk.  And so when I
15   came in in the morning, it was sitting right there,
16   and I was like -- with no explanation, no note,
17   nothing, like, come and see me.  Let's talk about
18   this.  Nothing.  It just was on there and not
19   signed with nothing else.
20          So I was like, she doesn't -- she doesn't
21   understand what I'm asking for, like, what this is.
22   So I knocked on her door and it was -- her door was
23   open.  I knocked on the -- like, the door frame.
24          I said, Hey, can I talk to you for a minute?
25   I want to talk about this form.

```
1            And she said, Sure.  Come on in.  So I came
2     into her office and the door was open.  And she was
3     sit -- sitting behind her desk and I was standing.
4     There are chairs in between.  And I was probably --
5     actually probably about 10 to 15 feet behind her,
6     like, not even as close as you and I are, further
7     back.
8            I said, I just wanted to talk about this form
9     and what it is and explain it to you.  And she just
10    sat there and she looked at me.  And I explained
11    what I explained to Dr. Oestreich in the e-mail
12    about it's a formality.  It just need -- I've been
13    working as a professional school counselor.  You
14    just have to sign on -- you know, the P and the I
15    form.
16           And she was like, I'm not signing that.
17           And I was like, I don't -- I -- I don't
18    understand.  Like, why won't you sign this?  Like,
19    it's just a formality.  I've already done the
20    internship and the practicum 19 years ago.  So I'm
21    just looking to get this signed because that's what
22    the State said.
23           And she says, I will not be signing that.
24           And I was like, I think you would do this for
25    anybody else.  Why are you giving me such a hard
```

1   time about it?  Like, I don't understand.  Like, I

2   was truly confused in that moment.  Like, I

3   don't -- I'm telling you what it is and what I need

4   and you're just saying, No, it's not going to

5   happen.  Like, this discussion is over.  And she

6   was very curt and dismissive and wouldn't have a

7   conversation about it.

8       And I was like, I don't understand.  So people

9   took that as yelling because the door was open and

10  the hall -- the area that we're in is very small,

11  but I was like, I don't understand why you won't

12  sign this.  I have talked to the State.  This is

13  what the State told me to do.  I'm just asking you

14  to sign off on it.

15      And I mentioned at that time that, you know,

16  really, I -- because I've been a professional

17  school counselor for over 19 years, I could go back

18  to one of my previous schools and ask them to sign

19  off on it.

