10IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DIANNA STRINGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *vs.* | ) | Cause No. 1:22-cv-00817-TWP-MG |
| | ) | |
| CARMEL CLAY SCHOOLS; and | ) | |
| BOARD OF SCHOOL TRUSTEES | ) | |
| OF CARMEL CLAY SCHOOLS, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Sandra L. Blevins
Jamie A. Maddox
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana  46204
Office: (317) 687-2222
Fax: (317) 687-2221

*Attorneys for Plaintiff Dianna Stringham*

## I.    INTRODUCTION

After more than eight (8) years of exemplary performance at Carmel Clay Schools, Plaintiff Dianna Stringham was terminated from her position as a Counselor at Carmel High School. Carmel terminated Stringham's career after Stringham filed 5 discrimination complaints wherein she complained of discrimination on the basis of her race, national origin, and sexual orientation. Following the filing of these 5 complaints of discrimination, Stringham was placed on 3 Performance Improvement Plans, received more than 60 negative artifacts (written statements by a supervisor uploaded to an evaluation tool to evaluate a teacher or counselor's performance), and was ultimately terminated. Carmel terminated Stringham's career on the basis of her race (Hispanic), her national origin (Mexican), and her sexual orientation (homosexual). Moreover, the bases provided by Carmel for the termination of Stringham's employment were false. Based on the arguments herein, the applicable case law and the disputed facts, Carmel's *Motion for Summary Judgment* should be denied in its entirety.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

**Stringham had an exemplary career for almost eight (8) years at Carmel before Carmel terminated her contract.**

1.    Stringham began working as a counselor at CHS in July of 2014. (Dkt. 62-48 at 50:18-21).

2.    During that time, Stringham had a course load of approximately 360 students. (Dkt. 62-26 at 18:25-19:15).

3.    Stringham's students included sophomores, juniors, and seniors. (Dkt. 62-26 at 20:8-21:7).

4.    Stringham's responsibilities as a counselor included being "responsible for [students'] academics, their graduation plan, the courses that they took and understood to take, helping students to have high school achievement, [and] academic success." (Dkt. 62-26 at 19:2-12).

5.     She also "dealt with some of their social-emotional issues [and] collaborated on the advanced placement team." (Dkt. 62-26 at 19:2-12).

6.     From 2014 to 2021, Stringham was always rated as Highly Effective or Effective on her evaluations. (Dkts. 62-14, 62-42, 62-43, 62-44, 62-45, 62-46, 62-47).

**Stringham was the only Counselor at CHS who was homosexual and/or Hispanic.**

7.     While employed at Carmel, Stringham was the only counselor that was Hispanic. (Dkt. 62-1; Dkt. 62-27 at 19:2-6; Dkt. 62-29 at 24:11-15; Dkt. 62-36 at 65:2-22).

8.     Indeed, Stringham was the only non-Caucasian counselor in the counseling department. (Dkt. 62-1).

9.     Stringham was also the only counselor at Carmel who is homosexual. (Dkt. 62-1; Dkt. 62-27 at 18:20-19:1; Dkt. 62-29 at 24:6-10; Dkt. 62-36 at 65:2-22).

10.     During the 2022-2023 school year, there were no counselors at CHS who are homosexual and/or Hispanic. (Dkt.62-2; Dkt. 62-3; Dkt. 62-27 at 19:14-19; Dkt. 62-29 at 24:25-25:5; Dkt. 62-36 at 67:14-20).

**Stringham worked well with her students, and she was also well liked by her students. Stringham also volunteered on campus when she could.**

11.     Alyson Harbor, a CHS School Counselor, stated that Stringham "was great with talking with her students," and "she [also] had a good working relationship when it came to building rapport" with students. (Dkt. 62-27 at 7:25-8:4; 9:14-21).

12.     Thomas Harmas, the now former Principal at CHS, stated that Stringham "cared about kids" as evidenced by "the students [he] saw her interacting with." (Dkt. 62-31 at 17:10-21).

13.     Harmas observed this was "a big strength" of Stringham's. (Dkt. 62-31 at 17:10-21).

14.     Stringham would sell tickets at CHS sporting events, and she was also the announcer at CHS volleyball games. (Dkt. 62-31 at 19:13-22).

15.     Stringham also did hallway duty more than any other CHS counselor. (Dkt. 62-31 at 19:23-20:5).

16.     Harmas's interactions with Stringham were always "civil and respectful." (Dkt. 62-31 at 48:8-15).

17.     Maureen Borto, the CHS Assistant Principal over Student Services, testified that Stringham had a "positive relationship with students." (Dkt. 62-35 at 12:24-13:7; 18:14-17).

**<u>On September 1, 2020, Stringham filed her first Report of Discrimination and/or Harassment.</u>**

18.     On or about September 1, 2020, Stringham filed an internal Report of Discrimination and/or Harassment with Carmel against Rachel Cole, the Director of Counseling for Carmel High School. (Dkt. 62-10).

19.     Stringham believed Cole was targeting her because she was homosexual and because she was Hispanic. (Dkt. 62-48 at 76:15-24).

20.     Sara Knoop, a Social Worker at CHS, stated that Cole told Knoop that she did not understand why people used pronouns to identify themselves and that Cole did not use pronouns to identify herself. (Dkts. 62-29 and 62-30 at 8:18-24; 18:23-19:2; 19:7-11).

21.     Cole testified, however, that she never said to anyone that she "didn't understand how people use different pronouns." (Dkt. 62-36 at 52:7-9).

22.     Cole initially stated during her deposition that she used "Miss, Mrs." for her pronouns. (Dkt. 62-36 at 51:21-22).

23.     She further stated in her deposition that she uses "she/her." (Dkt. 62-36 at 51:23-24).

24.     When asked if there was ever a meeting or any other time where she stated that she did not believe in the use of pronouns, Cole responded that she "didn't think so." (Dkt. 62-36 at 51:25-52:6).

25.     Cole does not have an ally rainbow in her home, and she does not make any financial contributions to any LGBTQ organizations. (Dkt. 62-36 at 53:7-12).

26.     Stringham reported to Cole that the white power symbol was used in documents at Carmel. (Dkt. 62-36 at 53:20-54:10).

27.     Cole did not notify the staff about the potential white power symbol. (Dkt. 62-36 at 54:6-8).

28.     Harmas recalled that a complaint was made by a Social Worker, Abby Cartwright, against Cole. (Dkt. 62-32 at 61:7-25).

29.     Cole told Cartwright that she did not think Cartwright dating women "was a great idea." (Dkt. 62-10 at 7).

30.     Cartwright told Stringham that "things changed after [Cartwright] started dating women." (Dkt. 62-10 at 7).

31.     Cartwright also told Stringham that she felt like Cole was targeting Cartwright because she was gay. (Dkt. 62-9 at 2; Dkt. 62-38 at 2).

32.     Cole also stated to Cartwright: "Can you believe Stringham is married to a woman? That is weird." (Dkt. 62-9 at 2; Dkt. 62-38 at 2).

33.     During an interview relating to Stringham's first Report of Discrimination and/or Harassment, Cartwright reported to Dr. Thomas Oestreich , the Assistant Superintendent of Carmel, that Cole stated that she found it "odd" that Stringham was dating women after being married to a man. (Dkt. 62-33 at 41:13-18).

34.     When Cartwright spoke to Stringham about Cole and her concerns, she was terrified, and she did not want Cole to know she was in the office talking to Stringham. (Dkt. 62-10 at 7; Dkt. 62-48 at 78:25-79:5).

35.     In April of 2019, Stringham overheard Cole and Karen McDaniel, the then Assistant Principal, talking about Cartwright. (Dkt. 62-10 at 7).

36.     Stringham heard Cole say, "in a hateful voice, I want her gone." (Dkt. 62-10 at 77).

37.     Oestreich asked both Cole and McDaniel about this, but they both denied it occurred. (Dkt. 62-33 at 40:5-24).

38.     Cole testified, however, that this did in fact occur. (Dkt. 62-37 at 49:25-50:4; Dkt. 62-36 at 79:15-80:3).

39.     She also admitted to making derogatory comments about Cartwright. (Dkt. 62-37 at 47:20-25).

40.     When Stringham began working at CHS, Bettina Cool, a counselor at CHS, told Stringham: "Don't tell people you're gay because that could be trouble for you." (Dkt. 62-26 at 63:20-64:3).

