UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DIANNA STRINGHAM,

        Plaintiff,

   v.

CARMEL CLAY SCHOOLS and BOARD
OF SCHOOL TRUSTEES OF CARMEL
CLAY SCHOOLS,

        Defendants.

Case No. 1:22-cv-00817-TWP-MG

## <u>DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

### INTRODUCTION

In her Response Brief, Stringham challenges some of the School's arguments in favor of summary judgment but not all of them, and she also waives some of her claims.

For those she did not waive, the following explains in much more detail why the entirety of the arguments in Stringham's Response Brief lack merit. Moreover, because the designated evidence establishes that the School remains entitled to judgment as a matter of law, the Court should grant the School's motion and enter final judgment accordingly.

### ARGUMENT

The following addresses Stringham's evidence and arguments in the order presented in her Response Brief. As shown in much more detail below, Stringham has failed to create an issue of material on any of her claims, and judgment as matter of law therefore remains appropriate on all of them.

I.    *The "Statement of Undisputed Facts" section of Stringham's Response Brief fails to establish any material factual dispute.*

The "Statement of Undisputed Material Facts" section of Stringham's Response Brief does not rebut that Stringham's longstanding performance deficiencies and untoward conduct resulted in

her termination. Not all of Stringham's assertions are material, though the following addresses the material ones in the order that she has presented them.

A.   *Stringham's attempts to show that Cole harbored discriminatory animus fail because they are based on statements that are inadmissible hearsay and, hearsay deficiencies aside, they do not show animus.*

To show that Cole harbored discriminatory animus toward her sexual orientation, Stringham attributes several statements to Cole and a former homosexual counselor, Abby Cartwright. [Filing No. 70 at 5, ¶¶29-33.] Each statement, however, is inadmissible hearsay and therefore the Court should disregard all of them. To elaborate:

- Stringham claims Cartwright told her that Cole said she did not think that a woman dating another woman "was a great idea." [Filing No. 70 at 5, ¶29.] But what Cartwright told Stringham is inadmissible hearsay. She is offering it to prove the truth of the matter asserted—that is, that Cole in fact did not think that a woman dating another woman was a great idea.

- Stringham claims Cartwright told her that "things changed after [Cartwright] started dating women." [Filing No. 70 at 5, ¶30.] Putting to the side that Stringham does not explain exactly what changed and therefore it cannot advance Stringham's overall argument that Cole harbored discriminatory animus, this statement also is inadmissible hearsay. Stringham is offering it to show that things in fact changed for Cartwright after she started dating women, presumably that Cole began treating her more harshly—but again, Stringham does not say this explicitly and that failure also is fatal to her argument that Cole harbored animus.

- Stringham asserts that Cartwright told her "that she felt like Cole was targeting [her] because she was gay." [Filing No. 70 at 5, ¶31.] This too is inadmissible hearsay. Stringham is offering Cartwright's subjective perception to prove that Cole in fact targeted Cartwright because she was a homosexual.

- Stringham claims Cartwright told her that Cole said, "Can you believe that Stringham is married to a woman? That is weird." [Filing No. 70 at 5, ¶32.] This is inadmissible hearsay. Stringham is offering Cartwright's statement to prove that Cole thought it was weird she was married to a woman.

Stringham cites two additional statements, but the Court should disregard them too. First, Stringham claims co-worker Bettina Cool told her, "Don't tell people you're gay because that could be trouble for you." [Filing No. 70 at 6, ¶40.] That statement is inadmissible hearsay for the same reasons as the statements above are. Second, citing Cole's deposition testimony, Stringham claims that

Cole "admitted to making derogatory comments about Cartwright," but hides the ball on the details of those comments. [Filing No. 70 at 6, ¶39.] When one reads from Cole's deposition, it becomes apparent why Stringham did so, for the "derogatory comments" have nothing to do with animus— rather, they show that Cole was concerned with Cartwright's performance as a counselor, as she testified that she was "[f]rustrated that the support [Cartwright] was giving kids was not in the direction we wanted to go." [Filing No. 62-37 (Cole Depo. 47:20-25).] That testimony does not allow for a reasonable inference that Cole harbored discriminatory animus.

Inadmissible hearsay aside, even if these statements are true, they do not show animosity based on Stringham's sexual orientation. "A remark can raise an inference of discrimination if it was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (internal quotation marks and citation omitted). Each of the statements that Stringham attributes to Cole, Cartwright, and Cool fails these elements. To use but one example, regarding Cole's alleged statement that she did not think that Cartwright dating women "was a great idea," according to Stringham, Cartwright told her that in March or April 2019, which means Cole would have made it around that time at the earliest. [Filing No. 62-10 at 11.] That means that at least seventeen months passed between Cole's statement and the first alleged adverse employment action—namely, Stringham's first improvement plan in September 2020. But the Seventh Circuit has held that a comment made *two months* before an adverse action does not constitute evidence of discrimination, *Markel v. Bd. of Regents of Univ. of Wisconsin Sys.*, 276 F.3d 906, 901-11 (7th Cir. 2002), which means it follows *a fortiori* that Cole's statement cannot serve as evidence of discrimination.