20      And she goes, You should do that then because

21  I'm not signing it.

22      And I -- I was like, This is ridiculous, which

23  it is ridiculous.  Like, you're not even

24  entertaining a conversation with me.  You're not

25  conversing with me about this.  You're just saying,

```
 1    No, and dismissing me.  And I'm trying to explain

 2    what the State said.

 3         And I said, Well, the phone number is on the

 4    paper.  You could call them and ask them.

 5         She goes, I'm not calling them.  And I was

 6    just taken aback at how dismissive she was towards

 7    me.

 8         And then I said, Well, would you consider even

 9    putting something on letterhead that just says that

10    I've been a professional school counselor at Carmel

11    High School?

12         And she goes, No, I'm not doing it.  I'm not

13    going to do it.

14         And I said, But there -- the number -- and I

15    took the form and I said, But the number is right

16    here and you could just call.

17         No, I'm not doing it.  So she was being very

18    dismissive and yelling at me at that time.

19         And then Mo Borto came in and said, Come on,

20    Rachel.  I want you to come with me.

21         And she goes, Dianna, you can just go to your

22    office.  Dr. Oestreich -- if you want to talk about

23    that, call Dr. Oestreich.

24         And I was like, Okay.  So I left and went to

25    my office and they -- I don't know where they went,
```

```
 1      but they left her office as well.
 2   Q  Did you take Mo Borto up on her suggestion to
 3      follow up with Dr. Oestreich?
 4   A  I'm trying to think of dates, like, because it
 5      was -- that was -- I believe that was on a Friday
 6      and, like, nothing else happened.  Like, I just
 7      went to my office and worked, came in on Monday,
 8      worked, and then was put on administrative leave
 9      at -- I was -- Mo Borto came to my office at 3:45
10      and said, We're meeting with Dr. Oestreich in my
11      office at 4:00.  I need you to be there.
12          I was like, Okay.  So that's when I was just
13      kind of, like, handed -- you're going to be put on
14      administrative leave at that time and was handed
15      the paper.
16   Q  I apologize if I asked this, but the mental health
17      counselor licensure and the associate licensure,
18      what were you doing that for?  Was that to advance
19      yourself with Carmel Clay Schools, with your
20      professorship, all the above, none of the above?
21   A  I don't know.  I wanted to improve myself.  Like,
22      there's nothing wrong with getting more
23      credentialing behind what you're doing.  And I
24      wanted to become an even better counselor.
25   Q  And I think you just said it --
```

```
 1   A   Sure.
 2   Q   -- but it would have had application and relevance
 3       to your duties as a counselor with Carmel Clay
 4       Schools?
 5   A   I don't think it's -- I don't think it would be
 6       irrelevant at all.  I -- we're dealing with kids.
 7   Q   I'm sorry.  It would have had relevance?
 8   A   Of course.
 9   Q   Okay.
10   A   Yes, it would -- it -- yes, it would have had
11       relevance, yes.
12   Q   And same for your professorship?
13   A   Yes.
14   Q   You testified at the board hearing about this
15       interaction with Rachel in her office that you just
16       described; right?
17   A   Yes.
18   Q   Do you recall that you admitted you said you raised
19       your voice during that conversation?
20   A   I don't recall if I said that during the board
21       meeting.
22   Q   You deny that you yelled at her; right?
23   A   I did not yell at her.
24   Q   But you raised your voice; correct?
25   A   I -- I'm a person that talks passionately and I --
```

```
 1    I don't think it was yelling, but it was -- I was
 2    upset about the fact that she was very dismissive
 3    with me and very curt and not having a conversation
 4    about what I was asking her to do.
 5  Q I know you said just now and before that Rachel was
 6    dismissive and curt toward you.
 7  A Yes.
 8  Q Did she raise her voice toward you?
 9  A Yes.
10  Q Did she yell at you?
11  A No.  She was passionate about what she was saying,
12    but, I mean, I guess it depends on what you
13    construe as yelling because she was louder than her
14    normal tone, but I wouldn't say she was yelling.  I
15    would say she was impassioned about what she -- her
16    being adamant about not signing the documents and
17    about -- you could leave.  Like, this conversation
18    is over.  Like, it was very curt and it was -- it
19    was passionate, but I -- yelling would be -- I --
20    again, it depends.  What do you mean by yelling?
21    At what octaves do we say it's yelling?
22         (Defendants' Exhibit 14 marked.)
23  Q Let's look at Defendants' 14.  Defendants' 14 are
24    two e-mails.  And the first is an e-mail from
25    Rachel to Mo Borto dated January 28, 2022.  And the
```

```
 1      second is Mo just forwarding that to Tom Harmas and

 2      Karen McDaniel.  Do you agree?