41.     Oestreich "determined that a violation of Board Policy did not occur" relating to Stringham's first Report of Discrimination and/or Harassment. (Dkt. 62-11 at 4). Specifically, Oestreich determined that "[t]here was not severe, pervasive or objectively offensive evidence found that [Cole] is discriminating against [Stringham] because she is gay or due to her race." (Dkt. 62-11 at 4).

**Immediately after filing her first Report of Discrimination and/or Harassment, Carmel placed Stringham on her first Performance Improvement Plan (PIP).**

42.     On September 10, 2020, just 10 days after filing her first Report of Discrimination and/or Harassment, Cole placed Stringham on her first improvement plan (PIP). (Dkt. 62-36 at 22:7-12).

43.     Cole could not recall when she drafted the PIP. (Dkt. 62-36 at 24:7-10).

44.     The PIP included "facts" relating to the 2019-2020 school year as well as the 2020-2021 school year. (Dkt. 62-16).

45.     This was the first PIP Stringham had ever been placed on. (Dkt. 62-48 at 62:14-24).

46.     Stringham did not believe she should be placed on a PIP. (Dkt. 62-39).

47.     Stringham did not agree with it as she had been highly effective every year. (Dkt. 62-48 at 81:12-19).

48.     Cole admitted and agreed during her deposition that during the 2020-2021 school year, Stringham was effective at her job. (Dkt. 62-36 at 25:9-14).

49.     For Stringham's 2020-2021 evaluation, however, Cole initially gave Stringham an overall rating of "Needs Improvement." (Dkt. 62-33 at 56:17-19).

50.     This was nonsensical as Stringham received "Highly Effective" in 10 of the evaluation categories, and "Effective" in 4 of the evaluation categories. (Dkt. 62-14).

51.     On the 2020-2021 evaluation, Stringham received no "Improvement Necessary" or "Ineffective" on any of the individual evaluation categories. (Dkt. 62-14).

52.     Oestreich directed Cole to change it from "Needs Improvement" to "Effective" as there was no evidence to support a "Needs Improvement." (Dkt. 62-33 at 56:9-57:11).

53.     Oestreich stated that evaluations are done "objectively" as they are "based upon indicators that coincide with the job responsibilities of the individual roles in our district." (Dkt. 62-33 at 55:22-56:4).

54.     He further testified: "Certainly we try to be objective as possible, but there is some level of subjectivity in any evaluation." (Dkt. 62-33 at 56:2-4).

**Following Carmel's placement of Stringham on a second PIP in July of 2021, Carmel began uploading "artifacts" into Stringham's Standards for Success (SFS) profile.**

55.     Stringham was placed on a second PIP in July of 2021. (Dkt. 62-17).

56.     On September 5, 2021, Stringham received 24 artifacts from Cole. (Dkt. 62-21 at 1-10). On September 22, 2021, Stringham received 2 artifacts from Cole. (Dkt. 62-21 at 11-12). On

September 29, 2021, Stringham received 3 artifacts from Cole. (Dkt. 62-21 at 13-15). On October

10, 2021, Stringham received 2 artifacts from Cole. (Dkt. 62-21 at 16-17).

57.     Thus, in 4 days, Stringham received 31 artifacts from Cole. (Dkt. 62-21).

58.     Artifacts are uploaded by supervisors in the Standards for Success (SFS) evaluation

tool. (Dkt. 62-27 at 9:1-22).

59.     Artifacts are used and/or considered with a teacher's or counselor's evaluation. (Dkt.

62-48 at 47:13-15). The artifacts are also used to evaluate performance. (Dkt. 62-48 at 47:16-18).

Artifacts are typically positive statements about a teacher's or counselor's performance. (Dkt. 62-36

at 18:21-19:1).

60.     Prior to Stringham receiving artifacts/write-ups in 2021 and 2022, she had never

received any artifacts and/or write-ups. (Dkt. 62-48 at 46:19-47:2).

61.     As part of Stringham's second PIP, Stringham was required to submit organizational

plans to Cole. (Dkt. 62-17 at 3). No other counselor was required to do this at any time. (Dkt. 62-35

at 58:1-11; Dkt. 62-36 at 105:12-22).

62.     Stringham was also required to keep a Student Support Team (SST) log, which

tracked the date of the SST meeting, students Stringham discussed, and what follow-up was needed.

(Dkt. 62-17 at 3; Dkt. 62-36 at 105:23-106:3). No other counselor was required to do this. (Dkt. 62-

35 at 58:12-25; Dkt. 62-36 at 81:6-14; 105:23-106:3).

63.     Stringham was required to observe a counselor selected by Cole. (Dkt. 62-17 at 3).

No other counselor was required to do this. (Dkt. 62-35 at 59:1-8; Dkt. 62-36 at 106:4-9).

64.     Stringham was required to keep a communication log. (Dkt. 62-17 at 3-4). No other

counselor was required to do this. (Dkt. 62-35 at 59:10-20; Dkt. 62-36 at 106:10-15).

65.     Stringham was required to go over her evaluations with Cole and McDaniel. (Dkt.

62-10 at 13). No other counselor was required to do this. (Dkt. 62-36 at 81:23-82:4).

**Stringham went on medical leave after receiving so many artifacts.**

66.     After receiving 31 artifacts, Stringham went on medical leave on October 11, 2021. (Dkt. 62-48 at 70:15-16).

67.     Stringham went on medical leave because she was suicidal, stressed, anxious, and depressed because of Cole's treatment of her. (Dkt. 62-48 at 83:17-84:1).

**On January 3, 2022, Stringham filed a second Report of Discrimination and/or Harassment.**

68.     Stringham filed a second internal Report of Discrimination and/or Harassment with Carmel against Cole on January 3, 2022, as well as a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). (Dkt. 62-12; Dkt. 62-50).

69.     In her second internal Report of Discrimination and/or Harassment, Stringham stated in part that she "was being targeted, harassed, micromanaged after being put on an improvement plan. The intolerance and retaliation became so extreme, [Stringham] broke out in hives and [had] a recorded reading of high blood pressure for the first time." (Dkt. 62-12).

70.     Stringham never received a decision relating to her second complaint of discrimination. (Dkt. 62-48 at 84:23-25; 145:6-9).

71.     Stringham later learned that individuals were interviewed about the second Report of Discrimination and/or Harassment. (Dkt. 62-20).

72.     Stringham was not one of the individuals interviewed. (Dkt. 62-20).

**Stringham returned to school on January 11, 2022 following her medical leave.**

73.     Stringham returned to work after her medical leave on January 11, 2022. (Dkt. 62-48 at 84:2-3). When Stringham returned to school, she was placed on a third PIP. (Dkt. 62-18). Stringham did not believe that she should be placed on a PIP. (Dkt. 62-48 at 84:4-9). No other counselors at Carmel High School had ever been placed on a PIP. (Dkt. 62-48 at 127:13-15).

**Stringham reported further discrimination on January 28, 2022.**

74. On January 28, 2022, Stringham reported further harassment and discrimination to Oestreich, Shelley Coover, Cole, and Borto. (Dkt. 62-15).

75. Specifically, Stringham stated:

> I am highly frustrated with [Cole] and how she treats me. If this were any other counselor, she would sign it no problem. When it comes to me, **she discriminates against me because I'm gay or a Latina or both**. I'm so tired of her discrimination against me. She is hateful and mean.

(Dkt. 62-15 at 1) (emphasis added).

76. She also asked that this latest report of discrimination be added to her second Report of Discrimination and/or Harassment. (Dkt. 62-15 at 1).

77. Oestreich did not know, however, if it was ever added to her second Report of Discrimination and/or Harassment. (Dkt. 62-33 at 54:5-13).

**Stringham was treated differently than other CHS Counselors because she is homosexual and/or Hispanic.**

78. David Schleper, a Counselor at CHS, was not disciplined after he failed to add a student to a waitlist. (Dkt. 62-5).

79. Schleper admittedly "spaced it," and he further stated that the student's "parents [were] pretty upset with [him], deservedly so…." (Dkt. 62-5).

80. Schleper, who is not homosexual and/or Hispanic, was not disciplined. (Dkt. 62-27 at 23:22-24:3; 27:19-28:1; Dkt. 62-34 at 33:23-34:3; Dkt. 62-36 at 72:8-21).

81. Cole stated that she did not upload any artifacts for Schleper relating to this issue because she "talked to him about it, and he said it wouldn't happen again." (Dkt. 62-36 at 72:8-21).