In short, the hearsay statements that Stringham relies on to show animus succumb to the Seventh Circuit's observation that "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory

animus." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006). Or so the Court should conclude.

### B.    *Stringham's alleged comparators are no such thing.*

In its Initial Brief, the School pointed to the lack of evidence that similarly-situated employees were treated more favorably than Stringham. [Filing No. 55 at 27-28.] To counter this argument—and thus allow for an inference of discriminatory animus—Stringham offers four counselors as comparators. However, they are nothing of the sort because none is "directly comparable in all material respects," *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012), nor has Stringham "show[n] substantial similarity" between her many performance deficiencies and their relatively few, minor mistakes. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

- First, Stringham claims that David Schleper was not disciplined for a single incident of forgetting to add a student to a waitlist. [Filing No. 70 at 10, ¶¶78-81.] But Stringham offers no evidence that she was disciplined for such an infraction. Moreover, she offers no evidence that Schleper engaged in the many other deficiencies and oversights that she engaged in, yet received no discipline. In short, Stringham's attempt to compare herself to Schleper is apples to oranges.

- Second, Stringham asserts that Alyson Harbor was called to Cole's office two or three times over a five-year period for mistakes she had made, but did not receive a written warning for any. [Filing No. 70 at 10, ¶¶82-83.] Stringham offers no evidence, however, that Harbor's mistakes were similar to hers or that Harbor made additional mistakes and Cole turned a blind eye to them. Moreover, Stringham overlooks that Harbor explained that she corrected each mistake and that none re-occurred. [Filing No. 62-27 at 28 (Harbor Depo. 32:5-13).] That was not the case with Stringham—for example, in two successive school years she failed to remove ineligible students from the graduation list [Filing No. 55 at 6, ¶16], and Stringham's improvement plan for the 2021-2022 school year addressed issues that had persisted. [Filing No. 55 at 10, ¶26.]

- Third, Stringham claims that Bettina Cool "yelled at Cole during a meeting, slammed the door, and walked out of the building," but "was not disciplined for this incident." [Filing No. 70 at 20.] Stringham overlooks, however, that she has not produced any evidence demonstrating that her first outburst toward Cole resulted in discipline either. [Filing No. 55 at 15, ¶42.] Although Stringham was disciplined for her second outburst in that the School administration initiated termination proceedings, that decision was based not only on her second outburst, but also on her many performance deficiencies from the preceding months and

school years. [Filing No. 55 at 16, ¶46.] Stringham provides no evidence that Cool had a second outburst or that Cool's performance deficiencies were similar to hers in terms of volume or severity. As such, Cool's single outburst does not allow for a meaningful comparison to Stringham's outbursts and many other performance deficiencies.

- Finally, Stringham claims that Kevin McDonough is a comparator because he "had one student specifically who was in danger of not graduating." [Filing No. 70 at 19.] Although addressed in further detail below, *see infra* at 10, Stringham misses the point entirely about the School's concern with her at-risk seniors. It was not concerned that she had at-risk students (every counselor did), but rather that unlike her fellow counselors, she failed to tell Borto about her at-risk seniors so that they might triage the situation and help them graduate on time. [Filing No. 55 at 8-10, ¶¶23-25.] Stringham provides no evidence that McDonough failed to identify at-risk seniors who were in his charge.

In sum, Stringham's attempts to show that similarly-situated employees were treated more favorably than she was fail. The four counselors Stringham offers as comparators have zero overlap with her when one considers the frequency, nature, and quality of her performance deficiencies. That falls far short of Stringham's burden to show that they are directly comparable in all material respects and substantially similar.

C.      *Cole acted reasonably in refusing to sign the forms that Stringham presented because they required her to certify inaccurate information.*

In its Initial Brief, the School designated evidence establishing that Stringham asked Cole to sign two forms and that Cole was concerned about doing so because they required her to certify inaccurate information. [Filing No. 55 at 12-13, ¶¶33-36.] Cole's refusal to sign them caused Stringham's outburst, which resulted in the School administration initiating termination proceedings. [Filing No. 55 at 16-17, ¶¶45-49.]

In her Response Brief, Stringham attempts to minimize Cole's concern by claiming that the purpose of the forms was "that the State of Indiana merely needed verification that Stringham had been a professional school counselor for the past [seven and one-half] years at Carmel High School" and that "her current employer could complete the verification." [Filing No. 70 at 13, ¶¶106-107.]

Stringham also claims that she "asked Cole to put the needed information on CCS letterhead, but Cole refused. [Filing No. 70 at 13, ¶110.]