 3   A  Yes.

 4   Q  And the first e-mail from Rachel, do you agree with

 5      me that she is describing her perception of what

 6      transpired during this meeting with you; is that

 7      right?

 8   A  It would be her perception, yes.

 9   Q  My question to you -- and I understand you need to

10      read through it -- is for you to tell me all the

11      things that Rachel's listed here that you think are

12      inaccurate about your meeting with her.

13   A  Can I have a pen to look through it or did you want

14      me to read through it?

15   Q  I want you to read through it and then I want you

16      to tell me what you think is inaccurate.

17   A  Unprofessional actions.  Body language was tense

18      and aggressive from the beginning.  Talking so fast

19      and loud.  In a raised voice.  Raising her voice

20      even more.  Was literally yelling at me leaning

21      over my desk.  Yelling each statement.  Physically

22      you could see her become more enraged and

23      frustrated.  Almost demanding and attacking with

24      her demeanor.  They could hear me yelling.  Let's

25      see.  I didn't see the attack/altercation coming.
```

```
 1        Anything I did to diffuse and end it escalated the
 2        situation even though I remained calm with my
 3        responses.
 4   Q    Okay.  And you've done something really helpful
 5        there on Defendants' Exhibit 14, is that as you
 6        were listing those things that are inaccurate, you
 7        also took a pen and underlined the inaccurate
 8        portions; is that correct?
 9   A    Yes.
10   Q    Is there any -- and again, look over it again.  Is
11        there anything else in that Defendants' Exhibit 14
12        that is inaccurate that you have not underlined?
13        And I'm just referring to Rachel Cole's account of
14        her interaction with you.
15   A    I would say that that is what it is.
16   Q    So you have underlined all the inaccurate parts of
17        her account; right?
18   A    Yes.
19   Q    And there's no inaccurate part of her account that
20        you haven't underlined; correct?
21   A    I think so.
22            (Defendants' Exhibit 15 marked.)
23   Q    Let's look at Defendants' 15.  This is an e-mail
24        from Bettina Cool to Mo Borto dated January 28,
25        2022; correct?
```

```
 1  A  Yes.
 2  Q  And I think Ms. Cool's name has come up a few
 3     times, but as it says here, she is also a counselor
 4     at the high school; correct?
 5  A  Correct.
 6  Q  And do you agree with me that this is Ms. Cool's
 7     account from her perspective of your interaction
 8     with Rachel that we've been talking about?
 9  A  This is Bettina's account.
10  Q  Same drill as before.  I want you to take that pen
11     and I want you to underline everything that you
12     think is inaccurate about Ms. Cool's perception of
13     your interaction with Rachel.
14  A  I heard a loud voice.  The italicized yelling.
15     Rachel was standing.  Loud voice of Dianna.
16  Q  And I'm sorry.  You underlined "Rachel was seated"
17     because --
18  A  Rachel was standing.
19  Q  Thank you.  And you've underlined everything on
20     Defendants' Exhibit 15 that you think is
21     inaccurate; is that correct?
22  A  Correct.
23  Q  And you haven't failed to underline anything that
24     you think is inaccurate?
25  A  Well, this is Bettina's account so I can't speak to
```

```
 1  STATE OF INDIANA

 2  COUNTY OF HAMILTON

 3

 4       I, Julie A. Nicholson, RPR, CRR, a Notary

 5  Public in and for said county and state, do hereby

 6  certify that the deponent herein was by me first duly

 7  sworn to tell the truth, the whole truth, and nothing

 8  but the truth in the aforementioned matter;

 9       That the foregoing deposition was taken on

10  behalf of the Defendants; that said deposition was

11  taken at the time and place heretofore mentioned

12  between 8:56 a.m. and 12:54 p.m.;

13       That said deposition was taken down in

14  stenograph notes and afterwards reduced to typewriting

15  under my direction; and that the typewritten

16  transcript is a true record of the testimony given by

17  said deponent;

18       And thereafter presented to said witness for

19  signature; that this certificate does not purport to

20  acknowledge or verify the signature hereto of the

21  deponent.

22       I do further certify that I am a disinterested

23  person in this cause of action; that I am not a

24  relative of the attorneys for any of the parties.

25
```

```
 1          IN WITNESS WHEREOF, I have hereunto set my

 2   hand and affixed my notarial seal this 5th day of

 3   July, 2023.

 4

 5

 6

 7                        _____

 8                          Julie A. Nicholson
                            NOTARY PUBLIC SEAL
                            STATE OF INDIANA
 9                          Commission No. NP0657532
                          My Commission Expires Sept. 1, 2030

10

11

12

13   My Commission Expires:
     September 1, 2030
14

15   Job No. 182050

16

17

18

19

20

21

22

23

24

25
```