82. Harbor, who is not homosexual and/or Hispanic, has only been called to Cole's office on 2 or 3 occasions in 5 years to discuss mistakes that were made. (Dkt. 62-27 at 31:3-17).

83. Harbor was never told that she would receive a written warning. (Dkt. 62-27 at 31:23-32:1).

84.     On September 9, 2021, Cole told Stringham as to SFS artifacts: "Going forward, we will upload documentation as it presents itself, in addition to addressing them directly with you." (Dkt. 62-22).

85.     On January 23, 2022, Stringham received 29 additional negative artifacts. (Dkt. 62-13; Dkt. 62-21 at 45-83).

86.     Many of these alleged issues that were the subject of these artifacts, however, had occurred many months prior. (Dkt. 62-35 at 65:3-12; 66:15-67:4). Cole admitted that the incidents were not uploaded when they happened. (Dkt. 62-36 at 120:4-15).

87.     Thus, on 5 separate days over the span of 4 months, Stringham received 60 total negative artifacts, after not receiving any in the prior 7 years of employment. (Dkt. 62-21).

88.     The most artifacts any other counselor ever had were 2 or 3 artifacts. (Dkt. 62-36 at 116:21-25). These artifacts for all other counselors were positive. (Dkt. 62-36 at 116:21-117:6).

89.     No counselor had ever received 60 or more artifacts from Cole. (Dkt. 62-35 at 65:22-66:14; Dkt. 62-48 at 127:11-12; Dkt. 62-36 at 115:17-117:6).

90.     Indeed, Oestreich testified that no employee at Carmel had ever received 60 or more artifacts. (Dkt. 62-48 at 145:22-25). Borto also never knew of any employee at Carmel ever receiving 60 or more artifacts. (Dkt. 62-35 at 25:14-24). Harmas stated that it was not typical to see 29 artifacts uploaded for one person on one day. (Dkt. 62-31 at 75:17-19; Dkt. 62-13).

91.     Borto did not believe it was typical either. (Dkt. 62-35 at 48:6-12; 72:18-73:11). Borto testified that she had never seen any other counselor receive so many artifacts in one (1) day. (Dkt. 62-35 at 73:12-74:6).

92.     Cole had never uploaded that many artifacts for any other counselor until she did it for Stringham. (Dkt. 62-36 at 89:6-90:1).

93.     Borto knew of no other counselor who had received more than Stringham. (Dkt. 62-35 at 74:4-6).

94.     Although other counselors made errors, Cole did not submit artifacts for these counselors when they made errors. (Dkt. 62-48 at 127:16-21).

95.     Other counselors also had issues with their audits, but these counselors were not placed on a PIP as Stringham was. (Dkt. 62-48 at 128:23-129:3).

96.     From 2020 to 2022, Stringham was the only counselor to be placed on a PIP. (Dkt. 62-35 at 26:9-11; Dkt. 62-36 at 121:11-20). During the 2022-2023 school year, no counselors were placed on a PIP. (Dkt. 62-35 at 26:12-14; Dkt. 62-36 at 121:21-23).

97.     Stringham is the sole counselor to whom Cole has ever issued a PIP. (Dkt. 62-36 at 121:24-122:2). Stringham is the only counselor to whom Cole has provided negative feedback. (Dkt. 62-48 at 136:3-7; 137:6-138:2).

98.     Cole uploaded only positive artifacts for other counselors, but did not recall uploading any positive artifacts for Stringham. (Dkt. 62-36 at 58:13-59:15; 116:21-117:18). These other counselors were all white, and none of them were homosexual. (Dkt. 62-36 at 59:1-15).

99.     Cole maintained an Excel spreadsheet relating to alleged concerns she had about Stringham. (Dkt. 62-36 at 40:24-41:11). Cole did not maintain an Excel spreadsheet for any other counselor. (Dkt. 62-36 at 41:12-14).

100.    Stringham was replaced by Angela Torvik, who is neither homosexual nor Hispanic. (Dkt. 62-2; Dkt. 62-3; Dkt. 62-27 at 19:14-19; Dkt. 62-29 at 24:25-25:8).

101.    Harmas never recommended cancellation of another counselor's contract while he was employed at CHS. (Dkt. 62-31 at 56:18-23). He only ever recommended cancellation of Stringham's contract. (Dkt. 62-31 at 56:18-23).

102.     Carmel does not require diversity training for its employees. (Dkt. 62-33 at 17:22-18:9; Dkt. 62-36 at 35:1-3; 36:6-21). Cole never asked the Carmel diversity team to come and present professional development to the counselors in her department. (Dkt. 62-36 at 39:18-21).

**Rachel Cole refused to sign required paperwork for Stringham.**

103.     As part of Stringham's licensing to become a Mental Health Counselor, she needed Cole to sign a form or provide verification of Stringham's employment as a counselor on CCS letterhead. (Dkt. 62-48 at 71:7-9; 85:15-86:5).

104.     Cole refused to provide the verification or sign it. (Dkt. 62-48 at 86:15-16).

105.     After Cole initially refused to sign the forms, Stringham went to Cole's office on January 28, 2022, to explain what needed to be done for the forms. (Dkt. 62-48 at 86:21-90:10).

106.     Stringham explained that the State of Indiana merely needed verification that Stringham had been a professional school counselor for the past 7 ½ years at Carmel High School. (Dkt. 62-48 at 87:8-12).

107.     Because some of the entities where Stringham did her training no longer existed, and because she had been a professional school counselor for so long, the State of Indiana informed Stringham that her current employer could complete the verification. (Dkt. 62-26 at 87:15-88:17; 94:3-24).

108.     Cole still refused to sign the form. (Dkt. 62-48 at 87:13-14; Dkt. 62-26 at 99:17-100:9).

109.     Stringham asked Cole to call the State so that the State could explain to Cole what was needed. (Dkt. 62-48 at 87:19-21). Again, Cole refused. (Dkt. 62-48 at 87:20-21).

110.     Stringham asked Cole to put the needed information on CCS letterhead, but Cole refused. (Dkt. 62-48 at 88:1-3; 97:19-24; Dkt. 62-26 at 102:20-103:17).

111.     During Stringham's meeting with Cole about the needed form, Stringham testified that Cole's tone was aggressive. (Dkt. 62-48 at 88:9-10).

112.     Stringham did not yell at Cole although Stringham can speak very passionately. (Dkt. 62-26 at 111:18-112:4).

113.     Stringham was understandably upset that Cole was refusing to provide the paperwork Stringham needed. (Dkt. 62-26 at 111:18-112:4).

114.     Stringham testified that Cole was speaking passionately. (Dkt. 62-26 at 112:5-21).

115.     Cole was also dismissive and curt toward Stringham. (Dkt. 62-26 at 112:5-21).

116.     At Borto's direction, Cole wrote a summary of the incident about Stringham's conduct during the meeting, and Oestreich "investigated" the incident. (Dkt. 62-35 at 48:14-23).

117.     Stringham never leaned over the desk as Cole claimed in her complaint about Stringham. (Dkt. 62-48 at 88:11-18).

118.     Stringham believes that others heard the conversation because the walls in the Counseling Department are thin. (Dkt. 62-48 at 89:19-90:7). Stringham noted that the walls were so thin, others could hear people sneeze while they were in different offices. (Dkt. 62-48 at 90:8-10). Indeed, the walls in the Carmel High School Counseling Department are so thin that each counselor was issued a white noise machine to drown out any noise. (Dkt. 62-48 at 48:7-11; 107:6-17). Further the area where Cole and Stringham were meeting was very small, so others could hear them speaking. (Dkt. 62-26 at 106:18-110:1).

119.     Stringham was never interviewed about this incident. (Dkt. 62-31 at 43:22-44:23). Cole was interviewed by Oestreich. (Dkt. 62-36 at 63:23-64:4).

120.     Harmas (the decisionmaker), however, thought this alleged incident between Stringham and Cole was out of character. (Dkt. 62-31 at 50:22-24).

121.   For the alleged incident on January 28, 2022, CCS never reminded Stringham to "remain civil and be respectful and courteous to others" contrary to CCS's own *Civility and Decorum* policy. (Dkt. 62-4; Dkt. 62-48 at 91:4-12). CCS also never attempted to progressively discipline Stringham for the alleged incident on January 28, 2022. (Dkt. 62-4; Dkt. 62-48 at 91:13-24). Again, this was contrary to CCS's own *Civility and Decorum* policy. (Dkt. 62-4).