Although she does not state so explicitly, presumably Stringham makes these assertions to suggest that by refusing to sign the forms, Cole was goading Stringham and that her refusal to put the "needed information" on the School's letterhead is proof of animus. Neither assertion, however, has evidentiary support. Regarding the first, it is undisputed that had Cole signed the forms, she would have been certifying inaccurate information, including that Stringham served as an intern for the School when it is undisputed that she did not. [Filing No. 70 at 13, ¶35.] Cole was not required to accept Stringham's explanation when the forms were so clearly at odds with it. Regarding the second, Stringham overlooks that the School provided her with the "needed information," by which she presumably means the information she was telling Cole she needed—that is, proof that she had worked for a counselor at the School, as opposed to the certified information on the forms. In fact, in Stringham's citation to her testimony from the Board termination hearing, she admits that the School provided her with the information she sought. [Filing No. 62-48 at 97 (Board Transcript 96:17-24).]

D.      *Stringham's assertion that the School disregarded its policy is meritless.*

Stringham asserts that the School was required to remind her to "remain civil and be respectful and courteous to others" after her outburst, as opposed to disciplining her. [Filing No. 70 at 15, ¶121.] Stringham further asserts that the School's failure to do so violated its "Civility and Decorum" policy. [Filing No. 70 at 15, ¶121.] Stringham also claims that her outburst should have resulted in progressive discipline, which is mandated by the same policy, and that the School administration's decision to initiate termination proceedings instead also violated the policy. [Filing No. 70 at 15, ¶121.] Although she does not say so explicitly, Stringham presumably offers these alleged policy violations as proof of

discriminatory animus. As explained below, however, Stringham's assertions are based on a misreading of the policy.

The quoted part of the policy that Stringham relies on applies to "disruptive behavior from parents/guardians, or other members of the public," not employees. [Filing No. 62-4 at 1.] That is obvious from even a cursory reading of the policy because after distinguishing progressive forms of action that the School will "usually" take with non-employees [Filing No. 62-4 at 1-2], the policy states toward that end that "[f]or [School] employees . . . who behave in an uncivil or disruptive manner, appropriate discipline will be taken in accord with negotiated agreements, employee handbooks, and the Student Code of Conduct." [Filing No. 62-4 at 2.] Stringham, however, offers no evidence that the School administration's decision to initiate termination proceedings was inconsistent with "negotiated agreements" or "employee handbooks." As such, her presumed argument that the School's disregard of its policy shows animus fails because she has misinterpreted the policy from the get-go.

II.      *The "Statement of Disputed Facts" section of Stringham's Response Brief fails to establish any material factual dispute.*

Similar to the above, the "Statement of Disputed Material Facts" section of Stringham's Response Brief does not create a factual dispute over any material issue. Each of Stringham's assertions in this section is addressed in the order she presents them.

A.      *Stringham's subjective perception of her outburst toward Cole cannot create a factual dispute regarding whether the School's response to it was appropriate.*

Stringham disputes that her January 28, 2022, interaction with Cole was an "outburst." [Filing No. 70 at 17, 20.] She also disputes that she acted inappropriately during that interaction. [Filing No. 70 at 17, 20.] As support, Stringham cites exclusively from her testimony and declaration, which include her subjective perception that she was not yelling and that she was not leaning over Cole's desk. [Filing No. 70 at 17, 20.] Stringham also claims that "Cole's tone was aggressive" and speculates

that others may have perceived her as yelling because "the walls in the Counseling Department are thin" and "each counselor was issued a white noise machine to drown out any noise." [Filing No. 70 at 17.]

None of these assertions creates an issue of fact regarding whether the School honestly believed that Stringham acted inappropriately toward Cole. For starters, Stringham's assertions are revealing for what she does not dispute—namely, that she disregarded Dr. Oestreich's directive to discuss the matter with him, that she was upset, that she accused Cole of "being ridiculous," and that she refused when Cole told her to address the matter with Dr. Oestreich. [Filing No. 55 at 13-14, ¶¶37-40.] Certainly the School could consider these undisputed facts and reasonably conclude that Stringham should not act that way toward her supervisor.

Moreover, although Stringham also may dispute that she yelled,[1] she conceded at her Board termination hearing that she raised her voice [Filing No. 54-1 at 77 (Ex. 1 – Board Transcript 75:15-21)], which, considering the circumstances and her other undisputed behavior, makes the School's conclusion that she acted inappropriately even more reasonable.