**Stringham was placed on Administrative Leave on January 31, 2022 – just 13 school days after returning from medical leave. A few days after being placed on Administrative Leave, Carmel sought to cancel Stringham's contract on February 4, 2022.**

122.   On January 31, 2022, Stringham was placed on paid administrative leave. (Dkt. 62-6).

123.   No reasons for this paid administrative leave were given in writing. (Dkt. 62-6).

124.   On February 4, 2022, Stringham received a *Notice of Preliminary Decision & Statement of Your Conference and Conference/Hearing Rights.* (Dkt. 62-7).

125.   The *Notice* listed only two (2) reasons for the proposed cancellation of Stringham's teaching contract:

- Your unprofessional behavior directed towards your supervisor on January 28, 2022 where you were yelling loudly at her about a form you demanded she sign, when the assistant superintendent already communicated with you that any questions should be directed to him about the topic.
- You [sic] continued job performance that falls below what we expect out of our counselors at Carmel High School. You continue to make errors in your role as a counselor that impacts other staff and students.

(Dkt. 62-7 at 1).

126.   Harmas stated that his recommendation for cancellation "was based on all the issues that were in SFS." (Dkt. 62-31 at 39:6-16).

127.   He further stated it was based on "[t]he recurring issues that - - that happened, also the unprofessionalism in the incident with [Cole]." (Dkt. 62-31 at 39:6-16).

128.   Harmas, however, did not draft the *Notice.* (Dkt. 62-31 at 52:15-20).

129.     Cole felt "relief" when Stringham's contract was canceled. (Dkt. 62-36 at 55:25-56:20).

130.     At the time Stringham received the *Notice*, she had never received an evaluation that was below effective. (Dkt. 62-35 at 37:13-23).

131.     The *Notice* provided to Stringham was confidential. (Dkt. 62-31 at 53:4-21).

132.     Oestreich shared Stringham's *Notice* with another Superintendent outside CCS although he knew it was confidential. (Dkt. 62-19;  Dkt. 62-33 at 68:2-24).

133.     Oestreich stated that he was not concerned about Stringham's confidentiality when he provided the *Notice* to a non-CCS Superintendent. (Dkt. 62-33 at 68:25-69:9).

134.     On February 8, 2022, Stringham timely requested a conference with the Superintendent. (Dkt. 62-40). On February 24, 2022, a private conference between Stringham and Beresford was held. (Dkt. 62-8).

135.     On February 25, 2022, Stringham amended her EEOC Charge. (Dkt. 62-38).

136.     On February 28, 2022, Stringham timely requested a private conference with the Board. (Dkt. 62-41).

137.     On March 1, 2022, Beresford affirmed the *Notice of Preliminary Decision & Statement of Your Conference and Conference/Hearing Rights*. (Dkt. 62-8).

138.     On March 15, 2022, a private conference was held with the Board. (Dkt. 62-48).

139.     On March 28, 2022, the Board issued its *Findings of Fact, Conclusions of Law and Decision*. (Dkt. 62-23).

### III.     STATEMENT OF DISPUTED FACTS USED IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Disputed Fact: Carmel refers to the discussion between Stringham and Cole as an "outburst" 10 times in its Brief. *See* Dkt. 55 at 1, 21, 24, 28, 34 and 25.**

There was no "outburst" between Stringham and Cole on January 28, 2022. Stringham and Cole were merely having a conversation. (Dkt. 62-24 at ¶¶3-4). It was Stringham that stated that Cole's tone was aggressive. (Dkt. 62-48 at 88:9-10). Stringham did not yell at Cole, although Stringham can speak very passionately. (Dkt. 62-26 at 111:18-112:4). Stringham testified that Cole was speaking passionately. (Dkt. 62-26 at 112:5-21). Cole was also dismissive and curt toward Stringham. (Dkt. 62-26 at 112:5-21). Stringham never leaned over the desk as Cole claimed in her complaint. (Dkt. 62-48 at 88:11-18). Stringham believes that others heard the conversation because the walls in the Counseling Department are thin. (Dkt. 62-48 at 89:19-90:7). Stringham stated that the walls were so thin, others could hear people sneeze while they were in different offices. (Dkt. 62-48 at 90:8-10). Indeed, the walls in the Carmel High School Counseling Department are so thin that each counselor was issued a white noise machine to drown out any noise. (Dkt. 62-48 at 48:7-11; 107:6-17). Further the area where Cole and Stringham met was very small, so others could hear them speaking. (Dkt. 62-26 at 106:18-110:1).

**Disputed Fact: "Additional concerns about Stringham's performance surfaced after the 2019-2020 school year–for example, in June 2020, a parent reported to McDaniel that her son had received a diploma in the mail even though he had not graduated. Cole confirmed that the student was Stringham's and that she failed to remove him from the graduation list. Stringham had made the same mistake with another student the year before. McDaniel noted that the error needed to be added to Stringham's 'paperwork for documentation of her improvement plan.'" [Dkt. 55 at 6]. "In an email dated June 23, 2020, Cole notified Stringham of her oversight and reminded her that she needed to pay better attention, especially since Stringham had known the student would be completing summer school and it had happened with another student the previous year." [Dkt. 55 at 6].**

McDaniel informed Stringham and the other counselors during a meeting that because of COVID, Carmel would be graduating all of the students. (Dkt. 62-26 at 39:2-41:16; 43:7-48:20). Based on McDaniel's direction, Stringham did not take any of the students off of her graduation list, including this particular student. (Dkt. 62-26 at 41:3-16). Further, Carmel provided no evidence that there was "another student the year before." Stringham disputes that she made a mistake on the graduation list the year prior. (Dkt. 62-24 at ¶ 5).

**Disputed Fact: "Based on Stringham's need for improvement, during the Summer of 2020 Cole, Borto, and others began developing a performance improvement plan for the upcoming 2020-2021 school year." [Dkt. 55 at 7].**

Carmel failed to provide any evidence showing that the PIP was drafted and/or developed during the "Summer of 2020." Oestreich testified that the PIP was "emailed to [him] and sent to [him]," but Carmel did not provide these emails to Stringham or the Court, even though Stringham requested these emails during discovery. (Dkt. 62-33 at 15:14-16:8). Further, Cole could not recall the date she drafted the PIP. (Dkt. 62-36 at 24:7-10). She did recall emailing it to Borto though. (Dkt. 62-36 at 24:7-25:1). Again, no emails between Cole and Borto with the PIP attached were provided to Stringham or this Court, even though Stringham requested these emails during discovery. The evidence shows, however, that Stringham's first PIP was not provided to Stringham until after she filed her first Report of Discrimination and/or Harassment. (Dkt. 62-26 at 69:23-71:2; *Compare* Dkt. 62-4 and Dkt. 62-10).

**Disputed Fact: "Later on, at the end of the Spring 2021 semester, Stringham notified Borto that five of her students would not graduate and would instead require further instruction in an alternative learning program over the summer. None of these five students was among the ones that Stringham identified when she met with Borto at the end of March. In addition, other counselors would report '[r]arely any' or at most one student at the end of the Spring semester who failed to graduate. Again, Stringham reported five." [Dkt. 55 at 9]. "Borto was 'angry to say the least' to learn that five of Stringham's students would not be graduating and that she failed to identify any of them during their end-of-March meeting. Borto added, '[T]o know we missed students that we could have gotten across the finish line to graduation was devastating for those kids . . . and for those families. And I get upset that we took time to do that and we missed those kids.' In Borto's view, of the five students Stringham identified belatedly, three could have graduated if she identified them sooner, and two of those three never graduated from Carmel High School." [Dkt. 55 at 9]. "Based on Stringham's failure to identify at-risk seniors, as well as her other performance deficiencies during the 2020-2021 school year, Borto and Cole determined that an additional improvement plan for the upcoming 2021-2022 school year was warranted." [Dkt. 55 at 9-10].**

Only 3students (not 5 as alleged by Carmel) were identified in Stringham's second PIP. (Dkt. 62-17). Of these 3 students, 2 of the students transferred in from other schools and did not transfer in enough credits to graduate at the end of the school year. (Dkt. 62-24 at ¶¶6-7). These 2 students both stopped attending school as well. (Dkt. 62-24 at ¶8). One of them moved away, and one of

them just stopped attending all together and the student's family refused to respond to any communication attempts from the school. (Dkt. 62-24 at ¶9). The third student **did** graduate from CHS. (Dkt. 62-24 at ¶10). Further, other counselors had students that were in danger of not graduating. (Dkt. 62-36 at  31:15-32:20). For example, Cole recalled that Kevin McDonough had one student specifically who was in danger of not graduating, , and she recalled that "[t]here were a couple of others." (Dkt. 62-36 at 31:15-32:20). Mr. McDonough was neither homosexual nor Hispanic. (Dkt. 62-1; Dkt. 62-27 at 18:20-19:6; Dkt. 62-29 at 24:6-15; Dkt. 62-36 at 65:2-22).