These undisputed facts are alone sufficient to establish the School's honest belief that Stringham's conduct was unbecoming of a counselor. But the School relied on much more information than that—all three co-workers who heard the interaction reported that Stringham was yelling and otherwise acting inappropriately. [Filing No. 55 at 16, ¶45.]; [Filing No. 54-20 at 2 (Ex. 20 at 2).] Stringham may quibble over the School's characterization of her behavior as an outburst, but

---

[1] Stringham's Board hearing testimony on whether she yelled was contradictory at best. When asked, "And you were yelling at her?", Stringham responded, "Yes. I mean, no and yes," and continued with a narrative response that does not clarify whether she was yelling or not. [Filing No. 54-1 at 77-28 (Ex. 1 – Board Transcript 75:23-76:18).] Next, Stringham was asked if she thought it was acceptable "for a counselor to yell at their supervisor and say, you're being ridiculous?", and Stringham answered, "In the circumstances, yes." [Filing No. 54-1 (Ex. 1 – Board Transcript 76:19-22).]

she cannot create an issue of fact regarding whether the School honestly believed she had acted inappropriately.

      B.      *It remains undisputed that Stringham made repeat, significant mistakes regarding graduating seniors assigned to her.*

Stringham attempts to create a factual dispute regarding her missteps with graduating seniors during the 2018-2019, 2019-2020, and 2020-2021 school years. [Filing No. 70 at 17, 18-19.] As support, Stringham designated her own declaration and made several arguments related to her assertions in that declaration, specifically the following:

- For the 2018-2019 school year, Stringham claims that she "did not make any mistakes on the graduation list . . . ." [Filing No. 62-24 at 1, ¶5.]; [Filing No. 70 at 17.]

- For the 2019-2020 school year, Stringham states she believed that all students were going to be permitted to graduate (presumably Stringham means all seniors, but she does not say so explicitly). [Filing No. 70 at 17.]

- For the 2020-2021 school year, Stringham asserts that there were several issues which caused those students not to graduate, including that two of the students stopped attending school and that one of those student's parents did not respond to her communication. [Filing No. 70 at 18-19].

"[S]elf-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are without factual support in the record." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (internal quotations and citation omitted). For the 2018-2019 and 2019-2020 school years, Stringham merely asserts her subjective perception that she did not think she had any issues, but the School designated evidence demonstrating that the opposite was the case. [Filing No. 55 at 6, ¶16.] To reiterate that evidence briefly, on June 23, 2020, Stringham received an email from Cole indicating that she had graduated a senior who was still completing summer school and therefore should not have received a diploma. [Filing No. 54-6 at 2.] That makes Stringham's assertion that she believed all students were supposed to graduate untenable. Moreover, in that same email, Cole expressed concern with Stringham's oversight because "you had a student last year that

had a similar mishap." [Filing No. 54-6 at 2.] As such, it is undisputed that Stringham demonstrated repeat performance deficiencies related to her graduating seniors, and the subjective perceptions in her declaration cannot create a factual dispute on this issue.

Likewise deficient is Stringham's attempt to create a factual dispute regarding her failure to identify at-risk seniors toward the end of the 2020-2021 school year. [Filing No. 70 at 18-19, ¶¶23-24.] For starters, Stringham cannot create an issue of fact based on her bald assertion that three of her students, and not five, were at risk of not graduating. *Buie*, 366 F.3d at 504. Borto provided testimony at Stringham's termination hearing that she failed to identify five seniors who were at risk, and Stringham did not dispute that testimony during the hearing. [Filing No. 55 at 8-9, ¶¶23-24.] Moreover, Stringham misses the School's argument entirely—it is not that she should have *known* about her at-risk seniors, but rather that she should have *reported* them to Borto so that they might triage before it was too late. [Filing No. 55 at 9-10; ¶¶24-26.] Stringham provides no response to this point whatsoever. As such, even if it was true that two of the at-risk seniors "stopped attending school" and that one of those student's parents "refused to respond to any communication attempts from the school" [Filing No. 70 at 18-29], it remains undisputed that Stringham failed to tell Borto they were at risk of not graduating. And that undisputed fact advances the School's overall point, supported by Borto's testimony, that had Stringham identified the students as at-risk, the School might have helped them sooner, and that her failure to identify them was a very real and legitimate deficiency that goes to the heart of her performance as a counselor.

> C.    *It remains undisputed that the School became concerned about Stringham's performance and drafted an improvement plan before Stringham filed her first internal complaint.*

It is undisputed that Stringham's review for the 2019-2020 school year indicated that she needed to improve her performance. [Filing No. 55 at 4-7.] Despite concerns in that review and in a June 2020 email [Filing No. 55 at 5-6 ¶¶ 12-13]; [Filing No. 55 at 6 ¶¶ 16-17], Stringham makes the remarkable assertion that there is no evidence Borto and Cole were considering an improvement plan

before she made her first internal complaint. [Filing No. 70 at 18.] Specifically, Stringham contends that the School "failed to provide any evidence showing that the PIP was drafted and/or developed during the 'Summer of 2020.'" [Filing No. 70 at 18.] Stringham even goes as far as claiming that no emails were produced in discovery that show the improvement plan was in the works before she made her first internal complaint. [Filing No. 70 at 18.]