   **Disputed Fact: "To address Stringham's concerns that she was not receiving written feedback, Cole uploaded 'artifacts' to help Stringham better understand the issues she was seeing. 'Artifacts' are not write-ups, but rather written communication from supervisors to subordinates that give subordinates feedback and help supervisors measure performance." [Dkt. 55 at 10].**

   Artifacts are used for performance purposes. (Dkt. 62-48 at 47:16-18). Artifacts are used and/or considered with a teacher's evaluation. (Dkt. 62-48 at 47:13-15). Artifacts are typically positive statements about a teacher's or counselor's performance. (Dkt. 62-36 at 18:21-19:1). On 5 separate dates over the span of 4 months, Stringham received 60 total artifacts. (Dkt. 62-21). The most artifacts any other counselor ever had were 2 or 3 artifacts. (Dkt. 62-36 at 116:21-25). These artifacts for all other counselors were positive. (Dkt. 62-36 at 116:21-117:6). Stringham is the only counselor to whom Cole provided negative feedback, even though other counselors had engaged in the same alleged conduct as Stringham. (Dkt. 62-48 at 136:3-7; 137:6-138:2). Cole uploaded only positive artifacts for other counselors, but did not recall uploading any positive artifacts for Stringham. (Dkt. 62-36 at 58:13-59:15; 116:21-117:18). No counselor had ever received 60 or more artifacts from Cole. (Dkt. 62-35 at 65:22-66:14; Dkt. 62-48 at 127:11-12; Dkt. 62-36 at 115:17-117:6). Indeed, Oestreich testified that no employee at Carmel had ever received 60 or more artifacts. (Dkt. 62-48 at 145:22-25). Harmas stated that it was not typical to see 29 artifacts uploaded for one person on one day. (Dkt. 62-31 at 75:17-19; Dkt. 62-13). Borto testified that she had never seen any other

counselor receive so many artifacts in 1 day. (Dkt. 62-35 at 73:12-74:6). Cole had never uploaded

that many artifacts for any other counselor until she did it for Stringham. (Dkt. 62-36 at 89:6-90:1).

Borto knew of no other counselor who had received more than Stringham. (Dkt. 62-35 at 74:4-6).

Although other counselors made errors, Cole did not submit artifacts for these counselors when

they made an error. (Dkt. 62-48 at 127:16-21).

      **Disputed Fact: "During this interaction, Borto was in her office with another**
**employee when a counselor interrupted to report that Stringham was yelling at Cole and**
**that Borto should help her. When she arrived at Cole's office, Borto observed Stringham**
**leaning over Cole's desk and 'yelling at Rachel to sign papers . . . .' This was the first time**
**Borto had seen a School employee yell at a supervisor. Borto defused the situation by telling**
**Stringham to direct any questions about the forms to Oestreich and removing Cole from the**
**office." [Dkt. 55 at 14-15].**

      Stringham did not yell at Cole although Stringham can speak very passionately. (Dkt. 62-26

at 111:18-112:4). Stringham stated that Cole was speaking passionately. (Dkt. 62-26 at 112:5-21).

Cole was also dismissive and curt toward Stringham. (Dkt. 62-26 at 112:5-21). Stringham never

leaned over the desk as Cole and Borto claimed. (Dkt. 62-48 at 88:11-18).

      **Disputed Fact: "This was not the first time that Stringham behaved this way toward**
**Cole–in February 2019, she became angry with Cole, yelled at her, and slammed her office**
**door. In her written account of that incident, Stringham admitted that she called Cole**
**'ridiculous' and acknowledged that '[i]t is not a moment that I'm proud of doing.' Other**
**than these two incidents, no other employee had acted this way toward Cole." [Dkt. 55 at**
**15].**

      Bettina Cool, who is neither homosexual nor Hispanic, yelled at Cole during a meeting,

slammed the door, and walked out of the building. (Dkt. 62-1; Dkt. 62-27 at 18:20-19:6; Dkt. 62-29

at 24:6-15; Dkt. 62-36 at 65:2-22; Dkt. 62-24 at ¶11). Ms. Cool was not disciplined for this incident.

(Dkt. 62-24 at ¶12).

      **Disputed Fact: "In a letter dated January 31, 2022, Oestreich informed Stringham**
**that the School was placing her on paid administrative leave. Oestreich decided that such**
**leave was appropriate '[b]ecause of the nature of the incident that took place between**
**[Stringham] and Rachel Cole' and because he wanted to have an opportunity to discuss the**
**incident with witnesses 'and also talk to Mo Borto and Harmas before making any decisions**
**on what next steps may look like.'" [Dkt. 55 at 15]. "After speaking with the employees,**
**Oestreich discussed the matter with Borto and Principal Harmas to decide how they wanted**

**'to move forward and address the concern.' []Oestreich shared the January 28th incident between Stringham and Cole, as well as '[c]ontinued concerns with Stringham,' '[c]ontinued errors in her performance,' 'the totality of working with Stringham,' and 'having her on improvement plans.' Based on the information []Oestreich provided, [] Harmas decided to recommend cancellation of Stringham's regular teacher's contract, and Borto concurred. [Dkt. 55 at 16].**

Cole was also involved in the decision-making process to cancel Stringham's contract and terminate her employment. (Dkt. 62-31 at 39:17-25). Harmas stated that "[Borto] and [Cole] were working with Oestreich and made that rec - - recommendation to me and it was my final approval." (Dkt. 62-31 at 39:17-25).

## IV.   LEGAL ANALYSIS

### A.  Legal Standard

Regarding Stringham's claims of discrimination on the basis of her race, national origin, and/or sexual orientation, the United States Supreme Court stated:

> An employer violates Title VII when it intentionally fires an individual employee based in part on [the protected class]. It doesn't matter if other factors besides the plaintiff's sex contributed to the decision.

*Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020).

Stringham is entitled to "the benefit of conflicts in the evidence and any reasonable inferences in her favor." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 700 (7th Cir. 2013). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2102 (2000). "'[A]ll evidence belongs in a single pile and must be evaluated as a whole' . . . ." *Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378, 383 (7th Cir. 2016). The courts "have tried to move away from the many multi-factored tests in employment discrimination cases and decide, when considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge ...'" *Monroe*

*v. Ind. DOT*, 871 F.3d 485, 504 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

**B.  Carmel terminated Stringham in violation of Title VII Of The Civil Rights Act when it terminated her on the basis of her race (Hispanic), national origin (Mexican), and/or sexual orientation (homosexual).**

1.  Elements – Discrimination on the basis of race, national origin, and sexual orientation

To defeat summary judgment, a plaintiff may "provide either direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). Notably, Stringham is only "*required* to show pretext when her only other evidence of discrimination is the prima facie *McDonnell Douglas* showing." *Joll*, 953 F.3d 923 a 933 (emphasis in original). "Where the plaintiff does not rely solely on *McDonnell Douglas*, she may survive summary judgment even without evidence that the employer's explanation is dishonest." *Id.*

"[T]hree broad types of circumstantial evidence" can "support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929. Here, "[t]aken together," Stringham's overall "evidence would permit a reasonable jury to infer an overall likelihood of discrimination that merits a trial, not summary judgment." *Id.*

Even if Stringham relied solely on *McDonnell Douglas*, which she does not, Carmel does not dispute Stringham met 2 of the 4 prima facie requirements under *McDonnell Douglas*, including that Stringham was (a) a member of a protected class; and (b) suffered an adverse employment action. *See Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2011). Instead, Carmel focuses on whether Stringham's job performance was meeting Carmel's legitimate expectations and whether a similarly situated employee outside the protected class was treated more favorably.