Stringham's claim that no such emails were produced during discovery is false. To use but one example, the School produced an email from Borto to Cole dated August 27, 2020, which was before Stringham's first internal complaint. [Filing No. 71-1 at 2.] That email contains a draft communication from Cole to Stringham for Borto to review. [Filing No. 71-1 at 3-4.] In that draft communication, Cole expresses concern that Stringham is continuing to demonstrate some of the deficiencies that were listed in her 2019-2020 review and that "[w]e need to address some of these items now and work on an improvement plan." [Filing No. 71-1 at 4.] This email and its attachment were produced on April 7, 2023, along with additional emails that were responsive to the parties' agreed-upon search terms. It definitively establishes that Cole and Borto were considering an improvement plan for Stringham before she made her first internal complaint. As such, Stringham cannot legitimately claim that her first improvement plan shows that the School retaliated against her based on her first internal complaint.[2]

---

[2] Stringham also should retract her assertion that the School failed to produce documents in discovery demonstrating that her improvement plan was in the works before her first internal complaint, as she has misstated the record on that point. Although the foregoing is but one example, in its original designation of evidence the School included an email thread between Cole and McDaniel from June 2022 discussing an oversight by Stringham and where McDaniel specifically stated, "[a]dd this to our paperwork for documentation of her improvement plan." [Filing No. 54-5 at 2.] That email also was produced in discovery.

D.     *Stringham's receipt of "artifacts" as part of her improvement plan does not establish that she was discriminatorily singled out.*

Stringham makes several assertions concerning the School's use of "artifacts" in relation to her improvement plan. [Filing No. 70 at 19-20.] Although Stringham does not say so explicitly, implicit in these assertions is that Cole was singling her out based on animus. What Stringham overlooks, however, is that she was an outlier regarding the number of artifacts she received precisely because she was on an improvement plan that necessarily required closer scrutiny of her day-to-day activities. Moreover, Stringham's assertion that she received more artifacts than anyone else is meaningless absent proof that other counselors made similar mistakes and received a pass. As demonstrated above, however, Stringham has failed to show that any other counselor is a valid comparator. Put another way, when it comes to artifacts, Stringham received so many more than her peers because she was an outlier in terms of poor performance, not because Cole or Borto or anyone else was singling her out due to animus.

E.     *Cole did not decide to terminate Stringham's employment.*

Stringham contends that Cole was involved in the decision to cancel her contract. [Filing No. 70 at 20-21.] There is no evidence to support this. Stringham admits that Principal Harmas was "the decisionmaker." [Filing No. 70 at 14, ¶120.] On February 4, 2022, Harmas informed Stringham by letter that he had made the preliminary decision to cancel her regular teacher's contract. [Filing No. 54-21 at 1]. Dr. Oestreich gathered information from Stringham's outburst toward Cole and relayed it to Harmas. [Filing No. 55 at 16, ¶¶46-47.] Although Harmas was aware of continued issues with Stringham's performance from Dr. Oestreich, Borto, and Cole, he made the decision to recommend termination. [Filing No. 55 at 16, ¶¶46-47.] Borto concurred with—but did not make—the decision. [Filing No. 55 at 16, ¶46.] The Board conducted a hearing and, based on the evidence presented, issued findings of fact and conclusions of law, deciding unanimously to cancel Stringham's regular teacher's contract. [Filing No. 55 at 16, ¶¶52-53.]

III.   *Stringham's failure to create any genuine issue of material fact necessarily forecloses her claims, and her legal arguments to the contrary are unavailing.*

The foregoing establishes that Stringham has failed to create a factual dispute regarding any material issue. The following addresses Stringham's attempts to support some of the claims in her Amended Complaint, but none has merit.

A.   *Stringham's Title VII unlawful discrimination claims fail.*

Stringham's Title VII unlawful discrimination claims (Counts 3, 5, and 7) fail for several independent reasons, each of which is sufficient for the Court to grant summary judgment in the School's favor.

1.   *Stringham has no direct evidence of discriminatory animus.*

Stringham offers several pieces of evidence that she claims are direct proof of Cole's discriminatory animus. [Filing No. 70 at 23-25.] They are not.

First, in several bizarre assertions, Stringham claims that Cole's alleged confusion over pronoun use, lack of explicit support for LGBTQ causes, and failure to notify staff about an alleged "white power symbol" somehow demonstrate that she harbored animosity toward Stringham's sexual orientation, race, and national origin. [Filing No. 70 at 23-24.] One strains to see how a reasonable juror could reach such a conclusion. Putting to the side that Stringham offers no context for her assertions—for example, what was the "white power symbol" and Cole's involvement with it?—at best these things show a benign neutrality on Cole's part, not animus.

Second, Stringham cites a series of statements from Cartwright and others that, for reasons explained above, are inadmissible hearsay and, at any rate, do not show animus. *See supra*, at 2-4.

The Court should conclude that Stringham has not provided any direct evidence of discriminatory animus.

2.     *Stringham was not meeting the School's legitimate performance expectations.*

Stringham makes several assertions to support her claim that she was meeting legitimate performance expectations, but none has merit.