Under Title VII of the Civil Rights Act of 1967, Stringham must show "(1) [s]he is a member of a protected class; (2) [her] job performance met [her] employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated persons outside the class received more favorable treatment. *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (citing *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010)). "Discrimination on the basis of sexual orientation is a form of sex discrimination." *Hively v. Ivy Tech Cmty. College of Ind.*, 853 F.3d 339, 341 (7th Cir. 2017). Thus, a claim of discrimination on the basis of sexual orientation is considered pursuant to Title VII of the Civil Rights Act of 1967. *Hively*, 853 F.3d at 351-352. Once Stringham establishes a prima facie case, Carmel must then provide a legitimate reason for her discharge. *Id.* If Carmel is successful in doing this, Stringham must then show that Carmel's reason is pretextual. *Id.* As discussed above, Carmel does not dispute that Stringham is a member of a protected class, and it admits that she suffered an adverse employment action. [Dkt. 55 at 21, 23, 25-29].

　　　*a.　Stringham has presented enough circumstantial evidence to prevail under the direct method of proof.*

Under the direct method of proof, Stringham must show "either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated his firing." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). "Circumstantial evidence may include suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment." *Burnell*, 647 F.3d at 708 (citing *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)). Carmel does not dispute that Stringham is a member of a protected class, and it admits that she suffered an adverse employment action. [Dkt. 55 at 21, 23, 25-29].

Stringham has provided circumstantial evidence that points to a discriminatory reason for Carmel's termination of her employment. Knoop, a Social Worker at CHS, stated that Cole told

Knoop that she did not understand why people used pronouns to identify themselves and that Cole

did not use pronouns to identify herself. (Dkts. 62-29 and 62-30 at 8:18-24; 18:23-19:2; 19:7-11).

Cole testified, however, that she never said to anyone that she "didn't understand how people use

different pronouns." (Dkt. 62-36 at 52:7-9). Cole initially stated during her deposition that she used

"Miss, Mrs." for her pronouns. (Dkt. 62-36 at 51:21-22). When asked if there was ever a meeting or

any other time where she stated that she did not believe in the use of pronouns, Cole responded that

she "didn't think so." (Dkt. 62-36 at 51:25-52:6). Cole does not have an ally rainbow in her home,

and she does not make any financial contributions to any LGBTQ organizations. (Dkt. 62-36 at

53:7-12). Stringham reported to Cole that the white power symbol was used in documents at

Carmel. (Dkt. 62-36 at 53:20-54:10). Cole did not notify the staff about the potential white power

symbol. (Dkt. 62-36 at 54:6-8).

Harmas recalled that a complaint was made by Cartwright against Cole. (Dkt. 62-32 at 61:7-

25). Cole told Cartwright that she did not think Cartwright dating women "was a great idea." (Dkt.

62-10 at 7). Cartwright told Stringham that "things changed after [Cartwright] started dating

women." (Dkt. 62-10 at 7). Cartwright also told Stringham that she felt like Cole was targeting

Cartwright because she was gay. (Dkt. 62-9 at 2; Dkt. 62-38 at 2). Cole also stated to Cartwright:

"Can you believe Stringham is married to a woman? That is weird." (Dkt. 62-9 at 2; Dkt. 62-38 at 2).

During an interview relating to Stringham's first Report of Discrimination and/or Harassment,

Cartwright reported to Oestreich that Cole stated that she found it "odd" that Stringham was dating

women after being married to a man. (Dkt. 62-33 at 41:13-18). When Cartwright spoke to Stringham

about Cole and her concerns, she was terrified, and she did not want Cole to know she was in the

office talking to Stringham. (Dkt. 62-10 at 7; Dkt. 62-48 at 78:25-79:5). In April of 2019, Stringham

overheard Cole and Karen McDaniel, the then Assistant Principal, talking about Cartwright. (Dkt.

62-10 at 7). Stringham heard Cole say, "in a hateful voice, I want her gone." (Dkt. 62-10 at 77).

Oestreich asked both Cole and McDaniel about this, but they both denied it occurred. (Dkt. 62-33 at 40:5-24). Cole testified, however, that this did in fact occur. (Dkt. 62-37 at 49:25-50:4; Dkt. 62-36 at 79:15-80:3). She also admitted to making derogatory comments about Cartwright. (Dkt. 62-36 at 47:20-25). When Stringham began working at CHS, Bettina Cool, a counselor at CHS, told Stringham: "Don't tell people you're gay because that could be trouble for you." (Dkt. 62-26 at 63:20-64:3).

Based on this evidence, Stringham has alleged sufficient evidence, for which there is little dispute, that a jury could infer discriminatory intent. Thus, Carmel's *Motion for Summary Judgment* should be denied in its entirety.

b. *Stringham was meeting Carmel's legitimate expectations.*

Stringham never received **any** ineffective and/or improvement necessary designations on any individual or overall categories of her performance evaluation during her entire tenure at Carmel High School. In Stringham's entire tenure at Carmel High School, she only received "Highly Effective" or "Effective" overall designations: (1) 2014-2015: Effective (Dkt. 62-42 at 23); (2) 2015-2016: Highly Effective (Dkt. 62-43 at 24); (3) 2016-2017: Highly Effective (Dkt. 62-44 at 20); (4) 2017-2018: Highly Effective (Dkt. 62-45 at 22); (5) 2018-2019: Highly Effective (Dkt. 62-46 at 13); (6) 2019-2020: Highly Effective (Dkt. 62-47 at 11); (7) 2020-2021: Effective (Dkt. 62-14 at 16). Stringham was placed on a PIP only **after** she made her first Report of Discrimination and/or Harassment. (Dkt. 62-26 at 69:23-71:2; *Compare* Dkt. 62-4 and Dkt. 62-10). Cole did not begin evaluating Stringham until the 2016-2017 academic year. Cole showed bias before Stringham complained, but once Stringham lodged official internal complaints of discrimination, Cole specifically targeted Stringham and treated her differently than the other counselors. At minimum, Stringham has raised sufficient issues of material fact to go to a jury on whether she was meeting Carmel's performance expectations.

      c.   *Carmel treated similarly situated employees who are heterosexual and/or non-Hispanic more favorably than Stringham.*

"[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (quoting *Humphries CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (internal citation omitted). The Court is "looking for comparators, not 'clone[s].'" *Coleman*, 667 F.3d at 846 (quoting *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir. 2010)). "So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied. *Coleman*, 667 F.3d at 846 (quoting *Humphries*, 474 F.3d at 405).

Stringham identified comparators (all counselors like Stringham who reported to Cole) who are not homosexual and/or Hispanic that were treated more favorably than she was. Schleper, a Counselor at CHS, was not disciplined after he failed to add a student to a waitlist (Dkt. 62-5). Schleper admittedly "spaced it," and he further stated that the student's "parents [were] pretty upset with [him], deservedly so…." (Dkt. 62-5). Schleper, who is not homosexual and/or Hispanic, was not disciplined. (Dkt. 62-27 at 23:22-24:3; 27:19-28:1; Dkt. 62-34 at 33:23-34:3; Dkt. 62-36 at 72:8-21). Cole stated that she did not upload any artifacts for Schleper relating to this issue because she "talked to him about it, and he said it wouldn't happen again." (Dkt. 62-36 at 72:8-21). Harbor, who is not homosexual and/or Hispanic, has only been called to Cole's office on 2 or 3 occasions in 5 years to discuss mistakes that were made. (Dkt. 62-27 at 31:3-17). Harbor was never told that she would receive a written warning, and no artifacts were uploaded in connection with her mistakes.

(Dkt. 62-27 at 31:23-32:1). Stringham was replaced by Angela Torvik, who is neither homosexual nor Hispanic. (Dkt. 62-2; Dkt. 62-3; Dkt. 62-27 at 19:14-19; Dkt. 62-29 at 24:25-25:8).

After lodging a discrimination and harassment complaint against Cole, on 5 separate dates over the span of 4 months, Cole gave Stringham 60 total negative artifacts after not receiving any in the prior 7 years of employment. (Dkt. 62-21). The most artifacts any other counselor ever received were 2 or 3 artifacts. (Dkt. 62-36 at 116:21-25). These artifacts for all other counselors were positive. (Dkt. 62-36 at 116:21-117:6). No counselor had ever received 60 or more artifacts from Cole. (Dkt. 62-35 at 65:22-66:14; Dkt. 62-48 at 127:11-12; Dkt. 62-36 at 115:17-117:6). Indeed, Oestreich testified that no employee at Carmel had ever received 60 or more artifacts. (Dkt. 62-48 at 145:22-25). Harmas stated that it was not typical to see 29 artifacts uploaded for one person on one day. (Dkt. 62-31 at 75:17-19; Dkt. 62-13). Borto testified that she had never seen any other counselor receive so many artifacts in 1 day. (Dkt. 62-35 at 73:12-74:6). Cole had never uploaded that many artifacts for any other counselor until she did it for Stringham. (Dkt. 62-36 at 89:6-90:1). Borto knew of no other counselor who had received more than Stringham. (Dkt. 62-35 at 74:4-6). Although other counselors made errors, Cole did not submit artifacts for these counselors when they made an error. (Dkt. 62-48 at 127:16-21). Other counselors also had issues with their audits, but these counselors were not placed on a PIP as Stringham was. (Dkt. 62-48 at 128:23-129:3).