First, Stringham claims she never received an overall rating of ineffective or improvement necessary on an annual review, and cites her annual reviews over seven school years as support. [Filing No. 70 at 25.] Stringham overlooks, however, that her annual reviews and overall ratings do not reflect the entirety of her performance, as well as the undisputed fact that Cole and McDaniel had concerns about her performance during the 2019-2020 school year and expressed those concerns in her review. [Filing No. 55 at 4-6, ¶¶9-15.] Moreover, somewhat ironically for Stringham, she overlooks that Cole gave her positive overall ratings despite knowing about her sexual orientation. That Cole and other administrators later expressed concerns about many aspects of her performance is further indication that the common thread running through Stringham's negative reviews and improvement plans is the unsurprising fact that she was not performing well, not that Cole abruptly decided to begin discriminating against her based on a protected category that she had known about for years.

Second, Stringham claims that "once [she] lodged official internal complaints of discrimination, Cole specifically targeted [her] and treated her differently than the other counselors." [Filing No. 70 at 25.] That is not the case. The above discussion demonstrates definitively that Cole and others had concerns about Stringham's performance and began working on an improvement plan before Stringham made her first internal complaint. *See supra*, at 10-11.

The Court should conclude as a matter of law that Stringham was not meeting legitimate performance expectations.

3.     *Stringham cannot establish that similarly-situated employees were treated more favorably than she was.*

Stringham offers four counselors who she claims were treated more favorably that she was when it came to discipline, implementing improvement plans, issuing artifacts, and recommendation

termination. [Filing No. 70 at 26-28.] It is undisputed, however, that Stringham was an outliner regarding performance deficiencies that went to the very heart of her duties as a counselor. She was the only counselor who brought nothing to the table when the heightened needs of the pandemic required counselor collaboration for students who were struggling. [Filing No. 55 at 4-5, ¶¶9-10.] She sowed confusion by repeatedly identifying her students as eligible for graduation when they were not. [Filing No. 55 at 6, ¶16.] She failed to identify several seniors who at risk of not graduating on time, when a mere alert to Borto would have put some of them on the right track. [Filing No. 55 at 8-9, ¶¶23-25.] And she had two outbursts toward Cole that included yelling (or at least raising her voice) and accusing Cole of "being ridiculous" under circumstances where Stringham was admittedly acting insubordinate and clearly in the wrong. [Filing No. 55 at 12-15, ¶¶33-43.] Against these many deficiencies, all Stringham offers are sporadic oversights and isolated mistakes from four counselors. For reasons explained above, none is a valid comparator, and therefore Stringham has failed to establish that similarly-situated employees were treated more favorably than she was. It is worth closing this section by noting that if the designated evidence demonstrates anything, it is that the School treated Stringham's many performance deficiencies with patience and a genuine desire to help, realizing that "enough was enough" when Stringham made her second "highly inappropriate" outburst at Cole.

4.    *Stringham has failed to rebut the School's legitimate non-discriminatory reasons for her termination.*

Stringham focuses solely on the artifacts she received in arguing that the School lacked legitimate, non-discriminatory reasons for terminating her employment. That was not the reason the School did so. Rather, it remains undisputed that Harmas initially recommended termination due to Stringham's continued poor job performance and her outburst toward Cole. [Filing No. 55 at 17, ¶48.] It also remains undisputed that the Board unanimously concluded that these deficiencies warranted termination on several separate and independent statutory grounds. [Filing No. 55 at 18, ¶53.] By

15

focusing solely on her receipt of artifacts, Stringham has waived her argument that the School lacked legitimate, non-discriminatory reasons for terminating her employment. Waiver aside, the designated evidence establishes that the School's reasons were valid as a matter of law.

        **5.**       *Stringham has not shown pretext.*

In its Initial Brief, the School argued that Stringham could not show pretext because Cole was the only administrator who Stringham claimed harbored animus, it was undisputed that Harmas based his termination recommendation on information he received from Dr. Oestreich and Borto, and that Cole was not involved in that decision. [Filing No. 55 at 28.]

In her Response Brief, Stringham does not contend that administrators other than Cole harbored animus, but asserts that "cutting off Cole is impossible, as she influenced the outcome of Stringham's contract cancellation," citing a New York district court case for the proposition that "a single individual . . . may taint the ultimate employment decision." [Filing No. 70 at 54-55.] But that is not the law in this Circuit—rather, *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007), instructs that "[f]or a nominal non-decision-maker's influence to put an employer in violation of Title VII, the employee must possess so much influence as to basically be herself the true 'functional[] . . . decision-maker.'" [*See also* Filling No. 55 at 28-29 n.3.] The designated evidence establishes that Cole did not have this amount of influence.