From 2020 to 2022, Stringham was the only counselor to be placed on a PIP. (Dkt. 62-35 at 26:9-11; Dkt. 62-36 at 121:11-20). During the 2022-2023 school year, no counselors were placed on a PIP, even though they made some of the same errors as Stringham. (Dkt. 62-35 at 26:12-14; Dkt. 62-36 at 121:21-23). Stringham is the sole counselor to whom Cole has ever issued a PIP. (Dkt. 62-36 at 121:24-122:2). Stringham is the only counselor to whom Cole has provided negative feedback. (Dkt. 62-48 at 136:3-7; 137:6-138:2). Cole uploaded only positive artifacts for other counselors, but did not recall uploading any positive artifacts for Stringham. (Dkt. 62-36 at 58:13-59:15; 116:21-

117:18). These other counselors were all white, and none of them were homosexual. (Dkt. 62-36 at 59:1-15). Cole maintained an Excel spreadsheet relating to alleged concerns she had about Stringham. (Dkt. 62-36 at 40:24-41:11). Cole did not maintain an Excel spreadsheet for any other counselor. (Dkt. 62-36 at 41:12-14). Harmas never recommended cancellation of another counselor's contract while he was employed at CHS. (Dkt. 62-31 at 56:18-23). He only ever recommended cancellation of Stringham's contract. (Dkt. 62-31 at 56:18-23).

At a minimum, Stringham has raised sufficient issues of material fact to go to a jury on her claims of discrimination, and Carmel's *Motion for Summary Judgment* should be denied in its entirety.

> d.   *Carmel presented no legitimate, nondiscriminatory reasons for Stringham's termination.*

Carmel attempted to set forth legitimate, nondiscriminatory reasons for Stringham's termination, but those reasons fail or at least raise issues of material fact, preventing summary judgment. At all times, Stringham was rated as Highly Effective or Effective. It was not until Stringham filed her first Report of Discrimination and/or Harassment that she was placed on the first of three PIPs.

Immediately following Stringham's reports of discrimination and/or harassment, Stringham began receiving what totaled more than 60 negative artifacts. The most artifacts any other counselor ever had were 2 or 3 artifacts. (Dkt. 62-36 at 116:21-25). These artifacts for all other counselors were positive. (Dkt. 62-36 at 116:21-117:6). Stringham is the only counselor to whom Cole provided negative feedback. (Dkt. 62-48 at 136:3-7; 137:6-138:2). Cole uploaded only positive artifacts for other counselors, but did not recall uploading any positive artifacts for Stringham. (Dkt. 62-36 at 58:13-59:15; 116:21-117:18). No counselor had ever received 60 or more artifacts from Cole. (Dkt. 62-35 at 65:22-66:14; Dkt. 62-48 at 127:11-12; Dkt. 62-36 at 115:17-117:6). Indeed, Oestreich testified that no employee at Carmel had ever received 60 or more artifacts. (Dkt. 62-48 at 145:22-25). Harmas stated that it was not typical to see 29 artifacts uploaded for one person on one day.

(Dkt. 62-31 at 75:17-19; Dkt. 62-13). Borto testified that she had never seen any other counselor receive so many artifacts in 1 day. (Dkt. 62-35 at 73:12-74:6). Cole had never uploaded that many artifacts for any other counselor until she did it for Stringham. (Dkt. 62-36 at 89:6-90:1). Borto knew of no other counselor who had received more than Stringham. (Dkt. 62-35 at 74:4-6). Although other counselors made errors, Cole did not submit artifacts for these counselors when they made errors. (Dkt. 62-48 at 127:16-21).

Because, at a minimum, there are multiple issues of material fact regarding Stringham's termination from her employment and career and Cole treated similarly-situated counselors more favorably than Stringham, Carmel's *Motion for Summary Judgment* should be denied in its entirety.

> e.   *Carmel's reasons for Stringham's termination are pretext for discrimination on the basis of race, national origin, and sexual orientation.*

"To demonstrate a material issue of fact as to pretext, [Stringham] must show that either 1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible." *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 778 (7th Cir. 2013) (quotation omitted). Although courts are not to "second guess an employer's business decision," courts "neither . . . abandon good reason and common sense in assessing an employer's actions." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013) (quoting *Gordon v. United Airlines*, Inc., 246 F.3d 878, 889 (7th Cir. 2001)). As a result, "[w]here an employer's reason for a termination is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation." *Hobgood*, 731 F.3d at 646.

As discussed in length above, the allegations made against Stringham have no basis in fact or at least involve multiple disputed, material facts, especially considering they all were alleged after Stringham filed her first Report of Discrimination and/or Harassment. Because, at a minimum, there are multiple issues of material fact regarding Stringham's termination from her employment

and Cole treated similarly-situated counselors more favorably than Stringham, Carmel's *Motion for Summary Judgment* should be denied in its entirety.

**C.  Carmel retaliated against Stringham by terminating her because Stringham filed 5 complaints of discrimination against Cole.**

To get past summary judgment on a retaliation claim, Stringham should "produce evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Carter v. Dart*, 2017 U.S. Dist. LEXIS 21496, at *23 (N.D. Ill. Feb. 15, 2017) (quoting *Volling*, 840 F.3d at 383). Stringham filed 5 complaints of discrimination – an internal complaint on September 1, 2020; an internal complaint on January 3, 2022; an EEOC Charge on January 3, 2022; an internal complaint on January 28, 2022; and an Amended EEOC Charge on February 25, 2022. (Dkts. 62-10, 62-12, 62-15, 62-38, 62-50). Following the filing of these complaints, Stringham was placed on 3 PIPs, received more than 60 negative artifacts, and was ultimately terminated. Indeed, just 10 days after Stringham filed her first Report of Discrimination and/or Harassment, Cole placed Stringham on her first PIP. Prior to complaining about discrimination and/or harassment, Stringham had never had any disciplinary issues or negative artifacts alleged against her. She always received Highly Effective or Effective on each of her annual performance evaluations. All of these materially adverse actions happened shortly **_after_** Stringham filed her complaints of discrimination.

Because, at a minimum, there are multiple issues of material fact regarding Stringham's termination from his employment and career and Cole treated similarly-situated counselors more favorably than Stringham, Carmel's *Motion for Summary Judgment* should be denied in its entirety.

**D.  Carmel's decision to terminate Stringham's teaching contract was arbitrary and capricious in violation of 42 U.S.C. § 1983.**

> *1.  Stringham had a property interest in her continued employment with Carmel.*

As a permanent teacher,[1] Stringham possessed a property interest in her continued employment with Carmel. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Mauke v. Town of Dune Acres*, 835 F. Supp. 468, 473 (N.D. Ind. 1993) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Stringham's property interest stems from Ind. Code §§ 20-28-7.5-1 and 20-28-7.5-2 (referred to as the "Indiana Teacher Tenure Act"). Most notably, this statute provides specific enumerated grounds for the termination of a permanent teacher's contract and, furthermore, outlines the procedure that a school corporation must follow prior to and during a teacher's termination.

Not only does Indiana case law provide that permanent teachers maintain a property interest in continued employment, but the statute itself also incorporates this interest. First, to have a property interest in a job, an individual must have a "legitimate claim of entitlement to it," rather than an abstract need or unilateral expectation of it. *Stewart v. Fort Wayne Cmty. Sch.*, 564 N.E.2d 274, 280 (Ind. 1990) (internal citations omitted). Ind. Code § 20-28-7.5-1(e) provides a list of specific grounds for which a permanent teacher's employment may be terminated; therefore, Stringham had a "legitimate claim of entitlement" to continued employment and may only lose that interest if one of the specific grounds for termination is met. *See Bankhead v. Walker*, 846 N.E.2d 1048, 1053 (Ind. Ct. App. 2006); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 5538-539 (1985) (finding public employees have a property interest in continued employment where the employees could only be terminated for specific acts enumerated in the relevant statute).