Moreover, Stringham makes no attempt to rebut Harmas' and the Board's honest belief that her outburst and performance deficiencies warranted termination. Their honest belief was supported by much more than Cole's observations—most prominently, Borto had seen Stringham's deficiencies all along, and concurred that Harmas' termination recommendation was appropriate. As such, assuming for argument's sake that Cole harbored animus and that it can be imputed to the School, there remains a separate and independent basis for the School's decision to terminate—namely,

Borto's involvement and independent conclusions regarding Stringham's deficiencies as a counselor. That point is fatal to Stringham's pretext challenge, and she has not rebutted it at all.

      B.    *Stringham has waived her harassment claims.*

In its Initial Brief, the School argued that summary judgment was appropriate on Stringham's harassment claims (Counts 3, 5, and 7) because several elements of a prima facie case were lacking as a matter of law. [Filing No. 55 at 29-32.] In her response, Stringham provides no response to this argument whatsoever. "When a party fails to address an argument in his summary judgment brief, it is deemed a waiver." *McCready v. Title Services of Illinois, Inc.*, No. 06 C 6280, 2008 WL 2435933, at *3 (N.D. Ill., June 16, 2008). Accordingly, the Court should conclude that Stringham has waived her harassment claims.

      C.    *Stringham's Title VII retaliation claims fail.*

In its Initial Brief, the School advanced six arguments demonstrating that it was entitled to judgment as a matter of law on Stringham's retaliation claims (Counts 4, 6, and 8), including that Stringham's improvement plans and artifacts were not adverse employment actions, that Stringham could not show pretext, and that Stringham's second outburst at Cole broke the causal chain between any protected activity and adverse employment action. [Filing No. 55 at 32-35.]

In her Response Brief, Stringham does not address any of these arguments. Instead, she asserts the following:

> Stringham filed 5 complaints of discrimination . . . . Following the filing of these complaints, Stringham was placed on 3 PIPs, received more than 60 negative artifacts, and was ultimately terminated. Indeed, just 10 days after Stringham filed her first Report of Discrimination and/or Harassment, Cole placed Stringham on her first PIP. Prior to complaining about discrimination and/or harassment, Stringham never had any disciplinary issues or negative artifacts against her. She always received High Effective or Effective on each of her annual performance evaluations. All of these materially adverse actions happened shortly **after** Stringham filed her complaints of discrimination.

[Filing No. 70 at 30 (emphasis in original).]

This is the sum total of Stringham's attempt to save her retaliation claims, and it contains many inaccuracies. To highlight the more substantial ones, it is undisputed that before her first alleged instance of protected category—that is, the September 2020 internal complaint—Cole expressed concerns about Stringham's performance in her 2019-2020 review, including most prominently that "moving forward I do want to work on improvement in your role as a counselor overall." [Filing No. 55 at 6, ¶13.] That vitiates Stringham's claim that "[p]rior to complaining about discrimination and/or harassment, Stringham never had any disciplinary issues . . . ." [Filing No. 70 at 30.] Likewise, Stringham's assertion that all of her alleged adverse employment actions "happened shortly **after** [she] filed her complaints of discrimination" cannot be squared with the undisputed fact that these events occurred over several school years. To use but one example, Stringham's September 2020 internal complaint was nearly a year and a half before the School administration sought to terminate her employment. That is not "shortly after."

The School respectfully submits that Stringham has failed to provide a substantive response to the six arguments advanced in its Initial Brief and therefore the Court should conclude that Stringham has waived her retaliation claims. *See Lee v. Chicago Youth Ctrs.*, 69 F. Supp. 3d 885, 889 (N.D. Ill. 2014) (observing that the Seventh Circuit "consistently holds that undeveloped, unsupported, perfunctory, or skeletal arguments in briefs are waived"). Regardless, the designated evidence establishes that the School is entitled to summary judgment in its favor on Stringham's retaliation claims.

D.      *Stringham's remaining Constitutional and Statutory Claims fail.*

In its Initial Brief, the School argued that the various constitutional and statutory claims that Stringham wove into Counts 1 and 2 of her Amended Complaint were all foreclosed as a matter of law, most prominently because substantial evidence supported the Board's decision to terminate her employment on several separate and independent statutory grounds. [Filing No. 55 at 20-25.]

In her Response Brief, Stringham addresses only her federal substantive due process claim and her Administrative Orders and Procedures Act claim. [Filing No. 70 at 32-34.] Her arguments in favor of those claims, however, are meritless.

Regarding her federal substantive due process claim, Stringham acknowledges that she must show that the School's decision was arbitrary and irrational, but her argument boils down to the following: "Carmel's decision was indeed arbitrary and capricious. Carmel wholly failed at any time to present evidence whatsoever contradicting Stringham." [Filing No. 70 at 32.] The Court should conclude that Stringham has waived her claim for lack of a substantive argument. *See Lee*, 69 F. Supp. 3d at 88. Waiver aside, the School remains entitled to summary judgment in its favor for all the reasons stated in its Initial Brief. [Filing No. 55 at 20-22.]