> ## 2. *Because Stringham had a continued property interest in her employment, Carmel's actions must have adhered with Stringham's substantive due process rights.*

---

[1] Although Stringham was a counselor at CHS, she had a Regular Teacher Contract. (Dkt. 62-49). Thus, for purposes of this *Response*, Stringham will be referred to as a counselor or teacher interchangeably.

To prevail on her substantive due process claim that Carmel's decision to terminate her was arbitrary and capricious, Stringham "must show (1) that the decision was arbitrary and irrational, and (2) that the decision-makers either committed another substantive constitutional violation or that state remedies are inadequate." *Strasburger v. Board of Educ.*, 143 F.3d 351, 357 (7th Cir. 1998). Carmel's decision was indeed arbitrary and capricious. Carmel wholly failed at any time to present any evidence whatsoever contradicting Stringham. The issues for determination by Carmel were whether Stringham's alleged unprofessional behavior directed towards her supervisor on January 28, 2022 and/or with her job performance that allegedly fell below what was expected of Carmel High School counselors constituted "insubordination," "incompetence," "neglect of duty" and "other good and just cause."

Carmel was required to prove by a preponderance of the evidence that Stringham committed "insubordination," "incompetence," "neglect of duty" and "other good and just cause." Carmel was required to prove by a preponderance of the evidence that Stringham engaged in unprofessional behavior directed towards her supervisor on January 28, 2022 and/or that her job performance fell below what was expected of Carmel High School counselors. Carmel failed to meet its burden of proof regarding its claim of "insubordination" pursuant to Ind. Code § 20-28-7.5-1(e)(2) by failing to present evidence that Stringham willfully refused to obey state school laws or reasonable rules adopted by Carmel. The evidence presented did not meet the legal standard required under Ind. Code § 20-28-7.5-1-(e)(2) because Stringham did not "willfully" violate such a law, rule or policy. Indeed, Carmel failed to provide any evidence whatsoever that Stringham willfully refused to obey state school laws or reasonable rules adopted by Carmel. No state school laws or reasonable rules were presented to the Carmel School Board.

Carmel also failed to meet its burden of proof regarding its claim of "incompetence" pursuant to Ind. Code § 20-28-7.5-1(e)(3) by failing to present evidence that Stringham "receiv[ed]

an ineffective designation on two (2) consecutive performance evaluations or an ineffective

designation or improvement necessary rating under IC 20-28-11.5 for three (3) years of any five (5)

year period." Indeed, Stringham never received **any** ineffective and/or improvement necessary

designations during her entire tenure at Carmel High School. In Stringham's entire tenure at Carmel

High School, she only received "Highly Effective" or "Effective" designations: (1) 2014-2015:

Effective (Dkt. 62-42 at 23); (2) 2015-2016: Highly Effective (Dkt. 62-43 at 24); (3) 2016-2017:

Highly Effective (Dkt. 62-44 at 20); (4) 2017-2018: Highly Effective (Dkt. 62-45 at 22); (5) 2018-

2019: Highly Effective (Dkt. 62-46 at 13); (6) 2019-2020: Highly Effective (Dkt. 62-47 at 11); (7)

2020-2021: Effective (Dkt. 62-14 at 16).

 Carmel failed to meet its burden of proof regarding its claims of "neglect of duty" and

"other good and just cause" pursuant to Ind. Code §§ 20-28-7.5-1(e)(5) and (7) by failing to present

evidence that Stringham engaged in unprofessional behavior directed towards her supervisor on

January 28, 2022 and/or that her job performance fell below what was expected of Carmel High

School counselors. The evidence presented does not meet the legal standard required under Ind.

Code §§ 20-28-7.5-1(e)(5) and (7) because Stringham did not engage in unprofessional behavior nor

did her job performance fall below what was expected of Carmel High School counselors. Indeed,

Stringham always received Highly Effective or Effective evaluations. Cole only placed Stringham on

multiple PIPs in retaliation for Stringham filing multiple complaints against Cole alleging

discrimination on the basis of sexual orientation and race and/or national origin. These multiple

PIPs and 60 artifacts only came shortly **after** Stringham filed her complaints of discrimination and

retaliation. Indeed, just 10 days after Stringham filed her first Report of Discrimination and/or

Harassment, Cole placed Stringham on her first PIP.

 By violating federal law – namely by Carmel and Cole discriminating against and retaliating

against Stringham in violation of Title VII of the Civil Rights Act of 1964 – Stringham's contract

could not be terminated. By making an arbitrary and capricious decision to terminate Stringham, Carmel violated Stringham's legitimate property interest in her continued employment as her termination did not comport with due process requirements. The actions taken by Carmel were so arbitrary and capricious as to violate Stringham's due process rights and other Constitutional rights; thus, Carmel's *Motion for Summary Judgment* should be denied in its entirety.

**E.  Carmel's decision to terminate Stringham's employment was arbitrary, capricious, an abuse of discretion; contrary to constitutional right, power, privilege, or immunity; and unsupported by substantial evidence.**

Pursuant to Ind. Code §4-21.5-5-14, "the court shall grant relief . . . if it determines that a person seeking judicial relief has been prejudiced by an agency action that is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity…or (5) unsupported by substantial evidence." Stringham incorporates Sections A, B, C, and D above and states that Carmel's decision to terminate her employment in violation of Title VII of the Civil Rights Act of 1964 was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [] contrary to constitutional right, power, privilege, or immunity…or [] unsupported by substantial evidence. Ind. Code §4-21.5-5-14. Based on the above (including Sections A, B, C and D of this *Response*), Carmel's *Motion for Summary Judgment* should be denied in its entirety.

**F.  Cole and others were involved in the decision to cancel Stringham's contract.**

The decision to cancel Stringham's contract was affected at all levels by employees of Carmel, including Cole. (Dkt. 62-31 at 39:17-25). Harmas stated that "[Borto] and [Cole] were working with Oestreich and made that rec - - recommendation to me and it was my final approval." (Dkt. 62-31 at 39:17-25). Even though Carmel has attempted to separate Cole from the rest of the contract cancellation process, cutting off Cole is impossible, as she influenced the outcome of Stringham's contract cancellation. *See Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300,

328 (E.D.N.Y. 2015) ("[E]ven if, as the Defendants contend, the record is lacking evidence that any voting Board member other than Betty Cross harbored racial animus, summary judgment is not appropriate . . . . [I]mpermissible bias of **a single individual at any stage of the promoting process may taint the ultimate employment decision** . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process") (citations omitted) (emphasis added). *See also Russell v. Bd. of Trs.*, 243 F.3d 336, 342 (7ᵗʰ Cir. 2001) ("[T]he committee's own action was tainted because of Margherone's participation in the decision. As the district court recognized, any improper motives Margherone harbored **had to be imputed** to the other members of the disciplinary committee because of Margherone's extensive role in initiating and carrying out the disciplinary process.") (emphasis added).[2]

The cancellation was affected by Cole as well as others. Thus, the Court should deny Carmel's attempts to discard the cat's paw theory of liability. *See Mateo v. City Colls. of Chi.*, No. 10 C 8012, 2013 U.S. Dist. LEXIS 133258, at *41–48 (N.D. Ill. Sep. 18, 2013) (Where the college argued one biased decision maker was too "attenuated from the final decision to deny [the candidate] tenure," but this decision maker "still played a role in the decision," summary judgment was denied.).

## V.   Conclusion

For all the foregoing reasons and because there are numerous issues of material fact in this matter and because Cole treated similarly-situated counselors more favorably than Stringham, Stringham respectfully requests the Court deny Carmel's *Motion for Summary Judgment*. Stringham further requests all other just and proper relief.

---

[2]  *See, e.g., Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 666 n.3 (7ᵗʰ Cir. 2007) (Applicant "adduced enough evidence to permit a reasonable jury to infer that a dean's recommendation letter influences the University Committee's tenure decision.").

Respectfully submitted,

*s/ Jamie A. Maddox*
Sandra L. Blevins, Atty. No. 19646-49
Jamie A. Maddox, Atty. No. 26522-49
*Attorneys for Plaintiff Dianna Stringham*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2023, a copy of the foregoing was served by electronic filing. Notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*s/ Jamie A. Maddox*
Jamie A. Maddox

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, IN 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com