Regarding Stringham's Administrative Orders and Procedures Act claim, she challenges each of the four statutory bases for the Board's termination decision, but none has merit. [Filing No. 70 at 32-34.] To elaborate:

- Regarding insubordination, the School argued in its Initial Brief that there was substantial evidence before the Board that Stringham did not follow two directives, one from Cole and the other from Dr. Oestreich, and that her own testimony established her awareness that she was disregarding Dr. Oestreich's directive. [Filing No. 55 at 24-25.] Stringham's response to this evidence parses the statute in two ways, specifically that she did not "willingly" disregard these directives and that the directives are not "reasonable rules" within the meaning of the statute. [Filing No. 70 at 32 (citing Ind. Code 20-28-7.5-1(b)(2)).] However, Stringham's willful refusal can be inferred from the circumstances—that is, she testified she was aware of Dr. Oestreich's directive to speak with him about the forms, but she went ahead and confronted Cole anyways. Moreover, "reasonable rules" within the meaning of the statute can include a supervisor's "unambiguous order," *see Smith v. Bd. of School Trustees of Monroe County Comm. School Corp.*, 991 N.E.2d 581, 585-86 (Ind. Ct. App. 2013), which plainly applies to both directives that Stringham received.

- Regarding incompetence, the School argued in its Initial Brief that there was substantial evidence before the Board that Stringham had many performance deficiencies and failed to show significant improvement. [Filing No. 55 at 23-24.] The School also noted that the statutory definition of incompetence does not require a finding of a certain number of negative evaluation ratings over a

prescribed period (though that is one definition of incompetence under the statute). [Filing No. 55 at 24.] In her response, Stringham asserts that her overall "Highly Effective" and "Effective" ratings foreclose an incompetence finding [Filing No. 70 at 33], but that assertion overlooks the substantial and well-documented issues with her performance. Moreover, Stringham is simply wrong to the extent she argues that incompetence can be proved only with a certain number of negative evaluations over a prescribed period—the statute's reference to "including" demonstrates that is not the case. *See* Ind. Code 20-28-7.5-1(b)(3).[3]

- Regarding neglect of duty, the School argued in its Initial Brief that substantial evidence supported the Board's decision based on the many instances where Stringham dropped the ball and those failures harmed students, including most prominently her failure to identify seniors who were at risk of not graduating. [Filing No. 55 at 24.] Stringham does not address this evidence at all, and that failure alone should allow the Court to conclude that substantial evidence supports the Board's decision.

- Regarding other good and just cause, the School argued in its Initial Brief that substantial evidence supported the Board's decision based on its finding that Stringham's outburst at Cole was "highly inappropriate," particularly considering that other good and just cause is not a difficult burden to meet. [Filing No. 55 at 25.] Stringham's sole challenge to this argument is a bald assertion that the School administration "fail[ed] to present evidence that [she] engaged in unprofessional behavior directed towards her supervisor on January 28, 2022 and/or that her job performance fell below what was expected of Carmel High School counselors." [Filing No. 70 at 30.] Simply put, several witnesses testified to the contrary during the Board termination hearing, and although Stringham may subjectively disagree with their views, it nevertheless follows as a matter of law that their testimony provides substantial evidence supporting the Board's termination decision.

In summary, Stringham has waived some of the claims alleged in Counts 1 and 2 of her Amended Complaint and, waiver aside, the School is entitled to judgment as a matter of law on all of them.

## Conclusion

For reasons stated, Defendants respectfully request that the Court grant summary judgment in their favor on all of Stringham's claims and also enter final judgment in their favor.

---

[3] Effective July 1, 2023, the General Assembly revised the statute to remove incompetence as a basis for termination. That said, incompetence was a valid statutory basis for termination at the time of Stringham's termination hearing in March 2022.

Respectfully submitted,

Brent R. Borg
Brent R. Borg, Atty. No. 27415-29
Hannah B. Gahimer, Atty. No. 37630-41
CHURCH CHURCH HITTLE + ANTRIM
10765 Lantern Road, Suite 201
Fishers, IN 46038
bborg@cchalaw.com
hgahimer@cchalaw.com

Jessica Williams Schnelker, Atty. No. 31566-49
Cassie N. Heeke, Atty. No. 36497-49
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
jschnelker@cchalaw.com
cheeke@cchalaw.com

Attorneys for Defendants,
Carmel Clay Schools and
Board of School Trustees of Carmel Clay Schools

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September 2023, a true and exact copy of the foregoing

was filed electronically via the Court's Electronic filing system. Notice of this filing was sent to the

following persons by operation of the Court's Electronic filing system:

Sandra L. Blevins
Jamie A. Maddox
BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, IN 46204
jmaddox@betzadvocates.com
sblevins@betzadvocates.com
litigation@betzadvocates.com

Brent R. Borg
Brent R. Borg, Atty. No. 27415-29